STEVEN D. SMELSER (SBN 180602)
*ssmelser@yukelaw.com*
BOBBIE N. EFTEKAR (SBN 240102)
*beftekar@yukelaw.com*
LUCAS E. ROWE (SBN 298697)
*lrowe@yukelaw.com*
YUKEVICH | CAVANAUGH
355 S. Grand Avenue, 15th Floor
Los Angeles, California 90071-1560
Telephone:   (213) 362-7777
Facsimile:   (213) 362-7788

Attorneys for Defendant
SAFARILAND, LLC

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOYMA VANESSA MICHEL, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>UNITED STATES OF AMERICA, B. GIBBONS, an individual, E.GARZA, an individual, G. BARCIA, an individual, SAFARILAND, LLC, a Delaware limited liability company, AND DOES 1 THROUGH 100, inclusive,<br><br>Defendants. | CASE NO. 16CV0277-GPC-AGS<br>[*Honorable Gonzalo P. Curiel*]<br><br>**DEFENDANT SAFARILAND, LLC'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br>Hearing Date: September 8, 2017<br>Time:              1:30 p.m.<br>Courtroom:   2D |

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION AND SUMMARY OF THE ARGUMENT .......................1

II.   STATEMENT OF FACTS ...................................................................2

    A.   Initial Inspection, Interview, and Arrest of Michel ....................2

    B.   Inspection of Storage Facility .................................................5

    C.   Testing by the Drug Enforcement Administration ....................5

    D.   Safariland's Narco Pouch Test 923 ........................................6

    E.   Plaintiff's Claims ..................................................................8

III.  SUMMARY JUDGMENT *MUST* BE GRANTED IN THE ABSENCE OF AFFIRMATIVE EVIDENCE SHOWING A DISPUTE OF A MATERIAL FACT ..........................................................................9

IV.   CALIFORNIA STATE LAW APPLIES TO PLAINTIFF'S CLAIMS AGAINST SAFARILAND ............................................................... 10

V.    PLAINTIFF'S CLAIMS IN NEGLIGENCE AND PRODUCT LIABILITY FAIL AS A MATTER OF LAW ...................................... 10

    A.   All Of Plaintiff's Claims Are Based Upon The Incorrect Premise That Safariland's Product Is Defective, Not Reliable, Or Did Not Work Accurately ................................................................. 11

    B.   Plaintiff Cannot Establish A Failure To Warn ...................... 12

        1.   There Is No Duty To Warn That A Product Is Reliable ............ 13

        2.   There Is No Unsafe Or Unreasonably Dangerous Condition Of The Narco Pouch 923 Test That Would Require Warning ................................................................. 14

        3.   Safariland Has No Duty To Provide A Legal Education To Users ................................................................................ 14

    C.   PLAINTIFF CANNOT ESTABLISH CAUSATION ......................... 15

        1.   Plaintiff's Proposed Instructions Would Not Have Prevented Her Injury ........................................................ 16

        2.   CBP Is A Sophisticated User Who Does Not Need To Be Warned Of Dangers Of Which They Are Already Aware Or Should Be Aware ............................................................ 17

        3.   Safariland Is Entitled To Summary Judgment Because The Bulk Seller Doctrine Precludes Liability For Failure To Warn ................................................................................ 21

YUKEVICH | CAVANAUGH
355 S. GRAND AVENUE, 15TH FLOOR
LOS ANGELES, CALIFORNIA 90071-1560
TELEPHONE (213) 362-7777
FACSIMILE (213) 362-7788

VI.    PLAINTIFF'S CLAIM FOR UNFAIR COMPETITION FAILS AS A MATTER OF LAW ............................................................................................ 23

VII.   CONCLUSION ........................................................................................................ 25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

YUKEVICH | CAVANAUGH
355 S. GRAND AVENUE, 15TH FLOOR
LOS ANGELES, CALIFORNIA 90071-1560
TELEPHONE (213) 362-7777
FACSIMILE (213) 362-7788

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986)..................................................................9

*Anderson v. Owens-Corning Fiberglass Corp.,*
53 Cal.3d 987 (1991) .............................................................11

*Artiglio v. General Electric Co.,*
61 Cal.App.4th 830 (Ct. App. 4th Dist. 1998)...........................9, 12, 13

*Brady v. Calsol, Inc.,*
241 Cal.App.4th 1212 (Cal.App.2d Dist. 2015) .........................11

*British Airways Bd. v. Boeing Co.,*
585 F.2d 946 (9th Cir. 1978) .................................................10

*California Ass'n of Bioanalysts v. Rank,*
577 F.Supp. 1342 (D.C. Cal. 1983) ..........................................4

*Chavez v. Glock, Inc.,*
207 Cal.App.4th 1283 (Cal.App.2d Dist. 2012) ....................... 17, 18, 20

*Committee on Children's Television, Inc. v. General Foods Corp.*
35 Cal.3d 197 (1983) ...........................................................23

*Felder v. Casey,*
487 U.S. 131 (1988)..............................................................10

*Fierro v. International Harvestor Co.,*
127 Cal.App.3d 862 (Cal.App 2d Dist. 1982) .........................18

*Forest v. Vitek, Inc.,*
884 F.Supp. 378 (D. Nev. 1993).........................................21, 22

*Gee v. Tenneco, Inc.,*
615 F.2d 857 (9th Cir. 1980) .................................................10

*Hall v. Time Inc.*
158 Cal.App.4th 847 (2008) ..................................................23

YUKEVICH | CAVANAUGH
355 S. GRAND AVENUE, 15TH FLOOR
LOS ANGELES, CALIFORNIA 90071-1560
TELEPHONE (213) 362-7777
FACSIMILE (213) 362-7788

*Hanna v. Plumer*,
   380 U.S. 460 (1965)..................................................................................10

*Jiminez v. Sears, Roebuck & Co.*,
   4 Cal.3d 379 (1971) ...............................................................................11

*Johnson v. American Standard, Inc.*,
   43 Cal.4th 56 (2008) ...................................................................... *passim*

*Johnson v. Honeywell Internat. Inc.*,
   179 Cal.App.4th 549 (Cal.App.2d Dist. 2009) ....................... 18, 19, 20

*Kasky v. Nike, Inc.*,
   27 Cal.4th 939 (2002) ............................................................................23

*Khan, et al. v. Shiley Inc., et al*,
   217 Cal.App.3d 848 (Cal.App.3d Dist. 1990) ........................ 11, 12, 13

*Kwikset Corp. v. Superior Court*,
   51 Cal.4th 310 (2011) .......................................................................23, 24

*Lee v. Electric Motor Division*,
   169 Cal.App.3d 375 (Cal.App.2d 1985).............................................21, 22

*Matsushita Elec. Indus. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986)..................................................................................9

*McLaughlin v. Liu*,
   849 F.2d 1205 (9th Cir. 1988) ................................................................9

*Merrill v. Navegar, Inc.*,
   26 Cal.4th 465 (2001) ............................................................................11

*State ex rel. Miller v. Tucson Assocs. Ltd. P'ship*,
   165 Ariz. 519 (Ct. App. 1990) ................................................................4

*Persons v. Salomon North America, Inc.*,
   217 Cal.App.3d 168 (Cal. App. 3d Dist. Jan. 18, 1990).........................20

*Plenger v. Alza Corp.*,
   11 Cal.App.4th 349 (Cal. App. 4th Dist. Nov. 30, 1992).........................19

*Powell v. Standard Brands Paint Co.*,
   166 Cal.App.3d 357 (Cal.App.3d Dist. 1985) ......................................11

YUKEVICH | CAVANAUGH
355 S. GRAND AVENUE, 15TH FLOOR
LOS ANGELES, CALIFORNIA 90071-1560
TELEPHONE (213) 362-7777
FACSIMILE (213) 362-7788

*Sara Lee Corp. v. Homasote Co.*,
719 F.Supp. 417 (D. Md. 1989)................................................................21, 22

*Strahan v. Coxe*,
939 F.Supp. 963 (D.C.Mass.1996) .................................................................4

*T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Assn.*,
809 F.2d 626 (9th Cir. 1987) ...........................................................................9

*In re Tobacco II Cases*,
46 Cal.4th 298 (2009) ..............................................................................24, 25

