# Table of Contents

EXHIBIT A - copy of relevant portions of Dept. of Homeland Security Reports of Investigation and other related records produced by Defendant United States of America ................................................................. 2

EXHIBIT B - copy of relevant portions of deposition transcript of Customs and Border Protection Officer Eduardo Garza .......................................................................................................................................... 35

EXHIBIT C - copy of relevant portions of deposition transcript of Customs and Border Protection Officer Brandon Gibbons ........................................................................................................................................ 59

EXHIBIT D - copy of relevant portions of deposition transcript of Homeland Security Investigations Special Agent Zachary Bulman ................................................................................................................................ 88

EXHIBIT E - copy of relevant portions of deposition transcript of Drug Enforcement Agency chemist Alexandra Ambriz ..................................................................................................................................... 120

EXHIBIT F - copy of relevant portions of deposition transcript of Safariland employee T. Allen Miller .......... .................................................................................................................................................................... 173

EXHIBIT G - copy of relevant portions of deposition transcript of Drug Enforcement Agency Lab Director James Malone ............................................................................................................................................ 183

EXHIBIT H - copy of relevant portions of deposition transcript of Okorie Okorocha ................................ 211

EXHIBIT I - copy of report of Okorie Okorocha produced by Plaintiff pursuant to FRCP 26 .................... 241

EXHIBIT J - copy of relevant portions of deposition transcript of Roger Clark ......................................... 251

EXHIBIT K - copy of relevant portions of report of Roger Clark produced by Plaintiff pursuant to FRCP 26 ... .................................................................................................................................................................... 281

EXHIBIT L - copy of relevant portions of deposition transcript of Alison Vredenburgh ............................ 296

EXHIBIT M - copy of relevant portions of Safariland LLC Presumptive Colorimetric Screening Report, written by Angelina Duggan and produced by Safariland pursuant to FRCP 26 .......................................... 337

EXHIBIT N - copy of relevant portions of the Budget in Brief Fiscal Year 2017, published by U.S. Dept. of Homeland Security ..................................................................................................................................... 382

EXHIBIT O - copy of relevant portions of a publication entitled Supplemental Document SD-2 For Part IVB: Quality Assurance/Validation of Analytical Methods ................................................................................ 390

EXHIBIT P - copy of relevant pages of a publication entitled Recommended Methods For The Identification And Analysis Of Amphetamine, Methamphetamine, And Their Ring-Substituted Analogues In Seized Materials ................................................................................................................................................... 395

EXHIBIT Q - copy of a publication entitled Methamphetamine ................................................................. 409

EXHIBIT R - copy of a document published by the Scientific Working Group for the Analysis of Seized Drugs regarding the History of the committee ................................................................................................... 424

EXHIBIT S - copy of the Bylaws of the Scientific Working Group for the Analysis of Seized Drugs ............ .................................................................................................................................................................... 426

EXHIBIT T - copy of a publication entitled Methoxymethamphetamine ..................................................... 432

# EXHIBIT A

REQUESTED BY:  BULMAN, ZACHARY

O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF HOMELAND SECURITY ICE | ████████████ |
|---|---|
| R E P O R T   O F   I N V E S T I G A T I O N | PAGE    1 |
| | CASE NUMBER SY13WE14SY0869 |

TITLE: ARREST OF DOYMA MICHEL

CASE STATUS:    INTERIM RPT

| REPORT DATE 080414 | DATE ASSIGNED 060314 | PROGRAM CODE ██ | REPORT NO. 002 |
|---|---|---|---|

RELATED CASE NUMBERS:

COLLATERAL REQ:

TYPE OF REPORT:
OTHER INFORMATION

TOPIC: SEIZURE OF 15 BOTTLES OF LIQUID METH FROM MICHEL'S STORAGE UNIT.

SYNOPSIS:
On June 2, 2014, at approximately 2:10 p.m., Doyma Vanessa MICHEL applied for admission into the United States from Mexico through the San Ysidro, California Port of Entry (POE) as the driver and sole occupant of a Black 2001 Audi A4 bearing California license plate 4UBZ197.  An examination of the vehicle driven by MICHEL revealed four (4) plastic bottles, weighing approximately 4.45 kilograms of methamphetamine hidden within the vehicle.

MICHEL was arrested and charged with violation of Title 21 USC 952, 960, Importation of a Controlled Substance, and booked into the Metropolitan Correctional Center, San Diego, CA.

| DISTRIBUTION: ████████████ | SIGNATURE: BULMAN    ZACHARY    SPECIAL AGENT |
|---|---|
| | APPROVED: PUENTES    CARLOS    G  OI GRP SUPERVISOR |
| | ORIGIN OFFICE: SY SAN YSIDRO, CA - DSA | TELEPHONE: ████████ |
| | TYPIST: BULMAN |

O F F I C I A L   U S E   O N L Y

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

USA_0026

EXHIBIT A
PAGE 6

O F F I C I A L   U S E   O N ʟ Y

| DEPARTMENT OF HOMELAND SECURITY ICE | PAGE    2 |
|---|---|
| | CASE NUMBER SY13WE14SY0869 |
| R E P O R T   O F   I N V E S T I G A T I O N C O N T I N U A T I O N | REPORT NUMBER: 002 |

CASE PROGRAM CODES:

███████████ ████████ ███████████

O F F I C I A L   U S E   O N L Y

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

USA_0027

EXHIBIT A
PAGE 7

O F F I C I A L   U S E   O N ⌐ Y

| DEPARTMENT OF HOMELAND SECURITY ICE | PAGE    3 |
|---|---|
| R E P O R T   O F   I N V E S T I G A T I O N<br>C O N T I N U A T I O N | CASE NUMBER SY13WE14SY0869 |
| | REPORT NUMBER: 002 |

DETAILS OF THE INVESTIGATION:

On June 3, 2014, at approximately 10:00 a.m., Special Agents (S/A) Zachary Bulman; David Glaze; Marina Griffin; Jason Polk and Group Supervisor Carlos Puentes gained access to MICHEL's personal storage unit #AL012 at Hilltop Main Self Storage (3755 Main Street, Chula Vista, CA. 91911). SA Bulman provided the on-site manager Elvira Avendano with a copy of consent to search form signed by MICHEL following her post arrest interview. Upon accessing the storage unit, thirty six (36) sealed bottles of Tequila and fifteen (15) plastic Cuajo bottles were located. The Cuajo bottles and tequila bottles were seized and packaged for transport to the CBP vault in Otay Mesa, CA. Three random Cuajo bottles were selected and field tested resulting in a positive reaction for the presence of methamphetamine.

On June 5, 2014, at 9:20 a.m., S/A Bulman issued a subpoena to Elvira Avendano (Manager of Hilltop Main Self Storage) for any and all documents related to the rental holder of unit # AL012. The subpoena requested dates and times of access to the unit from the beginning of the rental contract and copies of the rental contract. The information provided by Avendano listed MICHEL as the applicant on the rental agreement dated May 27, 2014. MICHEL rented a locker that was four feet by four feet by three feet. MICHEL's signature was on the lease agreement.

The activity log provided by the storage facility for MICHEL lists both inbound access and outbound exits from the front gate of the facility. MICHEL was provided an individual access code to the front gate by Hilltop Self Storage. MICHEL initially used the code on May 27, 2014 at 3:07 p.m. She accessed the facility again on May 28th at 1:02 p.m. MICHEL exited the facility eight minutes later. On May 29th at 2:30 p.m. MICHEL accessed the facility. She exited the facility four minutes later. On May 30th MICHEL accessed the facility at 2:50 p.m. and exited the facility seven minutes later. On May 31st, MICHEL accessed the facility at 4:11 p.m. and exited the facility at 4:17 p.m.

MICHEL never spent more than seven minutes within the storage facility during any of her visits. The dates and times MICHEL accessed the unit coincide with crossing data for her. On May 30th, MICHEL crossed into the U.S. through the San Ysidro, POE at approximately 12:44 p.m. and accessed the storage facility at 2:50 p.m. The time she accessed her storage facility contradicts MICHEL's claim during her post arrest interview on June 2nd. MICHEL never mentioned accessing the storage facility despite being questioned in detail regarding her specific actions after crossing into the U.S. on May 30th. (Reference ROI#1).

On June 9th at 10:30 a.m. and on June 12th at 1:00 p.m., DEA Chemist Alexandra

O F F I C I A L   U S E   O N L Y
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

USA_0028

EXHIBIT A
PAGE 8

O F F I C I A L   U S E   O N ⌐ Y

| DEPARTMENT OF HOMELAND SECURITY ICE | PAGE    4 |
|---|---|
| R E P O R T   O F   I N V E S T I G A T I O N C O N T I N U A T I O N | CASE NUMBER SY13WE14SY0869 |
| | REPORT NUMBER: 002 |

Ambriz responded to test and take samples of the liquid meth seized from MICHEL's vehicle and her storage unit.  The field tests conducted of the liquid methamphetamine seized from MICHEL's storage unit resulted in a positive result for the presence of methamphetamine.

Case Continues.

O F F I C I A L   U S E   O N L Y
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

USA_0029

EXHIBIT A
PAGE 9

REQUESTED BY:  BULMAN, ZACHARY
O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF HOMELAND SECURITY ICE<br><br>R E P O R T   O F   I N V E S T I G A T I O N | ████████████ |
|---|---|
| | PAGE    1 |
| | CASE NUMBER SY13WE14SY0869 |

TITLE: ARREST OF DOYMA MICHEL

CASE STATUS:     INIT RPT

| REPORT DATE<br>061914 | DATE ASSIGNED<br>060314 | PROGRAM CODE<br>██ | REPORT NO.<br>001 |
|---|---|---|---|

RELATED CASE NUMBERS:

COLLATERAL REQ:

TYPE OF REPORT:
MEMO OF INTERVIEW        /   OTHER INFORMATION

TOPIC: INTERVIEW OF DOYMA MICHEL

SYNOPSIS:
On June 2, 2014, at approximately 2:10 p.m., Doyma Vanessa MICHEL applied for admission into the United States from Mexico through the San Ysidro, California Port of Entry (POE) as the driver and sole occupant of a Black 2001 Audi A4 bearing California license plate 4UBZ197.  An examination of the vehicle driven by MICHEL revealed four (4) plastic bottles, weighing approximately 4.45 kilograms of methamphetamine hidden within the vehicle.

MICHEL was arrested and charged with violation of Title 21 USC 952, 960, Importation of a Controlled Substance, and booked into the Metropolitan Correctional Center, San Diego, CA.

| DISTRIBUTION:<br>████████ ██ | SIGNATURE:<br>BULMAN       ZACHARY       SPECIAL AGENT |
|---|---|
| | APPROVED:<br>PUENTES       CARLOS     G  OI GRP SUPERVISOR |
| | ORIGIN OFFICE: SY<br>SAN YSIDRO, CA - DSA |  TELEPHONE: ████████ |
| | TYPIST: BULMAN |

O F F I C I A L   U S E   O N L Y
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

USA_0031

EXHIBIT A
PAGE 10

O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF HOMELAND SECURITY<br>ICE<br><br>R E P O R T   O F   I N V E S T I G A T I O N<br>C O N T I N U A T I O N | PAGE    2 |
|---|---|
| | CASE NUMBER  SY13WE14SY0869 |
| | REPORT NUMBER:  001 |

CASE PROGRAM CODES:

████████████         ████████████         ████████████

O F F I C I A L   U S E   O N L Y

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

USA_0032

EXHIBIT A
PAGE 11

O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF HOMELAND SECURITY ICE | PAGE     3 |
|---|---|
| R E P O R T   O F   I N V E S T I G A T I O N C O N T I N U A T I O N | CASE NUMBER SY13WE14SY0869 |
| | REPORT NUMBER: 001 |

DETAILS OF THE INVESTIGATION:

On June 2, 2014, at approximately 2:10 p.m., Doyma Vanessa MICHEL applied for admission into the United States from Mexico through the San Ysidro, California Port of Entry (POE) as the driver and sole occupant of a Black 2001 Audi A4 bearing California license plate 4UBZ197.  An examination of the vehicle driven by MICHEL revealed four (4) plastic bottles, weighing approximately 4.45 kilograms of methamphetamine hidden within the vehicle.

PRE-PRIMARY INSPECTION:

At approximately 2:10 p.m., MICHEL was waiting in vehicle pre-primary inspection area at the San Ysidro, POE.  U.S. Customs and Border Protection Officer (CBPO) Eduardo Garza was conducting pre-primary roving operations when he encountered MICHEL in the driver's seat of her vehicle. According to CBPO Garza's report, MICHEL claimed she was entering the U.S. to have her vehicle's emissions test conducted at a service station off of Coronado Avenue.  CBPO Garza asked MICHEL for her entry document.  MICHEL presented her valid U.S. Passport (#464381561) with photograph identifying her as Doyma Vanessa MICHEL.

CBPO Garza wrote in his report that MICHEL exhibited visible signs of nervousness.  Specifically, CBPO Garza stated MICHEL's hands were shaking, she avoided making eye contact with Garza and he observed her jugular pulsing (carotid artery).  CBPO Garza conducted an inspection of MICHEL's vehicle and discovered a bottle within a sock that had been concealed in the dashboard above the glove compartment.  CBPO Garza asked MICHEL if she knew what the bottle contained.  MICHEL replied that she did not.

CBPO Garza then escorted MICHEL and her vehicle to the secondary inspection lot.  While being escorted to the security office, MICHEL informed CBPO Garza that she recalled the contents of the bottle hidden within her dashboard. MICHEL claimed the bottle contained a liquid that is used to make cheese.  CBPO Garza asked MICHEL why she would conceal the bottle in a dirty sock in the dash board if it simply contained a material used to make cheese.  MICHEL provided no answer.

A field test was conducted on the bottle hidden within MICHEL's dashboard.  The liquid within the bottle tested positive for the properties of methamphetamine. Following the positive test result, MICHEL was placed in handcuffs and escorted to the CBP security office.

SECONDARY INSPECTION:

At approximately 4:20 p.m., CBPO Brandon Gibbons was assigned to conduct a

O F F I C I A L   U S E   O N L Y

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

USA_0033

EXHIBIT A
PAGE 12

O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF HOMELAND SECURITY<br>ICE<br><br>R E P O R T   O F   I N V E S T I G A T I O N<br>C O N T I N U A T I O N | PAGE    4 |
|---|---|
| | CASE NUMBER SY13WE14SY0869 |
| | REPORT NUMBER: 001 |

detailed inspection of MICHEL's vehicle.  CBPO Gibbons observed a bulge on the driver's seat.  CBPO Gibbons lifted the seat cover and discovered one (1) plastic bottle containing a thick yellowish substance and two (2) glass tequila bottles.  Five (5) additional tequila bottles were found and two (2) more plastic bottles containing the thick yellowish substance throughout the vehicle.  A total of four (4) plastic bottles containing the thick yellowish liquid were recovered from the vehicle.

The contents of all four plastic bottles field tested positive for methamphetamine.  The total approximate weight of the four plastic bottles was 4.45 kilograms.  The methamphetamine was seized as evidence Exhibits 1, for analysis by the Drug Enforcement Administration, Southwestern Regional Laboratory Vista, CA.  At approximately 4:40 p.m., U.S. Homeland Security Investigations (HSI) Special Agent (S/A) Zachary Bulman, responding agent, was advised of the seizures and of MICHEL's arrest.

MICHEL INTERVIEW:

At approximately 7:40 p.m., MICHEL was contacted by S/A Zachary Bulman and San Diego Police Officer Oscar Torres and advised of her constitutional rights, per Miranda in the Spanish language.  MICHEL indicated she understood her rights and chose to make a statement without the presence of counsel.

MICHEL provided the following information:

MICHEL stated she had an appointment to have her vehicle smog checked at a service station off of Coronado Avenue.  When asked for specifics on the service station, MICHEL could not provide the name or the exact location. MICHEL stated the service station was next door to a Chevron station.  S/A Bulman asked if MICHEL had an appointment with the inspection station.  MICHEL replied that she did not have an appointment.  MICHEL also stated she intended on driving to her sister's house in Escondido prior to taking her vehicle to get smog checked in Chula Vista.

S/A Bulman asked MICHEL why she would drive so far north to Escondido and then turn around and drive over an hour South back to a service station in Chula Vista when she was so close to the service station immediately after crossing the border.  MICHEL replied that she had been informed by a mechanic at the inspection station on Friday, May 30th she would need to drive her vehicle around for an unspecified period of time after crossing the border before having the emissions test done.  S/A Bulman asked MICHEL how she intended to drive from San Ysidro at after 2:00 p.m. to her sister's house in Escondido, visit her sister for a while and then drive south to Chula Vista and have her emissions inspection done before the service station closed for the day. MICHEL replied that she only intended on visiting her sister briefly.

O F F I C I A L   U S E   O N L Y
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

USA_0034

EXHIBIT A
PAGE 13

O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF HOMELAND SECURITY<br>ICE<br><br>R E P O R T   O F   I N V E S T I G A T I O N<br>C O N T I N U A T I O N | PAGE   5 |
|---|---|
| | CASE NUMBER SY13WE14SY0869 |
| | REPORT NUMBER: 001 |

S/A Bulman informed MICHEL that even if she had not encountered any traffic driving in either direction and visited her sister for less than fifteen minutes, she still would not make it back to the service station until close to 5:00 p.m.  S/A Bulman pointed out that the inspection station likely closes at 5:00 p.m. and would not have enough time to perform the emissions test on her vehicle.  MICHEL replied that she would have enough time.

S/A Bulman was why MICHEL was bringing the bottles of tequila found hidden in her vehicle into the U.S.  MICHEL replied that she was bringing the tequila into the U.S. for other people that had asked for it.  S/A Bulman asked MICHEL what was in the plastic bottle found hidden in the dash board of her vehicle.  MICHEL replied that the bottle contained Cuajo.  MICHEL explained that Cuajo is used to make cheese and that she was bringing the Cuajo to a man in San Bernardino.  S/A Bulman asked MICHEL how she was going to bring the Cuajo to the man in San Bernardino.  MICHEL replied that she was bringing the Cuajo to him on a later date.  MICHEL claimed she had purchased the Cuajo on Thursday and Friday (May 29th and 30th).

MICHEL claimed she brings the man Cuajo every month and has a niece up in San Bernardino that she stays with.  SA Bulman asked for the man's name.  MICHEL stated his name was Francisco and that his last name was possibly ROSALES.  SA Bulman asked MICHEL when she planned on delivering the Cuajo to San Bernardino.  MICHEL replied that she planned on travelling up there in approximately one week.

MICHEL was asked what she was going to do with the Cuajo until that time.  MICHEL initially claimed she would be keeping the bottles in her car.  When asked if she planned on returning to Mexico with the Cuajo bottles, MICHEL stated she planned on keeping the bottles with her sister in Escondido.  MICHEL stated her sister would be holding the bottles for her.

MICHEL was asked what time she purchased the Cuajo on Thursday, May 29th and if she took the Cuajo home with her.  MICHEL replied that she had purchased the Cuajo at approximately 10:30 a.m. and had gone directly home with it.

Agent's Note:  MICHEL had two receipts in her possession at the time of her arrest for the purchase of Cuajo both dated on May 30th at 10:36 a.m. and 10:40 a.m.  MICHEL also had two additional receipts in her possession dated March 1st and May 14th for the purchase on Cuajo.

S/A Bulman asked MICHEL if she had tampered with the Cuajo bottles since purchasing them on Thursday.  MICHEL stated, "No, because it smells so bad."  S/A Bulman why the Cuajo bottle was found hidden within her dashboard.  MICHEL replied that it was possible her uncle had hidden the bottle in her dashboard

O F F I C I A L   U S E   O N L Y
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

USA_0035

EXHIBIT A
PAGE 14

O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF HOMELAND SECURITY ICE | PAGE    6 |
|---|---|
| R E P O R T   O F   I N V E S T I G A T I O N C O N T I N U A T I O N | CASE NUMBER SY13WE14SY0869 |
| | REPORT NUMBER: 001 |

because her uncle wanted her to bring more Cuajo.  MICHEL claimed that her uncle resides in Tijuana and also that he and Francisco were Compadre's (close friends).

S/A Bulman asked MICHEL how much Francisco paid her to bring the Cuajo to him. MICHEL claimed he only paid her $20 U.S.  SA Bulman asked MICHEL how much Cuajo MICHEL normally brought to Francisco.  MICHEL replied that on average, she would bring 6 to 8 bottles to him.  SA Bulman asked MICHEL how many bottles she was bringing into the U.S. today (June 2, 2014).  MICHEL replied, "Two."

MICHEL claimed that she had asked one time and had been informed that it was legal to bring Cuajo into the U.S.  S/A Bulman then asked MICHEL if it was legal to bring Cuajo into the U.S., why she had hidden it before coming into the U.S.  MICHEL replied that she knew it should not have been hidden.  S/A Bulman asked MICHEL why she had initially informed the CBP Officer that she did not know what the plastic bottle contained.  MICHEL replied that she had told the CBP Officer the Cuajo was used to make cheese.  S/A Bulman informed MICHEL that she had not informed the CBP Officer initially when he had asked her what it was.

MICHEL claimed that when the CBP Officer initially asked her, she did not know what he was referring to, but that when the CBP Officer pulled the bottle out from behind the dash board, she informed him the bottle contained Cuajo and that Cuajo was used to make cheese.

Agent's Note:  According to CBP Officer Garza's written report, MICHEL did not inform him of the contents of the bottle until he referred her into the secondary inspection lot and he was walking with her to the secondary lot.

S/A Bulman informed MICHEL that the bottle did not contain Cuajo.  SA Bulman asked if the other bottles of Cuajo found hidden within her vehicle had been in her possession the entire time.  MICHEL said, "Yes".  S/A Bulman reiterated the question and asked if the bottles not found behind her dash board had been in anyone else's possession.  MICHEL replied that the bottles of Cuajo had been purchased by either her or her uncle and that she had no idea how the one bottle had ended up hidden behind her dashboard, but that perhaps her uncle had hidden it there.

S/A Bulman asked again if the other bottles had been with her the whole time. MICHEL stated that they had.  S/A Bulman stated that her uncle may have hidden the one bottle of Cuajo, but that the other bottles had not been touched by anyone else.  MICHEL stated the other three bottles had been in her control only.  S/A Bulman stated that not only had the bottle hidden behind the dash board contained methamphetamine, but that all four bottles found within her vehicle contained methamphetamine.

O F F I C I A L   U S E   O N L Y

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

USA_0036

EXHIBIT A
PAGE 15

O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF HOMELAND SECURITY<br>ICE<br><br>R E P O R T   O F   I N V E S T I G A T I O N<br>C O N T I N U A T I O N | PAGE   7 |
|---|---|
| | CASE NUMBER SY13WE14SY0869 |
| | REPORT NUMBER: 001 |

S/A Bulman stated that it was no coincidence that MICHEL's son was caught smuggling methamphetamine approximately two months earlier through the same port of entry.

Agent's Note:  MICHEL's son Daniel GOMEZ (11/28/85) was caught on April 1st, 2014 at the San Ysidro, POE attempting to smuggle approximately 7.6 kilograms of methamphetamine in the trunk of his vehicle.

S/A Bulman informed MICHEL that he was asking for the truth and that if she continued to lie to him regarding her knowledge of the contents of the Cuajo bottles, then the interview could simply be stopped.  S/A Bulman informed MICHEL that whether she continued to lie or not, she would be going to jail regardless and that if she wished to help herself out, she should provide information on who she was working for.  MICHEL replied that she was only taking the Cuajo to Francisco.

S/A Bulman asked MICHEL how much she was going to be paid by Francisco to transport the Cuajo from Tijuana to San Bernardino.  MICHEL stated she was only being paid $20 dollars and that it was "Just money for gasoline."  S/A Bulman explained to MICHEL that he did think she was a bad person because she had smuggled methamphetamine, but he wanted to understand why.  S/A Bulman explained that if she had chosen to smuggle because she had financial obligations that she needed to meet, that would be understandable, but that it still would not make the smuggling legal.  MICHEL continued to persist with her original story.

S/A Bulman pointed out to MICHEL that she has been charged with smuggling before and that she was no stranger to smuggling items and people through the border.  S/A Bulman stated that unlike the two times prior when she had been caught smuggling people into the U.S., MICHEL would not simply be released and not prosecuted.  MICHEL replied that the bottles of Cuajo would still need to be examined by a lab.  S/A Bulman replied, "Yes".

MICHEL stated she had simply purchased the Cuajo at the store in Tijuana on May 31st and further stated that she purchases Cuajo because it is legal and brings the Cuajo into the U.S. because it is legal.

Agents Note:  If MICHEL thought the Cuajo was legal as stated, it does not explain why she made efforts to hide the Cuajo from the view of CBP Officers at the border and why she had not declared the Cuajo when entering the U.S.  In addition to the bottle found hidden behind the dash board just above the glove compartment the other three plastic Cuajo bottles were found in various places hidden from view.  One bottle of Cuajo was found hidden underneath the driver's side seat cover where MICHEL was sitting.  Another bottle was found underneath

O F F I C I A L   U S E   O N L Y
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

USA_0037

EXHIBIT A

PAGE 16

O F F I C I A L   U S E   O N ᴌ Y

| DEPARTMENT OF HOMELAND SECURITY<br>ICE<br><br>R E P O R T   O F   I N V E S T I G A T I O N<br>C O N T I N U A T I O N | PAGE    8 |
|---|---|
| | CASE NUMBER SY13WE14SY0869 |
| | REPORT NUMBER: 001 |

the driver's side dash board within a sock just behind the gas and brake pedals.

S/A Bulman asked MICHEL why she had not taken the Cuajo with her on May 30th when she crossed into the U.S. MICHEL replied that she was not going to see her sister, but was going crossing to do other things. S/A Bulman asked why she had not brought the Cuajo with her on May 31st when she crossed into the U.S. MICHEL responded that she had brought Cuajo into the U.S. on Friday, May 30th and had left the Cuajo with a friend at a Bodega (Store) in San Ysidro. MICHEL claimed that the store was a clothing store behind the Kentucky Fried Chicken (KFC) on San Ysidro Blvd (Possibly 644 E. San Ysidro, Blvd.)

S/A Bulman asked for the name of the friend she had left with her friend. MICHEL replied that the woman's name was Melissa (Unknown Last Name). MICHEL claimed that Melissa still had the bottles of Cuajo she had left with her and that she intended to pick up the Cuajo from Melissa after crossing today.

Agent's Note:  On the day following MICHEL's arrest (June 3, 2014), S/A Bulman with assistance from other HSI Agents attempted to locate the clothing store behind the KFC on San Ysidro Blvd. S/A Bulman entered six different clothing stores and located only one employee named Melissa, who had no knowledge of MICHEL.
S/A Bulman asked MICHEL again how she intended to get her vehicle's emission inspection completed before 6 p.m. after crossing into the U.S. at approximately 2:30 p.m. and then driving all the way up to Escondido to briefly visit her sister and then drive all the way back to Chula Vista during rush hour. MICHEL claimed she had plenty of time for the emissions inspection. MICHEL also claimed that if she felt she did not have enough time to make it to her emissions inspection, she would simply stay with her sister.

S/A Bulman asked MICHEL what time she crossed into the U.S. on Friday, May 30th. MICHEL stated she had crossed between 1 and 2 p.m. S/A Bulman asked if MICHEL drove straight to the service station off of Coronado Avenue after crossing on the 30th. MICHEL stated she had. S/A Bulman then asked what she did after leaving the service station. MICHEL replied that she went to the 99 cent store in San Ysidro and then drove back into Mexico.

S/A Bulman asked MICHEL if she had leased a storage unit at Hilltop Self Storage off of Main Street in Chula Vista. The question was based upon a business card found in MICHEL's possession at the time of her arrest. MICHEL said, "No". S/A Bulman asked a second time if MICHEL had a storage unit at Hilltop Self Storage. MICHEL again said, "No". S/A Bulman then asked MICHEL why she had the business card. MICHEL stated her friend Elvira (Last Name Unknown) worked there. S/A Bulman asked MICHEL how she knew Elvira. MICHEL claimed she met Elvira at a dance club called Las Pulgas.

O F F I C I A L   U S E   O N L Y
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

USA_0038

EXHIBIT A

PAGE 17

O F F I C I A L  U S E  O N L Y

| DEPARTMENT OF HOMELAND SECURITY<br>ICE<br><br>R E P O R T  O F  I N V E S T I G A T I O N<br>C O N T I N U A T I O N | PAGE    9 |
|---|---|
| | CASE NUMBER SY13WE14SY0869 |
| | REPORT NUMBER: 001 |

Agent's Note:  Following the interview, S/A Bulman looked at the back side of the business card from Hilltop Self Storage and observed a unit number, gate code number, rent due date and amount of rent that needed to be paid hand written on the card.  After discovering this information S/A Bulman asked MICHEL again if she had a storage unit under her name at the location.  MICHEL again stated she did not.  S/A Bulman asked why the card she had in her possession indicated otherwise and showed MICHEL a photocopy of the reverse side of the business card.  MICHEL then admitted she did have a storage unit at the location.  S/A Bulman asked MICHEL why she had lied regarding the unit. MICHEL replied that she had tequila in the unit and did not want to get in trouble for it.  S/A Bulman informed MICHEL that he was not very concerned about the alcohol and wanted to make sure there was not anything else illegal located inside the unit.  MICHEL replied that there was nothing illegal in the unit.  S/A Bulman asked for and obtained written consent from MICHEL to access the unit.  A detailed account of the search of MICHEL's storage unit will be documented in a following report.

S/A Bulman again asked MICHEL where she had been after leaving the service station on Friday, May 30th.  MICHEL again stated she had only gone to the 99 cent store and then went back to Tijuana.  S/A Bulman asked MICHEL what time she had crossed back into Mexico.  MICHEL stated between 4 and 5 p.m.  S/A Bulman informed MICHEL that she had spent a long time at the 99 cent store. MICHEL then claimed she had spent time at the swap meet near the 99 cent store and had eaten some food at a Chinese restaurant off of West San Ysidro Blvd.