*Town of Bruceton v. Arnold*,
818 S.W.2d 347 (Tenn. Ct. App. 1991) ...........................................................4

*Tribeca Companies, LLC v. First American Title Ins. Co.*,
239 Cal.App.4th 1088 (App.Dist.1st 2015) ..................................................11

*U.S. v. Rainbow Family*,
695 F.Supp. 314 (D.C.Tex.1988).....................................................................4

*United States v. M'Biye*,
655 F.2d 1240 (D.C. Cir. 1981).......................................................................4

*Webb v. Special Electric Co., Inc.*,
63 Cal. 4th 167 (2016) ....................................................................... 18, 19, 20

*Zambrana v. Standard Oil Co.*,
26 Cal.App.3d 209 (1972) .............................................................................22

**Statutes**

28 U.S.C.A. § 1332 ...........................................................................................10

28 U.S.C.A. § 1367 ...........................................................................................10

28 USC § 1331 and 1346(B) .............................................................................10

42 USC §§ 1983 and 1988 ................................................................................10

Cal. Business and Professions Code 17200 et seq.........................................1, 3

California Business and Professions Code § 17200, *et seq* .............................23

Federal Tort Claims Act....................................................................................10

YUKEVICH | CAVANAUGH
355 S. GRAND AVENUE, 15TH FLOOR
LOS ANGELES, CALIFORNIA 90071-1560
TELEPHONE (213) 362-7777
FACSIMILE (213) 362-7788

**Other Authorities**

California Civil Jury Instructions No. 1222.................................................................12

California Civil Jury Instructions Nos. 1205, 1206, 1222 ....................................14, 17

Fed. R. Civ. P. 56(a)........................................................................................................9

Fed. R. Evid. 902(5) ........................................................................................................4

Rest.2d Torts, §402A .....................................................................................................13

Scientific Working Group for the Analysis of Seized Drugs,
       Methamphetamine (Mar. 15, 2005)
       http://www.swgdrug.org/Monographs/METHAMPHETAMINE.pdf...................4

Scientific Working Group for the Analysis of Seized Drugs, p-
       Methoxymethamphetamine (Aug. 9, 2005)
       http://www.swgdrug.org/Monographs/p-
       METHOXYMETHAMPHETAMINE.pdf ......................................................4, 5

YUKEVICH | CAVANAUGH
355 S. GRAND AVENUE, 15TH FLOOR
LOS ANGELES, CALIFORNIA 90071-1560
TELEPHONE (213) 362-7777
FACSIMILE (213) 362-7788

## I.   INTRODUCTION AND SUMMARY OF THE ARGUMENT

This action arises from an incident where Plaintiff Doyma Vanessa Michel ("Plaintiff" or "Michel") applied for admission into the United States from Mexico through the San Ysidro, California Port of Entry. A cursory inspection revealed a hidden bottle of semi-translucent liquid, which Customs and Border Patrol ("CBP") had been put on heightened notice about as possible methamphetamine. A Sodium Nitroprusside field test was performed using the Safariland Narco Pouch 923 field drug test kit, which resulted in a positive result. According to the United States government, a positive result in such a test is a presumptive indication of methamphetamine. A further search revealed multiple hidden bottles of the same liquid, all of which tested positive using the Sodium Nitroprusside field test. Plaintiff repeatedly lied and provided inconsistent statements to CBP and the Department of Homeland Security during the entire process.

Michel was arrested and remained in custody for approximately six months until the Drug Enforcement Administration ("DEA") conducted the required confirmatory testing, which revealed that no controlled substances were present and released Michel. Michel sued Safariland and the United States claiming that she was improperly arrested and detained for six months.

Plaintiff's claims against Safariland lie in Negligence, Product Liability, and Cal. Business and Professions Code 17200 et seq. Plaintiff's claims, however, fail as a matter of law. Safariland did not invent presumptive color tests, such as the Simon's Reagent or Sodium Nitroprusside test. Safariland's Narco Pouch products simply create a way for officers to take presumptive color testing methods, used by labs all over the world in a variety of industries, out in the field. The invention of the Narco Pouch products was simply the invention of the portability of the color tests. There is nothing different about the substance of the Narco Pouch 923 test and the Sodium Nitroprusside or Simon's Reagent test that is done in the laboratory *de novo* by forensic chemists.

The undisputed evidence establishes that Safariland's Narco Pouch 923 Test worked as intended. In fact, the DEA forensic chemist conducted the same test using the original chemicals, as opposed to Safariland's product, and received the same result. The government's decisions to detain, arrest, charge, hold in-custody, and release an individual is based upon the law, not based upon Safariland's instructions or packaging. Safariland has no authority to advise the government as to when they have sufficient evidence to arrest, detain, or make any other legal decisions. The decision to detain, arrest, charge, hold in-custody, and to release Michel was made by parties separate and independent from Safariland, and over whom Safariland had no control or influence. Insofar as the packaging is concerned, Safariland's products are presumptive and such is stated multiple times directly on the box. Safariland is required to do no more. The instructions, further, communicate that all positive and negative results must be confirmed by a qualified laboratory. However, again, it is government agencies charged with the task of providing drug testing guidelines and law enforcement agency policies that mandate that all presumptive color testing must be confirmed in a qualified laboratory. Not Safariland. Safariland has no authority to tell the government when it can make an arrest, when it can file charges, when a suspect can be convicted. These are matters set by the law, the Rules of Evidence, and authorized government agencies.

Consequently, Safariland is entitled to summary judgment.

## II. STATEMENT OF FACTS

### A. Initial Inspection, Interview, and Arrest of Michel

On June 2, 2014 at approximately 2:10 p.m., Michel applied for admission into the United States from Mexico through the San Ysidro, California Port of Entry as the driver and sole occupant of a Black 2001 Audi A4. [Safariland's Stmt. of Undisputed Facts ("SUF") #1]. CBP Officer Eduardo Garza, assigned to an Anti-Terrorism Contraband Enforcement Team, was conducting pre-primary inspections when he approached Michel in the driver's seat of her vehicle. [SUF #2]. Garza

YUKEVICH | CAVANAUGH
355 S. GRAND AVENUE, 15TH FLOOR
LOS ANGELES, CALIFORNIA 90071-1560
TELEPHONE (213) 362-7777
FACSIMILE (213) 362-7788

observed visible signs of nervousness from Michel. He noted Michel's hands were shaking, she avoided making eye contact, and Garza could see her carotid artery pulsing in her neck. [SUF #3]. A bottle was found stuffed inside a black sock hidden between the glovebox and the firewall. [SUF #4]. Michel claimed she did not know what was in the bottle. *Id.* Garza noted the bottle contained a liquid substance which, based upon his training and experience, he believed to resemble liquid methamphetamine. *Id.*

Michel and her vehicle were escorted to secondary inspection. [SUF #5]. During escort, Michel suddenly recalled the contents of the bottle: "cuajo," a liquid substance used to make cheese. *Id.* Michel was asked why she concealed it, to which she had no reply. *Id.* Michel was handcuffed and escorted to the CBP security office. *Id.*

CBP Officer Brandon Gibbons ("Gibbons") conducted a thorough inspection and located a total of four plastic bottles of the thick liquid substance and seven bottles of Tequila hidden throughout Michel's vehicle. [SUF #6]. Gibbons utilized a Safariland Narco Pouch field drug test known as the Narco Pouch Test 923 to perform a test on the contents of the four plastic bottles of suspected liquid methamphetamine. [SUF #7]. The Narco Pouch Test 923 is a portable means by which to conduct a Sodium Nitroprusside or Simon's Reagent test, which tests for the presence of a secondary amine. [SUF #8]. The United States government has determined that the presence of a secondary amine is a presumptive indication for the presence of methamphetamine or MDMA. [SUF #25]; *see* Scientific Working Group for the Analysis of Seized Drugs,[1] Supplemental Document SD-2 For Part IVB: Quality Assurance/Validation of Analytical Methods 33 (SWGDRUG 2006)

---

[1] The Scientific Working Group for the Analysis of Seized Drugs is an organization formed by the U.S. Drug Enforcement Administration and the Office of National Drug Control Policy. [SUF# 26]. This committee sets minimum standards for the forensic examination of seized drugs domestically and internationally. *Id.*