S/A Bulman then asked MICHEL if she had stopped anywhere prior to going to the service station off of Coronado Avenue.  MICHEL stated she purchased gas at a gas station off of San Ysidro Blvd.  S/A Bulman asked MICHEL if she had gone anywhere else on May 30th.  MICHEL replied that she could not recall.

S/A Bulman asked MICHEL how much money she had brought with her into the U.S. on May 30th.  MICHEL stated she brought around $500 dollars.  S/A Bulman asked MICHEL if she had been given any money on May 30th after crossing into the U.S. MICHEL replied that she had not.

Agent's Note:  MICHEL had a receipt in her possession showing a ATM deposit she had made at the Wells Fargo Bank in San Ysidro on May 30that 1:03 p.m. in the amount of $125.00.  MICHEL also had a receipt from Baja-Mex Currency Services (358 E. San Ysidro Blvd, San Ysidro, CA.) dated for May 30th at 5:58 p.m. in which she sold $1,147.39 (U.S. Dollars) and received 14,480 pesos in return.

S/A Bulman asked again where MICHEL had gone immediately after crossing into the U.S. on May 30th.  MICHEL replied that she had gone to purchase gas at the 76 station off of San Ysidro Blvd.  S/A Bulman asked where MICHEL went after

O F F I C I A L  U S E  O N L Y

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

USA_0039

EXHIBIT A
PAGE 18

OFFICIAL USE ONLY

| DEPARTMENT OF HOMELAND SECURITY ICE | PAGE 10 |
|---|---|
| R E P O R T   O F   I N V E S T I G A T I O N   C O N T I N U A T I O N | CASE NUMBER SY13WE14SY0869 |
| | REPORT NUMBER: 001 |

purchasing gas. MICHEL replied that she had gone directly to the emissions inspection station after. S/A Bulman asked MICHEL approximately what time she had arrived at the emissions inspection station. MICHEL stated she arrived at approximately 3:00 p.m. MICHEL further stated she remembered the time because she looked at the time and realized she did not have enough time to drive around as she had been instructed to and come back to have her smog test conducted.

S/A Bulman asked again if MICHEL had stopped anywhere else after crossing into the U.S. before arriving at the emissions inspection station. MICHEL stated she had not made any other stops. S/A Bulman asked if MICHEL had made any other stops after leaving the emission inspection station. MICHEL replied again that she had only stopped at the 99 cent store and the swap meet. MICHEL stated she spent approximately one hour to one and a half hours at the 99 cent store and swap meet before returning to Mexico.

Agent's Note: The Wells Fargo receipt indicates that she stopped at the ATM and made a $125 dollar deposit at 1:03 p.m. Despite being asked several times, MICHEL did not state she made any other stops other than to purchase gas after entering the U.S. before driving directly to the emissions inspection station. MICHEL was also asked numerous times where she had driven to/visited in the U.S. after leaving the emissions inspection station. MICHEL only claimed to have gone to the 99 cent store and the swap meet in San Ysidro despite having a receipt dated May 30th, 2014 at 2:29 p.m. for the purchase of 12.842 gallons of gasoline from COSTCO (1130 Broadway, Chula Vista, CA.). MICHEL also had the aforementioned receipt from Baja-Mex Currency Services that she never mentioned.

S/A Bulman asked MICHEL how she exchanged $1,147.39 dollars at 5:58 p.m. MICHEL stated she exchanges a similar amount of cash every time she crosses into the U.S. S/A Bulman asked how MICHEL how she was able to cross into the U.S. on May 30th with approximately $500 dollars as she had previously stated and later that evening exchange over one thousand dollars before returning to Mexico. MICHEL stated she had not informed S/A Bulman she crossed with $500 dollars. MICHEL now claimed she crossed with approximately $800 dollars.

S/A Bulman pointed out to MICHEL that she was lying and stated that there was no reason to lie about the amount of money she had in her possession on May 30th. MICHEL claimed that she could not recall how much money she had brought with her into the U.S. S/A Bulman asked how it was possible for MICHEL to cross with $500 or $800 dollars, not receive any other money as she had previously stated during the interview and then deposit $1,147.39. S/A Bulman also pointed out that MICHEL had deposited $125.00 dollars at the Wells Fargo earlier in the day which brings the total she had in her possession while in the U.S. to $1,272.39.

O F F I C I A L   U S E   O N L Y

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

USA_0040

EXHIBIT A

PAGE 19

OFFICIAL USE ONLY

| DEPARTMENT OF HOMELAND SECURITY ICE | PAGE 11 |
| REPORT OF INVESTIGATION CONTINUATION | CASE NUMBER SY13WE14SY0869 |
| | REPORT NUMBER: 001 |

S/A Bulman asked MICHEL if she had walked into the bank and if she had spoken to a teller at the Wells Fargo Bank when she made the deposit. MICHEL stated, "Yes". S/A Bulman pointed out that the receipt was specifically for an ATM transaction (Wells Fargo ATM # 0883G) and not a teller to customer transaction. MICHEL then changed her story again and stated she had initially gone to the ATM, but had to go to a teller because the ATM would not take all of her $1 dollar bills.

When asked about the receipt for gas from COSTCO, MICHEL claimed she could not purchase gas from the 76 station using her card (despite have stated twice that she had purchased gas from the 76 station) and then went to the COSTCO. S/A Bulman asked if MICHEL had gone to the COSTCO before driving to the emissions inspection station or after. MICHEL claimed she purchased gas after leaving the inspection station.

Agent's Note: MICHEL claimed earlier in the interview that she recalled arriving at the emissions inspection station at approximately 3:00 p.m. and remembered this because she realized she did not have enough time to drive the car around as instructed and make it back before they closed. The time listed on the COSTCO receipt for when MICHEL purchased gas was 2:29 p.m.

S/A Bulman asked MICHEL why she had not provided this information earlier in the interview in spite of being asked the same questions numerous times. MICHEL claimed she simply could not remember. S/A Bulman asked how MICHEL had earned or gained over $600 dollars on May 30th after crossing into the U.S. MICHEL claimed she brought all of the money with her from Tijuana when she crossed into the U.S. S/A Bulman pointed out to MICHEL again that she initially claimed to have brought approximately $500 dollars into the U.S. and then had changed her story after being confronted with the discrepancy and claimed to have brought approximately $800 dollars into the U.S.

Agent's Note: MICHEL also had in her possession a receipt dated for May 21, 2014 in which she deposited $3,290.00 U.S. dollars (32, $100 dollar bills and additional U.S. currency).

The interview concluded at approximately 9:20 p.m.

CRIMINAL HISTORY:

MICHEL has prior criminal history (FBI# 217544NB5).

Following the interview, MICHEL was arrested for violations of 21 USC 952 and 21 USC 960 Importation of a Controlled Substance, and booked into the Metropolitan Correctional Center, San Diego, CA.

OFFICIAL USE ONLY
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

USA_0041

EXHIBIT A
PAGE 20

O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF HOMELAND SECURITY<br>ICE<br><br>R E P O R T   O F   I N V E S T I G A T I O N<br>C O N T I N U A T I O N | PAGE   12 |
|---|---|
| | CASE NUMBER SY13WE14SY0869 |
| | REPORT NUMBER: 001 |

CROSSING HISTORY:

MICHEL has crossed into the U.S. on fifty nine (59) prior occasions in the past six months.

PERSONAL HISTORY:

Last Name:                         MICHEL
First Name:                        Doyma
Middle Name:                       Vanessa
Alias:       Luisa BAUTISTA-Reyes; Doyma GOMEZ-Torres
Date of Birth:                     10/08/1960
Place of Birth:                    Chiapas, Mexico
Immigration Status:                United States Citizen
Social Security Number:            ███████
Alien Number:                      N/A
FBI Number:                        217544NB5
Race:                              White
Ethnicity:                         Hispanic
Sex:                               Female
Hair Color:                        Brown
Eye Color:                         Brown
Height:                     5'4"
Weight:                     160 lbs.
Tattoo / Scars:       Scar from C-Section
Address:        Calle Berlin 169, Playas De Tijuana,
Baja California, MX.
Employer:                   Unemployed
Passport Number:            464381561
Driver's License Number:         V8009162 (California)

EVIDENCE:

The following evidence is being held in the custody of the Fines, Penalties & Forfeitures (FP&F) in San Diego, California:

Methamphetamine (Net Weight 4.45 kgs.) was seized by CBP on CF 6051 # 2014250400168401 _ 001 and turned over to FP&F for storage.

2001 Audi A4 bearing California license plates 4UBZ197 (VIN# WAUDC68D81A143578), was seized by CBP as evidence on CF 6051 # 2014250400168401 _ 002  and turned over to FP&F for storage.

Miscellaneous Documents were seized by CBP as evidence on CF 6051 #

O F F I C I A L   U S E   O N L Y
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

USA_0042

EXHIBIT A
PAGE 21

OFFICIAL USE ONLY

| DEPARTMENT OF HOMELAND SECURITY ICE | PAGE 13 |
|---|---|
| R E P O R T   O F   I N V E S T I G A T I O N   C O N T I N U A T I O N | CASE NUMBER SY13WE14SY0869 |
| | REPORT NUMBER: 001 |

2014250400168401 _ 003 and turned over to HIS for storage.

Personal Effects were seized by CBP as evidence on CF 6051 # 2014250400168401 _ 004 and turned over to FP&F for storage.

Seven bottles of tequila were seized by CBP as evidence on CF 6051 # 2014250400168401 _ 005 and turned over to FP&F for storage.

Three cellular phones were seized by CBP as evidence on CF 6051 # 2014250400168401 _ 006 and turned over to HSI for storage.

Eight Hundred Sixty Six Dollars $866.00 was seized by CBP as evidence on CF 6051 # 2014250400168401 _ 007 and turned over to FP&F for storage.

WITNESS LIST

Zachary Bulman _ Special Agent
Narcotics Investigations
U.S. Homeland Security Investigations
███████████████    ███████    ███████
███   █

Oscar Torres _ Police Officer
San Diego Police Department

Eduardo Garza _ A-TCET CBP Officer
Brandon Gibbons _ Seizing Officer
U.S. Customs Border Protection
████████████████████    ███████████████
███   █

UNDEVELOPED LEADS

To be determined by the DSAC, San Ysidro, California.

OFFICIAL USE ONLY
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

USA_0043

EXHIBIT A
PAGE 22

REQUESTED BY:  BULMAN, ZACHARY

OFFICIAL USE ONLY -- TECS II INFORMATION -- OFFICIAL USE ONLY

080114                      TECS II - LIST OF RELATED RECORDS                   PAGE    1 ████

                       3 RECORDS ARE RELATED TO BASE RECORD
████████████    ROI  CSY BULMAN              Z 061914


██████████          MICHEL          DOYMA       V W F 100860
       SC   SUBJECT OF CURRENT INVESTIGATION                    SUB-SOURCE

██████████          4UBZ197     CA US WAUDC68D81A1435
       NO   NON-SUSPECT, OTHER                                  SUB-SOURCE

██████████          CASE CSY BULMAN          Z 060314
       ARREST OF DOYMA MICHEL

OFFICIAL USE ONLY -- TECS II INFORMATION -- OFFICIAL USE ONLY

USA_0044

EXHIBIT A
PAGE 23

First: Doyma            Mid. Vanessa          Last: MICHEL _____ - _____

Case No. _____

RAP SHEET SUMMARY CHART

| Conviction Date | Conviction Court | Charge | Prison Term | Points |
|---|---|---|---|---|
| | | 8 USC 1324 (4/22/2000) | Declined | |
| | | 8 USC 1324 (5/24/2000) | Declined | |
| | | 8 USC 1324 (7/14/2000) | Released | |
| | | 8 USC 1324 (9/27/2000) | Declined | |
| | | 18 USC 545 (2/19/2009) | Dismissed | |
| ███████ | | ON PAROLE/PROBATION | | No |
| | | TOTAL POINTS | | 0 |
| | | CRIMINAL HISTORY CATEGORY | | |
| | | ██████████████ | | |
| | | DEPORTATIONS | | No |
| | | DATE OF MOST RECENT DEPORTATION | | |

DSAt_0048

EXHIBIT A
PAGE 24

Homeland Security Investigations
2255 Niels Bohr Crt.
San Diego, CA 92154



# Homeland Security

# Cover Sheet

**Date**  June 5, 2014

**To:**  Hilltop Main Self Storage
Manager
3755 Main Street
Chula Vista, CA 91911
619-422-2578

**Electronic Service Methods:**

**Fax:**  (Not available)

**E-Mail:**  (Not available)

---

**From:**  Zachary S. Bulman

**Phone:** 619-240-4839

☐ Urgent    ☒ Action    ☐ Concurrence    ☐ FYI

**Number of pages including cover:  4**

---

Comments:

Attached is subpoena #: ICE-HSI-SY-2014-01670.

Please respond by June 9, 2014.

Draft_0051

EXHIBIT A
PAGE 25

DRAFT_0052 *(top right, obscured)*

| 1. To (Name, Address, City, State, Zip Code)<br>Hilltop Main Self Storage<br>Manager<br>3755 Main Street<br>Chula Vista, CA 91911 | DEPARTMENT OF HOMELAND SECURITY<br>U.S. Immigration and Customs Enforcement<br><br>**CONTROLLED SUBSTANCES ENFORCEMENT<br>SUBPOENA**<br><br>**to Appear and/or Produce Records**<br>21 U.S.C. § 967, Public Law 97-258, section 1, as amended |
|---|---|

Subpoena Number  ICE-HSI-SY-2014-01670

By the service of this subpoena upon you, **YOU ARE HEREBY SUMMONED AND REQUIRED TO:**

(A) ☐ **APPEAR** before the ICE Special Agent named in Block 2 at the place, date and time indicated to testify and give information.

(B) ☒ **PRODUCE** the records (including statements, declarations, and other documents and tangible things) indicated in Block 3 below, before the ICE Special Agent named in Block 2 at the place, date, and time indicated.

Your testimony and/or production of the indicated records is required in connection with the investigation or inquiry concerning the enforcement of section 545, Title 18, U.S. Code (relating to the smuggling of goods into the United States), with respect to any controlled substance (as defined in Title 21, U.S. Code).

Failure to comply with this subpoena will render you liable to proceedings in a U.S. District Court to enforce compliance with this subpoena as well as other sanctions.

| 2. (A) ICE Special Agent before whom you are required to appear<br><br>Name        Zachary S. Bulman<br>Title        ██████████<br>Address        ██████████<br><br>Telephone Number  ██████████ | (B) Date<br><br>June 9, 2014<br><br><br>(C) Time 9:00 AM |
|---|---|

3. Records required to be produced for inspection

Please see attached continuation page.

| 4. Name of ICE Special Agent authorized to serve this subpoena<br><br>Zachary S. Bulman | 5. Date of issue  6 5 14<br><br>By _____ <br>(Signature) |
|---|---|
| **U.S. Immigration and Customs Enforcement**<br><br>If you have any questions regarding this subpoena, contact the ICE Special Agent identified in Block 2. | 6. Person issuing this subpoena<br><br>Name        ██████████<br>Title        ██████████<br>Address        ██████████<br><br><br>Telephone Number ██████████ |

ICE Form 73-021(06/09)

DRAFT_0052 *(bottom right, obscured)*

EXHIBIT A
PAGE 26

CERTIFICATE OF SERVICE AND ACKNOWLEDGMENT OF RECEIPT

| A. CERTIFICATE OF SERVICE OF SUBPOENA | | |
|---|---|---|
| I certify that I served the subpoena on the front of this form as follows: | | |

| | Address or Location | Date |
|---|---|---|
| ☐ I delivered a copy of the subpoena to the person to whom it was directed, as follows: | | |
| | | Time |
| | | ☐ a.m. ☐ p.m. |

| | Address or Location | Date |
|---|---|---|
| ☒ (For corporations, partnerships, and unincorporated associations which may be sued under a common name) I delivered a copy of the subpoena to an officer, managing or general agent, or agent authorized to accept service of process as follows: | 3755 *Main St.* *Chula Vista, CA. 91911* | 06/06/14 |
| | | Time 9:20 |
| | | ☒ a.m. ☐ p.m. |
| | Name of person to whom the subpoena was delivered *CESIA AYALA* | |

| Signature | | |
|---|---|---|
| Title *SPECIAL AGENT* | | Date 06/06/14 |

| B. ACKNOWLEDGMENT OF RECEIPT | |
|---|---|
| I acknowledge receipt of a copy of the subpoena on the front of this form. | |

| Signature *Cesi ayala* | | | |
|---|---|---|---|
| Title *Clerck.* | Date 06/06/14 | Time 9:25 | ☒ a.m. ☐ p.m. |

ICE Form 73-021(06/09)

DSAU_0053

EXHIBIT A
PAGE 27

| 1. To (Name, Address, City, State, Zip Code)<br>Hilltop Main Self Storage<br>Manager<br>3755 Main Street<br>Chula Vista, CA 91911 | DEPARTMENT OF HOMELAND SECURITY<br>U.S. Immigration and Customs Enforcement<br><br>**CONTROLLED SUBSTANCES ENFORCEMENT**<br>**SUBPOENA (Continuation)**<br><br>**to Appear and/or Produce Records**<br>21 U.S.C. § 967, Public Law 97-258, section 1, as amended |
|---|---|

Subpoena Number  ICE-HSI-SY-2014-01670

3. Records required to be produced for inspection (continued)

Pursuant to an Official Investigation being conducted by U.S. Immigration and Customs Enforcement, it is directed that your company furnish any and all rental holder information for the storage unit # AL012 located at Hilltop Main Self Storage, 3755 Main St., Chula Vista, CA 91911. These records and information should include, but are not limited to all dates and times of access to the unit since the beginning of rental contract and a copy of the initial rental contract application and subsequent billing records.  Information should include the name, address, phone number, email address, and driver's license,  of the primary account holder, as well as the names of any authorized users. In addition, your company is directed to provide access to any video surveillance tapes.

You are requested not to disclose the existence of this subpoena for an indefinite period of time. Any such disclosure will impede this investigation and thereby interfere with the enforcement of Federal law.

**_Method of Response:_**

_**Preferred:**_

_Return the requested records in a data file format such as ".XLS", ".CSV", ".TXT", ".TIF", or ".PDF". The data file(s) should be delivered via e-mail to Special Agent Zachary S. Bulman at zachary.s.bulman@ice.dhs.gov._

_NOTE: The ICE e-mail system limits incoming messages containing file attachments to 10 MB. For larger files send the subpoena response in multiple e-mail messages._

_**Alternates:**_

_The records may be supplied in a file format on a CD-R. If the records are not available in data file format, paper documents will be accepted. The records should be delivered to Special Agent Zachary S. Bulman at U.S. Immigration and Customs Enforcement, 2255 Niels Bohr Crt., San Diego, CA 92154._

_If you have questions, please contact Special Agent Zachary S. Bulman at 619-240-4839._

_You are requested not to disclose the existence of this subpoena for an indefinite period of time. Any such disclosure will impede this investigation and thereby interfere with the enforcement of federal law._

_End of Document_

Box 3 (continued) – Page 1 of 1

Draft_0054

EXHIBIT A
PAGE 28

Hilltop Main Self Storage

# Activity Log

| Date | Time | Unit | Password | Name | Input Point | Activity |
|---|---|---|---|---|---|---|
| 05/27/14 | 3:07:25 PM | AL012 | ********** | MICHEL | *Inbound* →Keypad One | Access Granted |
| 05/28/14 | 1:02:37 PM | AL012 | ********** | MICHEL | Keypad One | Access Granted |
| 05/28/14 | 1:10:13 PM | AL012 | ********** | MICHEL | *Outbound* →Keypad Two | Access Granted |
| 05/29/14 | 2:30:27 PM | AL012 | ********** | MICHEL | Keypad One | Access Granted |
| 05/29/14 | 2:34:29 PM | AL012 | ********** | MICHEL | Keypad Two | Access Granted |
| 05/30/14 | 2:50:27 PM | AL012 | ********** | MICHEL | Keypad One | Access Granted |
| 05/30/14 | 2:57:11 PM | AL012 | ********** | MICHEL | Keypad Two | Access Granted |
| 05/31/14 | 4:11:55 PM | AL012 | ********** | MICHEL | Keypad One | Access Granted |
| 05/31/14 | 4:17:20 PM | AL012 | ********** | MICHEL | Keypad Two | Access Granted |
| 06/03/14 | 10:00:03 AM | AL012 | ********** | MICHEL | Keypad One | Access Granted |
| 06/03/14 | 10:04:19 AM | AL012 | ********** | MICHEL | Keypad One | Access Granted |
| 06/03/14 | 10:08:20 AM | AL012 | ********** | MICHEL | Keypad One | Access Granted |
| 06/03/14 | 10:30:52 AM | AL012 | ********** | MICHEL | Keypad Two | Access Granted |
| 06/03/14 | 10:42:06 AM | AL012 | ********** | MICHEL | Keypad One | Access Granted |
| 06/03/14 | 10:58:07 AM | AL012 | ********** | MICHEL | Keypad Two | Access Granted |
| 06/05/14 | 8:32:13 AM | AL012 | ********** | MICHEL | Keypad One | Access Granted |
| 06/05/14 | 8:45:23 AM | AL012 | ********** | MICHEL | Keypad One | Access Granted |
| 06/05/14 | 9:25:42 AM | AL012 | ********** | MICHEL | Keypad Two | Access Granted |

*ST RES* (handwritten margin note)

Printed On 06/06/14 9:33:48 AM                    6855-SC                              Page 1

EXHIBIT A
PAGE 29

Case 3:16-cv-00277-GPC-AGS    Document 60-3    Filed 08/11/17    PageID.2654    Page 27 of 240

**EXHIBIT A**
**PAGE 30**

How did you hear about us? _____

9542

## HILLTOP MAIN SELF STORAGE RENTAL AGREEMENT
### (Month-to-Month Tenancy)

**NOTICE:** Your stored property will be subject to a claim of lien for unpaid rent and other charges and may even be sold to satisfy the lien if the rent or other charges due remain unpaid for 14 consecutive days. This lien and its enforcement is authorized by Chapter 10 (commencing with Section 21700) of the California Business and Professions Code.

**HILLTOP MAIN SELF STORAGE**



DATE __5/27/14__

NAME __MICHEL__ __Doyma__ __VANESSA__ EMAIL _____
(Last)      (First)      (Middle Initial)

ADDRESS __1340 W 11th AVE__ CITY __ESCONDIDO__ STATE __CA__ ZIP __92079__
(Number and Street)

RES. PHONE ( __69__ ) __391-7495__ EMPLOYED BY _____ WORK PHONE ( ___ ) ____
Area                                                    Area

WORK ADDRESS _____ CITY _____ STATE _____ ZIP ____
(Number and Street)

REFERENCE: Please provide the name and address of another person to whom any preliminary lien and subsequent notices may be sent.

NAME __De chy__ _____ PHONE ( ___ ) ____

ADDRESS _____ CITY _____ STATE _____ ZIP ____
(Number and Street)

WILL TENANT OBTAIN INSURANCE?   YES ____ NO __D.V.M__ USE OF SPACE __CAJAS__
          Initial   Initial                              (Type of Goods being stored)

TENANT'S DRIVERS LIC. NO. __V8009162__

(THE ILLUSTRATIONS, EXPLANATIONS AND PARAGRAPH HEADINGS ARE NOT PART OF THIS AGREEMENT.)

I, _____signature_____ (Tenant) hereby rent from HILLTOP MAIN SELF STORAGE (Landlord),

those certain premises described as:   SPACE NUMBER: __AL012__   SIZE: __3x4x4 Locker__
                                                                approximate square feet

located at _____ 3755 MAIN STREET, CHULA VISTA, CA 91911 _____ , California, hereinafter referred to as "premises" or "space."

$16 Move in Special                                      Gate code 0012916 2

1. **TERM:** The term of this tenancy shall commence on the date first written above, and shall continue from that day of the month and every month thereafter on a month-to-month basis.

2. **RENT:** Rent is the sum of $ __39-__ , per month, payable in advance upon the date written above and on the same date thereafter of each and every calendar month to the Landlord or to Landlord's designated agent. Rent must be paid in full and no partial payments will be accepted. A late charge not to exceed $ __10__ will be applied as additional rent if the rent payment is not received in Landlord's principal office by the end of the 10th calendar day after the date first written above for which rent is due. In the event of a dishonored bank check from Tenant to Landlord, Tenant agrees to pay $ __25__ as liquidated damages. The monthly rental rate and other charges may be changed at any time by Landlord giving seven days written notice to Tenant at the address(es) provided above, seven days before the expiration of any month of this tenancy. If Tenant has made advance rental payments, the new rate will be immediately charged against such payments.

3. **DEPOSITS:** Tenant shall pay in advance a security, cleaning, and damage deposit of $ __0__ to be held by Landlord for Tenant's faithful performance of the terms of this agreement, and for cleaning and repair of the space after surrender by Tenant. The deposit shall be returned to Tenant within two weeks after Tenant relinquishes the space to Landlord, less all charges for cleaning, repair and replacement of any missing items. In addition, at Landlord's sole option, Landlord may retain any amounts necessary to compensate Landlord for rent due and unpaid under this agreement.

4. **OCCUPANCY:** Tenant may only store personal property owned by Tenant. Tenant has exclusive control of the storage space during the term of this agreement, and specifically agrees that Landlord is not concerned with the kind, quality or value of any goods stored. Tenant agrees that in no event shall the total value of all property stored be deemed to exceed $5,000. In the event Tenant's stored goods exceed the value of $5,000, Tenant agrees to notify Landlord of the actual value of stored property, and to obtain insurance covering all losses to said property, with Landlord being named as an additional insured. The provisions of this paragraph do not alter the release of Landlord's liability set forth in paragraph 11, nor constitute any admission that Tenant's stored property has any value whatsoever. Flammables, contraband, or materials creating a hazard or nuisance shall not be stored.

5. **ACCESS:** In Landlord's sole discretion, Tenant's access to the premises may be conditioned in any manner deemed reasonably necessary by Landlord to maintain order and protect security on the premises. Such measures may include but are not limited to, limiting hours of operation, requiring verification of Tenant's identity, and requiring Tenant to sign in and out upon entering and leaving the premises. Access will be denied any person who is under the influence to alcohol or narcotics.

6. **PREMISES:** Tenant accepts the space as being in good condition and will pay Landlord for repairs necessary due to negligence or misuse while under Tenant's control. Tenant may not, in any form, alter the inside nor outside of the space.





DRaft_0056






**EXHIBIT A**
**PAGE 31**

9. ASSIGNMENT: Tenant shall not sublet or assign the storage space nor store property owned by others without the written consent of Landlord.

10. INDEMNITY: Tenant will indemnify, hold harmless and defend Landlord from all claims, demands, actions or causes of action, (including attorney's fees, and all costs whatsoever) that are hereafter made or brought about by others as a result or arising out of Tenant's use of the premises, including claims for Landlord's active negligence.



11. RELEASE OF LANDLORD'S LIABILITY: Tenant, for himself and his agents, guests, licensees and invitees releases LANDLORD, Landlord's agents, employees, and assigns from all liability whatsoever arising out of the tenancy hereby created, including liability arising from negligence. This release of liability extends to all property damage or loss, physical injury or death. It is the intent of the Landlord and Tenant that as a result of this release, property is stored and the space is used at Tenant's sole risk. Tenant acknowledges that Landlord has made no warranties regarding security of the space or the facility from theft, fire, water, earthquake, weather, rodents, insects, or other hazards of any kind. Tenant further agrees that this release of liability is a bargained for condition of the rent set forth herein and that were Landlord not released from liability as set forth here a much higher rent would have to be agree upon. By placing his initials here _____D-V-M_____ Tenant acknowledges that he has read, understands, and agrees to this paragraph.

12. INSURANCE: Landlord does not provide insurance covering Tenant's stored property. Tenant acknowledges that insurance is available from independent insurance companies to protect Tenant in the event of theft, damage, or destruction of his stored property. Occupant, at Occupant's expense, shall maintain a policy of fire, extended coverage endorsement, burglary, vandalism and malicious mischief insurance for the actual cash value of stored property. Insurance on Occupant's property is a material condition of this agreement and is for the benefit of both Occupant and Owner. Failure to carry the required insurance is a breach of this agreement and Occupant assumes all risk of loss to stored property that would be covered by such insurance. Occupant expressly agrees that the carrier of such insurance shall not be subrogated to any claim of Occupant against Owner, Owner's agents or employees. Tenant agrees to indemnify and hold harmless Landlord from any expense, costs, or damage, incurred by reason of any claim or action based in whole or in part upon such subrogation, including all attorney's fees incurred by Landlord in connection with such claim or action. By placing his initials here _____D-V-M_____ Tenant acknowledges that he has read, understands, and agrees to this paragraph.

13. SECURITY OF SPACE: Tenant agrees to be solely responsible for providing a lock to secure access to the space. In the event such locks are rendered ineffective for their intended purpose, or the space is rendered insecure in any manner, Landlord may, at its sole discretion, place a safe lock on the space to resecure access to Tenant's space. Landlord is not responsible for taking any measures whatsoever, nor for notifying Tenant that access to the space has become insecure. The fact that Landlord has taken measures to resecure the access to Tenant's space under this paragraph shall not alter the limitations upon Landlord's liability set forth in Paragraph 11 of this agreement, nor shall such measures be deemed a conversion of Tenant's stored property.

14. ELECTRICITY: Tenants are not allowed to use Landlord's electricity for any purpose whatsoever.



15. NOTICE: CHANGE IN TERMS; CHANGE OF ADDRESS: All notices required by law, or by this agreement, may be sent to Occupant at any of the addresses given by Occupant above, by first class mail, postage pre-paid, and shall be deemed given when deposited in the U.S. mail. Occupant agrees that any such notice is conclusively presumed to have been received by Occupant five days after mailing, unless returned to Owner by the Postal Service. Occupant is responsible for notifying Owner in writing of the change of any of the addresses given by Occupant. Owner shall not be presumed to have received notice of any change of address unless given in writing by Occupant, and sent to Owner at Owner's address given above, by first class mail, postage prepaid. Any of the terms of this agreement may be changed by Owner by the giving of written notice by mail, as provided in this paragraph, seven (7) days prior to the expiration of any month of this tenancy.