YUKEVICH | CAVANAUGH
355 S. GRAND AVENUE, 15TH FLOOR
LOS ANGELES, CALIFORNIA 90071-1560
TELEPHONE (213) 362-7777
FACSIMILE (213) 362-7788

1   (hereinafter "SWGDRUG-Supplemental Document"); Scientific Working Group for

2   the Analysis of Seized Drugs, Methamphetamine (Mar. 15, 2005)

3   http://www.swgdrug.org/Monographs/METHAMPHETAMINE.pdf, last visited

4   June 27, 2017 (hereinafter "SWGDRUG-Methamphetamine"); Scientific Working

5   Group for the Analysis of Seized Drugs, p-Methoxymethamphetamine (Aug. 9,

6   2005) http://www.swgdrug.org/Monographs/p-

7   METHOXYMETHAMPHETAMINE.pdf, last visited June 27, 2017 (hereinafter

8   "SWGDRUG-MethOxyMethamphetamine"); United Nations Office on Drugs and

9   Crime, Recommended Methods For The Identification And Analysis Of

10  Amphetamine, Methamphetamine, And Their Ring-Substituted Analogues In Seized

11  Materials 18-20 (United Nations 2006) (hereinafter "UN Manual").[2]

12          Each bottle found in Michel's vehicle presumptively tested positive for

13  methamphetamine. [SUF #9]. Michel was arrested by CBP. *Id.* CBP then contacted

14  U.S. Homeland Security Investigations (HSI) Special Agent Zachary Bulman ("S/A

15  Bulman") and advised him of the seizures and of Michel's arrest. [SUF #10]. S/A

16  Bulman was not involved in the field testing of the seized substances and did not

17  make the decision to arrest Michel. *Id.*

18          Michel was interviewed for over an hour by S/A Bulman. [SUF #11]. A

19  records check revealed Michel had several priors for attempts to smuggle items and

20  people into the United States. *Id.* Additionally, her son who was also living with her

21  at the time, was caught attempting to smuggle 7.6 kilograms of methamphetamine

22  ――――――――――――――

[2] These publications are published by government agencies and committees and are
23  self-authenticating. Fed. R. Evid. 902(5); *United States v. M'Biye*, 655 F.2d 1240,
24  1242 (D.C. Cir. 1981); *U.S. v. Rainbow Family*, 695 F.Supp. 314 (D.C.Tex.1988);
     *California Ass'n of Bioanalysts v. Rank*, 577 F.Supp. 1342, 1355 (D.C. Cal. 1983);
25  *Strahan v. Coxe*, 939 F.Supp. 963, 968 (D.C.Mass.1996); *Town of Bruceton v.
26  Arnold*, 818 S.W.2d 347, 348 (Tenn. Ct. App. 1991); *State ex rel. Miller v. Tucson
     Assocs. Ltd. P'ship*, 165 Ariz. 519, 520 (Ct. App. 1990). For the court's convenience
27  the cited publications are attached as Exs. I, J, K, T to the Declaration of Steven D.
28  Smelser in Support of Motion for Summary Judgment ("Smelser Decl.").

YUKEVICH | CAVANAUGH
355 S. GRAND AVENUE, 15TH FLOOR
LOS ANGELES, CALIFORNIA 90071-1560
TELEPHONE (213) 362-7777
FACSIMILE (213) 362-7788

two months earlier through the same port of entry. *Id.* And, Michel had crossed into the United States 59 times in the preceding 6 months. *Id.*

During the interview by S/A Bulman, Michel repeatedly provided inconsistent statements, which S/A Bulman was able to prove with multiple various documents and evidence found in Michel's vehicle during CBP's inspection. [SUF #12].

**B.     Inspection of Storage Facility**

On June 3, 2014, HSI agents visited Hilltop Main Self Storage and accessed a storage locker rented by Michel. [SUF #12-13] Agents located 36 bottles of Tequila and 15 plastic bottles of liquid substance that appeared to be identical to those found in Michel's vehicle. [SUF #13]. The bottles were field-tested, which resulted in presumptive indications for the presence of methamphetamine. *Id.* Agents obtained the rental agreement dated May 27, 2014 and activity log which lists inbound access and outbound exits from the front gate of the facility. *Id.* The dates and times Michel accessed the storage unit coincide with the dates and times she crossed into the U.S., confirming Michel had lied about her whereabouts on the prior crossings she was questioned about. *Id.*

**C.     Testing by the Drug Enforcement Administration**

On June 9, 2014 at 10:30 a.m., DEA Chemist Alexandra Ambriz ("Ambriz") responded to the CBP vault at Otay Mesa, California in order to test and take samples of the bottles seized from Michel's vehicle and her storage unit. Her field tests also indicated a presumptive indication for the presence of methamphetamine. [SUF #17].

Ambriz begun her laboratory testing of the samples taken from the Otay vault in August 2014. She again conducted a Sodium Nitroprusside color test on the samples, but this time used bottles of reagents and a spot plate as opposed to Safariland's Narco Pouch 923 Test. She again received the same result: a presumptive indication for the presence of methamphetamine. [SUF #18].

YUKEVICH | CAVANAUGH
355 S. GRAND AVENUE, 15TH FLOOR
LOS ANGELES, CALIFORNIA 90071-1560
TELEPHONE (213) 362-7777
FACSIMILE (213) 362-7788

1   Ambriz conducted confirmatory gas chromatograph mass spectrometer tests

2   on each of the samples of the suspected liquid methamphetamine and ultimately

3   determined that the substances were, in fact, not controlled substances. [SUF #19].

4   Ambriz did, however, identify a secondary amine in the substance, which accounted

5   for the multiple positive results received on the Narco Pouch 923 Sodium

6   Nitroprusside Test and the Sodium Nitroprusside test prepared *de novo* in the

7   laboratory. [SUF #20]. Ambriz submitted her report in November 2014. [SUF #21].

8   **D.    Safariland's Narco Pouch Test 923**

9   The Safariland Narco Pouch field drug test kits are a product line of kits that

10  allow law enforcement agents and officers, including military, DEA, FBI, etc., to

11  conduct presumptive color tests approved by the United States government. [SUF

12  #22]; *see* SWGDRUG-Supplemental Document at 33; SWGDRUG-

13  Methamphetamine; SWGDRUG-MethOxyMethamphetamine; UN Manual at 17-

14  20.[3] Presumptive tests are screening procedures used by laboratories and law

15  enforcement "to provide an indication of the presence or absence of drug classes in a

16  test sample and quickly eliminate negative samples." UN Manual at 17. Pursuant to

17  the guidelines and procedures set out by the UN, SWGDRUG, and DEA, a forensic

18  lab analysis is to be performed using two test methods. [SUF #23]; *see also* UN

19  Manual at 17. The first method is a screening or presumptive method and the second

20  must be a confirmatory method. [SUF #24]; *see also* UN Manual at 17.

21  The DEA, SWGDRUG, and UN have determined that the proper screening or

22  presumptive color test for methamphetamine is the Simon's Reagent test, also

23  known as a Sodium Nitroprusside test. *See* UN Manual at 18-20; SWGDRUG-

24  Supplemental Document at 33; SWGDRUG-Methamphetamine; SWGDRUG-

25  MethOxyMethamphetamine; [SUF #25]. This presumptive color test is used as a test

26  for secondary amines, such as methamphetamine and MDMA. *Id.* The United States

27  _____

28  [3] Exs. I, J, K, T to Smelser Decl.

YUKEVICH | CAVANAUGH
355 S. GRAND AVENUE, 15TH FLOOR
LOS ANGELES, CALIFORNIA 90071-1560
TELEPHONE (213) 362-7777
FACSIMILE (213) 362-7788

YUKEVICH | CAVANAUGH
355 S. GRAND AVENUE, 15TH FLOOR
LOS ANGELES, CALIFORNIA 90071-1560
TELEPHONE (213) 362-7777
FACSIMILE (213) 362-7788

1   government has determined that a positive result in a Simon's Reagent or Sodium

2   Nitroprusside test is a presumptive indication of the presence of methamphetamine

3   or MDMA. *Id.*

4        In the laboratory, a chemist performing a Simon's Reagent/Sodium

5   Nitroprusside test places the suspected material on a spot plate and adds two to three

6   reagents in a particular order. *See* UN Manual at 18-19; [SUF #27]. After the last

7   reagent is added, the color is observed. *See* UN Manual at 18-19. If the mixture

8   turns blue, this is a presumptive indication for the presence of methamphetamine or

9   MDMA. *See* UN Manual at 17-19; SWGDRUG-Supplemental Document at 33;

10   SWGDRUG-Methamphetamine; SWGDRUG-MethOxyMethamphetamine.

11        The Safariland product at issue in this action is the Narco Pouch 923 Sodium

12   Nitroprusside Test. The Narco Pouch products have simply taken the presumptive

13   color tests used and approved by government agencies such as the UN, SWGDRUG,

14   and DEA and provided a convenient portable packaging method so that agents and

15   officers can perform such approved presumptive color tests out in the field without

16   having to keep and/or bring spot plates, petri dishes, and bottles of chemicals and

17   reagents in the trunks of their vehicles or otherwise when working out in the field.