16. RULES: Tenant agrees to follow all HILLTOP MAIN SELF STORAGE rules and regulations now in effect or that may be put into effect from time to time. Tenant acknowledges receiving a copy of HILLTOP MAIN SELF STORAGE rules and regulations.

17. NO ORAL AGREEMENTS: This rental agreement contains the entire agreement between Landlord and Tenant and no oral agreements shall be of any effect whatsoever. Tenant agrees that he is not relying, and will not rely, upon any oral representation made by Landlord or any of Landlord's agents or employees purporting to modify or add to this agreement in any manner. This rental agreement contains the entire agreement between Owner and Occupant, and no oral agreements shall be of any effect whatsoever. Occupant specifically acknowledges that no representations have been made with respect to safety, security or other special suitability of the space for the storage of Occupant's property, and that Occupant has made his or her own determination of such matters solely from inspection of the storage space and facility. Occupant agrees that he is not relying, and will not rely, upon any oral representation made by Owner, or by any of Owner's agents or employees purporting to modify or add to this agreement in any way whatsoever. Occupant agrees that this agreement may be modified only in writing, signed by both parties, in order for such modification to have any effect whatsoever.

18. ENFORCEABILITY: If any part of this agreement is held to be unenforceable for any reason, in any circumstance, the parties agree that such part shall be enforceable in other circumstances, and that all remaining parts of this agreement will nevertheless be valid and enforceable in all circumstances.



**REMIT ALL PAYMENTS TO:**
**HILLTOP MAIN SELF-STORAGE**
**3755 Main Street**
· **Chula Vista, CA 91911**
**(619) 422-2578**
**www.aspselfstorage.com**

This agreement has been executed on the __27__ day of __May__, __2014__

_____
TENANT

_____
HILLTOP MAIN SELF STORAGE
LANDLORD/AGENT

1 month minimum
No pro-rated refunds

| | |
|---|---|
| 1. 1st Month's Rent | $ |
| 2. Other Rent (If space is rented after 20th of preceding month) | $ 0 |
| 3. Onetime (per space) Administration Fee | $ 15 |
| 4. Refundable Gate Card Deposit # (When card is returned) | $ 0 |
| 5. Refundable Security Deposit (See paragraph 3) | $ 0 |
| 6. Padlock Sale | $ 0 |
| 7. Other | $ 0 |
| **TOTAL MOVE-IN COST TO TENANT** | $ 16 |
| The next month's rent $ 39 | due 6/27/14 |

Hot previous unit on AL60 (April 19, 2013)
Moved out 11/18/13.

Draft_0058

EXHIBIT A
PAGE 32

Fingerpri...

| RT THUMB | RT INDEX | LEFT INDEX | PHOTO COPY OF DRIVER'S LICENSE |

# HillTop Self Storage

3755 Main Street, Chula Vista, CA 91911
(619) 422-2578

## RULES AND REGULATIONS
### LEASE NO. 9542

Tenant agrees to be bound to the terms and conditions of the addendum as well as all terms and conditions of the rental agreement. Tenant understands and agrees that the addendum is incorporated by reference into the tenant's rental agreement. The manager has no authority to change any terms of your agreement, or alter any of the procedures concerning payment of rent, liens or any other part of these rules.

**OFFICE HOURS:**

Monday - Saturday     9:00 AM - 6:00 PM
Sunday               10:00 AM - 4:00 PM

*No Admittance within 15 minutes of closing*
*Office and grounds will be closed on all major holidays*

**GATE HOURS:**

**Monday - Sunday 5:00 AM - 8:45 PM**

All persons are required to secure their personal property & storage units 10 minutes before gate closing times. Anyone who is locked in will be charged a $50.00 fee.

D-V-M
Initial

**STORAGE RENT:**
**WE DO NOT SEND STATEMENTS**

Mail or bring your rent payment to the office. Be sure to put

**CHANGE OF ADDRESS:**

Customer's are required to update any change of address or phone in writing. No changes can be accepted by phone.

**NO SMOKING:**

Smoking is not permitted on the premises. Absolutely **NO ALCOHOL or DRUGS** are allowed on the property.

**TRASH:**

The trash dumpsters are for **normal** use by renters. Please do not place excess amounts of trash, furniture or large items like mattresses in the dumpsters; they must be removed from the facility. Break down boxes. **Do not bring trash from home for disposal** nor dump electronic equipment or computers.

**Engine repair work & oil changes on stored vehicles is not allowed.**

Draft_0059

EXHIBIT A
PAGE 33

## LATE FEES:

Rent is due each month on your entry date. The facility will not accept partial payments. The following late fees are applicable:

When rent is 10 days past due:

$10.00 if your rent is $0 to $60
$15.00 if your rent is $60.01 to $100.00
$20.00 or 15% if your rent is $100.01 or more

In addition to the above late fees, there will be Additional charges:

Add'l $20.00 Pre-Lien fee after 27 days
Add'l $25.00 Notice of Lien fee after 41 days
Add'l $150.00 Auction fee after 60 days



Initial

## ONLY CASH OR MONEY ORDER
## WILL BE ACCEPTED FOR PAYMENT OF PRE-LIEN
## OR LIEN ACCOUNTS.

## MOVING OUT ✦ IMPORTANT

There are no refunds on un-used rent. All rents are paid on a monthly basis in advance. The facility will not accept partial payments. "Past Due" and "Final Move-Out" payments must be made by cash or money order only.

When you move out, please advise the office and complete a vacate form. Sweep out the unit with nothing left behind and be sure to remove your lock. A clean-up fee may be charged for leaving items in a vacated unit.

## LOCKING THE STORAGE UNIT:

Always lock your unit. Only one lock is allowed per unit. As your contract spells out, A Storage Place Self-Storage is not responsible for lost or stolen items. We only provide the space, you must lock and care for your own goods that are under your custody and control.

# ᒪ 'EED LIMIT 5 MPH

## DUE TO TRAFFIC, PLEASE WATCH OUT FOR YOUR CHILDREN AND PETS.

They should be kept from playing in the driveways and empty storage spaces. No animals are allowed to run loose on the premises.

## DO NOT STORE:

Paint, gasoline, petroleum based products, hazardous materials, tires, highly toxic or volatile chemicals in the storage spaces; and DO NOT throw these items in the dumpsters.

REMEMBER, we are not liable for any damage or loss of your goods. We strongly recommend that you obtain your own insurance. For your convenience, included with your rental contract is an insurance application, please use it.

## I UNDERSTAND AND AGREE TO ADHERE TO THE CONTRACT AND THE ADDENDUM, RULES AND REGULATIONS PRESENTED TO ME.

UNIT #: A-2612

_____
Tenant Signature

5/27/14
_____
Date

_____
Facility Agent's Signature

DRAFT_0060

DEPARTAMENTO DE LA HACIENDA
SERVICIO DE ADUANAS DE LOS ESTADOS UNIDOS

CONSENTIMIENTO

Yo, *DOYMA VANESSA MICHEL* , de quien firma
aparece abajo, despues de haber sido informado de mi derecho
constitucional de no tener que permitir un registro de mi
residencia, mas abajo mencionada, sin una orden de cateo y mi
derecho de rechazar mi consentimiento para tal registro, por este
medio autorizo a los agentes especials de la Aduana de Los
Estados Unidos *HOMELAND SECURITY INVESTIGATIONS*
para conducir un cateo completo de mi residencia descrita como
*HILLTOP MAIN SELF STORAGE UNIT #AL012 AT 3755 MAIN STREET,*
*CHULA VISTA, CA. 91911*
Estos agentes especials de la Aduana estan autorizados por mi, de
tomar de mi residencia cualquier carta, papeles, materiales o
otra propiedad que ellos desean.

Este permiso escrito esta dado por mi para los nombrados agentes
especiales, voluntariamente y sin amenazas, coercion, de
cualquier clase, o promesas en forma alguna.

Firma.

Fecha y tiempo: *06/02/14   2155 HOURS*

Agente Especial: *ZACHARY S. BULMAN*

Testigo: *O. TORRES.*

DSAT_0061

EXHIBIT A
PAGE 35



USA_0238

EXHIBIT A
PAGE 36



USA_0239

EXHIBIT A
PAGE 37

# EXHIBIT B

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

DOYMA VANESSA MICHEL, an          )
individual,                       )
                                  )
                                  )
        Plaintiff(s),             )
                                  ) 16-cv-0277-GPC-AGS
                                  )
vs.                               )
                                  )
UNITED STATES OF AMERICA, et      )
al.,                              )
                                  )
                                  )
        Defendant(s).             )
                                  )

VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION OF

EDUARDO GARZA

9:15 A.M.

MARCH 22, 2017

1201 PACIFIC AVENUE, SUITE 700

TACOMA, WASHINGTON

REPORTED BY:  MARY L. GREEN, CCR 2981

A P P E A R A N C E S

FOR THE PLAINTIFF(S):

IREDALE & YOO

BY:  EUGENE G. IREDALE

105 West F Street, 4th Floor

San Diego, CA 92101


FOR THE DEFENDANT USA:


US ATTORNEY'S OFFICE


BY:  STEVE B. CHU


880 Front Street, Room 6293


San Diego, CA 92101


FOR THE DEFENDANT SAFARILAND, LLC:

YUKEVICH CAVANAUGH

LUCAS ROWE

355 S. Grand Avenue, 15th Floor

Los Angeles, CA 90071


ALSO PRESENT:  SHANE DAVIDSON, Videographer (By VC)

Doyma Michel (By VC)

Lauren Freidenberg (By VC)

EXHIBIT B
PAGE 40

I N D E X

WITNESS:   EDUARDO GARZA

EXAMINATION:                                              PAGE(S)

MR.  IREDALE                                                  4

MR.  ROWE                                                   39

MR  IREDALE                                                 52

EXHIBITS FOR IDENTIFICATION                            PAGE

                  NO EXHIBITS MARKED

EXHIBIT B
PAGE 41

TACOMA, WASHINGTON; WEDNESDAY, MARCH 22, 2017

9:15 A.M.

EDUARDO GARZA,

sworn as a witness by the Certified Court Reporter,

testified as follows:

EXAMINATION

BY MR. IREDALE:

Q.  May I ask your full name, sir.

A.  Eduardo Garza.

Q.  And, Mr. Garza, I understand that you're located now in Tacoma, Washington?

A.  Today I am.

Q.  And generally where are you living?  In Washington state?

A.  Vancouver, Canada.

Q.  I see.  And that is in the area of the world where it rains and is not beautiful and sunny the way it always is here in San Diego, right?

A.  It's still pretty nice.

Q.  Very good.  May I ask you have you ever testified in court?

A.  Yes.

Page 4

Q. And you'll be able to give us your best testimony today?

A. Yes.

Q. In other words, you're not physically ill in any way?

A. I'm ready.

Q. You look to be a very intelligent, oriented person, so let's begin. Could you tell me what your current position is?

A. I'm a US Customs and border protection officer and preclearance in Vancouver, BC.

Q. How long have you worked for the customs and border protection?

A. About 11 and a half years.

Q. And during that time, have you always worked as a customs and border protection officer?

A. Yes.

Q. And have you always worked at a port of entry of one kind or another?

A. Yes.

6:21-9:18

Q. I need to discuss with you some of the training that you may have had in the course of your work. You told me you were working -- you have worked for about 11 and a half years with CBP.

A. Yes.

Page 6

EXHIBIT B
PAGE 43

7:1-9:18

Q.   Can you tell me after you were hired whether you attended a law enforcement academy to learn the details of your job?

A.   Yes.

Q.   Where was that?

A.   In FLETC, Federal Law Enforcement Training Center, in, I believe, Glynco, Georgia.

Q.   Yes.  They have the lovely smell of paper mills all throughout that area.

A.   Yes, sir, they do.

Q.   How long was the academy which you attended?

A.   Approximately five months.

Q.   Very good.

MR. IREDALE:  I'm going to ask if we could suspend for just one moment so that my associate and Doyma Michel can enter.  Could you come across, please?

(Ms. Freidenberg and Ms. Michel entered the room.)

Q.   (BY MR IREDALE) Let's resume if we could.  I believe you -- what was the length that you told me was the school?

A.   Approximately five months.

Q.   Can you tell me:  During that time among the topics you studied, did you study the issue of using

Page 7

EXHIBIT B
PAGE 44

field tests for testing controlled substances?

A.   Yes.

Q.   Can you tell me what you recall learning in the academy concerning the use of field tests?

A.   There are several different types of field test kits depending on what the substance is.  Pretty much there's a methamphetamine kit, a marijuana test kit, cocaine test kit.  There's several others using different methods.  The ones that we use at the port are the ones that we were taught in FLETC on how to use them.

Q.   I'm sorry.  I violated my own rule.  Forgive me.  Would you tell me what you said before I stepped over you?

A.   Other than the ones that we use -- that we were trained in FLETC are the ones that we pretty much use at the port.

Q.   At FLETC, the Federal Law Enforcement Training Center, did you actually do the field tests?

A.   Yes.

Q.   And could you describe to me whether you did a field test for something that was suspected methamphetamine?

A.   I do not remember.

Q.   Can you tell me:  Were you taught anything

Page 8

about the difference between field tests for testing liquids and for testing solids or powders?

A. No.

Q. Do you remember anything else that you learned concerning the use of field tests at FLETC?

A. Other than using gloves and being cautious on what you're touching, that would be it.

Q. Yes. What were you taught was the information that the properly administered field test could provide to you as a CBP officer?

A. Depending on the results of the test?

Q. Yes.

A. It would show me if it was a narcotic or not.

Q. In other words, you were taught that if the test was positive -- that is to say, if the proper color change occurred -- that it was a controlled substance?

A. Correct.

Q. Now, let me if I could ask you after FLETC, what was the next thing you did with CBP?

A. My work down on Lambord in San Ysidro port of entry.

Q. And how long did you work at the port of entry at San Ysidro?

A. Since February 2006. I conducted a --

Page 9

EXHIBIT B

PAGE 46

Q. Until what time?

A. Until -- it was October 2016.

Q. So over ten years?

A. Yes.

Q. And then for some reason you decided that you wanted to go to Canada?

A. Yes, sir, I did.

Q. And to go where it's cold and people speak English with strange accents?

A. Yes.

MR. CHU: That's argumentative. Go ahead.

Q. (BY MR IREDALE) Forgive me. Counsel said it was argumentative, and although it was not intended as anything but a stupid joke, he's correct. I move to strike it.

Now, during the ten years that you were working as a CBP at the port of entry in San Ysidro, did you receive any additional training in the use of field tests for controlled substances?

A. We did on-the-job training, and it was pretty much what they taught us in FLETC.

Q. And when you say on-the-job training, does that mean that during the course of your work you would actually use the test kits to test what you suspected

Page 10

EXHIBIT B
PAGE 47

might be a controlled substance?

A.    Correct.

Q.    Did you ever go to another class or seminar concerning the use of field tests?

A.    No.

Q.    Or how to administer the field tests?

A.    We had briefings on how to test liquid meth.

Q.    And can you tell me:  When you say briefings, tell me what you mean by that.

A.    Pretty much we had a period of time where we were encountering a lot of liquid meth coming through the ports, and since it's very hazardous, they made sure that we all were briefed on wearing gloves and how to test the substance with the test kits that we had at the port.

Q.    And I appreciate your answer, but let me ask you how that information was conveyed to you.  Was it conveyed through a memo, through a computer bulletin that you may have seen on your computer, or through a meeting at which there was an instructor who discussed the issues that you mentioned?

A.    It was through email and a briefing, like a shift briefing by a supervisor.

Q.    So is it true that at the beginning of every shift there is generally a briefing of some kind?

Page 11

A.   Only if there's something to disseminate.

Q.   Can you tell me on average in the year 2016 how frequently there would be a briefing?

A.   I couldn't tell you that.

Q.   In other words, could you give me an estimate? Once a month?  Three times a week?

A.   Two or three times a week.

Q.   And so on one occasion at least you had a briefing in which a supervisor discussed with you the testing of liquid methamphetamine; is that fair?

A.   Yes.

Q.   Could you tell me what you remember that supervisor saying to you during that briefing?

A.   Once we encounter something that we may suspect as liquid meth amphetamines, we would get a piece of paper, dip it in the substance, and then place it inside the field test kit.

Q.   Anything else that you recall that the supervisor told to you during that briefing?

A.   Just to be careful because it's a very hazardous material and you don't want to get it on your skin and it's a danger to all the officers since we might accidentally put our hand in it, so just use precaution.

Q.   And when you say you were told that it was a

Page 12

EXHIBIT B

PAGE 49

and then I got on the team, and I was on the team at that time by approximately eight years.

Q. Okay. So you were on the team for eight years. When you say a regular officer, what does that mean? Standing in the booth?

A. Line officer at the booth, yes.

Q. Just out of curiosity, what is the series for a CBP officer? You're on the GS scale, right?

A. GS 12.

Q. But like a criminal investigator is an 1811.

A. I think it's 18 -- I'm not familiar with the number.

Q. 1802. Maybe that's it. And you went to FLETC for approximately --

MR IREDALE: He's trying to tell you he used to work for the government.

MR. ROWE: I did.

Q. (BY MR. ROWE) When you were at FLETC for five months, how much time did you actually spend if you recall on the field drug test training?

A. I want -- I don't remember the time, but approximately like two to three days.

Q. So two to three eight-hour days were spent on field drug testing training?

A. I don't think it was 8-hour days. I believe

*40:18- 41:19*

Page 40

EXHIBIT B
PAGE 50

it was like a 4-hour maybe.  I don't really recall.
It's been a long time.

Q.  So you would have a block of instruction as part of your training, you know, and part of the block of instruction that day may have included training on the field drug test kits?

A.  That's correct.

Q.  And you think those blocks of training lasted over two or three days?

A.  I don't recall.

Q.  I'm not going to hold you to a specific amount of time.  I'm just curious.

A.  Yeah.

Q.  And was that training conducted by a FLETC staff member, a CBP officer who was assigned to FLETC, or an employee of Safariland?

A.  I don't remember who, but I believe it might have been a staff member, maybe a Safariland.  I don't recall.

Q.  You don't know or --

A.  I just don't know.

Q.  Okay.  When you were at San Ysidro for those ten years, can you give me an estimate of how many vehicles you directed to secondary?

A.  There was too many to count.

Page 41

EXHIBIT B

PAGE 51

want to make sure it's clear.  Did you take it from the
substance directly into the pouch or did you allow it
to dry for a few minutes?

A.  Directly from the substance to the pouch.

Q.  And, again, he asked you, but I want you to
think about it for a moment.  Do you recall the amount
of time between you crushing the ampules and the color
change happening?  I mean, are we talking almost an
instant or are we talking two minutes?  Can you give me
a more specific breakdown?

A.  Probably instantly.  I think it happened
fairly quickly.

Q.  An instant?

A.  Fair quickly.

Q.  Have you used those NarcoPouches on many
occasions?

A.  Yes.

45:18-23

Q.  Can you estimate for me how many times you've
used them?

A.  On that particular one, over a hundred times.

Q.  When you say that particular one, what do you
mean?  That particular test?

A.  The meth test kit.

Q.  And those hundred plus times on the meth test
kit, what percentage of those tests would you think

EXHIBIT B
PAGE 52

were liquid meth tests as opposed to crystal or some other form?

A. I tested liquid meth about six times, and I believe three times it tested positive.

Q. So in other words, you suspected liquid meth six times, but three times the test indicated that there was a presence of methamphetamine?

A. That's correct.

46:9-47:14
46:9-15

Q. As part of the training you received at FLETC on these test kits or in the briefings you received or the emails or any supplemental training you might have gotten, was it ever impressed upon you that the field test kit itself is not probable cause to arrest but that you need additional evidence?

A. Sure. That's why I did not arrest her.

Q. That's why you did not arrest her?

A. I didn't arrest her. I detained her.    46:18-47:7

Q. Okay. At what point between the detention and the arrest -- at what point after the detention did the arrest occur?

A. I'm not familiar when the agent decided to prosecute. I was out trying to look for some other contraband.    46:24-47:7

Q. So I just want to make sure I understand the process, then. So you detained her after you did your

Page 46

EXHIBIT B
PAGE 53

initial test, and then she was passed off to the security office, and then another agent actually quote-unquote arrested her?

A.   Another agent takes over, and he's a seizing officer, and then he contacts an agent, an ICE agent or an HSI agent, and they decide they're going to prosecute or not.

46:18-47:7

Q.   So the point at which you placed her in handcuffs and took her to the security office, you didn't consider that an arrest?

A.   No.  I detained her.

Q.   When you detained her, did you read her her Miranda rights?

A.   No, because I did not arrest her.     46:9-47:14

Q.   That's the right answer.  I was just curious.

And the purpose for detaining her was because of the test result?

A.   That's correct.

Q.   Or was it the combination of the test result and other factors?

A.   It was the test result.

Q.   And did you talk to the agent who actually executed the arrest at any point after -- at any point after her arrest as to why he decided to make the arrest as opposed to releasing her after being

Page 47

EXHIBIT B
PAGE 54

49:1-21
49:1-11

Q. Had you ever been trained that the NarcoPouches they might use to test for narcotics are not definitive; that in other words, they need to be tested a second time by an actual lab to determine whether it's an actual narcotic?

A. I know that all the narcotics are sent to a lab. I don't know -- I'm not familiar with what they do with it, but I do recall that they have to retest everything at the lab.

Q. Do you know why that would be?

A. To make sure it's positive. I don't know.

Q. If you know. If you don't know, that's fine. And is that something that you would be in charge of? You know, if you seized a vehicle or if you were the officer who places -- detains someone, would you be responsible for then moving that elicit substance or suspected substance for testing to some other lab?

49:12-21

A. That substance is going to be boxed up and put -- held as evidence, and then it will be taken to the vault, and from there I don't know who takes over it, you know, or what agency takes over.

49:12-21

Q. And then it becomes -- sorry. I didn't mean to overtalk you there. So in an instance where, you know, the cuajo in this case was boxed up and put in evidence vault, if the agent eventually decides to

49:1-21

Page 49

MR. IREDALE: Same. I join. But, sir, you may answer the question.

A. I wouldn't know. I don't make those decisions.

Q. (BY MR. ROWE) Is it unlawful for someone to bring those type of substances into the United States without declaring them?

A. Are you talking about alcohol or...

Q. In this case, it was tequila and cuajo.

A. I believe the cuajo it is illegal to bring it in. It's an agriculture issue.

Q. Do you need probable cause to search a vehicle at the port of entry?

A. No.

Q. Do you need reasonable suspicion?

A. Yeah. I believe so.

51:17-24

Q. My understanding is that the additional bottles of cuajo were tested in the field as well. You did not conduct those tests; is that right?

A. That's correct.

Q. Do you know who did conduct those tests?

A. It was a seizing officer.

Q. I'm sorry. You said a seasoned officer?

A. Seizing.

MR. CHU: Seizing.

Page 51

EXHIBIT B
PAGE 56

A.  Seizing.

MR IREDALE:  Forgive me.

Q.  (BY MR. ROWE) And that's a CBP officer?  Would that be a DEA lab tech or do you know?

A.  CBP officer.

Q.  I think that's all the questions I have as well.

MR IREDALE:  Mr. Chu?

MR. CHU:  Nothing.

MR IREDALE:  May I just ask a couple more questions to clarify?

FURTHER EXAMINATION

BY MR IREDALE:

Q.  Officer Garza, in your now 11 and a half years as a CBP officer, have you ever participated in an arrest of somebody for bringing in five bottles of tequila into the United States?

A.  No.

Q.  And in your 11 and a half years as a CBP officer, have you ever arrested anyone for bringing in cuajo?

A.  No.

Q.  There is just one final thing I need to go over if I might.  Your testimony will be written up by the court reporter, who is there today taking down what

EXHIBIT B

PAGE 57

we have said, and we will have it sent to you for your

review and ask you if you would sign it at the end

under the pains and penalties of perjury.

You have the right to make any corrections.

If, for instance, a word is not properly reflected or

something is put down that's not accurate, you have the

right to change that before you sign it.  If it's a

matter that's very important, it could be made a

subject of comment at any trial in the case, but you

have the right to make sure that it's accurate before

you sign it.  Would you be willing to do that for us?

A.  Yes.

Q.  And if you were given 30 days from the time

you receive it, would you be able to get it back to the

US attorney's office here in San Diego?

A.  Via email or...

Q.  I will spring for a prepaid envelope that you

can slip it in and put it in the mail.

A.  Okay.

Q.  Thank you so very much.  I will let you get

back to the dreary confines of the northwest, although

I have to tell you I've been teasing a little, because

it's raining outside and it's very ugly here today, so

I'm sure you have bright sun, and I wish you the very

best.  Thank you so much.

Page 53

EXHIBIT B

PAGE 58

A.   Thank you.

MR. CHU:   Thank you, Officer.

MR IREDALE:   This deposition is now closed.

(Deposition concluded at 10:26 a.m.)

(Signature was reserved.)

Page 54

I, EDUARDO GARZA, do hereby declare under penalty of perjury under the laws of the State of California that I have read the foregoing transcript; that I have made such corrections as noted herein, in ink, initialed by me, or attached hereto; that my testimony as contained herein, as corrected, is true and correct.

Executed this _____ day of _____,

_____, at _____,_____.

_____

EDUARDO GARZA

Page 55

56

REPORTER'S CERTIFICATE

I, MARY L. GREEN, CCR No. 2981, a Certified Court Reporter of the State of Washington, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

Dated:  This 31st day of March, 2017, at Seattle, Washington.

MARY L. GREEN
Washington State Certified Court Reporter, #2981
mgreen@yomreporting.com

EXHIBIT B
PAGE 61

EXHIBIT C

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOYMA VANESSA MICHEL, an individual, | ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) Case No. 16CV0277-GBC-RBB ) |
| UNITED STATES OF AMERICA, B. GIBBONS, an individual, E. GARZA, an individual, SAFARILAND, LLC, a Delaware limited liability company, AND DOES 1 THROUGH 100, inclusive, | ) ) ) ) ) ) |
| Defendants. | ) ) |

VIDEOTAPED DEPOSITION OF BRANDON MICHAEL GIBBONS

San Diego, California

March 22, 2017

Reported by Gina Marie De Luca, CSR No. 6973, RMR, CRR

EXHIBIT C

PAGE 63

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

_____

DOYMA VANESSA MICHEL, an              )
individual,                           )
                                      )
                                      )
            Plaintiff,                )
                                      )
vs.                                   )  Case No. 16CV0277-GBC-RBB
                                      )
UNITED STATES OF AMERICA, B.          )
GIBBONS, an individual, E. GARZA,     )
an individual, SAFARILAND, LLC, a     )
Delaware limited liability            )
company, AND DOES 1 THROUGH 100,      )
inclusive,                            )
                                      )
            Defendants.               )
                                      )
_____)

VIDEOTAPED DEPOSITION OF BRANDON MICHAEL GIBBONS, commencing at the hour of 10:46 a.m., on Wednesday, March 22, 2017, at 880 Front Street, Fourth Floor, San Diego, California, before Gina Marie De Luca, Certified Shorthand Reporter in and for the State of California.

Page 2

EXHIBIT C

PAGE 64

APPEARANCES:

For Plaintiff:

IREDALE AND YOO, APC
BY:  EUGENE G. IREDALE, ESQ.
        - and -
BY:  LAUREN I. FREIDENBERG, ESQ.
105 West F Street, Fourth Floor
San Diego, California 92101-6036
619.233.1525
619.233.3221 Fax

For United States Customs and Border Protection:

OFFICE OF THE U.S. ATTORNEY
BY:  STEVE B. CHU
        ASSISTANT U.S. ATTORNEY
880 Front Street, Room 6293
San Diego, California 92101-8893
619.546.7167
619.546.7751 Fax
steve.chu@usdoj.gov

For Safariland, LLC:

YUKEVICH | CAVANAUGH
BY:  LUCAS E. ROWE, ESQ.
355 South Grand Avenue, 15th Floor
Los Angeles, California 90071
213.362.7777
213.362.7788 Fax
lrowe@yukelaw.com

Also present:   Shayne Davidson, Videographer
                Doyma Michel

INDEX

WITNESS:  BRANDON MICHAEL GIBBONS

EXAMINATION                                           PAGE

By Mr. Iredale                                          6

By Mr. Rowe                                            36

By Mr. Iredale                                         41


                          EXHIBITS

MARKED FOR IDENTIFICATION                             PAGE

Exhibit 1    Color laser photograph of bottles        24
             and test kits


Exhibit 2    Simplified Testing Procedure for the     27
             Major Drugs of Abuse

Exhibit 3    Color laser photograph of test kit       41
             923; and Department of Homeland
             Security, United States Customs and
             Border Protection, Incident Report,
             Bates USA_0239 and USA_0460

Page  4

Imagine Reporting 619.888.0297

EXHIBIT C
PAGE 66

THE VIDEOGRAPHER:  This is the beginning of Disk 1 of the deposition of Officer Gibbons.  The case caption is Michel vs. United States of America, et al.

My name is Shayne Davidson.  The court reporter today is Gina De Luca.  Today's date is March 22nd, 2017, and it is now 10:45 a.m.

Please be aware that the video and audio recording will take place at all times throughout this deposition unless all counsel agree to go off the record.

Would counsel please introduce yourselves and state who you represent.

MR. IREDALE:  Yes.  Gene Iredale, and I am here with Lauren Freidenberg on behalf of the plaintiff, Doyma Michel.

MR. ROWE:  Lucas Rowe on behalf of the defendant, Safariland, LLC.

MR. CHU:  AUSA Steve Chu, on behalf of United States.

THE VIDEOGRAPHER:  And at this time would the court reporter please swear in the deponent.