18   [SUF #22,25,29]. Safariland did not invent the Sodium Nitroprusside test nor did it

19   discover that it could be used to presumptively identify methamphetamine. [SUF #

20   30]. Safariland merely manufactures and sells a test that law enforcement use and

21   have used for many years to presumptively identify methamphetamine. *See* UN

22   Manual at 18-20; SWGDRUG-Supplemental Document at 33; SWGDRUG-

23   Methamphetamine; SWGDRUG-MethOxyMethamphetamine; [SUF #22,25,29].

24        Law enforcement agencies use the Narco Pouch products according to their

25   agencies' procedures and guidelines as well as the law of the jurisdiction within

26   which they operate. [SUF #31]. As such, while the tests are not intended, or

27   marketed, as being sufficient to form probable cause on the results alone, Safariland

28   does not have the authority to mandate law enforcement policy and procedures, nor

1   the laws of different jurisdictions throughout the world.

2       Safariland makes available training, training materials, and even instructor

3   training materials to all customers. [SUF #32]. However, law enforcement agencies

4   provide their own robust training to each and every officer and agent. [SUF #14,15,

5   33,48]. Safariland's training materials teach that an officer should have additional

6   facts that warrant administering the Narco Pouch tests in the first instance, such as:

7   behavior of the suspect in possession of the suspected narcotic, packaging,

8   appearance, smell, etc. [SUF #34]. In fact, Safariland's training materials state that,

9   "a positive predictable color change is only a *presumed* positive result for the

10   suspected compound: in no way should the test results be considered a confirmation

11   of identification." [SUF #50] (emphasis in original). The same training document

12   further states that, "it is important to note that all test results, positive or negative,

13   should be confirmed by the crime laboratory." *Id.*

14       The Narco Pouch 923 Test box contains labels stating that it is a "presumptive

15   test" in multiple places, a term that is common knowledge among all officers and

16   agents as each and every suspect detained, arrested, investigated, charged, etc. is

17   always "presumed" innocent until proven guilty. [SUF # 35]. The Narco Pouch

18   product instructional insert states, "Always retain sufficient sample of suspect

19   material for evidential analysis by the forensics laboratory." [SUF #36].

20   **E.**    **Plaintiff's Claims**

21       Against Safariland, Plaintiff asserts claims under negligence, product liability,

22   and unfair competition. *See* Dkt. No. 22 (Second Amended Complaint, hereinafter

23   "Compl." at 8-11).  Plaintiff alleges that the Safariland Narco Pouch 923 is defective

24   in that it produced an unreliable and inaccurate result. *See id.* at ¶¶ 44, 47, 49, 61,

25   63, 64, Plaintiff alleges that Safariland failed to warn users that its Narco Pouch 923

26   product is defective, unreliable, and inaccurate and further failed to warn users that

27   the Narco Pouch 923 product could not be used to determine probable cause for

28   arrest because it is defective, unreliable, and inaccurate. *See id.* at ¶¶ 61, 63, 64.

YUKEVICH | CAVANAUGH
355 S. GRAND AVENUE, 15TH FLOOR
LOS ANGELES, CALIFORNIA 90071-1560
TELEPHONE (213) 362-7777
FACSIMILE (213) 362-7788

YUKEVICH | CAVANAUGH
355 S. GRAND AVENUE, 15TH FLOOR
LOS ANGELES, CALIFORNIA 90071-1560
TELEPHONE (213) 362-7777
FACSIMILE (213) 362-7788

Plaintiff's claim under unfair competition is that Safariland falsely advertised its products as reliable and accurate. *Id.* at 10-11. Now in expert discovery, Plaintiff has revealed for the first time a new theory that Safariland failed to instruct law enforcement officers and agents as to the characteristics of Safariland's non-defective product and when the non-defective product provides correct and accurate results.

### III.   SUMMARY JUDGMENT *MUST* BE GRANTED IN THE ABSENCE OF AFFIRMATIVE EVIDENCE SHOWING A DISPUTE OF A MATERIAL FACT

Summary Judgment is proper where there is no triable issue of material fact and the moving party is entitled to judgment as a matter of law. *Artiglio v. General Electric Co.*, 61 Cal.App.4th 830, 835 (Ct. App. 4th Dist. 1998); *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); Fed. R. Civ. P. 56(a). A fact is "material" only if proof of that fact would establish or refute one of the elements of a claim or affirmative defense at issue: thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In order to show that there is a genuine dispute of material fact, the opposing party must do more than raise some doubt; it must produce sufficient admissible evidence for a jury to return a verdict for that party. *Id.* at 249-250. "The mere existence of a scintilla of evidence in support of the [opposing party's] position will be insufficient." *Id.* at 252.

The court may only draw those inferences that flow logically and plausibly from the underlying factual evidence, that are permissible under the governing law, and that are consistent with common sense and reasonable levels of probability. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Assn.*, 809 F.2d 626, 630-632 (9th Cir. 1987); *McLaughlin v. Liu*, 849 F.2d 1205, 1208-1209 (9th Cir. 1988). This is because "a jury is permitted to draw only those inferences of which the evidence is

reasonably susceptible, it may not resort to speculation." *British Airways Bd. v. Boeing Co.*, 585 F.2d 946, 952 (9th Cir. 1978).

## IV. CALIFORNIA STATE LAW APPLIES TO PLAINTIFF'S CLAIMS AGAINST SAFARILAND

In an action based on federal question, federal courts have supplemental jurisdiction pursuant to 28 U.S.C.A. § 1367 for all claims that form part of the same case or controversy as the federal claims, even if such claims are brought and/or arise under state law. In an action based on diversity, federal courts have jurisdiction pursuant to 28 U.S.C.A. § 1332. Federal courts hearing state claims are to apply state substantive law and federal procedural law. *Hanna v. Plumer*, 380 U.S. 460, 465 (1965), citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (9th Cir. 1996); *Shute v. Moon Lake Electrical Assoc.*, Inc., 899 F.2d 999, 1001 (10th Cir. 1990). The task of a federal court sitting in a diversity action is to approximate state law as closely as possible. *Gee v. Tenneco, Inc.*, 615 F.2d 857, 861 (9th Cir. 1980). While this rule of law originally developed in the context of cases based upon diversity jurisdiction, it has been found to also apply to cases in which federal courts have supplemental jurisdiction over non-diverse state claims. *Felder v. Casey,* 487 U.S. 131 (1988).

Here, Plaintiff filed claims against the United States Government under 42 USC §§ 1983 and 1988, and the Federal Tort Claims Act. This Court has jurisdiction over this action pursuant to 28 USC § 1331 and 1346(B). Plaintiff additionally filed claims based upon state law against Safariland for matters that form part of the same case or controversy as Plaintiff's federal question claims. This Court has supplemental and diversity jurisdiction over the state law claims against Safariland, and as such, California state law applies to such claims.

## V. PLAINTIFF'S CLAIMS IN NEGLIGENCE AND PRODUCT LIABILITY FAIL AS A MATTER OF LAW

General negligence is the (1) legal duty to use reasonable care, (2) breach of that duty, (3) proximate cause between the duty and the (4) plaintiff's injuries.