///

///

///

///

Page 5

EXHIBIT C

PAGE 67

BRANDON MICHAEL GIBBONS,

having been first duly sworn, testified as follows:

-oOo-

EXAMINATION

BY MR. IREDALE:

Q.    Good morning, sir.

A.    Good morning.

Q.    May I ask your full name, please.

A.    Brandon Michael Gibbons.

Q.    And you work now for the Customs and Border Protection?

A.    Correct.

Q.    And how long have you done that work?

A.    Since 2012.

Q.    Have you ever testified in court?

A.    Yes.

Q.    Can I ask about how many times?

A.    Roughly around ten.

Q.    And have you ever testified at a proceeding called a deposition?

A.    No.

Q.    You understand that the proceeding today is called a deposition?

A.    Yes.

Q.    And that it has to do with a civil case?

Imagine Reporting 619.888.0297

EXHIBIT C
PAGE 68

A.    Yes.

Q.    Your testimony is under oath.

A.    Yes.

Q.    And that counsel will be asking you questions concerning a particular incident in which you were a witness.

A.    Yes.

Q.    In the course of our discussions, I will be asking you questions, and I will want to make a request, if I could, that you make sure that I've completed the question before you give your answer.

A.    Okay.

Q.    And for my part, I will try my very best to make sure that I do not interrupt your answer with another question before it's complete.

A.    Okay.

Q.    Did you do anything to prepare for the deposition today other than speak with the Assistant U.S. Attorney?

A.    No.

Q.    Did you have a chance to review the report that you wrote back in the year 2014?

A.    Yes.

Q.    Did it refresh your recollection of the events that had occurred that day?

Imagine Reporting 619.888.0297

EXHIBIT C

PAGE 69

Q.    How long did you do that kind of work?

A.    About three years.

Q.    And then what did you do?

A.    I started this job.

Q.    And you began work, you told me, in 2012 for CBP?

A.    Yes.

Q.    And as part of that, did you go to the Federal Law Enforcement Training Center?

A.    Correct.

Q.    And was that in New Mexico, or was it in Glynco, Georgia?

A.    Glynco, Georgia.

Q.    The course of study that you took there before you began actual work as a CBP officer lasted how long?

A.    With Spanish?

Q.    Yes.

A.    About six months.

Q.    How long was the Spanish component?

A.    About six weeks.

Q.    And you took and passed the Spanish component of the training?

A.    Yes.

Q.    When did you actually enter on duty as a customs and Border Patrol officer?

*9:8-20*

*9:8-23*

Page 9

EXHIBIT C
PAGE 70

A.    You mean when I swore in?

Q.    Yes.

A.    July of 2012.

Q.    And could you tell me since that time where have you worked?

A.    San Ysidro, Otay, and Tecate.

Q.    Where are you currently working?

A.    Tecate.

Q.    And can you tell me what your current job is there at the Tecate Port of Entry?

A.    A Customs and Border Protection officer.

Q.    And in the year 2014, in June, you were working at the San Ysidro Port of Entry?

A.    Correct.

Q.    And can you tell me, if you recall, what job you were doing on the day of the 2nd of June.

A.    I was working in the secondary lot.

Q.    Tell me what the duty and responsibility that you had that day involved when you were working in the secondary lot.

A.    Inspecting cars and people that are sent to secondary inspection.

Q.    Now, let me ask, if I could, did you receive training at the Federal Law Enforcement Training Center in the use of what are called presumptive or field

10:23- 12:17

Page 10

EXHIBIT C
PAGE 71

tests?

A.   Yes.

Q.   And can you tell me what that training involved.

A.   How to use them properly and what to test for, how to test it out for different narcotics.

Q.   How long did the training component with respect to how to do the test and what it's used for last, best as you recall?

A.   Three to four days.

Q.   Can you tell me what you studied during that time, as best as you remember?

A.   We use all different types of kits with different types of drugs on how to -- what to look for and how they're -- what they're supposed to look like after you're done with them.

Q.   And so you were trained that the drug test kits involve the use of a reagent that will give a result that can have a change in the color of the liquid of the reagent if there's a controlled substance present?

A.   Yes.                                    11:22 - 12:1

Q.   Were you taught anything else regarding the meaning of those tests?

A.   That they're only field tests.  It's not 100 percent accurate.  It still has to go through DEA

Page 11

EXHIBIT C
PAGE 72

lab.

Q.    And in that regard, can you tell me what the DEA lab was to do, if you were instructed in that.

A.    I don't know.  I --

Q.    All right.  You said that you were taught at least that the tests were not 100 percent accurate.

A.    Yes.  It's a field test only.

Q.    Very good.

Now, let me, if I could, ask you, Do you have a copy of your report in front of you?

A.    No.

Q.    Let me, if I could, give you a copy of that report in case you need to refer to it from time to time just for the purpose of refreshing your recollection.

A.    Okay.

Q.    At about 4:20, you were assigned to complete an inspection of an Audi car that had a California plate 4UA -- -BZ197?

A.    Yes.

Q.    You discovered inside the car five bottles of alcohol and three bottles of a yellowish substance in a plastic container?

A.    I -- four plastic bottles.

Q.    Yes.  One plastic bottle had already been seized, as I understand it.

Page 12

EXHIBIT C
PAGE 73

A.    Yes.

Q.    And so there were three additional plastic bottles taken --

A.    Yes.

Q.    -- from the car.

Am I right in that?

A.    Correct.

Q.    And can you tell me -- did you have any discussion or interaction with CBPO Garza that you recall?

A.    I just recall him saying that he already tested it.  And that was pretty much it.  And she was already away.  She was already detained.

Q.    She was already detained?

A.    (Nods head.)

Q.    Now, she was in the security office --

A.    Correct.

Q.    -- at the time you spoke with Officer Garza?

A.    Correct.

Q.    Did you yourself have any interaction with Ms. Michel?

A.    Only when I arrested her.

Q.    Now, you then field tested four of the plastic bottles which had a thick, yellowish substance; is that true?

13:20-22
13:20-14:1

13:23-14:1

Page 13

EXHIBIT C
PAGE 74

A.    Yes.

13:23-14:1

Q.    Can you tell me -- you used the test kit 923?

13:20-14:1

A.    Yes.

Q.    Let me show you, if I could, a test kit that I have.

Does that appear to be similar to the test kit box from which you took out the reagents?

A.    Yes.

14:9-18

Q.    And can you tell me -- was there a pamphlet or set of instructions inside the box with the reagents that you recall?

A.    I don't recall.

14:13-24

Q.    Were there any instructions that you followed, either written on the box or inside the box, to do the test?

A.    Just what I got taught at FLETC.

Q.    Just what you were taught at FLETC?

A.    Yes.

Q.    Tell me, then, what you were taught at FLETC about how to perform the test kit procedures.

A.    You put some of the substance into a test kit. You close it up.  You pop one vial.  You shake it around, pop another vial, shake it, pop the third one, shake it, and it should be the same color at the end.

Q.    And may I ask you, in that regard, you were

Page 14

EXHIBIT C
PAGE 75

A.    Was on a piece of paper.

Q.    Was on a piece of paper.  Okay.

And both of those were positive?

A.    Yes.

Q.    And when you say positive, they turned a color?

A.    Yes.

Q.    Can you tell me -- did they turn that color within a matter of 10 or 20 seconds after the breaking of the third vial, if you recall?

A.    I don't recall.

Q.    Can you recall what color the --

A.    Dark blue.

Q.    Dark blue?

Now, do you remember seeing on the box that you used that day something that said "Warning:  These tests are not designed to test liquids except for #926 (GHB)"?

A.    No.

Q.    Do you know if that was written on the box that you had that day?

A.    I don't recall.  We have tons of boxes.

Q.    Fair enough.  I don't quarrel with that at all. I just need to ask the question.

A.    Um-hmm.

Q.    I hope you'll forgive me if 2 1/2 years after the event I am asking you questions that may seem unduly

18:14-20

Page 18

EXHIBIT C
PAGE 76

seal the pouch --

A.    Um-hmm.

Q.    -- break the bottles in sequence --

A.    Yes.

Q.    -- and wait and see what the color change showed you?

A.    Yes.

Q.    And with respect to whether there was one of the tests done with the paper or more than one of the tests done with the paper, with respect to the paper, you always did it the same way.  You would take a dropper, drop one or two or three drops on the paper, put it aside for a few seconds, pick it up, put it in the pouch --

A.    Yes.

Q.    -- and then do the test as we've described?

A.    Yes.

Q.    Now, after you did the tests --

Okay.  Let's just take a moment.  We can go off the record for a moment.

(Discussion held off the record.)

MR. IREDALE:  All right.  Then we're back on the record, and we're all set.

BY MR. IREDALE:

Q.    After you did the tests on each of the four

20:25-21:6

20:25-21:5

Page 20

EXHIBIT C
PAGE 77

bottles, whether it was simply a test involving the liquid, a test involving only the paper, or, for one or more bottles, a test involving both of them, after you completed them, did you have results that showed a positive result for each of the four bottles?

A.   Yes.

Q.   And at that point, did you place Doyma Michel under arrest?

A.   Yes.

Q.   And could you tell me how long after you were first brought in and asked to handle the matter at about 4:20 you actually placed her under arrest, if you can give me an estimate?

A.   I have no clue how long.

Q.   Fair enough.

Can you tell me how long after you finished your testing of the bottles you placed her under arrest?

A.   Usually right when I get one positive, I usually place the defendant right under arrest right away.

Q.   Okay.  So it's the positive test that led you to place her under arrest?

A.   That -- yes.

Q.   And so can you tell me exactly the process of that?  That is to say, what did you do?  What did you

Page 21

EXHIBIT C
PAGE 78

22:1-8

say?  And what did she do and say, if anything?

A.    Nothing.  I just took pictures.  I told her she's being arrested for bringing narcotics into the U.S.  Any questions she has -- there will be an ICE agent there to speak with her shortly.

Q.    Did you thereafter arrange to have ICE notified so they could send an agent?

A.    Yes.

Q.    And that's typical?  That is to say, if there is a seizure at the port of entry, generally ICE or DEA --

A.    Yeah.  Any other --

Q.    -- gets called over?

A.    Yes.

Q.    To do the interrogation?

A.    Correct.

Q.    And to follow up on any additional materials?

A.    Correct.

Q.    Now, the items that were seized, including the items in the bottles that were tested, the car itself, documents, a total of seven bottles of liquor, three cell phones, and some U.S. currency, were then seized?

A.    Yes.

Q.    And then you provided a seizure number for those items that were seized, I believe?

Page 22

A.    Yes.

Q.    And could you tell me what that seizure number was?  I believe it's in your report.

A.    Yeah.  It's pretty much 201425040016804 [sic] through 007.  So each one has their own.

Q.    May I talk with you just for a moment about the matter of the seizure of items, the maintenance of them, and chain of custody?

A.    Sure.

*23:10-23*

Q.    You had some training in that regard, regarding the correct manner in which to seize things and to keep a chain of custody so there is a clear record of where the item is going, who has access to it, and how it is disposed of?

A.    I don't have everything.  I mean, I -- once I sign it off, it's no longer in my chain of custody.

Q.    Oh, I understand, but you're taught at least the requisites for what you need to do to properly seize --

A.    Yes.

Q.    -- and process the matter before you turn it over?

A.    Yes.

Q.    Tell me what your procedure, your practice is in that regard.

Page 23

EXHIBIT C
PAGE 80

BY MR. IREDALE:

Q.   Did you read the instructions before using the test kit?

A.   No.

Q.   Are there instructions that are in the test kit itself in the form of a page or two pages?

A.   There should be.  I don't -- I don't recall, though, if there were or not that day.

Q.   You say there should be.

Typically are there?

A.   Yes.

Q.   Let me mark this next document as Exhibit 2 and ask if I could show it to you.

(Exhibit 2 marked)

BY MR. IREDALE:

Q.   And let me ask if I can refer you, on the first page of that, to the procedure that's on the lower left quadrant of the document underneath the word "NarcoPouch" where it says "Procedure."

Do you see that?

A.   Um-hmm.

Q.   It lays out a procedure.  It says "1, Remove clip.  2, Use correct amount of sample.  3, Insert sample - replace clip.  4, Tap on hard surface to drive sample to bottom.  5, Break ampoules at liquid level.

27:2-8

Imagine Reporting 619.888.0297

EXHIBIT C
PAGE 81

A.    No.

Q.    Or iodized salt?

A.    No.

Q.    Did you know that from time to time secondary amines are used as a cleaning agent in water that is run out of taps?

MR. CHU:  Assumes facts not in evidence.

Go ahead.  You can answer.

THE WITNESS:  No.

BY MR. IREDALE:

Q.    Did you determine whether sodium propionate would result in a positive chemical --

A.    No.

Q.    -- test?

Or sodium benzoate?

A.    No.

Q.    So is it fair to say that the decision to arrest Doyma Michel was based on the results of the field test that you did?

A.    Yes.

Q.    And had the field test turned out a different way, she would not have been arrested that day?

MR. CHU:  May call for speculation.

MR. IREDALE:  That's fair.  I'll --

MR. CHU:  You can answer.

35:21-36:4

Page 35

EXHIBIT C
PAGE 82

MR. IREDALE:  I'll withdraw that question.

MR. CHU:  You can answer.

I'll let him answer subject to the objection.

THE WITNESS:  Not necessarily.

BY MR. IREDALE:

Q.  Did you have a thermal image done of the vehicle, if you recall?

A.  I don't recall.

MR. IREDALE:  Okay.  Thank you so much.  That is all I have.  And I appreciate your coming in.

MR. CHU:  Counsel for Safariland will ask you some questions now.

THE WITNESS:  Okay.

MR. IREDALE:  All right.

MR. CHU:  Do you want to move over here?

MR. ROWE:  Sure.

MR. CHU:  If that's all right with Eugene.

MR. IREDALE:  Yes.  Logistically that's the only way to do it.

                      -oOo-

                  EXAMINATION

BY MR. ROWE:

Q.  Officer Gibbons.

A.  Sir.

Q.  Again, I'm Luke Rowe.  I represent Safariland

Imagine Reporting 619.888.0297

EXHIBIT C
PAGE 83

in this case.  Just a few questions.  Actually, Mr. Iredale hit on a lot of things I would have asked on my own but --

You've been with CBP since 2012, you said?

A.   Correct.

Q.   On how many occasions do you think you've used one of these NarcoPouches?  The 923 or the 902.   37:7-38:3

A.   Since -- when -- when this happened or after? Total?

Q.   Well, let's say -- let's break it up.

A.   All right.

Q.   From the time you joined in 2012 up until the incident in June 2014.

A.   20, 30 times maybe.

Q.   Okay.  And what about since?

A.   30, 40 times maybe.

Q.   Okay.  So 2012 until the present, somewhere between 40 and 60 times, you would say?

A.   Yeah.

Q.   And of those 40 to 60 times -- just to be clear, are those 40 to 60 times using any type of NarcoPouch or one specifically for methamphetamines?

A.   Any type, I guess, NarcoPak [sic].  I don't know exactly -- I mean, I've done a lot, maybe, of just methamphetamine.

Page 37

EXHIBIT C
PAGE 84

Q.    Okay.

A.    Maybe 20, 30 times, maybe, of just methamphetamine.

Q.    Okay.  So somewhere around half of the uses of the NarcoPouch has been for a meth test?

A.    Yes.

Q.    And has there ever been an occasion where you've used one of the pouches and you find out after the fact that -- you know, and it -- back up.

You used a pouch, tested a substance, presents a positive result for the presence of methamphetamines. You conduct an arrest, and then at some point after the fact you're informed that the substance was, in fact, not methamphetamines?

A.    No.

Q.    Has that ever occurred?

A.    No.

Q.    And I don't remember if Mr. Iredale asked or not, but are you responsible for sending the substance you tested to a DEA lab for further testing, or is that someone else's?

A.    That's somebody else's.

Q.    Do you know who that is?

A.    I don't know.  Because after -- chain of custody is supervisor next.  I don't know where it goes

next to me looking, but I don't -- he didn't test any.

Q. Do you know if anyone from the DEA came out to take custody of the substances?

A. I -- I don't know.

Q. If you know.

A. No. It was placed in the vault, and that's the *40:8-18* last that I know of. *40:8-16*

Q. You stated earlier that when you were at FLETC, you were instructed that the tests are -- I forget the phrase you used, but presumptive only. It wasn't conclusive that this was actually methamphetamines, but it was presumptive.

A. Yes.

Q. So further testing would be required to confirm that the substance is methamphetamines; is that right?

A. Correct.

Q. I'm sorry.

A. Correct.

MR. ROWE: Actually, I think that's all I'll ask. Good.

MR. IREDALE: Okay. Mr. Chu?

MR. CHU: I have nothing further.

MR. IREDALE: I just have a few follow-up questions, if I might, and then I think we'll be able to break early before lunch. Thank you.

EXHIBIT C
PAGE 86

don't know exactly.  It's been so long.

Q.    Fair enough.

Do you remember that at some point there was a directive that was sent out saying that the officer should not have any person eat or drink a suspected controlled substance?

A.    I don't recall.

Q.    May I ask if, at any point, there was any discussion, either formal or informal, between you and other members of CBP at the Port of Entry regarding the idea that if liquid meth was put onto a piece of metal, it would crystallize?

A.    I don't recall.

Q.    That's all right.  That answer is as good as any other, and it is an appropriate note on which to end.

May I ask this:  The lady who is taking down what we say today is going to produce a booklet.

A.    Okay.

Q.    And we're going to arrange to have that sent to your counsel and ask him to forward it to you.

Would you be willing to review it, make sure that it's accurate, and sign it at the back?

A.    Yes.

Q.    And then return it to Mr. Chu?

Page 43

EXHIBIT C
PAGE 87

A.    Yes.

Q.    And if we give you 30 days for that purpose, would it be sufficient?

A.    Yes.

MR. IREDALE:  Thank you so much.  I have nothing further.  I appreciate your coming in today. Thank you.

MR. CHU:  Thank you.

THE VIDEOGRAPHER:  Off the record at 11:33 a.m., and this marks the end of this deposition.

(Whereupon, the deposition concluded at 11:35 a.m.)

* * * * *

Imagine Reporting 619.888.0297

EXHIBIT C
PAGE 88

I, Brandon Michael Gibbons, do hereby declare under penalty of perjury under the laws of the State of California that I have read the foregoing transcript; that I have made such corrections as noted herein, in ink, initialed by me, or attached hereto; that my testimony as contained herein, as corrected, is true and correct.

Executed this _____ day of _____, _____, at _____, _____.

_____

Brandon Michael Gibbons

Imagine Reporting 619.888.0297

EXHIBIT C

PAGE 89

: : :   CERTIFICATE OF REPORTER   : : :

I, GINA DE LUCA, a Certified Shorthand Reporter, holding a valid and current license issued by the State of California, CSR No. 6973, duly authorized to administer oaths, do hereby certify:

That the witness in the foregoing deposition was administered an oath to testify to the whole truth in the within-entitled cause;

That said deposition was taken down by me in shorthand at the time and place therein stated and thereafter transcribed into typewriting, by computer, under my direction and supervision.

( X )   Reading and signing was requested.

(    )   Reading and signing was waived.

(    )   Reading and signing was not requested.

Should the signature of the witness not be affixed to the deposition, the witness shall not have availed himself/herself of the opportunity to sign or the signature has been waived.

I further certify that I am neither counsel for nor related to any party in the foregoing depositions and caption named nor in any way interested in the outcome thereof.

Dated:   This 4th day of April 2017
         at San Diego, California.

Gina Marie De Luca
CSR No. 6973, RMR, CRR

Imagine Reporting 619.888.0297

EXHIBIT C
PAGE 90

# EXHIBIT D

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOYMA VANESSA MICHEL, an individual, | ) ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) Case No. 16CV0277-GBC-RBB ) |
| UNITED STATES OF AMERICA, B. GIBBONS, an individual, E. GARZA, an individual, SAFARILAND, LLC, a Delaware limited liability company, AND DOES 1 THROUGH 100, inclusive, | ) ) ) ) ) ) |
| Defendants. | ) ) |

VIDEOTAPED DEPOSITION OF ZACHARY STEVEN BULMAN

San Diego, California

March 22, 2017

Reported by Gina Marie De Luca, CSR No. 6973, RMR, CRR

EXHIBIT D

PAGE 92

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

DOYMA VANESSA MICHEL, an
individual,

         Plaintiff,

vs.                           Case No. 16CV0277-GBC-RBB

UNITED STATES OF AMERICA, B.
GIBBONS, an individual, E. GARZA,
an individual, SAFARILAND, LLC, a
Delaware limited liability
company, AND DOES 1 THROUGH 100,
inclusive,

         Defendants.

VIDEOTAPED DEPOSITION OF ZACHARY STEVEN BULMAN,
commencing at the hour of 1:12 p.m., on Wednesday,
March 22, 2017, at 880 Front Street, Fourth Floor,
San Diego, California, before Gina Marie De Luca,
Certified Shorthand Reporter in and for the State of
California.

Page 2

EXHIBIT D

PAGE 93

APPEARANCES:

For Plaintiff:

IREDALE AND YOO, APC
BY:  EUGENE G. IREDALE, ESQ.
105 West F Street, Fourth Floor
San Diego, California 92101-6036
619.233.1525
619.233.3221 Fax

For United States Customs and Border Protection:

OFFICE OF THE U.S. ATTORNEY
BY:  STEVE B. CHU
      ASSISTANT U.S. ATTORNEY
880 Front Street, Room 6293
San Diego, California 92101-8893
619.546.7167
619.546.7751 Fax
steve.chu@usdoj.gov

For Safariland, LLC:

YUKEVICH | CAVANAUGH
BY:  LUCAS E. ROWE, ESQ.
355 South Grand Avenue, 15th Floor
Los Angeles, California 90071
213.362.7777
213.362.7788 Fax
lrowe@yukelaw.com

For ICE-DHS:

ICE-DHS
BY:  JENNIFER L. WOODMANSEE, ESQ.
880 Front Street, Suite 2246
San Diego, California 92101-8810
619.557.5578
619.557.7062 Fax
jennifer.woodmansee@dhs.gov

Also present:  Shayne Davidson, Videographer
                Doyma Michel

Page  3

Imagine Reporting 619.888.0297

EXHIBIT D
PAGE 94

I N D E X

WITNESS:  ZACHARY STEVEN BULMAN

EXAMINATION                                                    PAGE
By Mr. Iredale                                                   7
By Mr. Chu                                                      98
By Mr. Iredale                                                 100


E X H I B I T S

MARKED FOR IDENTIFICATION                                      PAGE

Exhibit 1    Case Chronology and Review Form,        15
             Department of Homeland Security
             Immigration and Customs Enforcement,
             Bates USA_0002

Exhibit 2    Inside Front Cover, Administrative      35
             Items, Bates USA_0001

Exhibit 3    Inside Back Cover, Investigative        39
             Paperwork, Bates USA_0158

Exhibit 4    Declaracion de Derechos, Bates          41
             USA_0161

Exhibit 5    Consentimiento, Bates USA_0061          42

Exhibit 6    Agent's Notes dated 06/02/14, Bates     44
             USA_0162

Exhibit 7    Department of Homeland Security ICE     46
             Report of Investigation
             Continuation, Page 3, Bates USA_0033
             through USA_0043

Exhibit 8    Department of Homeland Security,        62
             U.S. Customs and Border Protection,
             Disposition Order, Bates USA_0069

Imagine Reporting 619.888.0297

E X H I B I T S (continued)

MARKED FOR IDENTIFICATION                                   PAGE

Exhibit 9    Department of Homeland Security,              64
             Custody Receipt for Seized Property
             and Evidence, Bates USA_0070 and
             USA_0071

Exhibit 10   E-mails, top e-mail from Zachary             76
             Bulman to Johnson Pham and Curt
             Alleman dated 09/24/14, Bates
             USA_0156 and USA_0157

Exhibit 11   Video Request dated 09/25/14, Bates          84
             USA_0155

Exhibit 12   Case Details Report, Bates USA_0499          92
             through USA_0511

Exhibit 13   Chemical Analysis Report, Bates              93
             USA_0364

Page  5

THE VIDEOGRAPHER:  This is the beginning of Disk 1 of the deposition of Zachary Bulman.  The case caption is Michel vs. United States of America, et al.

My name is Shayne Davidson.  I am a partner in VideoTrack located at 600 West Broadway, Suite 700, San Diego, California.  The court reporter today is Gina De Luca.  Today's date is the 22nd day of March 2017, and it is now 1:11 p.m.

Please be aware that the video and audio recording will take place at all times throughout this deposition unless all counsel agree to go off the record.

Would counsel please introduce yourselves and state who you represent.

MR. IREDALE:  Gene Iredale for the plaintiff, Doyma Michel, who is present.

MS. WOODMANSEE:  Jennifer Woodmansee, attorney for ICE.

MR. ROWE:  Lucas Rowe on behalf of Safariland, LLC.

MR. CHU:  AUSA Steve Chu for the United States.

MR. IREDALE:  And would you swear the witness, please.

///

///

ZACHARY STEVEN BULMAN,

having been first duly sworn, testified as follows:

-oOo-

EXAMINATION

BY MR. IREDALE:

    Q.    Would you tell me your full name, sir.

    A.    Zachary Steven Bulman.

    Q.    And Bulman is spelled B-u-l-m-a-n?

    A.    Yes, sir.

    Q.    Can you tell me -- you're currently employed as a special agent with Homeland Security Investigations?

    A.    Yes, sir.

    Q.    How long have you done that work?

    A.    I've been a special agent for 8 1/2 years.

    Q.    And before you were a special agent, did you have any other function with the government?

    A.    Not with the federal government, no.

    Q.    With a state or local government?

    A.    Yes.

    Q.    And could you tell me what that was.

    A.    I was a police officer with the Fairfax County, Virginia, Police Department.

    Q.    How long had you been a police officer with the Fairfax County Police Department?

    A.    Just over 6 1/2 years.

Page 7

EXHIBIT D

PAGE 98

to make a clear record.

A.   I understand.

Q.   At the end of the deposition, she will then later type up your testimony in a booklet, and that transcript will be sent to you for your review and signing so that you can correct it to make sure that it's entirely accurate.

A.   Okay.

11:9 - 13:14

Q.   Let me ask you, in connection with your training for the police department of Fairfax County, did you attend a police academy?

A.   Yes, I did.

Q.   How long was that, if you can recollect?

A.   The police academy was approximately six months long.

Q.   In that regard, did you have any training regarding field tests --

A.   Yes.

Q.   -- for controlled substances?

A.   Yes, I did.

Q.   Tell me what you were taught in your academy for the Fairfax County Police Department.

A.   This would have been over 15 years ago.  So it's -- I don't have a lot of recollection as to the specific class that I was given on field test kits.  I

Page 11

EXHIBIT D
PAGE 99

just don't have a lot of recollection on that.

Q.   Fair enough.

Do you remember anything that you were taught?

A.   Not specifically on field test kits, no.

Q.   All right.  Now, let's go 6 1/2 years later to the point at which you began to work for the Department of Homeland Security.

A.   Yes, sir.

Q.   Did you then attend the Federal Law Enforcement Training Center program or any other training academy?

A.   Yes, I did.

Q.   Could you tell me where that was and when.

A.   I attended the Federal Law Enforcement Training Center in Glynco, Georgia, for approximately six months starting in October of 2008 -- I'm sorry -- August of 2008, and I'm finishing my training in March of 2009.

The training was titled -- the first portion of the training was called CITP, which is Criminal Investigator Training Program, and the second portion of the training was called ICESAT, or Immigration and Customs Enforcement Special Agent Training.

Q.   In connection with either of those two segments of training, did you study the use of test kits for field testing of suspected controlled substances?

A.   I do recall a class on it, yes.

_12:9-25_

Page 12

Imagine Reporting 619.888.0297

EXHIBIT D
PAGE 100

Q.    And can you tell me how long that subject was studied, if you recall?

A.    To the best of my recollection, it was a couple-hour block maximum.

Q.    Can you tell me what you recall learning at the Federal Law Enforcement Training Center regarding field testing of potential controlled substances.

A.    What I recall is specific testing of marijuana and utilization of the field test kits in order to make those tests so that we actually tested an actual narcotic or an actual drug and utilized the test kits in order to make those tests.  So it was demonstrated to us, and then we actually did -- conducted the test ourself.

11:9-13:14

Q.    And then did you have any other training beyond the testing and -- specifically the testing of marijuana in field tests while you were at FLETC that you recall?

A.    Not that I recall, no.

Q.    Now, you then began to work as a special agent?

A.    Yes, sir.

Q.    And your job as a special agent is to perform investigations?

A.    Yes, sir.

Q.    That involves, among other things, interrogation or questioning of suspects?

Page 13

EXHIBIT D
PAGE 101

A.　We would call it questioning, yes, sir.

Q.　You would prefer questioning to interrogation?

A.　I'm just saying that's what we -- we consider it.　We call it questioning.

Q.　Questioning.

And learning and doing all of those other things that are involved in doing a criminal investigation?

A.　Yes, sir.

Q.　Now, during the time between March -- it was March of 19- -- 2009 that you actually entered on duty?

A.　Yes.

14:13-23

Q.　Between March of 2009 and June of 2014, did you have any additional training as an agent?

A.　Yes.

Q.　Did you have any additional training in the use of testing kits for field tests?

A.　Not that I recall, no.

Q.　From time to time, I take it, there would either be briefings or memos regarding subject matters concerning the work that you would be doing as a special agent?

A.　Yes, sir.

Q.　Any memos that you recall on the subject matter of field test kits and how they are to be used?

Page 14

EXHIBIT D
PAGE 102

to document a criminal investigation as it progresses.

Q.    And the part where it says "Time Expended" --
is that there so that you are required in some way to
keep rough track of the time that you're spending on the
case?

A.    Yes, it is.

Q.    And then the date is to be placed on the far
left column there?

A.    Yes.

Q.    And then the Description of Activity -- is that
filled out in your handwriting?

A.    Yes, it is.  Most of it.  Not all of it.

Q.    All right.  I need to ask you just a few
things.

The first date in this chronology is 6/2/14,
and it notes that you expended six hours doing an
interview, preparing a criminal complaint, and
transporting to the MCC.

Did I read that properly?

A.    You did read it properly.

Q.    Then the following day there was a seizure at
the storage unit and an entry for opening the case in
the TECS, the Treasury Enforcement Communication System?

A.    Yes, sir.

Q.    The following day -- not the following day.

*16:21-24*

Imagine Reporting 619.888.0297

EXHIBIT D
PAGE 103

A.    EAGLE is the Enforcement -- EAGLE is an acronym, and I don't remember the exact acronym that it stands for, but it's basically immigration enforcement but also an arrest.  It also would capture arrest statistics, and it's an internal database that ICE uses.