YUKEVICH | CAVANAUGH
355 S. GRAND AVENUE, 15TH FLOOR
LOS ANGELES, CALIFORNIA 90071-1560
TELEPHONE (213) 362-7777
FACSIMILE (213) 362-7788

1  *Tribeca Companies, LLC v. First American Title Ins. Co.*, 239 Cal.App.4th 1088

2  (App.Dist.1st 2015). "A products liability case may rest on either a theory of strict

3  liability or negligence." *Merrill v. Navegar, Inc.*, 26 Cal.4th 465, 478 (2001); *Brady*

4  *v. Calsol, Inc.*, 241 Cal.App.4th 1212, 1281 (Cal.App.2d Dist. 2015). The two

5  theories, though, run parallel and are adjudicated on the same elements. *Jiminez v.*

6  *Sears, Roebuck & Co.*, 4 Cal.3d 379, 387 (1971).  Plaintiff's claims, likewise, for

7  negligence and products liability can be decided using essentially the same analysis.

8  That is to say, the plaintiff must prove that a defect in the product caused her

9  injuries, *Brady, supra,* at 1281, or that a failure to warn of a defect caused plaintiff's

10  injuries. *See generally Powell v. Standard Brands Paint Co.,* 166 Cal.App.3d 357,

11  363-364 (Cal.App.3d Dist. 1985) (manufacturing/design defects); *Anderson v.*

12  *Owens-Corning Fiberglass Corp.*, 53 Cal.3d 987, 995 (1991) (warning defects).  No

13  matter what theory of product liability is utilized (strict, negligent, manufacturing

14  defect, design defect, failure to warn, etc.), proof that the product malfunctioned is

15  an element of a product liability action and is essential to establish liability.  *Khan,*

16  *et al. v. Shiley Inc., et al,* 217 Cal.App.3d 848, 854-856 (Cal.App.3d Dist. 1990).

17      Plaintiff's Eighth and Ninth Claims (Negligence and Products Liability,

18  respectively) are essentially the same in substance. The Eighth alleges that the

19  product is not reliable and accurate and that Safariland failed to warn of such, while

20  the Ninth alleges the product is defective in that it provided an inaccurate result. *See*

21  Compl. at 8-10.

22  **A.    All Of Plaintiff's Claims Are Based Upon The Incorrect Premise**
   **That Safariland's Product Is Defective, Not Reliable, Or Did Not**
23      **Work Accurately**

24      The undisputed evidence establishes that Safariland's product (a Simon's

25  Reagent/Sodium Nitroprusside test) was accurate, reliable and worked as intended,

26  providing the same response as the DEA's own Simon's Reagent/Sodium

27  Nitroprusside test performed in the lab *de novo*. [SUF #18,20,37,52].

28      In this case, officers utilized the Narco Pouch 923 Sodium Nitroprusside Test

YUKEVICH | CAVANAUGH
355 S. GRAND AVENUE, 15TH FLOOR
LOS ANGELES, CALIFORNIA 90071-1560
TELEPHONE (213) 362-7777
FACSIMILE (213) 362-7788

1    in the field and received positive results each and every time the Test was

2    conducted. [SUF #7,9,13,17]. DEA Forensic Chemist Alexandra Ambriz performed

3    a Sodium Nitroprusside test in the laboratory using the chemicals from scratch, as

4    opposed to Safariland's products, and also obtained the same result for a total of 16

5    times: a positive indication for the presence of a secondary amine. [SUF #18]. Ms.

6    Ambriz then conducted her confirmatory testing of Gas Chromatography, as

7    required under DEA and SWGDRUG guidelines, and confirmed the presence of a

8    secondary amine within each of the 16 samples she tested. [SUF # 19-20]. The

9    undisputed evidence establishes that Safariland's Narco Pouch Test 923 performed

10    consistently with the Sodium Nitroprusside test administered *de novo* and correctly

11    detected a secondary amine that was in fact contained in the suspected material.

12    [SUF #20]. Furthermore, Plaintiff's own experts admit that the Narco Pouch 923

13    Test performed accurately, reliably, as intended, and was not defective. [SUF #37,

14    52]. Proof that the product malfunctioned is essential to establish liability in a

15    product liability action. *Khan*, 217 Cal.App.3d at 855. Plaintiff cannot establish

16    that the Narco Pouch 923 Test malfunctioned and as such her Eighth and Ninth

17    claims for negligence and product liability fail as a matter of law. *Id.* at 854-856.

18    **B.**    **Plaintiff Cannot Establish A Failure To Warn**

19    A product liability claim as to negligent failure to warn under California law

20    requires a Plaintiff to prove, among other things, that the defendant manufactured a

21    product that was defective, the defendant knew or reasonably should have known

22    that users would not realize the defect, the defendant failed to adequately warn of

23    the defect or instruct on the safe use of the product, and the defendant's failure to

24    warn or instruct was a substantial factor in causing plaintiff's harm. *See* Judical

25    Council of California Civil Jury Instructions No. 1222.

26    A "manufacturer has a duty to use reasonable care to give warning of the

27    dangerous condition of the product," if the manufacturer has reason to believe that

28    the danger will not be realized. *Artiglio v. General Electric Co.*, 61 Cal.App.4th 830,

YUKEVICH | CAVANAUGH
355 S. GRAND AVENUE, 15TH FLOOR
LOS ANGELES, CALIFORNIA 90071-1560
TELEPHONE (213) 362-7777
FACSIMILE (213) 362-7788

835 (Cal.App.4th Dist. Feb. 20, 1998) (*quoting Putensen v. Clay Adams, Inc.,* 12 Cal.App.3d 1062, 1076-1077 (Cal.App.1st Dist. 1970) and Rest.2d Torts, §§ 388, 394.). The requirement's purpose is to inform consumers about a product's *hazards* of which they are unaware, so that they can refrain from using the product altogether or evade the danger by careful use. *Johnson v. American Standard, Inc.,* 43 Cal.4th 56, 64-65 (2008). A warning is meant to make a product *safe* for its intended use so that it is *not unreasonably dangerous*. *Id.* at 65 (*citing* Rest.2d Torts, §402A, com. j, p. 353). The standard of care is based upon what a reasonably prudent manufacturer would have known and felt it necessary to warn about. 61 Cal.App.4th at 835 (*quoting Anderson v. Owens-Corning Fiberglass Corp.*, 53 Cal.3d 987, 1002 (1991)).

Plaintiff's complaint alleges that Michel was harmed because Safariland breached a duty to Michel to warn CBP Officers that CBP Officers could not use the Narco Pouch product to determine probable cause for an arrest because the product is inaccurate, unreliable, and/or defective. *See* Compl. at ¶ 60-64. There are considerable and numerous issues with this absurd allegation.

1.     There Is No Duty To Warn That A Product Is Reliable

A claim as to failure to warn inherently rests upon the notion that there is some sort of defect that exists within the manufacturer's product that cannot be designed around. *Khan,* 217 Cal.App.3d at 855; *Artiglio,* 61 Cal.App.4th at 835; *Johnson,* 43 Cal.4th at 64-65; Rest.2d Torts, §402A, com. j, p. 353. There is no such defect present here. [SUF # 20,37,52]. Safariland manufacturers a portable version of the Sodium Nitroprusside or Simon's Reagent test that forensic chemists conduct in the laboratory. [SUF # 8,22,25,29,31]. The undisputed evidence shows that the product worked just as the Sodium Nitroprusside or Simon's Reagent did in the laboratory. [SUF # 18,20,37,52]. Safariland does not have a duty to warn officers that its product worked as intended. *See Khan,* 217 Cal.App.3d at 855; *Artiglio,* 61 Cal.App.4th at 835; *Johnson,* 43 Cal.4th at 64-65; Rest.2d Torts, §402A, com. j, p.

YUKEVICH | CAVANAUGH
355 S. GRAND AVENUE, 15TH FLOOR
LOS ANGELES, CALIFORNIA 90071-1560
TELEPHONE (213) 362-7777
FACSIMILE (213) 362-7788

YUKEVICH | CAVANAUGH
355 S. GRAND AVENUE, 15TH FLOOR
LOS ANGELES, CALIFORNIA 90071-1560
TELEPHONE (213) 362-7777
FACSIMILE (213) 362-7788

353. Simply put, there is nothing here for Safariland to warn against.

        2.     <u>There Is No Unsafe Or Unreasonably Dangerous Condition Of The Narco Pouch 923 Test That Would Require Warning</u>

The law in a failure to warn case focuses on making a product safe and not unreasonably dangerous. *Johnson*, 43 Cal. 4th at 65 (citing Rest.2d Torts, §402A, com. j, p. 353). The issue is physical harm -- allergic reactions, explosions, burns, infections, cancer. *See id;* Judicial Council of California Civil Jury Instructions Nos. 1205, 1206, 1222. Plaintiff's supposed "dangerous condition" appears to be an officer's determination that probable cause exists to make an arrest. The determination of probable cause for arrest is not a condition of the product, let alone a dangerous condition of the product that would require warning of. There is no legal support for the attempt to equate a dangerous condition in using a product to the possible decisions a user may make after using a product and receiving a correct result.