Q.    For internal statistical purposes?

A.    Yes, sir.

*40: 8-20*

Q.    Now, your involvement in the case in the investigation of Doyma Vanessa Michel began on the 2nd of June of 2014?

A.    Yes, sir.

Q.    And may I ask, were you the case agent that was on call that day should there be an --

A.    I was -- I was one of the duty -- narcotics duty agents at that time.

Q.    And so it fell to you to be involved in the investigation when you were called?

A.    Yes, sir.

Q.    You interviewed Ms. Michel on that day?

A.    Yes, I did.

Q.    And I believe there was a police officer named Torres who was also with you?

A.    There was a San Diego police officer with me, yes.

Q.    And did he translate as part of his work?

Page 40

EXHIBIT D
PAGE 104

Q. The document itself, though -- your understanding is that it was a document that gave you consent to search a storage unit on Main Street in Chula Vista?

A. Yes.

Q. And your understanding is that she signed this document giving you consent to search that storage unit without the necessity of getting a search warrant?

A. Yes.

Q. With her consent? With her permission?

A. Yes, sir.

Q. And then you at least know this much Spanish: You are the "Agente Especial."

A. Yes, sir.

Q. And then you signed there, and then Oscar Torres signed as a witness as well?

A. Yes, sir.

Q. So Ms. Michel then voluntarily gave you a statement and voluntarily waived the right to demand a search warrant and authorized you to search the storage unit?

A. Yes, sir.

Q. Now, on the date of the 2nd of June of 2014, you yourself did not do any field tests on any of the seized bottles of Cuajo?

43:23- 44:5

Page 43

Imagine Reporting 619.888.0297

EXHIBIT D
PAGE 105

A.    On June 2nd, I did not.

Q.    There had been, to your understanding, some tests that had already been performed by Customs and Border Patrol officers?

A.    Yes, sir.

Q.    Now, let me talk to you about the interview you conducted with Ms. Michel.

Am I correct that the interview took place there at a location at the Port of Entry?

A.    Yes, sir.

Q.    And do you recall about how long the total interview lasted?

A.    To the best of my recollection, I would say the interview lasted approximately an hour, a little less than an hour and a half.

Q.    And I believe from time to time you would take notes?

A.    Yes, sir.

(Exhibit 6 marked)

BY MR. IREDALE:

Q.    Let me show you Exhibit 6.

And can you tell me, are those some of the notes at least that you took during the course of the interview?

A.    To the best of my recollection, those are all

Page 44

Imagine Reporting 619.888.0297

EXHIBIT D
PAGE 106

Q.    And you said, whether she continued to lie to you or not, she was going to be going to jail regardless?

A.    That was -- yes, that is true.

Q.    And if she wanted to help herself out, she should provide information to you on who she was working for?

A.    Yes, I did.

Q.    And her response is "I'm taking the cuajo to Francisco" or words to that effect?

A.    I believe that was her response, yes.

Q.    Now, you tried to tell her at a later point, "I don't think you're a bad person because you smuggled methamphetamine, but I want to understand why."

A.    That's a general line of questioning I use in drug smuggling cases, yes.

Q.    And she continued to say what she had said before:  "No, it's not methamphetamine.  It's Cuajo."

A.    Yes.

Q.    And you said, "Well, you've been charged with smuggling before, and you're no stranger to smuggling things and people through the border."

A.    I did tell her that, yes.

54:24-55:7

Q.    And you said "Unlike the other times, you're not going to be released.  You're going to be prosecuted

Page 54

Imagine Reporting 619.888.0297

EXHIBIT D
PAGE 107

this time" or words to that effect?

A.   That is true, yes, sir.

Q.   She said, "Well, the bottles of Cuajo still need to be examined by a laboratory."

A.   That is what she said, yes, sir.

Q.   And you told her yes, you agreed with her?

A.   Because I knew that was going to be the case.

Q.   Then she said, "I bought the Cuajo in a store 54:24-55:7 in Tijuana on May the 31st, and I purchased cuajo because it's legal, and I bring it into the United States because it is legal."

A.   That was what she said.

Q.   And at some later point in the interview, the document that we've discussed, the consent to search the storage locker, was signed; is that true?

A.   Yes, sir, it is.

Q.   The next day was the 3rd of June 2014?

A.   Yes, sir.

Q.   You and other agents in your investigative group went to a self-storage locker located at 3755 Main Street in Chula Vista?

A.   Yes, we did.

Q.   And that was in the morning?

A.   Yes, sir.

Q.   The agents who went with you were David Glaze,

Page 55

EXHIBIT D
PAGE 108

Marina Griffin, Jason Polk, and then your group supervisor, Carlos Puentes; is that true?

A.    Yes, sir.  That is correct.

56:4-14

Q.    You provided the manager, whose name was Elvira Avendano, a copy of the consent to search that had been signed by Ms. Michel?

A.    Yes, I did.

Q.    And then, when you went into the storage unit, you found 36 bottles of Tequila?

A.    Yes, I did.

Q.    And 15 additional plastic bottles of Cuajo?

A.    Yes, sir.

Q.    And you seized them?

A.    Yes, sir, we did.

Q.    The Cuajo bottles that were there looked like the Cuajo bottles that you had seized?

A.    Yes, sir.

Q.    And looked same as the bottle that we have right here?

A.    Yes, sir.

Q.    Now, let me ask you, At any time did you speak to one of the other agents or Oscar Torres the day before to ask what the contents of the bottle were reflected as being in the writing that was on the bottle?

Page 56

EXHIBIT D

PAGE 109

58:1-8

58:1-22

Q.   Who did the field test?

A.   I don't recall who exactly did the field test. I was physically removing bottles of tequila and bottles of Cuajo from the storage unit and placing them in cardboard boxes.  We had two agents that probably would have conducted those tests.  I don't know which one of those two did, but they are both trained in evidence recovery.

Q.   Who were the two agents you believe probably did the test?

A.   It would have either been Jason Polk or Marina Griffin.

Q.   And do you know what test kit they used to perform the test?

A.   I believe they used a NarcoPouch test kit, but I don't recall specifically.

Q.   Do you remember whether there was a number that was on the NarcoPouch test kit?

A.   I don't recall.

Q.   Did you see the test being done?

A.   I think I just saw the results of the test, sir.

Q.   Did one of those agents show you the results, if you recall?

A.   I recall, yes.

Page 58

EXHIBIT D
PAGE 110

Q.   No.  No, no, no.  This is what I'm asking you.

A.   Oh.  I don't -- I don't recall whether there was a second test done or not.

Q.   No.  Let me be fair, because it's not a memory test.

A.   Okay.

*60:7-61:5*

Q.   What your report says is, quote, "Three random Cuajo bottles were selected and field tested, resulting in a positive reaction for the presence of methamphetamine."

And what I am asking is if you recall who did the test and your statement was you don't recall for sure, but there were two agents who were probable.

A.   Yes, sir.

Q.   If you saw the test, and your answer, as I understand it, is "No, I was moving things in and out."

A.   Yes, sir.

Q.   "But I did see the results."

A.   Yes, sir.

Q.   And I asked you whether there was a second test done, and I thought you said yes, but maybe I misunderstood.  So --

A.   I think my -- my belief is there was more than one test done because three bottles were selected for testing.

Page 60

Q.   Fair enough.

But the same test kit was used with multiple pouches to test each bottle?

A.   The same box, different test kits within the box for the different bottles, yes, sir.

*60:7-61:5*

Q.   Yes.  But not two different test numbers?

A.   Not that I recall, no, sir.

May I look at the boxes, sir.

Q.   Yes, of course.

A.   I don't recall which boxes or which -- whether it was 923 or 902.  I don't recall, sir.

*61:12-62:8*

Q.   Now, you said that there was a DEA chemist at one point.

Did I understand that properly?

A.   Yes, you did.

Q.   Who was the DEA chemist?

A.   Alexandra Ambriz or Ambrose.

Q.   A-m-b-r-i-z?

A.   Ambriz, yes.

Q.   And did she come at some point to the Main Street location of the storage unit?

A.   She did not, no.

Q.   Did you see her and speak with her on the 3rd of June of 2014?

A.   I don't recall the exact date when I spoke with

Page 61

EXHIBIT D
PAGE 112

her, but it would have been following Ms. Michel's arrest and following the seizure of the contents of the storage unit --

Q.    All right.

A.    -- in order to set up an appointment or a -- schedule a time for her to respond to the CBP vault to take representative samples of -- of the seized -- suspected seized liquid methamphetamine.    61:12-62:8

Q.    And do you recall, then, about how many days after the seizure from the storage unit Ms. Ambriz came to the CBP vault?

A.    It was several days later.  I don't recall the exact date.  If I could look at the -- the report, I've got it written down.

Q.    Absolutely.

A.    So Ms. Ambriz responded on June 9th.  So I guess approximately six days following the second seizure.

(Exhibit 8 marked)

BY MR. IREDALE:

Q.    Let me show you, if I might, Exhibit No. 8. And this is a U.S. Customs and Border Protection form that is headed "Disposition Order."

A.    Yes.

Q.    Can you tell me what the nature of the document

she did involved taking a strip of paper of some kind and dipping it into the liquid?

A.   To the best of my recollection, yes.

Q.   And then did the piece of paper then change colors?

A.   To the best of my recollection, yes.

Q.   Do you recall what color it changed to and from what color it changed?

A.   I believe, or to the best of my recollection, it changed to purple, but I'm not positive.

Q.   All right.  And you said you recall her doing more than one of those tests?

A.   I believe she also conducted a field test in a NarcoPouch as well, but I'm not 100 percent positive on that.  I think she did two, two separate types of tests, field tests.

Q.   All right.  Two separate types of tests.

And can you tell me how many bottles were tested?

A.   I believe she tested every bottle that we had seized.

Q.   Which would have been a total of 19?

A.   Yes, sir.

Q.   Now, you have worked with DEA chemist personnel in the past?

in the past?

67:24-68:18

Page 67

EXHIBIT D
PAGE 114

A.   Not closely.  We -- we transport seized narcotics to the DEA lab, and then they conduct their tests, and then we retrieve those, those seized narcotics.  That's about the extent of our interactions. This is the only time in which they respond to the vault, is for a liquid methamphetamine case.

*68: 7-18*

Q.   All right.  Now, did you ask Ms. Ambriz to do the confirmatory test as soon as possible when you saw her on the 9th of June?

A.   The -- when you -- when you ask about the confirmatory test, are you talking about the actual analysis that's conducted at the lab?

Q.   Yes.  Did you ask her to speed up that analysis?

A.   I did not.

Q.   Did you ask her when she would do the analysis at the lab?

A.   I did not.  Not that I recall.

*67:24 - 68:18*

Q.   Well, now, you recall Ms. Michel told you that that's not liquid methamphetamine?

A.   That is what she told me, yes.

Q.   She told you that over and over and over again; yes?

A.   And I've been told crystal meth is -- is coconut shavings.  It doesn't necessarily make it so.

Page 68

EXHIBIT D
PAGE 115

And it's -- you've seen this e-mail before?

A. Yes, sir.

Q. You were able, from where you are over across the way, to see the e-mail that I was looking at, apparently.

A. Yes, sir.

Q. So you knew the configuration of the e-mail because you reviewed it before you came here today.

A. Yes, sir.

Q. Because it was a matter of some concern to you in the case, I take it.

A. Yes, sir.

77:13-78:4

Q. Because on Monday, September the 22nd, 2014, Ms. Cline e-mailed you, Zachary S. Bulman; correct?

A. Yes.

Q. And she referred to you as Zach. That's your nickname, I take it.

A. That's what people refer to me as, yes.

Q. Yes.

And she says "Please see if there is video from primary. Also see if you can rush the lab results for both the border and storage unit.

"Please send" Report of Investigation, abbreviated "ROI asap of storage unit.

"Thanks.

Page 77

EXHIBIT D
PAGE 116

"Julia."

Did I properly read -- did I properly read the e-mail that she sent to you which is dated 22 September 2014 at 4:32 p.m.?

A.    Yes, you did, sir.

Q.    As a result of that, did you then write an e-mail to some officials who were connected with the Port of Entry at San Ysidro?

A.    Yes, I did.

Q.    And you wrote that e-mail approximately two days later on 24 September at 3:53 p.m., according to the document Exhibit 10 --

A.    Yes, sir.

Q.    -- am I correct?

And by the way, do you know where this copy of the e-mail was obtained?  Was it obtained, if you know, from your computer?  Did you turn it over to the government?  Counsel?

A.    I believe it was obtained -- I believe it was obtained from my case file, but I am not positive.

Q.    All right.  Did you print it out and put it in your case file?

A.    It was printed out when the video from the Port of Entry was provided to me by CBP along with the video.

Q.    Now, at -- let me just ask a few brief

Page 78

EXHIBIT D
PAGE 117

Q.    And was the video footage located and turned over to you?

A.    It was.

Q.    And did you then turn it over to Ms. Cline?

A.    I did, I believe.

*86:6-18*

Q.    All right.  Now, so she asked you to see if there was a video, and within 48 hours you made the request to CBP, and they responded within 24 hours of your request, and the video was preserved and was available.

She also said to you, "see if you can rush the lab results for both the border and the storage unit."

So is there an e-mail that's dated within 48 hours of her e-mail to you that says "Dear Ms. Ambriz, Please do the lab results as soon as possible for me"?

A.    It wouldn't have been conducted in e-mail format.

Q.    Did you make a phone call to Alexandra Ambriz asking that she conduct the lab analysis on a rush basis for you?

A.    I don't believe so.

Q.    I'm sorry?

A.    I don't believe so.

Q.    You did not make a call?

Page 86

Imagine Reporting 619.888.0297

EXHIBIT D
PAGE 118

closed.  Thank you so much.

THE WITNESS:  You're welcome.

THE VIDEOGRAPHER:  Off the record at 3:32 p.m., and this marks the end of this deposition.

THE REPORTER:  Counsel, may I ask who would like a copy?

MR. ROWE:  I'll take one.

MR. IREDALE:  Well, actually, send the original -- send the original to counsel -- let's do this.  We didn't -- can we go back on?  Let me do this for all -- all of the depositions that we took today.

MR. CHU:  Okay.

MR. IREDALE:  So since they're your witnesses, in essence, they're associated with the government, what we'll do is to put on you the obligation to get the originals, signatures, and maintain the originals.

Is that all right, Steve?

MR. CHU:  Yes.

MR. IREDALE:  All right.  So let's go back on just for the purpose of that.

THE VIDEOGRAPHER:  Can we do that paper only?

MR. IREDALE:  Yes, we can do that.

MR. CHU:  Oh, yeah, sure.

MR. IREDALE:  Yes, absolutely.

Then it would be stipulated between the parties

EXHIBIT D
PAGE 119

that the deposition should be handled as follows:  The original of all the deponents who gave depositions today will be sent to Assistant U.S. Attorney Steven Chu. Mr. Chu will undertake to forward them to the witness, who will then have 30 days to review and sign the deposition under the pains of penalties of perjury.  And Mr. Chu thereafter will maintain the original for use at trial.  And should the original be lost, then a certified copy can be used for all purposes in lieu thereof.

MR. CHU:  So stipulated.

MR. ROWE:  Agreed.

MR. IREDALE:  Thank you so much.

MR. CHU:  All right.

(Whereupon, the deposition concluded at 3:35 p.m.)

* * * * *

Imagine Reporting 619.888.0297

EXHIBIT D
PAGE 120

I, Zachary Steven Bulman, do hereby declare under penalty of perjury under the laws of the State of California that I have read the foregoing transcript; that I have made such corrections as noted herein, in ink, initialed by me, or attached hereto; that my testimony as contained herein, as corrected, is true and correct.

Executed this _____ day of _____, _____,
at _____, _____.

_____

Zachary Steven Bulman

**Page 104**

**EXHIBIT D**
**PAGE 121**

: : : **CERTIFICATE OF REPORTER** : : :

I, GINA DE LUCA, a Certified Shorthand Reporter, holding a valid and current license issued by the State of California, CSR No. 6973, duly authorized to administer oaths, do hereby certify:

That the witness in the foregoing deposition was administered an oath to testify to the whole truth in the within-entitled cause;

That said deposition was taken down by me in shorthand at the time and place therein stated and thereafter transcribed into typewriting, by computer, under my direction and supervision.

( X ) Reading and signing was requested.

( ) Reading and signing was waived.

( ) Reading and signing was not requested.

Should the signature of the witness not be affixed to the deposition, the witness shall not have availed himself/herself of the opportunity to sign or the signature has been waived.

I further certify that I am neither counsel for nor related to any party in the foregoing depositions and caption named nor in any way interested in the outcome thereof.

Dated: This 4th day of April 2017
at San Diego, California.

_____
Gina Marie De Luca
CSR No. 6973, RMR, CRR

EXHIBIT D
PAGE 122

EXHIBIT E

PAGE 123

ALEXANDRA AMBRIZ - 03/30/2017

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

DOYMA VANESSA MICHEL, AN
INDIVIDUAL,

        PLAINTIFF,

   VS.

UNITED STATES OF AMERICA, B.
GIBBONS, AN INDIVIDUAL, E. GARZA,
AN INDIVIDUAL, G. BARCIA, AN
INDIVIDUAL, SAFARILAND, LLC, A
DELAWARE LIMITED LIABILITY
COMPANY, AND DOES 1 THROUGH 100,
INCLUSIVE,

        DEFENDANTS.

CASE NO.: 16CV0277-GPC-AGS

VIDEOTAPED DEPOSITION OF ALEXANDRA AMBRIZ

THURSDAY, MARCH 30, 2017

JOB NO. 97035

REPORTED BY CARLINE A. FONSECA, CSR NO. 8068

ALEXANDRA AMBRIZ - 03/30/2017

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

DOYMA VANESSA MICHEL, AN          )
INDIVIDUAL,                       )
                                  )
            PLAINTIFF,            )
                                  )
    V.                            )  CASE NO.: 16CV0277-GPC-AGS
                                  )
UNITED STATES OF AMERICA, B.      )
GIBBONS, AN INDIVIDUAL, E. GARZA, )
AN INDIVIDUAL, G. BARCIA, AN      )
INDIVIDUAL, SAFARILAND, LLC, A    )
DELAWARE LIMITED LIABILITY        )
COMPANY, AND DOES 1 THROUGH 100,  )
INCLUSIVE,                        )
                                  )
            DEFENDANTS.           )
_____)

-OOo-

VIDEOTAPED DEPOSITION OF ALEXANDRA AMBRIZ,

TAKEN BY THE ATTORNEY FOR THE DEFENDANT SAFARILAND, LLC,

COMMENCING AT THE HOUR OF 10:14 A.M. ON THURSDAY,

MARCH 30, 2017, AT 800 FRONT STREET, SUITE 6293,

SAN DIEGO, CALIFORNIA, BEFORE CARLINE A. FONSECA,

CERTIFIED SHORTHAND REPORTER NO. 8068, IN AND FOR THE

STATE OF CALIFORNIA.

ALEXANDRA AMBRIZ - 03/30/2017

APPEARANCES:


  FOR THE PLAINTIFF:

     IREDALE & YOO, APC
     BY:  EUGENE G. IREDALE, ESQ.
     105 WEST F STREET, FOURTH FLOOR
     SAN DIEGO, CALIFORNIA  92101
     619.233.1525



  FOR THE UNITED STATES CUSTOMS AND BORDER PROTECTION:

     OFFICE OF THE U.S. ATTORNEY
     BY:  STEVE B. CHU, ESQ.
     880 FRONT STREET, ROOM 6293
     SAN DIEGO, CALIFORNIA  92101
     619.546.7167



  FOR THE DEFENDANT SAFARILAND, LLC:

     YUKEVICH CAVANAUGH
     BY:  BOBBIE N. EFTEKAR, ESQ.
     355 S. GRAND AVENUE, 15TH FLOOR
     LOS ANGELES, CALIFORNIA  90071
     213.362.7777



  VIDEOGRAPHY SERVICES PROVIDED BY:

     VIDEOTRACK, LLC
     BY:  SHAYNE DAVIDSON
     600 WEST BROADWAY, SUITE 700
     SAN DIEGO, CALIFORNIA  92101
     619.234.1990



  ALSO PRESENT:   DOYMA VANESSA MICHEL

                  RICHARD CUMMINGS - PARALEGAL

///

ALEXANDRA AMBRIZ - 03/30/2017

                                I N D E X


WITNESS:   ALEXANDRA AMBRIZ


EXAMINATION BY                                          PAGE

MS. EFTEKAR                                                6
(FURTHER EXAMINATION)                                    153

MR. IREDALE                                              102

MR. CHU                                                  150




                         EXHIBIT INDEX

EXHIBIT            DESCRIPTION                           PAGE

EXHIBIT 1          CURRICULUM VITAE, ALEXANDRA             9
                   AMBRIZ;

EXHIBIT 2          CHEMICAL ANALYSIS REPORT, WITH         26
                   ATTACHED REPORT OF DRUG
                   PROPERTY COLLECTED, PURCHASED,
                   OR SEIZED;

EXHIBIT 3          FOUR COLOR PHOTOGRAPHS;                26

EXHIBIT 4          RUSH ANALYSIS REQUEST FORM;           110

EXHIBIT 5          CASE DETAILS REPORT, BATES NOS.       140
                   USA_0499 - USA_0511;

EXHIBIT 6          DOCUMENTS BATES STAMPED               143
                   USA_0854 - USA_0988 PRODUCED IN
                   DISCOVERY;



                      *  *  *  *  *

ALEXANDRA AMBRIZ - 03/30/2017

SAN DIEGO, CALIFORNIA, THURSDAY, MARCH 30, 2017, 10:14 A.M.

THE VIDEOGRAPHER: This is the beginning of Disk 1 of the deposition of Alexandra Ambriz. The case caption is Michel v. United States of America, et al.

My name is Shayne Davidson. I am a notary public for the State of California, County of San Diego. I am a partner in VideoTrack, located at 600 West Broadway, Suite 700, San Diego, California. The court reporter today is Carline Fonseca.

Today's date is the 30th day of March, 2017, and it is now 10:14 a.m.

Please be aware that the video and audio recording will take place at all times throughout this deposition, unless all counsel agree to go off the record.

Would counsel please introduce yourselves and state whom you represent.

MS. EFTEKAR: Bobbie Eftekar on behalf of defendant Safariland.

MR. CHU: Assistant U.S. Attorney Steve Chu on behalf of the United States.

MR. IREDALE: Gene Iredale on behalf of the plaintiff Doyma Michel, and Ms. Michel is present here today.

ALEXANDRA AMBRIZ - 03/30/2017

THE VIDEOGRAPHER:  And at this time, would the court reporter please swear in the deponent.

MS. EFTEKAR:  We agreed to stipulate that the court reporter does not have to do her read-in under the new Rule 30.

MR. IREDALE:  That's true.

MR. CHU:  Agreed.


ALEXANDRA AMBRIZ,

having been first duly sworn, testified as follows:


EXAMINATION

BY MS. EFTEKAR:

Q     Can you please state your name for the record.

A     My name is Alexandra Ambriz.

Q     And how many times have you been deposed?

A     None.  This is my first time.

Q     Okay.  And have you -- okay.  This is your first deposition?

A     Yes.

Q     So are you aware of -- we call them admonitions, kind of the ground rules of how a deposition goes?

A     Not really.

Q     No.  Have you testified in court before?

ALEXANDRA AMBRIZ - 03/30/2017

A    I have.

Q    Okay.  So probably very similar.  I will go through them quickly, though.

So this is simply a question-and-answer session and it's given under oath.  So the oath that you were just given, it's the same oath in a court of law in front of a judge and a jury.

Does that make sense?

A    Yes.

Q    Okay.  Everything we say, the reporter is going to take down for us, so we have to try to give audible answers, yeses and noes.  We have to -- we should avoid, even though we have a videographer, nods or shakes of the head or "huh-uh" or "uh-huh."

A    Okay.

Q    And let's see.  If I ask you a question that you don't understand, please let me know and I will do my best to rephrase it.

A    Okay.

Q    During the deposition, we make -- may make objections, and that's just for purposes outside of the deposition, at trial or later on, so we are just making that to reserve our -- our rights.  Let us finish, and then go ahead and answer the question if you can, and if Mr. Chu allows you to.

ALEXANDRA AMBRIZ - 03/30/2017

undergraduate degrees, a BS in biology and a BA of anthropology from UC Irvine; is that correct?

A    That's correct.

Q    And then you have a graduate degree in criminalistics?

A    I did not complete my graduate degree, but I did take all of the classes.  That is correct.

Q    Okay.  And that is California State University, Los Angeles?

A    Yes.

Q    Okay.  What is criminalistics?

A    It's the -- like, a general forensic science term, so it encompasses DNA analysis, trace analysis, impressions, footprints --

(Reporter interjects.)

THE WITNESS:  Impressions.  It's just the whole field of forensic science.  It's a different word for the whole field of forensic science.

BY MS. EFTEKAR:

Q    And does it include drug testing?

A    It does, yes.

Q    Okay.  Is this all of your education, licensing, certifications, training -- is that all included in your CV?

A    Yes.

EXHIBIT E
43-DEPOS
PAGE 131

ALEXANDRA AMBRIZ - 03/30/2017

Q    Okay.  Let's see.

A    There might be some more recent training that is not on the CV, but it's as of -- I think April of 2016 was when I last updated it.

Q    Okay.

A    I believe.

Q    Well, it looks like May 5th, 2016.

A    Okay.  So it was May.

Q    Okay.  Do you -- let's see.  You work for the DEA.  Do you have to go through any type of academy?

A    We -- when I was trained, I went through a six-month in-house training program at the DEA laboratory in Chicago, Illinois, which is where I began. And then after that, we participated in a one-month training program in Quantico, Virginia.

Q    Okay.  What's covered in that training?

A    So during the six-month training in -- at the laboratory, we cover everything from the different types of controlled substances, how to analyze them with the various instruments that we use, how to testify in court.  It's -- it's training for, like, our day-to-day activities.

When we go to the Quantico, it's also training, perhaps testifying in court.  It's a lot of training with things involved with working with the DEA, legal --

ALEXANDRA AMBRIZ - 03/30/2017

some legal issues.  And then there is also clandestine laboratory training.

Q    What does that mean, "clandestine laboratory training"?

A    So a clandestine laboratory is, for example, if somebody's synthesizing methamphetamine in their home, we go through a mock scenario.  We suit up in our appropriate gear.  We go and we try and identify substance -- or things that might be present that you might want to seize as evidence, different tests that you might do on the spot to make sure that the environment is safe and -- yes, things like that.

Q    So you mentioned in the six-month training, that you go through -- and correct me if I'm not saying this right -- but you go through how to do your lab testing?

A    Exactly.

Q    For drugs?

A    Yes.

Q    Okay.  And who -- who created the procedure of how you do the drug testing?

A    So a lot of it is -- is done through our ADM or our analysis drug manual, ADM, analysis drug manual. That's what we follow, our protocols and procedures for how to analyze a controlled substance.

ALEXANDRA AMBRIZ - 03/30/2017

some legal issues.  And then there is also clandestine laboratory training.

Q    What does that mean, "clandestine laboratory training"?

A    So a clandestine laboratory is, for example, if somebody's synthesizing methamphetamine in their home, we go through a mock scenario.  We suit up in our appropriate gear.  We go and we try and identify substance -- or things that might be present that you might want to seize as evidence, different tests that you might do on the spot to make sure that the environment is safe and -- yes, things like that.

Q    So you mentioned in the six-month training, that you go through -- and correct me if I'm not saying this right -- but you go through how to do your lab testing?

A    Exactly.

Q    For drugs?

A    Yes.

Q    Okay.  And who -- who created the procedure of how you do the drug testing?

A    So a lot of it is -- is done through our ADM or our analysis drug manual, ADM, analysis drug manual.  That's what we follow, our protocols and procedures for how to analyze a controlled substance.

12:9-16:17

ALEXANDRA AMBRIZ - 03/30/2017

Q    Okay.  And who wrote the ADM?

A    It's written in headquarters, in DEA headquarters, and they follow SWGDRUG recommendations, SWGDRUG.

(Reporter interjects.)

THE WITNESS:  SWGDRUG, so it's SWDRG [sic].  It's scientific working group drug.  They provide guidelines to DEA as to what are the minimum requirements that need to be followed, and then that influences what is written in the -- in the analysis of the drug manual, in the ADM, but then we go beyond that as well.  So.

BY MS. EFTEKAR:

Q    So they decide what the minimum requirements are that need to be followed?

A    Yes.

Q    Is that based upon the law?

A    I am not exactly sure what that's based upon. I think some of it is, you know, based on, like, scientific -- like, what's accepted in the scientific community.

Q    Okay.

And you said that's by this word -- how do you say it?

A    SWGDRUG.  So it's scientific, so that's the S,

ALEXANDRA AMBRIZ - 03/30/2017

Q    Okay.  And who wrote the ADM?

A    It's written in headquarters, in DEA headquarters, and they follow SWGDRUG recommendations, SWGDRUG.

(Reporter interjects.)

THE WITNESS:  SWGDRUG, so it's SWDRG [sic]. It's scientific working group drug.  They provide guidelines to DEA as to what are the minimum requirements that need to be followed, and then that influences what is written in the -- in the analysis of the drug manual, in the ADM, but then we go beyond that as well.  So.

BY MS. EFTEKAR:

Q    So they decide what the minimum requirements are that need to be followed?

A    Yes.

Q    Is that based upon the law?

A    I am not exactly sure what that's based upon. I think some of it is, you know, based on, like, scientific -- like, what's accepted in the scientific community.

13:20 - 14:21

Q    Okay.

13:20 - 14:22

And you said that's by this word -- how do you say it?

A    SWGDRUG.  So it's scientific, so that's the S,

ALEXANDRA AMBRIZ - 03/30/2017

*15:3-9*

working group, and then DRG. I think it's S-W-G-D-R-G or something like that.

Q    Oh, okay. The SWGDRUG group?

A    Yeah, the scientific working group.