        3.     <u>Safariland Has No Duty To Provide A Legal Education To Users</u>

The law does not recognize a duty for manufacturers to provide legal education to its users, or to provide any instruction, for that matter, regarding possible decisions users may make after correctly using a product. Safariland is a manufacturer that sells a product containing a test already existing for many years and already in use by law enforcement agencies. [SUF # 22,25,29,30,31]; *see* UN Manual at 18-20; SWGDRUG-Supplemental Document at 33; SWGDRUG-Methamphetamine; SWGDRUG-MethOxyMethamphetamine. Safariland merely sells a convenient means by which law enforcement may take the same test they were already and still do already perform in the lab, out in the field. [SUF # 29]. Safariland's duties are to instruct on the safe use of its products, i.e., the avoidance of chemical burns or other possible physical injuries to the user of the product, not to instruct on the proper legal decisions an officer of the law may make. Indeed, DEA forensic chemist Alexandra Ambriz and DEA laboratory director James

1   Malone testified that Safariland does not have the authority to advise the

2   government on the law, and regardless of what information Safariland stated on its

3   packaging and instructional material, the agents and officers would follow police

4   and agency procedures and guidelines made pursuant to the law. [SUF # 31,38]. Dr.

5   Malone further explained that the DEA provides its own training to its agents and

6   CBP Officers on how to use a presumptive drug test and what the results mean.

7   [SUF# 33].

8         It does not matter whether Safariland states to its users that the Narco Pouch

9   product cannot be used to determine probable cause because Safariland does not

10   have the authority to decide whether the product can be used to determine probable

11   cause, the authority to mandate the law, or the authority to mandate the practices of

12   police agencies.[4] [See SUF #38]. If the law says, if the federal government tells its

13   officers, etc. that a positive test result on a Sodium Nitroprusside or Simon's

14   Reagent test is sufficient for probable cause to arrest, then nothing Safariland says or

15   does not say will change an officer's actions. [SUF #38]. Safariland does not have

16   the authority to tell an officer how to do his job just as a manufacturer of a

17   mammogram machine does not have the authority to instruct a doctor on the proper

18   course of treatments for cancer.

19   **C.   PLAINTIFF CANNOT ESTABLISH CAUSATION**

20         Even if it was somehow determined that Safariland owed a duty to Plaintiff to

21   warn CBP of the legal sufficiency of making a probable cause determination for

22

---

23   [4] Indeed, Safariland sells its products to multiple law enforcement agencies and

24   military in the United States and abroad, who may each abide by different laws and
regulations. The sufficiency for probable cause may be different. Requiring a

25   chemical manufacturer to provide legal education to different users all over the
world operating under different legal standards is completely outside of the purview

26   of a duty to warn. *Johnson*, 43 Cal.4th at 40 ("Requiring manufacturers to warn their

27   products' users in all instances would place an onerous burden on them and would

28   'invite mass consumer disregard and ultimate contempt for the warning process.'").

YUKEVICH | CAVANAUGH
355 S. GRAND AVENUE, 15TH FLOOR
LOS ANGELES, CALIFORNIA 90071-1560
TELEPHONE (213) 362-7777
FACSIMILE (213) 362-7788

arrest when using its non-defective product, which worked accurately and reliably as intended to be a portable method of performing a Simon's Reagent or Sodium Nitroprusside test[5], then Plaintiff's claims against Safariland would still fail as a matter of law because Plaintiff cannot establish causation.

1.   Plaintiff's Proposed Instructions Would Not Have Prevented Her Injury

Safariland did not arrest Michel. [SUF # 9] Safariland did not tell CBP to arrest Michel. [SUF # 9]. Safariland does not have the legal authority to state whether officers should and should not make arrests. Safariland had no control over Ms. Michel's arrest and detainment or the timing of the laboratory testing [SUF #9, 16]. Plaintiff's expert Roger Clark opines that the arrest and detainment of Ms. Michel was proper. [SUF # 39]. The only claim that Plaintiff's experts have identified is that Safariland failed to include a statement on its packaging and instructions that its presumptive test is not confirmation of the identification of methamphetamine and that all samples must be sent to the laboratory for confirmatory testing, claiming that if they had done so, the subject lab testing would have been rushed and Michel's injury would have been prevented. [SUF # 40]. However, Plaintiff's own expert agrees that Safariland has no control over when laboratories perform their analysis or testing. [SUF# 16]. Such instructions would not have prevented Michel's injury.

The packaging already states that the test is presumptive and the instructions already state that all samples must be sent to the lab for confirmatory testing. [SUF # 35-36]. Plaintiff's own experts admitted that it is common knowledge that a presumptive test is not conclusive. [SUF #35,41,51]. Furthermore, Plaintiff herself commented in her interview with S/A Bulman that the suspected substance would have to undergo confirmatory testing in a laboratory before she could be convicted of a crime. [SUF #42]. Plaintiff, an unsophisticated individual, understood the field

---

[5] Which Safariland contends it does not owe such a duty.

YUKEVICH | CAVANAUGH
355 S. GRAND AVENUE, 15TH FLOOR
LOS ANGELES, CALIFORNIA 90071-1560
TELEPHONE (213) 362-7777
FACSIMILE (213) 362-7788

drug test was not confirmation of a controlled substance and knew a lab would have to confirm the results. *Id.* S/A Bulman confirmed that she stated this to him and he agreed. *Id.* It is axiomatic to claim that Safariland should have to warn sophisticated users, who receive extensive training through the Academy and continuing training through the Department, regarding something that is common knowledge to be presumptive only and that a civilian with no training clearly was aware of and understood.

Moreover, the CBP officers who conducted the field tests and arrested Michel stated that they did not read the instructions or packaging of the field tests. [SUF #45]. S/A Bulman, who managed Ms. Michel's case, did not conduct the field tests, did not read the instructions or packaging, and did not arrest Ms. Michel. [SUF #9-10]. Any information contained on Safariland's instructions and packaging, was not and would not have been received by S/A Bulman. It was S/A Bulman who contacted the DEA to request an analyst obtain samples from the seized material, submit such samples to the laboratory and conduct the testing. [SUF #43]. It was S/A Bulman who had the ability to request a rush on such testing, not the CBP officers.[6] [SUF #44]. As such, nothing contained on Safariland's instructions and packaging could have prevented Ms. Michel's injury.

## 2.   CBP Is A Sophisticated User Who Does Not Need To Be Warned Of Dangers Of Which They Are Already Aware Or Should Be Aware

CBP is a sophisticated user and sophisticated users need not be warned about dangers of which they are already aware or should be aware. *Johnson v. American Standard, Inc.*, 43 Cal.4th 56, 65 (2008); *Chavez v. Glock, Inc.,* 207 Cal.App.4th

---

[6] In fact, S/A Bulman was requested to rush the laboratory results by an Assistant U.S. Attorney prosecuting the case, but he still did not make such a request. [SUF #44]. There is no basis to claim that anything Safariland stated on its product packaging or instructions that S/A Bulman never saw would have caused S/A Bulman to rush the laboratory results.

YUKEVICH | CAVANAUGH
355 S. GRAND AVENUE, 15TH FLOOR
LOS ANGELES, CALIFORNIA 90071-1560
TELEPHONE (213) 362-7777
FACSIMILE (213) 362-7788

1283, 1301 (Cal.App.2d Dist. 2012); *Fierro v. International Harvestor Co.*, 127 Cal.App.3d 862, 866 (Cal.App 2d Dist. 1982).