MR. IREDALE:  SWGDRUG.

THE WITNESS:  Exactly.

BY MS. EFTEKAR:

Q    Okay. And is this -- is this within the DEA or are they outside of the DEA?

A    So it's outside of the DEA, but there are employees of the DEA that participate in that working group.

Q    Okay. And if you know -- I understand there is -- there is drug laboratories that do testing outside of the DEA, for example, for state prosecutors --

A    Yes.

Q    -- right? Do they also follow the SWGDRUG guidelines?

A    Yes. That I'm aware of, yes.

Q    Okay. Did you also go over colorimetric chemistry?

A    Yes. During my training?

Q    Yes. Okay. And that was in the six-month training by the DEA?

A    Yes.

ALEXANDRA AMBRIZ - 03/30/2017

Q    And again, that training is based upon the guidelines of the SWGDRUG?

A    I believe it is.  I went through my training in 2005, so that was a few years ago.  I don't recall if SWGDRUG was actually in existence at that point.  I think it was.

Q    Okay.

A    And then -- but it did follow the ADM, which is what is written by DEA headquarters, so.

Q    Okay.  Was there something before the SWGDRUG?

A    I am not sure.

Q    That's fine.  Do you -- did you get any training on drug field test kits?

A    Not specific training, because we do -- the colorimetric tests that we do at the laboratory are reagents that we make up, and those are the ones that we get trained on.

*12:9-16:17*

Q    Okay.  And those colorimetric tests are the same as the field drug test kits?

MR. CHU:  May call for speculation.

You can answer if you know.

THE WITNESS:  I don't know.  I know, like, the marquis test is the same as a marquis color test pouch kit.  So if the name corresponds to it, then I'm assuming yes.

ALEXANDRA AMBRIZ - 03/30/2017

BY MS. EFTEKAR:

Q    Okay.  Okay.  Have you published any articles or papers?

A    No, I have not.                    17:5 - 19:24

Q    Okay.  And you mentioned that you do training?

A    Yes.

Q    Is that -- so on the first page of your CV, it says "training" in a couple of places.  Is that training you have completed or --

A    I believe that is training I have taken.  So the first paragraph is training that I have received.  So we receive training, but then we also provide training to -- to law enforcement.

Q    Is that noted in your CV?

A    I don't believe it is.  Oh, presentations and lectures, that's -- that's where it would be under.

Q    Okay.  Do you --

A    And that needs to be updated a bit.

Q    Okay.  What is a TFO school instructor?

A    TFOs are task force officers, so we instruct them -- in this instance, for example, it was just on the lab services, what we offer, the kind of tests that we run, how to properly submit evidence, things of that nature.

But there is also another one that I

ALEXANDRA AMBRIZ - 03/30/2017

participated in that is a -- where we train local law enforcement on how to synthesize methamphetamine, just so they know, as well, what to look for.

Q    Okay.  And when was that one?

A    I don't recall at the moment.  It was --

Q    Was it within the last five years?

A    Yes.

Q    Okay.

A    Definitely.

Q    Within the last year?

A    No, it was -- it was -- I believe it was in 2015.

Q    Okay.  And what was that again?

A    It's called a CNOA class.  And it is for local law enforcement, to basically teach them how to -- how meth is synthesized so that they know what to look for.

Q    You say "local law enforcement."  Is that going to be Customs and Border Patrol or, you know, San Diego Police Department?

A    All of it.

Q    Anybody?

A    Anybody.

Q    Anybody.

A    Anybody that wants to participate.

Q    You mentioned for the TFO class, that you also

ALEXANDRA AMBRIZ - 03/30/2017

teach them how to submit samples properly?

A    Yes.

Q    What does that mean?

A    So for example, if they come in with a gallon -- a liquid, they are not supposed to submit the entire gallon of liquid, because it cannot be stored at our laboratory.  It's, like, a hazardous -- it could be a hazardous material, so they are only supposed to submit a small sample of that.

Q    Okay.

A    We just try and teach them how -- like, if you have -- I don't know -- a different array of ecstasy tablets, you are not supposed to just submit all of the ecstasy tablets.  You should try and separate them by color, things like that.

Q    Okay.  What is Citizens Academy?

A    The Citizens Academy is -- it's more for -- that one was taught in Los Angeles.  It's for law enforcement in other areas like Los Angeles and Orange County, and you also talk about meth synthesis and different -- different labs that have kind of been seen throughout the area, like BHO labs, things like that, so that people are aware -- law enforcement is aware of what's out there.

*17:5-19:24*

Q    There is a lot of meth being mentioned.  Is --

ALEXANDRA AMBRIZ - 03/30/2017

is there a big focus on meth?

A      Methamphetamine is, I would say, the drug that I analyze the most --

Q      Okay.

A      -- yes.  And it's the one drug that is really synthesized out there that people can make on their own.

Q      And they can make it in different ways?

A      Yes.

20: 9-11

Q      National Guard School, what was that?

A      National Guard School was also training law enforcement on how to synthesize methamphetamine.

Q      What does that mean exactly?  So you show them how people synthesize methamphetamine?

A      Yes.

Q      Okay.  But there is many different ways to synthesize methamphetamine?

A      We -- yes, there is a couple of different ways. We show them one of the most common ways that it is made.

Q      Okay.  And then besides the CNOA class, is there any other training that you do that's missing from here?

A      No, the CNOA class, I did a presentation to attorneys that were in -- that actually came from Peru and they wanted to just get an understanding of how our

ALEXANDRA AMBRIZ - 03/30/2017

advisor to the president.  I understand there is an exemption from any ethical constraints.

BY MS. EFTEKAR:

Q     Have you ever designed a field drug test kit?

A     No, I haven't.

Q     Have you made a field drug test kit?

A     No, I have not.

_33:8-21_

Q     When you go out to the field to do your tests, do you -- do you use field drug test kits or do you use the chemicals from scratch?

A     We use the field drug test kits, typically.  I would say there has been, like, one or two instances where we take, like, a marquis reagent that we have in the lab --

(Reporter interjects.)

THE WITNESS:  Marquis, something like that if we are out of pouches.  That could be an instance, but personally, I have always taken a field drug test kit.

BY MS. EFTEKAR:

Q     Okay.  Is that just because of convenience?

A     Yes.

Q     Does somebody say that you are allowed to use these field drug test kits instead of bringing in the chemicals?

A     No, nobody says that.

ALEXANDRA AMBRIZ - 03/30/2017

Vista and then you go east to Otay.

BY MS. EFTEKAR:

Q    Okay.  When the -- do you recall the agent calling you in this instance?

A    I recall, yes, that -- I don't recall the agent's name, but I recall that I was called to test -- I remember these specific samples.

Q    Do you remember what they -- he told you?

A    He said there were multiple containers containing a liquid.

Q    Okay.  By the time you are called, has an arrest already been made?

A    I don't know.

Q    Did you know in this instance?

A    No.

Q    Okay.  So at some point, you received a phone call and then you went out to Otay?

A    Yes.

MR. IREDALE:  That's good.

BY MS. EFTEKAR:

Q    Do you know when that was?

A    I went on June 9th of 2014.

Q    Okay.  And you went to conduct field tests and take samples?

A    Exactly.

36:16-25

ALEXANDRA AMBRIZ - 03/30/2017

MS. EFTEKAR:  Okay.  I'm not going to add it as an exhibit.  Did you need to see this?

MR. IREDALE:  No, that's fine.  Thank you.

BY MS. EFTEKAR:

Q     So the photographs show that the four bottles -- did you take photographs of the 15 bottles?

A     I did not.

Q     Is there a reason for that?

A     No, I just -- I took a -- these were the first ones that I tested.  I took a picture of the containers. The other ones were the same, so I only took a picture of these.

Q     Okay.  Were they stored in different places?

A     When I went to the Otay vault, there were four in one area and then 15 in another on the same table. So they all looked the same, so I just -- like I said, I just took a picture of one set of them.

Q     Okay.  The Otay vault, is it refrigerated?

A     This is a -- like, a warehouse area, so I don't know if there are parts of it that might be refrigerated.

Q     Okay.  Were these substances refrigerated?

A     Not at the moment when I was sampling them. 38:24-39:14

Q     Okay.  Okay.  What is the first thing you did when you reported at the Otay vault?

ALEXANDRA AMBRIZ - 03/30/2017

A    I can't recall, like, the first thing that I did.  I know I took a weight of the bottles and I took pictures.  And I took a sample amount into a glass vial and I did the color test, but I don't know, like, the order -- I can't recall the order in which I did things.  I'm sure I took the weight before I took the sample out.  And I believe I took the color test before I put it in the bottle.  That's -- that's kind of the sequence of events.

*39:10-40:4*

Q    Okay.  Why did you do a color test?

A    It's just something we typically do when there is a substance that they don't know.  We have various pouches, and if they think it's suspected as something, we just put a small amount into the pouch.

*38:24-35:14*

Q    Okay.  And who -- I can't remember how you phrased it, but who, I guess, directs you to do that?

A    It's our typical practice for when we go out into the field.

Q    Okay.  And who sets the practices?

A    So it's common, like, analytical practice that we would do.  We also don't have to take a color test.  We can just take the sample --

Q    Okay.

A    -- and take it back to the laboratory and analyze it.

ALEXANDRA AMBRIZ - 03/30/2017

Q    Okay.  So just standard practice --

A    It's standard practice.

Q    -- in the industry?

A    Yes.

39:10-40:4

Q    Okay.  Were you aware that the agents had also done field tests?

A    I was not aware of that.

Q    Okay.  Does it -- would it have mattered?

A    No.

Q    Okay.  What if the test had come out negative?

A    I would have still removed my sample and have it be submitted to the laboratory.

Q    And why is that?

A    Because if it's evidence that they need analyzed, then we still analyze it.

Q    Okay.  You wouldn't have turned to them and said, "It came out negative.  This isn't drugs"?

A    I can't make that determination just based off of a color test.

Q    Who makes that --

A    So it still needs to be analyzed.

Q    Okay.  Who makes that determination?

A    When it gets analyzed, then you can make that determination.

Q    Okay.  I understand.  So when you use the

ALEXANDRA AMBRIZ - 03/30/2017

you do your field testing or your colorimetric testing, if you had no idea what the drug you are looking for is, what would you do first?

A    If I had no idea what the drug test is, what would I do first.  One of the things --

MR. CHU:  Incomplete hypothetical.

THE WITNESS:  Yes.

MR. CHU:  Calls for speculation.

You can answer.

THE WITNESS:  One of the things we also do is a pH, so sometimes you pH it to see if it's acidic or basic.  Or we do a Watesmo to see if it's aqueous.

So those are other tests that we can do.  If we don't know what it is, I don't know that I would use any color test kit.  I would just submit it to the laboratory to be tested.

BY MS. EFTEKAR:

48; 18-21

Q    Okay.  Well, then why use the color test kits at all?

A    Like I said, we don't have to.  It's just common practice.

Q    Okay.  What is -- what does the pH tell you?

A    If it's -- something is acidic or basic.

Q    What does that tell you in terms of --

A    So for example, methamphetamine, when it is

ALEXANDRA AMBRIZ - 03/30/2017

Q     Who do you submit your paperwork to?

A     I submit my paperwork to my supervisor.

Q     Who does he submit the paperwork to?

MR. IREDALE:  She.

MS. EFTEKAR:  She.

THE WITNESS:  She submits it -- it gets sent out to the agent.

BY MS. EFTEKAR:

Q     The agent?  What is --

A     Whatever agent is in charge of whatever case.

Q     Okay.  Is the agent an officer or a lawyer?

A     An officer.

Q     An officer?

A     (Witness nods head.)

Q     Okay.  And so the officer decides if that was a violation of law?

A     I am assuming.

Q     Okay.

A     I don't know.                              56:20-57:17

Q     Okay.  Okay.  When was -- after you went out and sampled, when was the next time that you did anything in connection with these materials or this case, actually, with this case?

A     So I received it from the vault at the laboratory on August 18th, and then I opened one of the

ALEXANDRA AMBRIZ - 03/30/2017

exhibits on August 19th and the other one on August 28th.

Q    When you say "one of the exhibits," what do you mean?

A    So the exhibit that contained four bottles, I opened on August 19th; and the one that contained 15 bottles on the 28th.

*56:20-57:7*

Q    Okay.  So August 19th, you opened four bottles. What did you do with them?

*57:8-58:6*

A    So I did a sodium nitroprusside color test at the laboratory.  And then I did -- I believe I did a pH as well.  So I'm looking at my notes.  I did a pH as well, and then I did a mass spectrometer analysis.

Q    Okay.  So you do the sodium nitroprusside test, and why do you do that?

A    It's just common practice.  So usually we do two tests for our samples when we receive them.  One of them -- and in this instance was a color test and then the other one was a mass spectrometer.

Q    Okay.  Why go beyond that?

A    Oh, we have -- we have to follow our guidelines that say that you have to do two samplings, one of which has to be a confirmatory technique.

Q    And what is a confirmatory technique?

A    So a confirmatory technique -- for example, in

ALEXANDRA AMBRIZ - 03/30/2017

exhibits on August 19th and the other one on August 28th.

Q    When you say "one of the exhibits," what do you mean?

A    So the exhibit that contained four bottles, I opened on August 19th; and the one that contained 15 bottles on the 28th.

Q    Okay.  So August 19th, you opened four bottles. What did you do with them?

A    So I did a sodium nitroprusside color test at the laboratory.  And then I did -- I believe I did a pH as well.  So I'm looking at my notes.  I did a pH as well, and then I did a mass spectrometer analysis.

Q    Okay.  So you do the sodium nitroprusside test, and why do you do that?

A    It's just common practice.  So usually we do two tests for our samples when we receive them.  One of them -- and in this instance was a color test and then the other one was a mass spectrometer.

Q    Okay.  Why go beyond that?

A    Oh, we have -- we have to follow our guidelines that say that you have to do two samplings, one of which has to be a confirmatory technique.

Q    And what is a confirmatory technique?

A    So a confirmatory technique -- for example, in

ALEXANDRA AMBRIZ - 03/30/2017

exhibits on August 19th and the other one on

August 28th.

Q     When you say "one of the exhibits," what do you

mean?

A     So the exhibit that contained four bottles,

I opened on August 19th; and the one that contained

15 bottles on the 28th.                    51:8-13

Q     Okay.  So August 19th, you opened four bottles.

What did you do with them?

A     So I did a sodium nitroprusside color test at

the laboratory.  And then I did -- I believe I did a pH

as well.  So I'm looking at my notes.  I did a pH as

well, and then I did a mass spectrometer analysis.

Q     Okay.  So you do the sodium nitroprusside test,

and why do you do that?

A     It's just common practice.  So usually we do

two tests for our samples when we receive them.  One of

them -- and in this instance was a color test and then

the other one was a mass spectrometer.

Q     Okay.  Why go beyond that?

A     Oh, we have -- we have to follow our guidelines

that say that you have to do two samplings, one of which

has to be a confirmatory technique.

Q     And what is a confirmatory technique?

A     So a confirmatory technique -- for example, in

ALEXANDRA AMBRIZ - 03/30/2017

exhibits on August 19th and the other one on August 28th.

Q    When you say "one of the exhibits," what do you mean?

A    So the exhibit that contained four bottles, I opened on August 19th; and the one that contained 15 bottles on the 28th.

57:8-23

Q    Okay.  So August 19th, you opened four bottles. What did you do with them?

A    So I did a sodium nitroprusside color test at the laboratory.  And then I did -- I believe I did a pH as well.  So I'm looking at my notes.  I did a pH as well, and then I did a mass spectrometer analysis.

Q    Okay.  So you do the sodium nitroprusside test, and why do you do that?

A    It's just common practice.  So usually we do two tests for our samples when we receive them.  One of them -- and in this instance was a color test and then the other one was a mass spectrometer.

Q    Okay.  Why go beyond that?

A    Oh, we have -- we have to follow our guidelines that say that you have to do two samplings, one of which has to be a confirmatory technique.

Q    And what is a confirmatory technique?

A    So a confirmatory technique -- for example, in

ALEXANDRA AMBRIZ - 03/30/2017

exhibits on August 19th and the other one on August 28th.

Q    When you say "one of the exhibits," what do you mean?

A    So the exhibit that contained four bottles, I opened on August 19th; and the one that contained 15 bottles on the 28th.

57:8-58:6

Q    Okay.  So August 19th, you opened four bottles. What did you do with them?

57:8-60:17

A    So I did a sodium nitroprusside color test at the laboratory.  And then I did -- I believe I did a pH as well.  So I'm looking at my notes.  I did a pH as well, and then I did a mass spectrometer analysis.

Q    Okay.  So you do the sodium nitroprusside test, and why do you do that?

A    It's just common practice.  So usually we do two tests for our samples when we receive them.  One of them -- and in this instance was a color test and then the other one was a mass spectrometer.

Q    Okay.  Why go beyond that?

A    Oh, we have -- we have to follow our guidelines that say that you have to do two samplings, one of which has to be a confirmatory technique.

Q    And what is a confirmatory technique?

A    So a confirmatory technique -- for example, in

ALEXANDRA AMBRIZ - 03/30/2017

this instance, the gas chromatograph/mass spectrometer is something that will definitely say whether something is there or not.

Q    Okay.  The sodium nitroprusside test is not a confirmatory test?

A    That is a presumptive test.

57:8 - 58:6

Q    Right.  And the NarcoPouch 923 test is not a confirmatory test?

A    If it has sodium nitroprusside, then no, it's not a confirmatory test.

Q    It's a presumptive test?

A    Yes.

Q    So on August 19th, you did the mass spectrom- -- spec- -- how do you say that?

A    Mass spectrometry?

Q    Yes.

A    Okay.

Q    You are referring -- you are looking at a page right now.  Which page are you looking at?

A    It's 0934 -- oh, I'm sorry.  I also took a weight.  That was another thing that I did, but I forgot to mention that.

Q    You took a weight?

A    I took weights and density.

Q    Okay.  What did you find on August 19th when

ALEXANDRA AMBRIZ - 03/30/2017

you did these testings?

A    I did not find anything.

Q    Okay.  Let me start with -- first you did the sodium nitroprusside test.  What result did you get?

A    It turned blue.

Q    And is that a positive result?

A    Yes.

Q    And is that a positive result for a secondary amine?

A    Yes.

Q    Okay.  On Page 513, for the sodium nitroprusside color test, under Remarks, it has some abbreviations and it's the same one for all of the tests.  What does that mean?

A    So that is the batch number.  So somebody at the laboratory makes up the reagent and they assign it a batch number.  So sodium nitroprusside is composed of two vials that contain two different substances.  The L8 is Laboratory 8, which is ICE office L8, which is the laboratory number.  And then April 14th was the day that it -- April of 2014 was when it was made.

Q    Okay.  Can you explain how you do the sodium nitroprusside test?

A    Sure.  So I take a spot plate and I add reagent A to it.  And then I add my sample and then I

ALEXANDRA AMBRIZ - 03/30/2017

59:22-60:1

add reagent B.

Q     Okay.  And you can do that with a liquid; is that correct?

A     I did it with a liquid, yes.

Q     Okay.

A     And I run a blank as well.  So I will add reagent A to the spot plate, and then I don't add anything, and then I add reagent B to the spot plate as well.

Q     Okay.  And that looks like that was run No. 1?

A     Yes.

Q     Okay.  And it passed?

A     Yes.

60:14-17

Q     So were your results of the sodium nitroprusside color test consistent with the results you got with the NarcoPouch 923 test?

A     Yes, they were.

59:8-60:17

Q     And then I notice at the bottom of 513, you did a pH test?

A     Yes.

Q     And what -- and you found a pH of 8?

A     Yes.

Q     And what does that tell you?

A     That it is a little bit on the basic side.

Q     Okay.  Was that -- did that give you any

ALEXANDRA AMBRIZ - 03/30/2017

(Reporter interjects.)

THE WITNESS:  Yes, mass spectrometer.

MR. CHU:  Mass spec.

THE WITNESS:  Mass spec.  Sorry.

BY MS. EFTEKAR:

63:6-64:18

Q    Why did you go straight to the sodium nitroprusside test?

A    Because it's a quick and easy test to do.  As soon as you open it, you can just do a drop in there and see what -- what happens.  Then I prepped my sample for my confirmatory test.

Q    Okay.

(Reporter interjects.)

THE WITNESS:  Prepared my sample for the confirmatory test.

BY MS. EFTEKAR:

Q    So if the agent, when he called you, had said it was suspected cocaine, you would have done a different color test?

A    Yes.

Q    Would you have then done the marquis test first?

A    If it was suspected cocaine, no, I would have done a cobalt thiocyanate test.

(Reporter interjects.)

ALEXANDRA AMBRIZ - 03/30/2017

THE WITNESS:  Cobalt, and then thiocyanate is t-h-i-o-c-y-a-n-a-t-e.

BY MS. EFTEKAR:

Q     Are you familiar with the term "SOPs"?

A     Standard operating procedures.

Q     Who sets your SOPs?

A     The headquarters does.

Q     DEA headquarters?

A     DEA headquarters, yes.

Q     And what are your SOPs in connection with drug testing?

A     So we follow the analysis of drugs manual, the ADM, which is what I mentioned in the beginning, which are the rules as to how to test something.  So like I said, you have to do a minimum of two tests on each -- whether it's a vial or a -- or a container of any kind. So you do two tests.  One of them has to be confirmatory.

*63:6 - 64:18*

Q     Okay.  And in this case, you did three tests?

A     I did do three tests, yes.

Q     Okay.  Why do you have to do two tests?  Do you know the reasoning behind that?

A     Because -- well, one of the reasons is they want to make sure you don't switch vials or, you know, that you don't do some sort of mix-up.  So that's why

ALEXANDRA AMBRIZ - 03/30/2017

these?

A    So I saw that there was nothing in these.  So then what I decided to do was use a different solvent.

Q    Okay.

A    And that's what I did in my second set of tests.

*66:6-67:23*

Q    Okay.  And does that start with 938?

A    Yes, 938.

Q    Okay.  So is 938 Sample 1?

A    So this is a blank.  So this is a solvent that we commonly use to see if there is anything under one percent.  We are supposed to try and identify any controlled substance or any substance that's greater than one percent in our samples.  So this is a solvent that we use.

And then this solvent, we use an internal standard called C24.  I believe it's tetracosane.  And that's what we use as our marker to see if anything -- so anything above that peak is greater than one percent; anything below that peak is less than one percent.

Q    If something is less than one percent --

A    If it's, for example, not controlled, then we don't identify it if it's less than one percent.

Q    Okay.  But if it is a controlled substance, you still identify it?

EXHIBIT E 43-DEPOS
PAGE 160

ALEXANDRA AMBRIZ - 03/30/2017

A    We try and go after it and identify it, yes, if it is, but we -- that's kind of a -- you know, if there is something else there, then you identify the major components, and then if -- you can try and identify something else, but if you can't identify it, then you just say that it's suspected or indicated.

Q    Okay.  And is it normal to have these little ups and downs?

A    Yes.  So the -- this is the -- the second -- so 0939 is a -- the same blank, but it was ran under a different method.  It's drug 1, split 15.

So in the instrument -- you can decide how much you actually put into the detector, into the instrument. So this one was ran at a lower split, which means that more was being put into the instrument, less was being, like -- not evacuated, but was being taken out of your sample and more was being put into the instrument.

So it's a way of doing something at a -- kind of a higher concentration, but I didn't change the concentration, just more was being injected into the instrument.

Q    Okay.

A    So that's the blank for that and it's still clean.

Q    Okay.  And the 940, USA 940?

ALEXANDRA AMBRIZ - 03/30/2017                                      83:1-13

Q    Okay.  Is tryptamine a secondary amine?

A    It does have a secondary amine, yes.

Q    Is that why you got the blue result in the sodium nitroprusside test in the NarcoPouch 923 test?

A    I don't know.

Q    Okay.  What gave you the blue result?

A    I don't know.

Q    Okay.  And we went over this before, but the sodium nitroprusside and the NarcoPouch 923, they test for secondary amines, right?

A    Yes.

Q    Tryptamine has a secondary amine in it?

A    Yes, it does.

Q    951, is that a different split that you ran at?

A    Yes.  So 952 is the other peak at 4.7.  That's also -- there is a library match of something that could be it that's not a controlled substance.

Q    Do you know what the substance is?

A    No, I do not.

Q    Do you -- are you familiar with tetrahydroharmon?

A    No.

Q    You have never heard of that before?

A    No.

Q    And then 953, same?

EXHIBIT E
43-DEPOS
PAGE 162

ALEXANDRA AMBRIZ - 03/30/2017

to measure anything greater than that being at one percent, and anything lower being less than.

Q Okay. 956, what is this?

A That's the same -- the same peak at the other split, at the more concentrated split.

Q Okay. And this is the 6.122 peak?

A Yes.

Q Okay. What's 957?

A That is for Sample 2, so.

Q Okay. So I will just ask you, then, did you find the same results in the other samples?

A Yes.

Q Okay. Exactly the same?

A Yes.

Q And then why is it that for the phenethylamine and the tryptamine, at the very end you did this -- what did you call it?

A A gas chromatograph?

Q No.

A No?

Q The retention time?

A Retention time comparison, yes.

Q All right. Why for those two?

A I just wanted to have another test. Especially since the sodium nitroprusside came out positive, but

*86:23-87:17*

ALEXANDRA AMBRIZ - 03/30/2017

there wasn't any methamphetamine in there, I wanted to have a second test that showed -- that showed me -- or there could have been something else in there that maybe I could have missed in the mass spectrometer that maybe would have been better detected in the FID, the detector in the gas chromatograph, so I just ran another set of tests.

86:23-87:7

Q    So this is called a gas chromatograph?

A    Gas chromatograph flame ionization detector, GCFID.

Q    All right.  And you only compared it with phenethylamine and tryptamine?

A    Yes, because that is what I had found in the mass spectrometer portion -- or in the mass spectrometer test.  Had I seen other peaks that would have alluded about the time that, like, say, methamphetamine comes out, then I would have noted that, but there was nothing there.

Q    Why did you choose these two out of the seven or so that we went through?

A    These two are the ones that we had standards for.

Q    What does that mean, "standards"?

A    Standards?  So we -- we actually have these powders in our laboratory, so we can run them as

ALEXANDRA AMBRIZ - 03/30/2017

procedures?

A    Yes, we don't normally do a positive control.

Q    And is that the same thing as co-injections?

A    Co-injections is -- it can mean a couple of things. You can either inject it -- in one instrument, like the FID, because there is two columns, you can inject it at the same time. Or I guess the positive control could be, like, you inject your sample and then you inject the positive control. But I have never done anything like that and we don't normally do that. 94:11-17

Q    Okay. On the -- we went over that -- your color testing noted the presence of a secondary amine, correct?

A    Yes.

Q    Did you find a secondary amine in the further testing that you did?

A    Well, tryptamine is a secondary amine.

Q    Okay.

Have you heard of instances where meth has been synthesized with protecting groups so that you wouldn't detect them in the GC/MS?

A    No.

Q    You have never heard of that?

A    No.

Q    Do you attempt to purify the substances and

ALEXANDRA AMBRIZ - 03/30/2017

          MR. IREDALE:  Make cheese.

BY MS. EFTEKAR:

     Q    So I understand that meth is a synthetic drug, correct?

     A    Yes.

     Q    What defines meth for your purposes of finding a controlled substance?

     A    What do you mean what defines it?

     Q    What do you need to identify within the -- a substance to determine that it is meth?

     A    Found methamphetamine.  That's usually what we --

     Q    So is that a very specific chemical composition?

     A    We identify the -- the chemical compound itself, methamphetamine.

     Q    Isn't -- aren't there, I guess, forms of meth that have been changed, but have a similar effect?

     A    I haven't come across that.  I don't know.

     Q    Okay.  So there is only one form of meth that you identify as meth?

     A    What do you mean by "form"?

     Q    I'm trying to figure out how you identify methamphetamine.  What does that mean?  Is it, you know, three carbon groups, and a this group, and a that group?

96:23-97:5

96:23-97:12

ALEXANDRA AMBRIZ - 03/30/2017

A    Okay.  So for example, if we receive a meth sample, what we typically do, we do a color test, and that can tell us -- it could be sodium nitroprusside or marquis -- just to indicate what might be -- if meth might be there.

*96:23-97:5*

And then we do a mass spectrometer, which is -- we put the -- we dissolve the methamphetamine -- it's typically in a powder, but it could be in a liquid.  We dissolve it and -- and by "in a liquid," I mean that they could have put the methamphetamine in the liquid, dissolved it, and then they evaporate the solvent and then they can extract the meth from that.

*96:23-97:12*

But you can still -- because usually it's so concentrated in that liquid, you can still take that liquid and inject it into the mass spectrometer.  The mass spectrometer will separate every component that's in either that powder or that liquid into these peaks, similar as we saw here.

One of those peaks will be methamphetamine -- or -- if you are analyzing a methamphetamine sample, would be methamphetamine.  You compare that TIC.

So it has -- the methamphetamine molecular structure will break up at the same fragmentation every time.  So you will see a 58 ion.  You will see a 91 ion. You will see a 148 ion, which are the different

ALEXANDRA AMBRIZ - 03/30/2017

goes into the plastic bottle.

Q    All right.  Now, you, of course, have had significant training in forensic chemistry, at least forensic analysis; is that fair?

A    That is correct.

Q    And so you understood, of course, that the presumptive test that you did was not something that would establish to a degree of scientific certainty the identity of the liquid which was tested?

A    That is correct.

Q    As a matter of fact, it only, as you understood it, could establish that something in that liquid was in the family of secondary amines to which this test would react?

A    That's correct, yes.

Q    And of course, you told us, as I recall when you were asked by counsel, that you did not know the exact reagent, but she asked you, in essence, to assume it was sodium nitroprusside?

A    Yes.

Q    And so -- by the way, under your training, under your practice, you would never go into a courtroom and testify to any degree of scientific certainty on the basis of a presumptive test alone that a liquid did or did not contain --

*107:21- 108:6*

ALEXANDRA AMBRIZ - 03/30/2017

A    That is correct.

Q    -- a controlled substance?

A    We do not testify based on presumptive tests.