The sophisticated user defense exempts manufacturers from their typical obligation to provide product users with warnings about a products' potential hazards. *Johnson v. American Standard, Inc.*, 43 Cal.4th at 65 (citing *In re Related Asbestos Cases,* 543 F. Supp. 1142, 1151 (N.D.Cal. 1982) (held that the Navy is a sophisticated user of asbestos products which absolved a manufacturer of warning users of the dangers of asbestos)). The defense is considered an exception to the manufacturer's general duty to warn consumers, and <u>negates</u> the manufacturer's duty to warn. *Id.* The sophisticated user defense applies to strict liability and negligent failure to warn cases. *Id.* at 65.

Under the sophisticated user defense, sophisticated users need not be warned about dangers of which they are already aware or should be aware. 43 Cal. 4th at 65; *Webb v. Special Electric Co., Inc.,* 63 Cal. 4th 167, 182-183 (2016).  Because these sophisticated users are charged with knowing the particular product's dangers, the failure to warn about those dangers is not the legal cause of any harm that product may cause. *Chavez,* 207 Cal.App.4th at 1313 (*quoting Johnson v. American Standard*, 43 Cal.4th at 65); *see also Johnson v. Honeywell Internat. Inc.,* 179 Cal.App.4th 549, 559 (Cal.App.2d Dist. 2009). The rationale supporting the defense is that "the failure to provide warnings about risks already known to a sophisticated purchaser usually is not a proximate cause of harm resulting from those risks suffered by the buyer's employees or downstream purchasers." *Id.* This is because the user's knowledge of the dangers is the equivalent of prior notice. *Id.* (*citing Billiar v. Minnesota Mining and Mfg. Co.,* 623 F.2d 240, 243 (2nd Cir.1980) ("[N]o one needs notice of that which he already knows")).

The duty to warn is measured by what is generally known or should have been known to the class of sophisticated users, rather than by the individual plaintiff's subjective knowledge. *Id.* at 65. Under the sophisticated user defense, a

YUKEVICH | CAVANAUGH
355 S. GRAND AVENUE, 15TH FLOOR
LOS ANGELES, CALIFORNIA 90071-1560
TELEPHONE (213) 362-7777
FACSIMILE (213) 362-7788

manufacturer is only required to inform a user of a potential risk if it has no reason to believe that the user will have the special experience to enable him/her to perceive the danger. *Id.* at 66. In other words, "if the manufacturer reasonably believes the user will know or should know about a given product's risk, the manufacturer need not warn that user of the risk." *Id.* (internal citations omitted). This is particularly the case where a "user is a professional who should be aware of the characteristics of the product." *Id.*; *see also Plenger v. Alza Corp.*, 11 Cal.App.4th 349, 362 (Cal. App. 4th Dist. Nov. 30, 1992) (finding, in an action against a manufacturer brought by heirs of a patient who died after doctors implanted the manufacturer's intrauterine device, "We are aware of no authority which requires a manufacturer to warn of a risk which is readily known and apparent to the consumer, in this case the physician. Further if the risk … is universally known in the medical profession, the failure to warn the physician of that risk cannot be the legal cause of the [patient's] death."). As the California Supreme Court explained in *Johnson v. American Standard, Inc.*, "[j]ust as a manufacturer need not warn ordinary consumers about generally known dangers, a manufacturer need not warn members of a trade or profession (sophisticated users) about dangers generally known to that trade or profession." *Id.* at 67.

The defense applies whether the "sophisticated user knew or *should have known* of that risk, harm, or danger." *Id.* at 71. The sophisticated user defense does not require a user's actual awareness of potential hazards. *Webb*, 63 Cal. 4th at 183. The "individuals who represent that they are trained or are members of a sophisticated group of users are saying to the world that they possess the level of knowledge and skill associated with that class." *Johnson*, 43 Cal. 4th at 71. Manufacturers and suppliers are justified in relying on that representation. *Id.* The fact that a sophisticated user does "not actually possess that knowledge and skill" does "not give rise to liability on the part of the manufacturer." *Id.*

Certainly, "[i]t would be nearly impossible for a manufacturer to predict or

YUKEVICH | CAVANAUGH
355 S. GRAND AVENUE, 15TH FLOOR
LOS ANGELES, CALIFORNIA 90071-1560
TELEPHONE (213) 362-7777
FACSIMILE (213) 362-7788

1   determine whether a given user or member of the sophisticated group actually has

2   knowledge of the dangers because of the infinite number of user idiosyncrasies." *Id.*

3   Whether a given user "may have misread their training manuals, failed to study the

4   information in those manuals, or simply forgotten what they were taught" is simply

5   not the responsibility of the manufacturer. *Id.*; *see also id.* at 73-74.

6      It is also significant if the intermediary itself had a legal duty to warn end

7   users about the particular hazard in question. *Webb,* 63 Cal. 4th at 191; *Persons v.*

8   *Salomon North America, Inc.,* 217 Cal.App.3d 168, 178 (Cal. App. 3d Dist. Jan. 18,

9   1990). Generally, "every person has a right to presume that every other person will

10   perform his duty and obey the law." *Webb,* 63 Cal. 4th at 191 (internal citations

11   omitted); *see also Persons*, 217 Cal.App.3d at 178 (*quoting* Rest.2d Torts, § 388,

12   com. n, 308).

13      Defendant United States of America, comprised of the DEA, Department of

14   Homeland Security, and Customs and Border Patrol, is a sophisticated user of

15   presumptive drug tests and of determining probable cause to arrest an individual for

16   transporting controlled substances over the United States border. [SUF #14,15,31,

17   33,48,]; *see Chavez,* 207 Cal.App.4th at 1313. Safariland does not need to warn the

18   United States or these government entities on the determination of probable cause.

19   *Id.*; *see Johnson,* 43 Cal.4th at 65; *Johnson v. Honeywell Internat. Inc.,* 179

20   Cal.App.4th at 559. In fact, the government agencies have a legal duty to provide

21   the appropriate education to its officers and agents to ensure they uphold the law and

22   do so within the law. [SUF #14,15,31,33,48]. Safariland had every right to rely upon

23   CBP's duty to educate their officers on determining probable cause for arrest and

24   the appropriateness of relying upon a presumptive drug test to do so. *Johnson,* 43

25   Cal. 4th at 71; *Webb,* 63 Cal. 4th at 191; *Persons,* 217 Cal.App.3d at 178; *Chavez,*

26   207 Cal.App.4th at 1313. Any attempt by Plaintiff to claim that the CBP Officers did

27   not actually have the appropriate training in using presumptive drug test kits or

28   determining probable cause has no relevance to the claims against Safariland.

YUKEVICH | CAVANAUGH
355 S. GRAND AVENUE, 15TH FLOOR
LOS ANGELES, CALIFORNIA 90071-1560
TELEPHONE (213) 362-7777
FACSIMILE (213) 362-7788

1  *Johnson,* 43 Cal. 4th at 71.

2          3.      Safariland Is Entitled To Summary Judgment Because The Bulk

3                  Seller Doctrine Precludes Liability For Failure To Warn

4          Safariland additionally has an absolute defense in the bulk seller doctrine.

5  *Forest v. Vitek, Inc.*, 884 F.Supp. 378, 379 (D. Nev. 1993) *citing Sara Lee Corp. v.*

6  *Homasote Co.*, 719 F.Supp. 417 (D. Md. 1989). The bulk seller/supplier doctrine is

7  available to manufacturers who manufacture products that are not defective when

8  they "come off the line" (*Lee v. Electric Motor Division*, 169 Cal.App.3d 375, 383

9  (Cal.App.2d 1985)) and who were objectively reasonable in relying on a

10  knowledgeable intermediary to provide a warning to ultimate users. *Forest, supra,* at

11  381. Such is the case here: Safariland relies on the training facilities and personnel

12  of its various customers' agencies to train their officers, agents, and other personnel

13  in the proper use and interpretation of the Narco Pouch test kits. [SUF #14,15,31,

14  33,48]. Indeed, Safariland has no control or authority over any officer of the CBP,

15  agent of HSI, or the United States Attorney's Office to instruct them to arrest

16  plaintiff.

17          California courts have addressed this issue on multiple occasions. For

18  instance, in *Lee,* the Court of Appeals affirmed the grant of summary judgment

19  against the plaintiffs in their products liability case. 169 Cal.App.3d 375. The Lees

20  alleged that a motor within a meat grinder was defective and caused injury to Mr.