Q    And as far as you know, that is the general consensus or policy of the DEA lab?

A    Yes.

107:21-108:6

Q    And so, of course, you -- you were taught, I suspect early on, maybe even before you got your BA, but certainly in -- in the criminalistics that you studied thereafter, that a field test or presumptive test is by no means a confirmatory finding?

A    That is correct.

Q    Or a definitive test?

A    Yes.

Q    And certainly not something that you, as an expert, would go into court and testify about?

A    Yes.

Q    Now, as I understand it, after you took these photographs, you then also went through the same procedure with respect to sampling as to the other 15 bottles that were in a separate group?

A    Yes, the samples.

Q    And you gave that a different exhibit number, I believe?

A    That was given a different case number.

ALEXANDRA AMBRIZ - 03/30/2017

FURTHER EXAMINATION

BY MS. EFTEKAR:

153:3 - 154:1

Q     Earlier you said that you would never testify in court based upon a presumptive test, correct?

A     Just a presumptive test; that is correct.

Q     Right.  And that's a DEA rule?

A     I don't know that it's a DEA rule.  I know we are not -- when we analyze something, we can't just submit a lab report based off of what you -- the results you observe off of a presumptive test.

Q     Where does that come from?

A     It is in our manual that we need to do further testing than that.

Q     Okay.  If Safariland -- these NarcoPouches that you used had written on the box, "This is good enough for you to testify in court upon.  You don't have to do any further testing," would you have followed those instructions?

A     No.

MR. CHU:  Calls for speculation.

THE WITNESS:  I follow the instructions of our -- of our manual that we use.

BY MS. EFTEKAR:

Q     Okay.  Safariland doesn't have the authority to tell you how to do your job; is that correct?

ALEXANDRA AMBRIZ - 03/30/2017

153:3-154:1

A    That is correct.

Q    Are you aware that Safariland instructs users to use the marquis test before using another test?

A    No.

Q    Knowing that, is that going to change your procedures when you go do field drug testing?

A    Knowing that, I will probably now use both, yes.

Q    Okay.

MR. IREDALE:  If they had clearly set that out in the instructions --

(Reporter interjects.)

MR. IREDALE:  It was -- it was a snotty comment.  I move to strike it and apologize.

MS. EFTEKAR:  And that is all that I have.

MR. IREDALE:  Okay.  Now, it's your deposition, so would you like to propose the stipulation?

MS. EFTEKAR:  Yes.

Steve, is 30 days enough time?

MR. CHU:  I think so.  Thirty days.

We are going to get a copy of the transcript. I will forward it to you for your review.  Is 30 days enough for you to review it?

THE WITNESS:  Yes.

MR. IREDALE:  And then shall we do it so that

ALEXANDRA AMBRIZ - 03/30/2017

the original of the transcript will be then sent to
Mr. Chu, who will forward it to the witness?  She will
have 30 days to review it, sign it --

          MS. EFTEKAR:  I'm going to say --

          MR. IREDALE:  Oh, good.

          MS. EFTEKAR:  All right.  Let's stipulate to
leave -- to relieve the court reporter of her duties
under the Code with regard -- is it the same in federal
court?

          MR. IREDALE:  No.

          MS. EFTEKAR:  No.  Okay.

          MR. IREDALE:  It's a little different, and we
are going to take care of this with a stipulation too.

          MS. EFTEKAR:  Okay.

          So you will have 30 days to review your
transcript, make any changes you deem necessary, and you
sign it.  The original transcript will be sent to
Mr. Chu.

          And, Mr. Chu, once you receive any notice of
changes, you will let everyone else know -- is ten days
sufficient time for that?

          MR. CHU:  Why don't we say two weeks, just in
case it falls on a vacation or something?

          MS. EFTEKAR:  Okay.  And then your office will
maintain custody of the original transcript and will

ALEXANDRA AMBRIZ - 03/30/2017

produce it upon reasonable request.

In the event the original transcript is not signed or is subsequently lost, destroyed, or otherwise becomes unavailable, an unsigned, certified copy may be used for all purposes that the original could be used, including trial.

MR. CHU:  So stipulated.

MR. IREDALE:  That would be so stipulated.

And we have all stipulated as well to waive any additional information required by Rule 30 to be uttered by the court reporter at the conclusion of the deposition.  We want to thank her very much.

MR. CHU:  Agreed.

MR. IREDALE:  And I think that would conclude the deposition.

MR. CHU:  Thank you.

THE VIDEOGRAPHER:  Off the record at 1:49 p.m. and this marks the end of this deposition.

(Whereupon, the deposition concluded at 1:49 p.m.)

* * * * *

ALEXANDRA AMBRIZ - 03/30/2017

I, ALEXANDRA AMBRIZ, do hereby declare under penalty of perjury under the laws of the State of California that I have read the foregoing transcript; that I have made such corrections as noted herein, in ink, initialed by me, or attached hereto; that my testimony as contained herein, as corrected, is true and correct.

Executed this _____ day of _____, _____, at

_____, _____.

_____

ALEXANDRA AMBRIZ

ALEXANDRA AMBRIZ - 03/30/2017

I, Carline A. Fonseca, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

Dated:  This _____ day of _____, _____,
        at San Diego, California.

_____
Carline A. Fonseca
CSR No. 8068

EXHIBIT F

PAGE 176

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

CASE NO.:  16-cv-0277-GPC-AGS

DOYMA VANESSA MICHEL, an
individual,

    Plaintiff,

    vs.

UNITED STATES OF AMERICA,
et al.,

    Defendants.

_____

VIDEOTAPED DEPOSITION OF

T. ALLEN MILLER

Taken on behalf of the Plaintiff

DATE TAKEN:   Tuesday, March 28, 2017

TIME:   1:06 p.m. to 3:15 p.m.

LOCATION:   Hedquist & Associates
345 East Forsyth Street
Jacksonville, Florida 32202

Examination of the witness taken before:

Terrie L. Cook, RPR, CRR, FPR, and a Notary Public

Hedquist and Associates
345 East Forsyth Street
Jacksonville, Florida  32202
(904)354-4111 FAX (904)791-9103

ORIGINAL

EXHIBIT F
PAGE 177

2

APPEARANCES OF COUNSEL

On behalf of Plaintiff

    Eugene G. Iredale, Esquire, via teleconference
    Iredale & Yoo, APC
    105 West F Street
    Fourth Floor
    San Diego, California   92101-6036

On behalf of the Defendant United States of America

    Steve B. Chu, Esquire, via teleconference
    U.S. Attorney's Office
    880 Front Street
    Room 6293
    San Diego, California   92101

On behalf of the Defendant Safariland, LLC

    Steven D. Smelser, Esquire
    Yukevich Cavanaugh
    355 South Grand Avenue
    15th Floor
    Los Angeles, California   90071

ALSO PRESENT:

    Shane Davidson, Videographer
    VideoTrack Litigation and Trial Support
    600 West Broadway
    Suite 700
    San Diego, California   92101

-     -     -

EXHIBIT F
PAGE 178

3

I N D E X


E X A M I N A T I O N


WITNESS                                                  Page

T. ALLEN MILLER

DIRECT EXAMINATION BY MR. IREDALE                          5


E X H I B I T S

FOR IDENTIFICATION                                       Page

Plaintiff's Exhibit 1                                      89

4

S T I P U L A T I O N

It was stipulated and agreed by and between counsel for the respective parties, and the witness, that the reading and signing of the deposition by the witness was not waived.

- - -

THE VIDEOGRAPHER:  This is the record videoconference depo in the matter of Michel versus United States of America.  My name is Shane Davidson.  Today's date is March 28th, 2017, and it is now 9:06 here in San Diego.

Please be aware that the video and audio recording will take place at all times throughout this deposition unless all counsel agree to go off the record.

Would counsel please introduce yourselves and state who you represent?

MR. IREDALE:  Yes.  Gene Iredale for the plaintiff, Doyma Michel.

MR. CHU:  This the U.S. attorney, Steve Chu, for the United States.

MR. SMELSER:  Steven Smelser for Safariland.

THE VIDEOGRAPHER:  And at this time would the court reporter please swear in the deponent?

- - -

EXHIBIT F
PAGE 180

5

T. ALLEN MILLER,

acknowledged having been duly sworn to tell the truth

and testified upon his oath as follows:

THE WITNESS:  I do.

DIRECT EXAMINATION

BY MR. IREDALE:

Q     For me, it is good morning; for you, it just

became good afternoon.

A     Good morning/afternoon.

Q     Could I ask you, sir, your full name, please?

A     Sure.  Allen Miller.

Q     Mr. Miller, have you ever testified in a

deposition?

A     Yes.

Q     You understand that in this case, it is a

deposition that may be used at a later time for various

reasons in court?

A     Yes.

Q     You understand that you are under oath, which

you have just taken?

A     I do.

Q     And also because we are doing this deposition

by videoconference, there may be a slight delay between

the end of my question and your answer.  And I have seen

that you have taken care to make sure that you permit me

6

to finish the question before you begin the answer, which I appreciate. For my part, I will try to make sure that I let you complete any answer before I follow on with an additional question.

A    That's fine. Can you hear me okay?

Q    Yes, you're coming through very clearly. Thank you.

A    Okay.

Q    And I hope the reciprocal is true.

A    Yes.

Q    Mr. Miller, can you tell me what your position is at Safariland?

A    I am the product manager for the forensics division.

Q    What I'd like to do first is briefly cover your background, training and experience. Could you describe to me what your educational background is, please?

A    Yes, I have a Bachelor of Science in Chemistry from the University of Tampa.

Q    And when did you earn that degree?

A    In 1979.

Q    Could you tell me now, in brief, your occupational history after you earned your degree?

A    I was briefly employed by a small analytical laboratory in Tampa as a water chemist, testing drinking

EXHIBIT F
PAGE 182

20

called Ectasy.                                           20:2-11

Q    Now, I don't want to tredge on any trade secrets but is it fair to say that the major ingredient of the 923 is sodium nitroprusside?

A    Yes.

Q    Which is a common re-agent that is used for presumptive tests for those two controlled substances that you have mentioned, methamphetamine and methylenedioxymethamphetamine?

A    Yes, sir.  I'm -- I'm only giggling at your command of the chemical terminology, so.

Q    Oh.  Actually, to be accurate, I should have said 3, 4 methylenediethylmethamphetamine.

MR. IREDALE:  Now, may I ask, Mr. Smelser, if you happen to have there with you the discovery that was turned over by Safariland in response to the plaintiff's request for production?

MR. SMELSER:  I do.

MR. IREDALE:  The reason I ask is that in order to avoid any logistics difficulties in marking and show exhibits to the witness, what I would like to do is to refer from time to time, with your permission, to the Safariland Bates stamp and we will have those particular documents referred to set aside and used as exhibits for this deposition.  And

21

they'll -- they'll go by, though, the denomination that you've put as the Bates stamp.

MR. SMELSER:  That's acceptable.

MR. IREDALE:  Thank you.

21:6-11

BY MR. IREDALE:

Q     Now, 923 gives -- now, there's also something called the Simon's Reagent, am I correct?

A     They're one in the same.

Q     Sodium nitroprusside is the same as Simon's Reagent?

A     Yes, sir.

Q     Now, let me ask you also, you mentioned that the 923 is designed to test for two controlled substances, presumptively methamphetamine and MDMA, which is commonly known as Ectasy; is that true?

A     Correct.

Q     But the 923 cannot itself distinguish between those two by its reaction presumptively; is that true?

A     Correct.

Q     So am I correct that the 902 NarcoPouch is designed to be used in conjunction with the 923?

A     You are.

Q     And 902 is also a commonly used reagent, the Marquis reagent?

A     Yes, it is.

102

REPORTER'S CERTIFICATE

STATE OF FLORIDA

COUNTY OF DUVAL

I, Terrie L. Cook, RPR, CRR, FPR, certify that I was authorized to and did stenographically report the deposition of T. ALLEN MILLER; that a review of the transcript was requested; and that the foregoing transcript, pages 1 through 100 is a true record of my stenographic notes.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

DATED on April 12, 2017.

_____
Terrie L. Cook, RPR, CRR, FPR

EXHIBIT F
PAGE 185

EXHIBIT G

PAGE 186

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

DOYMA VANESSA MICHEL,   )
an individual,          )
                        )
        Plaintiff,      )
                        )
vs.                     )   Case No.:
                        )   16-cv-0277-GPC-AGS
UNITED STATES OF        )
AMERICA et al,          )
                        )
        Defendants.     )
_____)

Deposition of James Malone

San Diego, California

Thursday, March 30, 2017

Abigail R. Torres, CSR No. 13700

EXHIBIT G
PAGE 187

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

DOYMA VANESSA MICHEL,          )
an individual,                 )
                               )
          Plaintiff,           )
                               )
vs.                            )    Case No.:
                               )    16-cv-0277-GPC-AGS
UNITED STATES OF               )
AMERICA et al,                 )
                               )
          Defendants.          )
_____)

DEPOSITION OF JAMES MALONE, commencing at the hour of 2:26 p.m. on Thursday, March 30, 2017, at 880 Front Street, Room 6293, San Diego, California 92101, before Abigail R. Torres, Certified Shorthand Reporter in and for the State of California.

Page 2

EXHIBIT G

PAGE 188

A P P E A R A N C E S

For the Plaintiff:

IREDALE & YOO, APC

BY:   EUGENE G. IREDALE, ESQ.

105 "F" Street, 4th Floor

San Diego, California 92101

619.233.1525

For the Defendant United States of America:

US ATTORNEY'S OFFICE

BY:   STEVE B. CHU, ESQ.

880 Front Street, Room 6293

San Diego, California 92101

619.546.7167

For the Defendants Safariland, LLC:

YUKEVICH CAVANAUGH

BY:   BOBBIE EFTEKAR, ESQ.

355 South Grand Avenue, 15th Floor

Los Angeles, California 90071

213.326.7777

Also Present:

Shane Davidson, Videotrack, LLC

Page  3

EXHIBIT G
PAGE 189

I N D E X

WITNESS:   James Malone

                                                            PAGE

EXAMINATION BY MR.  IREDALE:                                   6

EXAMINATION BY MS.  EFTEKAR                                   50

EXAMINATION BY MR.  CHU                                       55

FURTHER EXAMINATION BY MR.  IREDALE                           60

FURTHER EXAMINATION BY MS.  EFTEKAR                           67


E X H I B I T S


MARKED FOR IDENTIFICATION                                   PAGE

Exhibit 1        James Malone, curriculum vitae               7

Exhibit 2        Rush Analysis Request form                  17

Exhibit 3        Chemical Analysis Report                    29

Exhibit 4        Case Details Report                         41
                     (USA_0499 through USA_0511)

Exhibit 5        Documents                                   44
                     (USA_0854 through USA_0988)


**Page 4**

EXHIBIT G
PAGE 190

San Diego, California

Thursday, March 30, 2017, 2:26 p.m.

-oOo-

THE VIDEOGRAPHER:  This is the beginning of Disc 1 of the deposition of James Malone.  The case caption is Michel versus United States of America, et al.

My name is Shane Davidson.  I am a notary public for the State of California, County of San Diego.

The court reporter today is Abigail Torres. Today's date is the 30th day of March, 2017, and it is now 2:25 p.m.

Please be aware that the video and audio recording will take place at all times throughout this deposition unless all counsel agree to go off the record.

Would counsel please introduce yourselves and state who you represent?

MR. CHU:  Assistant US Attorney Steve Chu for the United States.

MS. EFTEKAR:  Bobbie Eftekar, attorney for defendant Safari Land.

MR. IREDALE:  And Gene Iredale for the plaintiff, Doyma Michel who is present with us

Page 5

EXHIBIT G
PAGE 191

today.

THE VIDEOGRAPHER:  And at this time, would the court reporter please swear in the deponent.

James Malone,

having first been duly sworn, testified as follows:

EXAMINATION

BY MR. IREDALE:

Q.  Sir, may I ask your full name, please.

A.  My name is James V. Malone.

Q.  Mr. Malone, you are currently employed with the Drug Enforcement Administration?

A.  That's correct.

Q.  And you work as the laboratory director for the Southwest laboratory?

A.  Yes.

Q.  That's now located in Vista, California?

A.  Yes.

Q.  You've been in that position since 2011?

A.  Correct.

Q.  I'd like to discuss with you some of the background, training, and experience that you have in the area of forensic chemical analysis and management of a lab.

Page 6

EXHIBIT G
PAGE 192

the -- anyone regarding the deadline.

Q.  And let me ask you in that regard.  If you know, were any statistics kept concerning the questions about which I was asking you for 2014?  In other words, the total number of rush requests submitted, how many were able to be fulfilled?  How many needed to be at least negotiated or modified?

A.  No.

Q.  Now, I'm going to ask you, if I could, some questions regarding a forensic matter.

First of all, you're familiar with what are called presumptive tests?

A.  Yes, I am.

Q.  And in the course of your work, you've seen the commercially marketed NarcoPouch tests?

A.  Yes, I have.

Q.  And may I ask, in that connection, is there any program by which you or someone from your lab can present training to the actual investigative agents as to the administration of field tests?

A.  We have conducted training before, yes.

Q.  Did you conduct any such training in 2014 --

A.  I don't recall.

Q.  -- if you remember.

And, now, let me ask you a procedural

21:17-23:6

Page 21

question regarding whether there's a policy in place or was a policy in place in 2014.

First of all, do any of the DEA analysts who were employed there in 2014 get training in the basics of the criminal justice system? What a trial is? The manner in which they may be called upon to testify?

A. Yes.

Q. And are they taught such elemental legal things as elements of a crime, if you know?

A. I -- I don't know exactly what -- what each group has been taught in their training.

Q. And when you say "each group," you mean --

A. Each group of new chemists.

Q. Now, could I just ask a little bit about that.

The new chemists that you're getting right now, can you tell me what your understanding is of their training before they come to you, understanding that you don't necessarily conduct it?

But --

A. Right.

Q. -- what is your understanding?

A. Well, we don't do the training in the laboratory anymore, but I think our training is more

Page 22

EXHIBIT G
PAGE 194

focused on moot court testimony and really more our role in it.  We don't have a huge role in the investigative end of the criminal proceedings.

So our scope is more limited towards the -- the chemical analysis and the expert witness testimony.

*21:17-23:6*

Q.  Fair enough.  And, in any event, is there any policy that was in effect in 2014 that in the event a -- an analysis showed that these samples or substance to be tested was not a controlled substance that that should be reported on an expedited basis to the case agent?

A.  There's not a policy on that.

Q.  Well, let me ask you this:  Is there any provision by which an analyst can reach out and contact the case agent and give an oral report?

A.  No.  We issue our reports on the analysis on the DEA-113 Report, so our goal is to complete that analysis, and then transmit it.

Q.  Can you tell me what rules, if any, were in effect about the timely production of reports within a time period after the completion of the analysis?

A.  There are not rules in place for that.

Q.  There's no rule at all?

A.  No.

Page 23

EXHIBIT G
PAGE 195

So as I mentioned, I represent Safariland, the maker of these NarcoPouches.

51:4-18
51:4-12

A. Okay.

Q. Are you familiar with the NarcoPouch 923?

A. I am.

Q. Do -- it's a presumptive test; correct?

A. Correct.

Q. Do you know what it's a presumptive test for?

A. I would have to look at it. Specifically, it's a presumptive test for methamphetamine and MDMA.

Q. Okay. Are you familiar with sodium nitroprusside test?

A. Yes, I am.

Q. All right. Are you aware if that test is the same as the NarcoPouch 923?

A. I believe it is.

Q. Okay. And then the NarcoPouch 902, are you familiar with that test?

A. Yes, I am.

Q. And you're aware it's the Marquis test?

A. Correct.

Q. And then there is a color test that's performed in the lab also called the Marquis test?

Page 51

EXHIBIT G
PAGE 196

A.   Yes.

Q.   What does the Marquis test test for?

A.   It's a presumptive test for opiates as well as amphetamine-related compounds, but it produced a presumptive color with several things.

Q.   Okay.  Is it your practice to do the Marquis test as a first color test?

A.   That really depends on the individual analyst and the sample that they have.

52:10-53:15

Q.   Okay.  You mentioned that sometimes -- let me get this right, so correct me -- your office does training for officers on how to use these field tests?

A.   Upon request, we have conducted training, yes.

Q.   And when you say "officers," is that any officer in any division of the government?

A.   We have honored several requests for CBP, ICE, DEA, or other individuals as -- as they have requested training, yes.

Q.   Okay.  And does that training involve how to use the field test?

A.   Usually, the office that we're training will supply the field test because there are multiple manufacturers.

Page 52

So, like, for example, your Marquis test may be somebody else's color test that's a different number, but it's, essentially, the same chemistry.

But they'll typically provide the narcotics test, and, then, we will bring the controlled substances and demonstrate what a -- a positive reaction is and what is the -- usually the appropriate amount of time to wait on the reaction and things like that.

Q.  Okay.  Do you do any training on what they're supposed to do with the a positive reaction?

A.  We train them that it's presumptive. Exactly, I mean, it can indicate that there's something present.  But there -- it's a color, and it is, in fact, a presumptive test.  *52:10 - 53:15*

Q.  Okay.  I noticed that you were a forensic chemist, you know, since 1992; correct?

A.  I was, yes.

Q.  Back then, did they have field drug test kits?

A.  Yes.

Q.  And -- and those, again, were presumptive tests; correct?

A.  Correct.

Q.  And at that time, you would never testify

Page 53

So, like, for example, your Marquis test may be somebody else's color test that's a different number, but it's, essentially, the same chemistry.

But they'll typically provide the narcotics test, and, then, we will bring the controlled substances and demonstrate what a -- a positive reaction is and what is the -- usually the appropriate amount of time to wait on the reaction and things like that.

53:10-15

Q. Okay. Do you do any training on what they're supposed to do with the a positive reaction?

A. We train them that it's presumptive. Exactly, I mean, it can indicate that there's something present. But there -- it's a color, and it is, in fact, a presumptive test.

Q. Okay. I noticed that you were a forensic chemist, you know, since 1992; correct?

A. I was, yes.

Q. Back then, did they have field drug test kits?

A. Yes.

Q. And -- and those, again, were presumptive tests; correct?

A. Correct.

Q. And at that time, you would never testify

Page 53

EXHIBIT G
PAGE 199

So, like, for example, your Marquis test may be somebody else's color test that's a different number, but it's, essentially, the same chemistry.

But they'll typically provide the narcotics test, and, then, we will bring the controlled substances and demonstrate what a -- a positive reaction is and what is the -- usually the appropriate amount of time to wait on the reaction and things like that.

Q. Okay. Do you do any training on what they're supposed to do with the a positive reaction?

A. We train them that it's presumptive. Exactly, I mean, it can indicate that there's something present. But there -- it's a color, and it is, in fact, a presumptive test.

Q. Okay. I noticed that you were a forensic chemist, you know, since 1992; correct?

A. I was, yes.

Q. Back then, did they have field drug test kits?

A. Yes.

Q. And -- and those, again, were presumptive tests; correct?

A. Correct.

Q. And at that time, you would never testify

*53:16-24*

Imagine Reporting 619.888.0297

EXHIBIT G
PAGE 200

So, like, for example, your Marquis test may be somebody else's color test that's a different number, but it's, essentially, the same chemistry.

But they'll typically provide the narcotics test, and, then, we will bring the controlled substances and demonstrate what a -- a positive reaction is and what is the -- usually the appropriate amount of time to wait on the reaction and things like that.

Q. Okay. Do you do any training on what they're supposed to do with the a positive reaction?

A. We train them that it's presumptive. Exactly, I mean, it can indicate that there's something present. But there -- it's a color, and it is, in fact, a presumptive test.

53:16-54:24

Q. Okay. I noticed that you were a forensic chemist, you know, since 1992; correct?

A. I was, yes.

Q. Back then, did they have field drug test kits?

A. Yes.

Q. And -- and those, again, were presumptive tests; correct?

A. Correct.

Q. And at that time, you would never testify

Page 53

EXHIBIT G
PAGE 201

based solely on a field drug test kit --

A.   No.

Q.   -- result?

54:4-18

Okay.  And you're always required to do the confirmatory testing; is that correct?

A.   Yes.

Q.   Who mandates that?

A.   It's our -- part of our procedures.

Q.   Okay.

A.   So part of your policy.

Q.   And that's DEA?

A.   Correct.

54:13-25

Q.   Okay.  Does Safariland have any authority to tell you whether their test is sufficient alone -- on its own?

A.   Sufficient for?

Q.   So if Safariland said, "All you have to do is my test.  You don't have to do any of your confirmatory tests," would you follow that?

A.   No.

Q.   Right.  Because Safariland doesn't have the authority to tell you how to do your drug testing?

A.   Safariland can't dictate what DEA does.  Yes.

Q.   Okay.  Thank you.

Page 54

Q.  And you said it's used to test for methamphetamine and MDMA?

A.  Yes.

MS. EFTEKAR:  Objection.  Misstates testimony.

Presumptively.

BY MR. IREDALE:

Q.  Well, fair enough.  It says "a presumptive test for methamphetamine and MDMA (ecstasy)"; is that right?

A.  That's what it says.  Correct.

Q.  Yes.  And do you know, generically, what this test was?

A.  Generically?

Q.  Yes.

MS. EFTEKAR:  Objection.  Vague.

MR. CHU:  Go ahead.

BY MR. IREDALE:

Q.  Go ahead.

A.  I -- I don't understand the question.

Q.  Well, do you know what else in the world other than methamphetamine and MDMA would cause a color reaction?

A.  It's generally described as a secondary amine.

61: 21-25

Page 61

EXHIBIT G
PAGE 203

A.   I haven't tested those.

Q.   Can you tell me just generally how many other substances in the world other than methamphetamine or MDMA would cause a dark blue result?  Would it be in the thousands?

A.   I don't know.

Q.   Or the hundreds of thousands?

A.   I don't know.

Q.   Is there any scholarly literature which you have reviewed which has a list of other commonly available substances which would react as a secondary amine and give a positive reaction to sodium nitroprusside?

A.   Nothing that I've reviewed, no.

Q.   Nothing you've ever read?

A.   No.

Q.   Let me ask you this:  In the last month, have you read any articles in the field of forensic drug testing?

A.   Yes.

Q.   Tell me what.

A.   I don't recall a title, off the top of my head.

Q.   Well, anything in the last year on the issue of presumptive or field tests?

63:24-64:12

Page 63

EXHIBIT G

PAGE 204

A.   I've read the SWGDRUG guidelines which deal with both.

Q.   And do you consider the SWGDRUG lines -- DRUG guidelines to be definitive or authoritative in the field?

A.   They're recommendations.

Q.   Do you yourself consider them to be valid --

A.   Yes.

Q.   -- to be authoritative?  Something that you can rely on?

A.   It's something that we have incorporated into our analysis, yes.

Q.   Now, when you lecture to the agents, do you tell them that there are many other things which could cause a positive reaction on this test?

A.   We lecture them that it's a presumptive test.  Occasionally, we may show them another compound or something that could produce a color that is not the drug.

Q.   Do you tell them what presumptive means?

A.   Oh, absolutely.

Q.   What do you tell them presumptive mean?

A.   Presumptive is generally that it's -- produces a color for a class of compound.  It just involves the chemistry that may produce a color.  It

*63:24-64:10*

*64:13-65:1*

Page 64

64:13-65:1

is not a definitive test.

Q. Have you ever reviewed any training material produced by Safariland?

A. I have not personally, no. I may have looked at one of their inserts before in their packaging, but that would be the extent of it.

Q. Now, let me ask you, sir, what considerations, if any, dictated the order in which seized drugs or suspected drugs were to be tested in the year 2014?

A. What dictated the order?

Q. Yes.

A. Really, we were trying to work on the oldest cases first, as well as work on anything that needed to be rushed.

Q. All right. In other words, your rule of thumb for the triage --

A. Yes.

Q. -- would be, do it according to chronology and that subject to being overridden by immediate necessity or rush requests?

A. Correct.

Q. Was that essentially the criteria which were used?

A. Yes.

Page 65

EXHIBIT G
PAGE 206

well, I think you've already explained your procedures with respect to processing the request for a rush analysis.

And that would depend on the particulars and the discussion regarding the necessity for doing the work and --

A.   Right.

Q.   -- the parameters?

A.   We would have them complete the form, and then they would submit it to us, and then we would review it and just make sure that, yeah, we understood what they needed.

Q.   And, then, if you could do it, if you could satisfy them per their request, you would do it. And if you felt you couldn't, you would try and negotiate something that would be more reasonable?

A.   Correct.

Q.   All right.   I think that's all I need. Thank you so much.   Now --

MS. EFTEKAR:   Hold on.   I have a few more questions.   Sorry.

FURTHER EXAMINATION

BY MS. EFTEKAR:

Q.   Why do you do color tests in the lab?

A.   We don't do them for everything.   It really

67:24 - 69:11

Page 67

Imagine Reporting 619.888.0297

EXHIBIT G
PAGE 207

just depends on the test that we have or the compound that we have.

Q. Okay. For methamphetamine, do you do color tests in the lab?

A. We may.

Q. Okay.

A. They're not required.

68:8- 69:11

Q. Okay. Is -- are colored tests an acceptable presumptive test under DEA policies?

A. As long as it's a test for the compound that you're testing. Obviously, you couldn't do a color test and get a negative and say, then, it's a negative because it's not supposed to give a test.

So an example, if you're doing a test that should result in a positive for methamphetamine, then that would give you a valid color as long as there wasn't something else that interfered with that.

Q. Okay. And is that same true for under the SWGDRUG guidelines?

A. Yes.

Q. Okay. And --

A. Color tests are one of the listed presumptive tests.

Q. Okay. And is that true under the United

Page 68

EXHIBIT G
PAGE 208

Nations; do they approve these color tests?

A.   I haven't specifically reviewed the United Nations Monograph for methamphetamine.  However, the monographs that I have reviewed in the past simply say that if you do these -- these are what the outcome will be.

So it provides just a wide range of type of tests that could be done.  I don't think they actually say you have to do an individual test. It's a -- this is a test that provides a result and may be done in combination with other tests.  *68:8-69:11*

Q.   Okay.  May be done?

A.   Yes.

MS. EFTEKAR:  Okay.  That's all.