21  Lee's right hand, requiring it to be amputated. *Id.* The Court determined that the

22  defendants were entitled to the bulk supplier defense (or component part

23  manufacturer defense) because the defendant had no part in designing or

24  manufacturing the meat grinder.[7] *Id.* at 383-389. The Court held that defendant

25  ────────────────

26  [7] The bulk supplier and component part manufacturer defenses are identical. The

27  defenses are often used in the context of raw chemical manufacturers whose

     chemicals are later made a part of subsequent product, but the cases (like *Lee*)

28  demonstrate that while a product may be a part of another product, the products at

YUKEVICH | CAVANAUGH
355 S. GRAND AVENUE, 15TH FLOOR
LOS ANGELES, CALIFORNIA 90071-1560
TELEPHONE (213) 362-7777
FACSIMILE (213) 362-7788

YUKEVICH | CAVANAUGH
355 S. GRAND AVENUE, 15TH FLOOR
LOS ANGELES, CALIFORNIA 90071-1560
TELEPHONE (213) 362-7777
FACSIMILE (213) 362-7788

1  could not be held liable for the manufacture of its non-defective product, "if there

2  was no defect in the motor at the time the motor left the defendants plant." *Id.* at

3  384. The instant case is analogous.

4      Here, plaintiff alleges that the Narco Pouch 923 was defective, though not

5  because the product itself was defective, in that it came off the line in a way that was

6  different from other Narco Pouch 923 kits. Instead, the alleged "defectiveness" is in

7  the product's failure to adequately warn the CBP officers that the test was not

8  conclusive. The Court should understand the Narco Pouch to be a "component" of

9  the formation of probable cause, leading to plaintiff's arrest.

10      Like in *Lee*, the Narco Pouch itself is not defective. Plaintiff's own police

11  practices expert and toxicologist agree that the test functioned as intended and is an

12  acceptable, validated, and appropriate method to presumptively test for

13  methamphetamine. [SUF# 37,46,49,52].

14      In *Zambrana v. Standard Oil Co.*, 26 Cal.App.3d 209, 213-214 (1972), the

15  plaintiff alleged, as is done in the instant case, that it was the combination of the

16  parts that was unreasonably dangerous. The Court held that the manufacturer had no

17  duty to warn in such an instance as it was not the designer/manufacturer of the

18  combination of parts which is said to be defective. *Id.* at 217-218. Likewise here, the

19  Narco Pouch 923 was not a danger to the plaintiff by itself. In fact, plaintiff never

20  touched the pouches or had any exposure to the chemicals contained therein.

21  Instead, plaintiff asserts that she was arrested because the Narco Pouch gave a

22  positive result (because it functioned as intended), and that this constitutes an

23  unwarranted danger (i.e., of false arrest) for which Safariland is liable. But the cases

24

25  issue are often *complete* products in and of themselves. *See Forest, supra*, at 1467,

26  fn. 8. ("Many bulk supplier cases involve bulk products that are themselves
   complicated or finished products…It is the positions of the bulk supplier and the

27  intermediary relative to the user that impacts on the duty to warn, not whether the

28  product is raw or finished.") (internal quotes omitted).

1  dictate otherwise as Safariland has no control or authority over any officer of the

2  CBP, agent of HSI, or the United States Attorney's Office to instruct them to arrest

3  plaintiff. Consequently, the Court must find that Safariland is entitled to the bulk

4  supplier defense and grant summary judgment as to all claims.

5  **VI.  PLAINTIFF'S CLAIM FOR UNFAIR COMPETITION FAILS AS A**

6  **MATTER OF LAW**

7       Lastly, plaintiff makes a California state law claim pursuant to California

8  Business and Professions Code § 17200, *et seq* ("section 17200"). Specifically,

9  plaintiff alleges that supposed "misrepresentations" constitute unfair, fraudulent,

10  misleading, and deceptive advertising resulting in lost income and property to the

11  plaintiff.

12       Section 17200 prohibits, and provides civil remedies for, unfair competition,

13  which it defines as "any unlawful, unfair or fraudulent business act or practice." Its

14  purpose "is to protect both consumers and competitors by promoting fair

15  competition in commercial markets for goods and services." *Kasky v. Nike, Inc.,* 27

16  Cal.4th 939, 949 (2002); *see also Hall v. Time Inc.* 158 Cal.App.4th 847, 852

17  (2008). The state's false advertising law (§ 17500, et seq.) is equally comprehensive

18  within the narrower field of false and misleading advertising, and is specifically

19  incorporated by section 17200. *See generally Kasky*, at pp. 950–951; *Committee on*

20  *Children's Television, Inc. v. General Foods Corp.* 35 Cal.3d 197, 210–211 (1983).

21       In order for a party to prove a cause of action under section 17200[8], a plaintiff

22  must show an injury in fact (i.e., an economic injury), and that the economic injury

23  was the result of (i.e., *caused by*) the unfair business practice or false advertising of

24  the defendant corporation. *Kwikset Corp. v. Superior Court*, 51 Cal.4th 310, 322

25  _____

26  [8] Section 17200 was subject to a California ballot proposition, Prop. 64. Prop 64
required that plaintiffs under 17200 must suffer an injury in fact and loss of money

27  or property. Prior to that enactment, plaintiffs could bring suit on behalf of

28  consumers, generally, without having suffered any actual injury.

YUKEVICH | CAVANAUGH
355 S. GRAND AVENUE, 15TH FLOOR
LOS ANGELES, CALIFORNIA 90071-1560
TELEPHONE (213) 362-7777
FACSIMILE (213) 362-7788

1   (2011).

2          Section 17200 requires that the injury in fact must be "as a result of the unfair

3   competition or violation of the false advertising law." *Id.* at 326 (internal quotations

4   omitted). The court in *Kwikset* stated that "as a result of" is no different than saying

5   that the one *caused* the other, and it pointed to its prior analysis in *In re Tobacco II*

6   *Cases*, 46 Cal.4th 298, 325-326 (2009). There, the Court held that a plaintiff "must

7   demonstrate actual reliance on the allegedly deceptive or misleading statements, in

8   accordance with well-settled principles regarding the element of reliance in ordinary

9   fraud cases." *Id.* at 306. The Court further stated that a "plaintiff must show that the

10  misrepresentation was an immediate cause of the injury-producing conduct…" *Id.* at

11  326.

12         In this case, plaintiff cannot establish that she saw, let alone *relied on*, any

13  alleged misrepresentations by Safariland. This inability is reasonable given that

14  Safariland does not market or advertise its Narco Pouch kits to the general public.

15  [SUF #47]. They are sold to governmental bodies, police forces, military agencies,

16  and narcotics testing laboratories. *Id.* There is absolutely no advertisement or

17  marketing materials to which the plaintiff can point as the basis for her detrimental

18  reliance, such that any alleged deceptive materials caused her to lose money or

19  property. *Id.* Furthermore, there are no deceptive materials at all. Safariland's

20  product is an accurate and reliable presumptive test for methamphetamine and did

21  what it is designed to do, a fact that Plaintiff's own experts admit. [SUF #37,

22  46,49,52].

23         The premise of plaintiff's claim is that third parties (CBP officers Garza and

24  Gibbons, employed by the United States) were deceived and that reliance by those

25  third parties on the alleged deception is what caused her injuries. But such tangential

26  injuries have not been recognized as cognizable under section 17200 case law post-

27  Prop. 64. *Kwikset*, 51 Cal.4th at 326; *In re Tobacco II Cases*, 46 Cal.4th at 325-326.

28  After Prop. 64, the plaintiff must be directly injured by the allegedly bad conduct.

YUKEVICH | CAVANAUGH
355 S. GRAND AVENUE, 15TH FLOOR
LOS ANGELES, CALIFORNIA 90071-1560
TELEPHONE (213) 362-7777
FACSIMILE (213) 362-7788

1 | *Id.* Consequently, plaintiff's cause of action brought pursuant to section 17200

2 | should be dismissed with prejudice.

3 | **VII.** **CONCLUSION**

4 | For the foregoing reasons, Defendant Safariland, LLC is entitled to summary

5 | judgment as to each of plaintiff's claims.

6 |

7 | DATED: July 21, 2017

Respectfully submitted,
YUKEVICH | CAVANAUGH

8 |

9 |

10 |

By: _/s/ Steven D. Smelser_

11 |

Steven D. Smelser
Attorneys for Defendant SAFARILAND,
LLC

12 |

13 |