MR. IREDALE:  All right.

MS. EFTEKAR:  Sorry.

BY MR. IREDALE:

Q.   All right.  Then, let me just say this. Your testimony will be written up in a booklet and then submitted to you for your review.

You have the right to make any corrections or changes, and then we're going to ask you to sign it if you would under the pen- -- penalties of perjury.

You have the right to make any changes you

Page 69

EXHIBIT G
PAGE 209

want.  If the changes are of a significant or material nature, that could be made the subject of comment.  But that is a matter for the lawyers.

You have the right to make whatever changes you feel are appropriate and necessary.

A.  Okay.

Q.  If we get you the transcript, would you be able to review it and sign it within 30 days?

A.  Yes.

Q.  And would you be willing to do that?

A.  Yes.

Q.  Thank you so much.

And then what I would like to do is see if that stipulation, together with this addition, that the original will be sent to Mr. Chu, the Assistant US Attorney.  He will undertake to forward it to the witness, and then we'll retain the original for use at trial.  And if, for any reason, it's lost or misplaced, that a certified copy can be used for all purposes in lieu of the original.

And also we're going to waive whatever incantations are required to be made by the court reporter or the videographer at the conclusion of the deposition.

Would that be acceptable --

Imagine Reporting 619.888.0297

EXHIBIT G
PAGE 210

MR. CHU:   Agreed.

MR. IREDALE:   -- to counsel?

MS. EFTEKAR:   So stipulated.

MR. IREDALE:   Thank you so much.   Then that concludes this deposition.

Thank you, sir.

THE VIDEOGRAPHER:   Off the record at 3:47 p.m., and this marks the end of this deposition.

(The videotaped deposition was concluded at 3:48 p.m.)

-oOo-

Page 71

EXHIBIT G
PAGE 211

DECLARATION UNDER PENALTY OF PERJURY

I, James Malone, do hereby declare under penalty of perjury under the laws of the State of California that I have read the foregoing transcript; that I have made such corrections as noted therein, in ink, initialed by me, or attached hereto; that my testimony as contained herein, as corrected, is true and correct.

Executed this _____ day of _____, 2017, at _____, California.

_____
James Malone

Imagine Reporting 619.888.0297

EXHIBIT G
PAGE 212

REPORTER'S CERTIFICATE

I, Abigail R. Torres, Certified Shorthand Reporter, in and for the State of California, Certificate No. 13700, do hereby certify that the deponent was by me first duly sworn to testify to the truth, and that the foregoing testimony was reported by me in shorthand and was thereafter transcribed with computer-aided transcription; that the foregoing is a true, correct, and complete record of said proceedings.

I further certify that I am not in any way interested in the outcome of the cause in said caption.

The dismantling, unsealing, or unbinding of the original transcript will render the Reporter's Certificate null and void.

_____ Reading and signing was requested

\_\_X\_\_\_ Reading and signing was waived

_____ Reading and signing was not requested

In witness thereof, I have hereunto set my hand this 14th day of April, 2017.

_____
Abigail Torres, CSR No. 13700

EXHIBIT H

EXPERT OKORIE OKOROCHA, MS - 07/12/2017

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

DOYMA VANESSA MICHEL,  )
AN INDIVIDUAL,         )
                       )
            PLAINTIFF, )
                       )
      VS.              )   CASE NO.: 16CV0277-GPC-AGS
                       )
UNITED STATES OF AMERICA,  )
B. GIBBONS, AN INDIVIDUAL, )
E. GARZA, AN INDIVIDUAL    )
G. BARCIA, AN INDIVIDUAL,  )
SAFARILAND, LLC, A         )
DELAWARE LIMITED LIABILITY )
COMPANY, AND DOES 1        )
THROUGH 100, INCLUSIVE,    )
                       )
          DEFENDANTS.  )
_____)

DEPOSITION OF EXPERT OKORIE OKOROCHA, MS

WEDNESDAY, JULY 12, 2017

JOB NO. 105670

REPORTED BY MARTHA OJEDA-JIMENEZ, CSR NO. 13574

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

DOYMA VANESSA MICHEL,        )
AN INDIVIDUAL,               )
                             )
          PLAINTIFF,         )
                             )
     VS.                     ) CASE NO.: 16CV0277-GPC-AGS
                             )
UNITED STATES OF AMERICA,    )
B. GIBBONS, AN INDIVIDUAL,   )
E. GARZA, AN INDIVIDUAL      )
G. BARCIA, AN INDIVIDUAL,    )
SAFARILAND, LLC, A           )
DELAWARE LIMITED LIABILITY   )
COMPANY, AND DOES 1          )
THROUGH 100, INCLUSIVE,      )
                             )
          DEFENDANTS.        )
_____)

          DEPOSITION OF EXPERT OKORIE OKOROCHA, MS

TAKEN BY THE DEFENDANT, COMMENCING AT THE HOUR OF

12:06 P.M. ON WEDNESDAY, JULY 12, 2017, AT 105 WEST F

STREET, 4TH FLOOR, SAN DIEGO, CALIFORNIA, BEFORE

MARTHA OJEDA-JIMENEZ, CSR NO. 13574, IN AND FOR THE

STATE OF CALIFORNIA.

EXPERT OKORIE OKOROCHA, MS - 07/12/2017

APPEARANCES:


     FOR THE DEFENDANT SAFARILAND, LLC:

          YUKEVICH | CAVANAUGH
          BY:  BOBBIE N. EFTEKAR, ESQ.
          355 S. GRAND AVENUE, 15TH FLOOR
          LOS ANGELES, CA 90071-1560
          T. 213.362.7777


     FOR THE PLAINTIFF DOYMA VANESSA MICHEL:

          IREDALE & YOO, APC
          BY:  GRACE JUN, ESQ.
               EUGENE IREDALE, ESQ.
          105 WEST F STREET, FOURTH FLOOR
          SAN DIEGO, CALIFORNIA 92101-6036
          T. 619.233.1525


     FOR THE DEFENDANT UNITED STATES OF AMERICA:

          ASSISTANT UNITED STATES ATTORNEY
          OFFICE OF THE UNITED STATES ATTORNEY
          BY:  STEVE B. CHU, ESQ.
          880 FRONT STREET, SUITE 6293
          SAN DIEGO, CALIFORNIA 92101-8893
          T. 619.546.7167

EXHIBIT H43-DEPOS

PAGE 217

EXPERT OKORIE OKOROCHA, MS - 07/12/2017

                         I N D E X

WITNESS:  EXPERT OKORIE OKOROCHA, MS


EXAMINATION                                          PAGE

BY MS. EFTEKAR                                          5


                       E X H I B I T S

EXHIBIT                                              PAGE

EXH. A   DOCUMENT, "DEFENDANT SAFARILAND,              6
         LLC'S AMENDED NOTICE OF TAKING THE
         DEPOSITION OF PLAINTIFF'S EXPERT
         OKORIE OKOROCHA, MS," SIX PAGES

EXH. B   CURRICULUM VITAE, EIGHT PAGES                7

EXH. C   REPORT ENTITLED, "TOXICOLOGICAL             24
         REPORT - MICHEL V. U.S. CUSTOMS AND
         BORDER PROTECTION" BY
         OKORIE OKOROCHA, MA, NINE PAGES

EXH. D   DOCUMENT ENTITLED, "OKORIE OKOROCHA,        33
         M.S., M.S., J.D., CASES TESTIFIED IN
         AT TRIAL, HEARINGS, DEPOSITION, OR BY
         DECLARATION," TWO PAGES

EXH. E   CD CONTAINING CASE MATERIAL REVIEWED        39
         BY OKORIE OKOROCHA, MS, FOR RENDERING
         HIS OPINIONS

EXH. F   NARCOPOUCH INSTRUCTION SHEET,               76
         "NARCOPOUCH SIMPLIFIED TESTING
         PROCEDURES FOR THE MAJOR DRUGS OF
         ABUSE," TWO PAGES

EXH. G   FEE SHEET, ONE PAGE                         110


                       *    *    *

EXHIBIT H
ITC-143-DEPOS
PAGE 218

EXPERT OKORIE OKOROCHA, MS - 07/12/2017

SAN DIEGO, CALIFORNIA - WEDNESDAY, JULY 12, 2017

12:06 P.M. - 4:17 P.M.

* * *

EXPERT OKORIE OKOROCHA, MS,

having been first duly sworn, testified as follows:

EXAMINATION

BY MS. EFTEKAR:

Q    Will you please state your name for the record?

A    Okorie Okorocha.

Q    Will you please spell that, please?

A    O-k-o-r-i-e.  Last name, O-k-o-r-o-c-h-a.

Q    How many times have you been deposed before?

A    Probably between 10 and 20.

Q    Okay.  Are you familiar with the standard admonitions of how a -- a deposition goes?

A    Yes.

Q    Okay.  Can we dispense with those?

A    Yes.

Q    What should I call you?  Dr. Okorocha?  Are you a doctor?

A    No.  Most people call me Okorie or Coach.

Q    Or Coach?

A    Yeah.  With kids.

Q    What do you coach?

A    Soccer.

EXPERT OKORIE OKOROCHA, MS - 07/12/2017

Q    Did you bring an updated curriculum vitae with you today?

A    The one -- I don't think anything's changed since I did the Rule 26.  Yeah.  It's the same.

Q    Okay.  This one is your curriculum vitae?

A    Yes.

Q    Okay.  Let me ask you, did you see our notice of deposition for today?

A    Yes.

Q    Did you bring anything with you in response to it?

A    I have the documents, electronically, that I used.  And I have a -- billing documents somewhere.  I don't see it now, but I can send it over e-mail.

MS. EFTEKAR:  Okay.  So let me start with this: I'll attach the Notice of Deposition as Exhibit A.

(Exhibit A marked for identification.)

BY MS. EFTEKAR:

Q    And then we'll go to -- you handed me a CD, and this looks like a CD of all the materials that you reviewed in connection with this case; is that correct?

A    Yes.  The -- the file and exhibits that I used.

Q    Okay.  Are there any, I guess, letters or -- between you and counsel on this CD, or is it just the actual documents?

EXHIBIT H43-DEPOS
PAGE 220

EXPERT OKORIE OKOROCHA, MS - 07/12/2017

product or in the instructions?

A    No.

Q    Are you going to render any opinions on the actions of the U.S. Attorney's Office in prosecuting Ms. Michel?

A    I -- I don't think so.

Q    Okay.

MR. IREDALE:  (Indiscernible.)

(Reporter clarification.)

MR. IREDALE:  They're above reproach.

26: 12 - 28: 17

BY MS. EFTEKAR:

Q    Are you going to any render any opinions on the proper determination of probable cause for an arrest?

A    No.

Q    And then -- so you will be rendering an opinion regarding Customs and Border Patrol's use of the NarcoPouch field test?

A    How it was used in this case.

Q    And the actions of the DEA drug laboratory?

A    That's part of it.

Q    What about the design of the NarcoPouch product?

A    No.

Q    And the manufacturer of the NarcoPouch product?

A    What about the manufacturer?

Q    Are you going to render any opinions about the manufacturer of the NarcoPouch product?

A    No.

Q    Are you going to render any opinions on the conduct of Safariland?

A    Only as far as what they -- they explained, they were doing or they -- during the deposition -- T. Allen, somebody who worked there, was explaining what the -- the test is supposed to be for or how it's supposed to work.

Q    Okay.  So you're rendering opinions about what the test is for and how it's supposed to work?

A    Yes.  And how it's supposed to be used.

Q    And you mentioned Allen Miller's deposition testimony.

A    Yes.

Q    What portion of the testimony are you referring to?

A    He was explaining that it was just a screening test and it's not a confirmatory test.  And it's a -- he, essentially, said it was just a quick test that they can do right there.

Q    Okay.  And you have opinions that disagree with that?

A    I think that's what it should be for, the way

EXHIBIT H43-DEPOS
PAGE 222

EXPERT OKORIE OKOROCHA, MS - 07/12/2017

he talked about the -- what it means if you have a positive or not.

Q   So in that, are you speaking as to what the government should have done or as to what Safariland should have done?

A   What the government -- how the government should have used the test.

Q   Okay.  Are you going to render any opinion on the Safariland training materials?

A   Those, I didn't -- I found some of them, but not in the materials themselves, just more the communication to whoever's using it.

Q   I'm sorry.  I didn't -- I --

A   Yeah.  What -- what information should have been provided to the person using the test.

Q   Okay.  So you are going to render opinions about training for officers, I guess, for the people using it?

A   For anybody using the test.

Q   Are you -- you received some of -- I mean, based upon the Bates stamp label, I'm assuming you received some of the training PowerPoint slides that Safariland provided.

Did you see PowerPoint slides on that?

A   I don't think I did.

EXPERT OKORIE OKOROCHA, MS - 07/12/2017

Q    No.   Okay.   So do any of your opinions go directly to any training that Safariland had available?

A    No.

Q    Okay.   So just to confirm, you don't have an opinion whether officers had sufficient probable cause to arrest Michel?

A    Not in a -- not -- no, not in a legal determination.

Q    And you don't have an opinion as to whether Safariland had sufficient warnings and instructions on its product?

A    Not specifically warnings on the product.   I just had some opinions about the training or what training should be done.

29:15-20

Q    And then, do you have an opinion as to whether the officers correctly performed the NarcoPouch 923 test?

A    I believe they -- the used it as you're supposed to, because they got the colors that they were looking for.

Q    Okay.   You don't have an opinion as to whether -- strike that.

Do you have an opinion as to whether the NarcoPouch product is defective in any respect?

MS. JUN:   Objection.   Vague.

EXPERT OKORIE OKOROCHA, MS - 07/12/2017

A     It's a -- it's just an on-point explanation, and if she wasn't an organic chemist or trained police officer, that would be really remarkable to come up with that.

Q     What do you mean "an on-point explanation"?

A     It's a great explanation for why it says methamphetamine, but it isn't.

Q     Why is it a great explanation for that?

A     It -- it's a perfectly logical one and just coupled with the fact that she probably doesn't know these reagents and all that.

Q     Why is it perfectly logical that there's a secondary amine present in rennet?

A     Well, that's a logical explanation, but that's more an organic chemist thing that they would say.  But without looking at the structure, you wouldn't necessarily know.

MS. EFTEKAR:  Okay.  Do you guys want to take a break or you want to keep going?

MS. JUN:  It's up to Okorie.

THE WITNESS:  I can keep going if you want.

BY MS. EFTEKAR:

79:23-80:22

Q     I'm trying to figure out where we were.  I was asking you what training did you think that the officers should have.  I believe that's where we left off.

EXPERT OKORIE OKOROCHA, MS - 07/12/2017

A    Oh.  Okay.

MS. JUN:  And let me just interpose an objection that this expert's not proffered for any opinion on training given to law enforcement officers.

MS. EFTEKAR:  Okay.  I did not realize that. So at the beginning, when I asked about his opinions, he mentioned training.

BY MS. EFTEKAR:

Q    So that's why I was asking you about it.

So you are not rendering any opinions about what is the appropriate training for using the NarcoPouch -- or what was the appropriate training for the -- I guess anything about training.

A    I was just -- that was something that I questioned in the report, like what training is there, and I was going to evaluate it, but I didn't get any documents that reflected it.

Q    So you have no opinions about the training that officers used -- I mean, officers had?

MS. JUN:  Again, we're not proffering this expert as an expert on training on NarcoPouches that should have been given to law enforcement officers.

THE WITNESS:  More just based on what they did and would it indicate inadequate training or incorrect training.

EXPERT OKORIE OKOROCHA, MS - 07/12/2017

83:3-84:9

MS. JUN:   Okay.

BY MS. EFTEKAR:

Q    You're not rendering an opinion about the adequacy of the -- about the NarcoPouch box that it came in?

A    Correct.

Q    You're not rendering an opinion about the adequacy of the instructions that it came with?

A    No, I'm not.

Q    Or about what it says on the actual pouch itself?

A    No.

Q    Are you rendering an opinion about the Customs and patrol officers' actual use of the NarcoPouch product in this case?

A    Not their use in doing the actual test.

Q    Are you rendering an opinion about their arrest of Ms. Michel in this case?

A    No.

Q    Are you rendering an opinion about how about the procedures -- strike that.

Are you rendering an opinion about the confirmatory testing at it was done in this case?

A    No.   Just the timing of it.

Q    Okay.   Are you -- so you're rendering an

EXPERT OKORIE OKOROCHA, MS - 07/12/2017

opinion about how quickly the confirmatory testing was done?

A    And how fast it should be done under these circumstances.

Q    Okay.  Are you rendering an opinion about anything else?

A    I think we've gone over everything -- oh.  I guess what the difference between a presumptive versus a confirmatory test is.

Q    Okay.

MS. JUN:  I think this -- we had some testimony about secondary amines.

MS. EFTEKAR:  Okay.  But the NarcoPouch is a test for secondary amine.  The NarcoPouch 923 test is -- okay.

THE WITNESS:  Correct.

MS. JUN:  We talked at length about spermidine and or other -- proline, so we had some discussion of secondary amines.

BY MS. EFTEKAR:

84: 21-23

Q    Okay.  Do you have any opinion that the NarcoPouch product worked incorrectly in this case?

A    No.

Q    Do you have any opinion about what Safariland should have done to prevent -- let me -- let me ask you

EXPERT OKORIE OKOROCHA, MS - 07/12/2017                86:1-87:6

This expert is not being proffered as -- on any issue with respect to training to law enforcement officers on the proper use of the NarcoPouch 923.  In fact, there are no records in this case that any of the law enforcement officers were trained on the NarcoPouch 923.

MS. EFTEKAR:  The lack of records doesn't mean that they were trained.  I mean, I don't remember seeing requests for them.  The point is -- and you still have an expert talking about training.

MS. JUN:  Correct.

MS. EFTEKAR:  So I don't know if that is -- I mean, that reasoning doesn't make sense.

MS. JUN:  I think we digress because nevertheless -- nonetheless, this expert is not being proffered as an expert who will opine on issues of training with respect to law enforcement officers on the NarcoPouch 923.

MS. EFTEKAR:  Will he be offered for any training for anyone related to this case?

MS. JUN:  I think he is going to talk about practices and procedures related to laboratory testing.

MS. EFTEKAR:  But not training?

MS. JUN:  If there is some sort of ancillary issue with respect to what is the practice and procedure

EXPERT OKORIE OKOROCHA, MS - 07/12/2017

encompassing training for laboratory procedures, he may go to that area, but you had asked specifically about the NarcoPouch 923 and training on issues related to the NarcoPouch 923. This expert is not being proffered for any issue related to training on the NarcoPouch 923 given to law enforcement officers.

BY MS. EFTEKAR:

87: 8-13

Q    Okay. So -- then let's go back to my previous question of, do you have an opinion of something Safariland should or should not have done in this case?

MS. JUN: Objection. Vague. Incomplete hypothetical. Calls for a legal conclusion.

THE WITNESS: No.

MS. EFTEKAR: Okay. Let's just take a short break so I can figure out what questions I can eliminate.

MS. JUN: Sure.

(Recess was taken.)

BY MS. EFTEKAR:

Q    Let's just make it easier. Can you tell me what opinions you are rendering in this case?

A    Regarding what the test is, what it -- what the results mean, and what should be done after you get a positive result.

Q    Okay. What is the test?

EXPERT OKORIE OKOROCHA, MS - 07/12/2017

about other things that can cause a false positive.  And then the national standards also say that general matter of scientific and forensic principle -- the detection or initial identification of drugs and other toxins should be confirmed whenever possible by a second technique, based on the different chemical principle.

*89:7-20*

Q    Okay.  Are you reading from page 8 of your report?

A    Yes.

Q    Section 8.1, "Screening Tests"?

A    Yes.

Q    Okay.  What is a screening test?  Is that a presumptive test?

A    Right.

Q    That's a narcotics field test?

A    Correct.

*89:17-20*

Q    Simon's reagent test or sodium nitroprusside test, is that an appropriate and validated test for the presumptive identification of methamphetamine?

A    For presumptive identification.

Q    Okay.  You said you read something about that it should be confirmed by a second technique?

A    Correct.

Q    Is it your belief that that wasn't done in this case?

EXPERT OKORIE OKOROCHA, MS - 07/12/2017

A    It was, but the results were being used for a significant amount of time before the second technique results came out.

Q    The resulted were being used for what?

A    For purposes of incarcerating somebody for prosecution.

Q    Is it your opinion that that's not appropriate?

A    Yes.  It's not appropriate to use a screening test for that purpose.

*90:10-20*

Q    So what should you -- what should have been done?

A    For example, in California standards, when somebody is being incarcerated, they're supposed to test whatever it is right away, and it shouldn't take more than a day or two.  But when you're going just off of a presumptive test, you have almost no idea if you, in fact, have what you were looking for or not.

Q    So your -- your opinion is going to the time -- the time it took to do the confirmatory test?

A    Yes.  That's part of it.

Q    What is the other part of it?

A    I guess, just the meaning of the presumptive test, what that actually shows, and -- for example, in a leading forensic pathology textbook, they discuss that it shouldn't be -- no -- it says no scientist should go

EXPERT OKORIE OKOROCHA, MS - 07/12/2017

(Discussion held off the record.)

BY MS. EFTEKAR:

92: 3-15

Q    So we were talking about -- you're saying that you can't use a screening test to detain someone.

Is that what you're trying to say?

A    If there is a short detention while they do the testing, that would be normal.

Q    Okay.  How -- what is a short detention?

A    A day or two.

Q    Okay.  So your problem is not that they used a screening test in deciding or in determining whether to detain her or not?

A    That's -- yeah.  That's -- that's not -- there's a whole a lot of other things that go into whether you're detaining somebody.

Q    Which is not your area to testify about.

A    Right.

Q    And then you said you also are going to render opinions about what the results mean?

A    Yes.

Q    What do the relate mean?

A    The results simply mean that there may be a drug of abuse present, but they don't mean -- what happened in this case -- that the drug is actually present.

*101:2-13*

A    Yes.

Q    Did we -- did I ask you this?  The Simon's reagent test and the nitro -- sodium nitroprusside test, is it your understanding that those are the same tests?

A    Yes.                              *101:6-13*

Q    So in here, the screening tests, if you go -- we have a couple paragraphs talking about screening tests, correct?  They must be appropriate and validated. And we already talked about sodium nitroprusside test as *101:9-13* an appropriate and validated test for the presumptive of -- presumptive indication of methamphetamine, correct?

A    Correct.

Q    Okay.  Third paragraph down, it says -- and I think you will have this in your report, too -- "If the results of preliminary, unconfirmed screening tests are included on the final report, the report must clearly state that the results are unconfirmed."

A    Correct.

Q    In this section, this is the first time I see the words unconfirmed.  Do you agree?

A    That's the first time I recall.       *101:23-102:5*

Q    How is someone reading this supposed to know that a screening test is unconfirmed?

A    By definition, it's unconfirmed if it hasn't

EXPERT OKORIE OKOROCHA, MS - 07/12/2017

been tested by a sophisticated instrument.

Q     So that's common knowledge?

A     Yes.

Q     It's expected to be known?

A     Yes.

Q     And you would agree that a screening test is an accepted methodology in a forensic lab -- forensic lab testing or analysis?

MS. JUN:  Objection.  Vague.

THE WITNESS:  It's only used so they know what they need to run in the instrument, because it's -- these are relatively cheap, as opposed to having a technician and $100,000 worth of instruments run everything they find.  They use them in the lab to determine what gets tested.

BY MS. EFTEKAR:

Q     Okay.  But you would agree that this is saying that they are -- that it's an acceptable methodology, as long as the screening test is appropriate and validated for the purpose of what it's being used?

MS. JUN:  Objection.  Vague.

"Acceptable methodology" in what context?

MS. EFTEKAR:  In a forensic lab test.

THE WITNESS:  I mean, it's -- I mean, it's appropriate to do the screening test, but that's --

EXPERT OKORIE OKOROCHA, MS - 07/12/2017

that's not all you would do.

BY MS. EFTEKAR:

*103:3-6*

Q    Okay.  That's fine.

*103:4-6*

It's normal for a screening test to be used when analyzing a controlled substance?

A    Yes.

Q    Page 8 of your report --

A    This is the longest report I've ever done.

Q    -- you say (as read), Detection of an analyte by immunoassay.

Do you see that?

A    On page 8?

Q    Yes.  It's the bold -- in bold -- that sentence in bold.

A    I don't see immunoassay.

Q    "For example, detection" --

A    Oh.

Q    -- "of an analyte by immunoassay."

A    Yes.  Uh-huh.

Q    Is that a screening test?

A    The immunoassay part is, and then it talks about the confirmation.

Q    Okay.  Confirmation by GC/NP or GC/FID.

What are those?

A    Those -- that's gas chromatography and nitrogen

EXPERT OKORIE OKOROCHA, MS - 07/12/2017

Q    A police officer?

A    I -- I don't know what he would know.

Q    What about a court of law?

A    I would think this would be used in court, these guidelines.

*107: 6-24*

Q    Okay.  I want to go back to -- you said you were going to -- to the opinions that you were offering. The third thing you mentioned is what should be done after you receive a positive result?

A    Correct.

Q    Okay.  What are your opinions there?

A    After you receive a positive screening result, the California standards are to turn it around and -- turn it around in one day when somebody's being held or incarcerated, and up to four days if they're not being incarcerated.

Q    Just to confirm, you don't have any opinions on what Safariland could have done to prevent that injury -- I'm sorry.

*107:20-24*

You don't have any opinions on what Safariland could do -- could have done to address the turnaround time that you just spoke of?

A    Right.  That wouldn't be a -- something they would decide.

Q    And you don't have an opinion that it's not

EXPERT OKORIE OKOROCHA, MS - 07/12/2017

Q    We're almost done.

A    Long day.

Q    Okay.  I just want to make sure that your source for this information is Exhibit N.

A    Yes.

Q    Would you agree that the time when tests are run are left up to the specific law enforcement entity that is testing the material?

A    You mean they decide when they're going to test it?

Q    Well -- right -- well, I mean, isn't the time frame, the turnaround time, the testing that's ultimately done by the law enforcement entity, isn't that left up to the law enforcement entity?

A    It is.  But I would just note that it's a different standard if the person's incarcerated or not incarcerated.

*109:18-20*

Q    Okay.  So Safariland doesn't control what the DEA lab does, correct?

A    Correct.

Q    This is a cleanup matter:  Exhibit C is your fee charge.  I'm going to attach that as an exhibit as well.

G?  Are we on Exhibit G?  What did we attach the CD as?  G.  So the fee sheet is Exhibit G.

*112:1-4*

Q    Okay.  But you're not offering an opinion that there is anything unacceptable about doing a sodium nitroprusside field test, correct?

A    Correct.

Q    K was a repeat of D.  Was it supposed to be something else?

A    Did you say K?

Q    Yeah.  K is a repeat of D.  I just want to confirm that -- make sure there's not anything different with that.

A    E and K?

Q    No.  D.

A    D.

Q    D and K to your report, not the deposition, but to your report.

A    I think must have just included it twice.

Q    Okay.  That's fine.  Exhibit L, "Preliminary Identification of Suspected Heroin Samples by a NarcoPouch Field Test Panel."

Why did you reference this?

A    It was part of my file when I was gathering information on the test and what the literature said.

Q    Okay.  Are you using this to base any of your opinions, and if so, what opinions?

A    Is that -- what exhibit is that?

EXHIBIT H
43-DEPOS
PAGE 239

Q   L.

A   It just has explanations of the different reagents and what you're looking for.

Q   Okay.

A   What colors and everything.

Q   Guess that's all I have, I think.

THE WITNESS:  That's it?

MS. EFTEKAR:  That was it.  Okay.  Did you --

MS. JUN:  No, no questions.

MS. EFTEKAR:  Can we do a stip?

MS. JUN:  Sure.

MS. EFTEKAR:  How many days?

MS. JUN:  You know, for the other witnesses, we stipulated to 30 days.

Did you want the original to go to the witness directly?

MS. EFTEKAR:  Up to you.

MS. JUN:  That's fine -- you know, do you want to stay consistent, because Steve had wanted the originals to go to him.

MS. EFTEKAR:  Okay.

MS. JUN:  Yeah.  And so he would retain the original.

MS. EFTEKAR:  Okay.  Let's stipulate to relieve the court reporter of her responsibilities under the

EXPERT OKORIE OKOROCHA, MS - 07/12/2017

Code of Civil Procedure with regard to the care, custody, and maintenance of the deposition transcript.

We will have the original transcript sent to my office.  A copy will be sent to Mr. Okorocha for your review and signature under penalty of perjury.  You'll have 30 days from your receipt of the transcript to review it, make any changes or corrections that you deem necessary, sign it under penalty of perjury.  You will then notify your counsel of any changes, who will then notify us.

The original transcript will be maintained by my office, and we will produce it upon reasonable request.  In the event the original transcript is not signed or subsequently lost, destroyed or otherwise becomes unavailable, an unsigned, certified copy may be used for all purposes that the original could be used, including trial.

MS. JUN:  So stipulated.

MR. CHU:  Agreed.

MS. JUN:  Can I get a copy?

MR. CHU:  Yeah me, too.

(The deposition concluded at 4:17 p.m.)

* * *

EXPERT OKORIE OKOROCHA, MS - 07/12/2017

I, EXPERT OKORIE OKOROCHA, MS, declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct; that I have read my deposition and have made the necessary corrections, additions or changes to my answers I deem necessary.

    Executed on this_____day of_____, 2017.


                                    _____
                                    EXPERT OKORIE OKOROCHA, MS

EXPERT OKORIE OKOROCHA, MS - 07/12/2017

I, MARTHA OJEDA-JIMENEZ, CSR No. 13574, Certified Shorthand Reporter for the State of California, do hereby certify:

That the witness in the foregoing deposition was by me first duly sworn to testify to the truth, the whole truth and nothing but the truth in the foregoing cause; that the deposition was taken by me in machine shorthand and later transcribed into typewriting, under my direction, and that the foregoing contains a true record of the testimony of the witness.

Dated: This_____day of_____, 2017, at San Diego, California.

_____

MARTHA OJEDA-JIMENEZ

CSR No. 13574