EXHIBIT I

PAGE 244

# THE OKOROCHA FIRM

ADDRESS                                                                        TELEPHONE
3940 Laurel Canyon Blvd., Suite 1038                          (310) 497-0321
Studio City, CA 91604
EMAIL: OO@OOESQ.COM

Toxicological Report— Michel v. U.S. Customs and Border Protection

**I, Okorie Okorocha, M.S., M.S., J.D., declare and state as follows.**

1. I have a Master's of Science Degree in Pharmaceutical Science with a specialization in Forensic Science from the College of Pharmacy at the University of Florida.

2. I also earned a Master's of Science Degree in Forensic Toxicology.

3. My formal education included the study of PHARMACOLOGY, FORENSIC TOXICOLOGY, TOXICOLOGY, FORENSIC SCIENCE, NATURAL MEDICINAL PRODUCTS, DRUGS OF ABUSE (INCLUDING ALCOHOL), MARIJUANA and [METH]AMPHETAMINES.

4. I have qualified approximately three hundred times in State, Federal and Military Courts in multiple states. My qualifications are more fully set-forth in my attached curriculum vitae, a copy of which is attached as Exhibit A and the cases I have testified in are also listed in an attachment as Exhibit B. I am also attaching a copy of my fee schedule which describes my fees for consultation and testimony as Exhibit C.

5. Seven (7) of my papers as a lead author in the area of forensic science/ toxicology have been accepted for publication in major peer-review and law review journals.

6. I have further retrieved and reviewed the relevant literature for this case, from the National Library of Medicine® including MEDLINE. MEDLINE is the U.S. National Library of Medicine® (NLM) premier bibliographic database that contains more than 22 million references to journal articles in life sciences with an emphasis on biomedicine. A distinctive feature of MEDLINE is that the records are indexed with NLM Medical Subject Headings (MeSH®).

1

# EXHIBIT I
# PAGE 245

**Items Reviewed Thus Far:**

1.    Plaintiff's Second Amended Complaint.

2.    Documents: Bates SAFARILAND000001 - 000212.

3.    Documents: Bates USA0001 - 1051, including the following:

   a.    CBP Reports: Bates USA_0018 - USA_0044.

   b.    CBP Incident Report: Bates USA 0460 - USA 0487.

   c.    CBP Directive 3290-019A: Bates USA 0488 - USA 0493.

   d.    Miscellaneous CBP Email and correspondence: Bates USA0997 - USA1051.

4.    Deposition transcripts:

   a.    CBP Officer Eduardo Garza, March 22, 2017.

   b.    CBP Officer Brandon Michael Gibbons, March 22, 2017.

   c.    ICE Special Agent Zachary Steven Bulman with Exhibits 1-12, March 22, 2017.

   d.    DEA Chemist Alexandra Ambriz with Exhibits 1 - 6, March 30, 2017.

   e.    T. Allen Miller (Safariland PMK) with Exhibit, March 28. 2017.

**General remarks/concerns**: Did the administering officer receive formal training on how to use the NarcoPouch?   There are no records reflecting any training received by Ambriz, Gibbons, Garza and Bulman on use of NarcoPouch 923 according to USA's response to Plaintiff's special interrogatory no. 14.

**Cuajo**: is Rennet, which is a complex of enzymes produced by animals that ruminate, or digest, plant matter by fermentation. Rennet is usually used to produce cheeses. Rennet can lead to a number of secondary amine fermentation byproducts when brought in contact with the right food material (reviews attached). These secondary amine byproducts would produce positive results in both the 902 and the 923 NacroPouch tests. For instance, spermine/spermidine are secondary amines that would result in positive results and are produced from the breakdown of foods by bacteria/fungi. Proline, a secondary amine and an amino acid found in all living organisms, would also produce a positive result in the 923 test.

2

**EXHIBIT I**

**PAGE 246**

**The Safariland NarcoPouch 902 and 923** are presumptive tests that identify potential functional groups, like amines, found in unknowns. These tests do not conclusively identify a substance but only suggest that one with similar functional groups is present.

**NarcoPouch Test 902**: is a **presumptive test** for alkaloids (including opioids and amphetamines) consisting of Marquis reagent.

**Marquis reagent**: This reagent is a mixture of concentrated sulfuric acid and formaldehyde. The test is color-based, and will change different colors when amines are present. This test will change color in the presence **many** primary, secondary, and tertiary amines through a chemical reaction with the formaldehyde. Other functional groups such as aromatic rings can also react. Methamphetamine reacts with this reagent through its aromatic ring to form an orange cation. However, many OTC and prescription drugs have an aromatic ring and secondary amine and would lead to the same readout in the 902 **presumptive** test. See the attached charts for some examples of color readouts in this test. A **confirmatory** test is needed to truly identify/confirm the compound in question. The reaction of Marquis test with methamphetamine is depicted below (outlined in technical UN report attached).

methamphetamine:
illegal drug

$$HCHO \xrightarrow{} H_2SO_4$$

orange product

**NarcoPouch Test 923**: Is another **presumptive test,** but for **secondary amines**. Methamphetamine (see structure below) contains a secondary amine, but so do many other common compounds. These include proline, an amino acid and a dietary supplement, and spermadine, a fermentation byproduct that could arise from rennet coming in contact with an appropriate food source. This kit consists of sodium nitroprusside, acetaldehyde, and a carbonate base. The mechanism of the reaction is outlined below. The secondary amine reacts to form an iminium intermediate (not shown) that rapidly rearranges to form an enamine (**1**), which reacts with the nitroprusside (**2**) to form the nitroprusside adduct (**3**) that fragments to regenerate the amine and deliver the bright blue Simon-Awe complex (**4**) that is visualized.

3

EXHIBIT I
PAGE 247



### Amines explained:

Amines are ammonia derivatives. The nitrogen of amines can form up to three bonds with alkyl groups. Depending on the number of alkyl groups (1, 2, or 3), the amine is either primary, secondary or tertiary. Some examples are shown below.

A much more detailed explanation of amines can be found here: http://www.chemguide.co.uk/organicprops/amines/background.html

**Attachments**: I'm attaching a report containing information where NarcoPouches were used incorrectly. See pages 47-51, EXHIBIT D.

4

## EXHIBIT I
## PAGE 248

I'm attaching "Idaho State Police Forensic Laboratory Training Manual." They mention that Benadryl (diphenhydramine) reacts to give "yellow" result while fentanyl and methamphetamine give and orange or brown color. Those two colors are hard to distinguish and have a spectrum of ambiguity, especially since those colors would change in intensity depending on the concentration of the substance being tested. This brings back the questions brought up in the general remarks section.

**Reaction Schemes of NarcoPouch 923 with Amphetamine, Proline, and Spermadine**

This can also happen with other secondary amines, like proline, which is a very common supplement:

Simon-Awe Complex

Or with spermidine, a common fermentation byproduct, which would come from rennet coming in contact with a fermentable material:

5

**EXHIBIT I**
**PAGE 249**

spermidine:
fermentation byproduct

Simon-Awe Complex

All three reactions would lead to the same blue product depicted in the bottom right of each scheme.

## Presumptive vs. Confirmatory Tests

There are two types of tests, a presumptive or screening test and a confirmatory test. A screening test casts a wide net and is used as a fast method that allows for false positives, but rarely results in false negatives. In other words, the test will tell you that that the substance you are looking for, or something with similar chemical properties is present. Hence this method is not conclusive. A confirmatory test is more elaborate, time-consuming and expensive; however, it eliminates the uncertainty and is required to positively identify substances in the fields of analytical chemistry, toxicology and pharmacology. A presumptive test cannot be used as evidence of a substance being present. You must perform a confirmatory test to **identify** the item in question in a scientifically and legally valid fashion. The leading Forensic Pathology textbook discusses this issue and the relevant pages are attached as EXHBIT E.

As a result of the inconclusiveness of presumptive tests, they are not used to identify substances in forensic forums or other forums that require concrete rather than speculative evidence. Furthermore, screening tests have no quantitation capability and means of identifying which substance or medication the subject may have consumed that could have provided a non-specific positive in both tests.

6

EXHIBIT I
PAGE 250

**Standards for Scientific Evidence**

"A certainty of >99%… is a well-accepted standard for scientific evidence…"[1][2]

The Narco Pouches do not have a certainty interval since they are presumptive tests. There is no doubt that the Safariland Narco Pouch 902 and 923 are screening or presumptive tests and this is clearly stated by the manufacturer's representative, as follows:

"We teach that all results are presumptive and avoid the -- any links to confirmation. Confirmation with colorimetrics is just a cesspool."

See Deposition of T. Allen Miller page 29.

**Widespread/common Potential Sources of False Positives**

A partial list of FDA Approved Drugs That Would Provide Positive Results in both NarcoPouch 902 (Amines and Aromatic Rings) and 923 (Secondary Amines) Tests is attached as EXHIBIT F.

Additional reference materials regarding amines and their reactivity with the NarcoPouch are attached as EXHIBITS G-M.

**Forensic Testing Standards**

**The standards for turnaround time for testing and reporting in the state of California are as follows for controlled substances:**

Table 10 **Acceptable Turnaround Times: Routine vs. Urgent Requests**

| Service Category | Routine Request (calendar days) | Routine % | Urgent Requests (calendar days) | Urgent % |
|---|---|---|---|---|
| Alcohol Blood/Breath | 6 | 96% | 2 | 5% |
| Clan Laboratory | 11 | 91% | 4 | 10% |
| Computer Crime | 90 | 90% | 10 | 10% |
| Controlled Substance | 4 | 91% | 1 | 9% |
| Crime Scene | 5 | 50% | 1 | 50% |

---

[1] Rainey, P. M. (1993). Relation between serum and whole-blood ethanol concentrations. Clinical chemistry, 39(11), 2288-2292.
[2] Labianca, D. A., & Simpson, G. (1996). Statistical analysis of blood-to breath-alcohol ratio data in the logarithm-transformed and non-transformed modes. Clinical Chemistry and Laboratory Medicine, 34(2), 111-118.

7

**EXHIBIT I**

**PAGE 251**

**As indicated above, a "routine" test is completed in 4 days. A routine would be when someone is not being held in prison or jail. An urgent request is supposed to be turned around in one day. This is the standard for acceptability of reporting times. See Exhibit N, The California Department of Justice 2003 California Task Force on Forensic Services Force Report.**

The United States National Standards for Forensic Laboratories regarding procedures, that were developed by the U.S. Department of Health and Human Services, and the leading national forensic science organizations, the American Academy of Forensic Sciences [AAFS] and the Society of Forensic Toxicologists [SOFT] indicate the following:

*8. ANALYTICAL PROCEDURES*

**8.1    *Screening Tests***

*"8.1.3    If the results of preliminary, unconfirmed screening tests are included on the final report, the report must clearly state that the results are unconfirmed.*

*8.1.4    Where the results of class-based screening tests are normally included on the final report (e.g. immunoassay test for opiates, benzodiazepines, amphetamines), it is good practice to inform the client of the drugs normally detected by that test and the approximate sensitivity. For example, a "negative" result for some manufacturers immunoassay tests may not mean that lorazepam was absent, due to poor cross reactivity.*

**8.2    *Confirmatory Tests***

*8.2.1    As a general matter of scientific and forensic principle, the detection or initial identification of drugs and other toxins should be confirmed whenever possible by a second technique based on a different chemical principle.*

*Where possible, the confirmatory (second) test should be more specific than the first test for the target analyte. The use of mass spectrometry is recommended as the confirmatory technique, where possible and practical.* ***For example, detection of an analyte by immunoassay and 'confirmation' by GC/NP or GC/FID does not generally provide sufficient specificity for prosecution of a criminal case.*** *However, the rigor required of a confirmation depends to some extent on the importance of the analytical finding and circumstances of the case.*

8

**EXHIBIT I**
**PAGE 252**

A copy of the National Standards are attached hereto as Exhibit O.

Date:  May 30, 2017

OKORIE OKOROCHA, M.S., MS.

9

**EXHIBIT I**
**PAGE 253**

# EXHIBIT J

**PAGE 254**

ROGER A. CLARK - 06/27/2017

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

DOYMA VANESSA MICHEL, AN
INDIVIDUAL,

        PLAINTIFF,

VS.                                    ) CASE NO. 16CV0277-GPC-AGS

UNITED STATES OF AMERICA,
B. GIBBONS, AN INDIVIDUAL,
E. GARZA, AN INDIVIDUAL,
G. BARCIA, AN INDIVIDUAL,
SAFARILAND, LLC, A DELAWARE
LIMITED LIABILITY COMPANY,
AND DOES 1 THROUGH 100,
INCLUSIVE,

        DEFENDANTS.

DEPOSITION OF ROGER A. CLARK

TUESDAY, JUNE 27, 2017

JOB NO. 103787

REPORTED BY JUDY M. REIERSEN, CSR NO. 7505

ROGER A. CLARK - 06/27/2017

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

DOYMA VANESSA MICHEL, AN
INDIVIDUAL,                          )
                                     )
          PLAINTIFF,                 )
                                     )
VS.                                  )    CASE NO. 16CV0277-GPC-AGS
                                     )
UNITED STATES OF AMERICA,            )
B. GIBBONS, AN INDIVIDUAL,           )
E. GARZA, AN INDIVIDUAL,             )
G. BARCIA, AN INDIVIDUAL,            )
SAFARILAND, LLC, A DELAWARE          )
LIMITED LIABILITY COMPANY,           )
AND DOES 1 THROUGH 100,              )
INCLUSIVE,                           )
                                     )
          DEFENDANTS.                )
_____)

DEPOSITION OF ROGER A. CLARK,

TAKEN BY THE DEFENDANT SAFARILAND, LLC, COMMENCING AT

9:00 A.M. ON TUESDAY, JUNE 27, 2017, AT

105 WEST F STREET, 4TH FLOOR, SAN DIEGO, CALIFORNIA,

BEFORE JUDY M. REIERSEN, CERTIFIED SHORTHAND REPORTER, IN

AND FOR THE STATE OF CALIFORNIA.

ROGER A. CLARK - 06/27/2017

APPEARANCES:

FOR THE PLAINTIFF:

IREDALE & YOO, APC
BY:　GRACE JUN, ESQ.
　　　　　　　- AND -
　　　EUGENE G. IREDALE, ESQ.
105 WEST F STREET, 4TH FLOOR
SAN DIEGO, CALIFORNIA　92101-6036
619.233.1525
GJUN@IREDALELAW.COM
EGIREDALE@IREDALELAW.COM


FOR THE DEFENDANT SAFARILAND, LLC:

YUKEVICH CAVANAUGH
BY:　STEVEN D. SMELSER, ESQ.
355 SOUTH GRAND AVENUE, 15TH FLOOR
LOS ANGELES, CALIFORNIA　90071
213.362.7777
SSMELSER@YUKELAW.COM


FOR THE DEFENDANT UNITED STATES OF AMERICA:

OFFICE OF THE U.S. ATTORNEY
BY:　ERNEST CORDERO, JR.
ASSISTANT U.S. ATTORNEY
880 FRONT STREET, ROOM 6293
SAN DIEGO, CALIFORNIA　92101-8893
619.546.7167
ERNEST.CORDERO@USDOG.GOV

EXHIBIT J - PAGE 257

ROGER A. CLARK - 06/27/2017

                            I N D E X

WITNESS:  ROGER A. CLARK


EXAMINATION                                          PAGE

BY MR. SMELSER                                         5
                                                     80
                                                     93

BY MR. CORDERO                                        60

BY MS. JUN                                           73
                                                     88


                          E X H I B I T S

EXHIBIT                                            MARKED

EXHIBIT 1        MR. CLARK'S CV, SIX PAGES            5

EXHIBIT 2        FEE SCHEDULE, ONE PAGE              6

EXHIBIT 3        UPDATED LIST OF SWORN               6
                 TESTIMONY, 25 PAGES

EXHIBIT 4        MR. CLARK'S REPORT, 20 PAGES        9

EXHIBIT 5        HANDWRITTEN NOTES, ONE PAGE         9

EXHIBIT 6        "COMPLAINT FOR VIOLATION OF"        73
                 AND "PROBABLE CAUSE STATEMENT,"
                 USA_0046 AND 0047, TWO PAGES

EXHIBIT 7        9/2014 E-MAIL STRING,               73
                 USA_0156 AND 0157, TWO PAGES

EXHIBIT 8        CBP DIRECTIVE NO. 3290-019A,        86
                 USA_0488 THROUGH 0493,
                 SIX PAGES

                          *   *   *

EXHIBIT J - PAGE 258

ROGER A. CLARK - 06/27/2017

ROGER A. CLARK,

having been first duly sworn, testified as follows:


EXAMINATION

BY MR. SMELSER:

Q    State your name for the record, please.

A    Roger Alma Clark.

Q    I know you've been deposed quite a few times over your career so I imagine we can dispose with the instructions.  Is that fair?

A    Yes.

Q    Good.  All right.  So we were provided with this.  Is this your -- which we'll mark that as Exhibit 1.

A    This looks like what was provided as exhibits to my report.

Q    Right.  I'm just breaking it up to make it a little easier for us.

A    Right, as indicated on the last page of my report.

Q    Okay.  So the first six pages are your resume, CV?

A    Yes.

Q    Mark that as Exhibit 1.

(Exhibit 1 was marked.)

EXHIBIT J - PAGE 259

ROGER A. CLARK - 06/27/2017

BY MR. SMELSER:

Q   Is your CV up to date?

A   It should reflect 1600 cases instead of 1500 cases here.  Other than that, it's complete.

Q   Okay.  No need to add anything with respect to papers, speaking engagements, or anything like that?

A   That's always included in the report under the section "My Qualifications."

(Exhibit 2 was marked.)

BY MR. SMELSER:

Q   Okay.  Then we have this, essentially your fee schedule?

A   Yes.

Q   So your reviewing of documents, reviewing the materials, $250 an hour, and that's $350 an hour at trial or deposition?

A   Yes.

Q   Then we have a 25-page updated list of sworn testimony for Rule 26, and this goes from 2013 through May 22, 2017, revised May 10, 2017; is that right?

A   Yes.

Q   Mark that as Exhibit 3.

(Exhibit 3 was marked.)

BY MR. SMELSER:

Q   When were you first contacted in this case?

ROGER A. CLARK - 06/27/2017

A   As I remember, I talked to Mr. Iredale around the end of February.

I was -- he indicated to me by March, early part of March, that he wanted me to work with him on the case.

Q   Of this year --

A   Yes.

Q   -- 2017?

7:8-20

Okay.  And what were you asked to look at by Mr. Iredale?

A   To review the material that he had acquired thus far and to write a report.

Q   On what topics?

A   He didn't give me any topics.  We've worked together in the past.  It's -- he understands my areas of expertise, and I understood from the very beginning of conversations with him this had two unique aspects, the police conduct, the law enforcement conduct better said because they're federal officers, and then the product issues, which are the test kit in particular, which I learned was Test Kit No. 923.

Q   How many times have you worked with Mr. Iredale in the past?

A   I've had probably six to eight cases.  That's just an estimate.  I think it's pretty accurate.

Q   And were all those cases involving you providing

ROGER A. CLARK - 06/27/2017

it independently.

It's the use of the narcotic field test kits, plural, dated September 2, 2008.

Q    Did you base any of your opinions on that document?

A    Well, I think so.  It's listed in my report as an item considered, and as you know, I comment on the fail -- the inappropriate reliance on the field test kit for keeping somebody in custody, and that's my best way of expressing it.  And I call it false -- a false procedure.

Q    When you say "false procedure," what do you mean?

A    Well, it's based on a false premise that it's sufficient for continued incarceration.  It's a presumptive test and does not -- wouldn't -- should not be the basis of an incarceration.  It's an investigative tool.

Q    Right.  So the officers are supposed to use the entire circumstances of the interaction with a suspect, and one of the pieces of what they're looking at to make a determination as to whether they're going to detain somebody or arrest somebody can be the NarcoPouch test or any narcotics field test.  Is that a fair statement?  10:25-11:1

A    For the purpose of detention and arrest, I would

ROGER A. CLARK - 06/27/2017

agree, and clearly, it is a valuable tool.    10:25-11:)

Q   I mean, when were you an officer?  I know I'm taking you back.

A   50 years ago, I took the oath.  So 1965 is when I was sworn in, and we didn't have the chemical tests. It was visual but always sent to a lab for verification; that has never changed, but it was some time ago.  I was a patrol officer seizing the stuff in '68.

Q   Do you know when the NarcoPouch and portable tests like the NarcoPouch were brought into use?

A   Well, I saw them being used by the time I retired out in '93.  I don't know if it was this kit, but it was a -- they would mix with a reactive chemical that would display a color which would be presumptive for whatever it is that they were suspecting.

Q   Right.  And then, and I think you mentioned it once, you have the presumptive test trigger the correct color.  You then send that to -- or it doesn't even turn to the right color.  You send the material to the lab for further and full confirmatory testing?

A   Yes.

Q   Let's walk through your notes there.

A   Sure.

Q   I don't understand what you have there so why don't you run through what you've got.

ROGER A. CLARK - 06/27/2017

decides they want to use Joe Smith's NarcoPouch tests? Would Safariland still be then responsible for the policies and procedures of the CBP with respect to what to do when you get a positive test?

A    That's an interesting question, and I would say that the federal government is responsible for its procedures, but in -- wherever -- and in any respect that it relied on what Safariland offered to them, then Safariland's responsible because both agencies, and I -- you asked me the question in regards to Safariland.

Safariland knows what the implications are of someone being arrested on the basis of their test kit.

Let me say this, too:  And by offering the kit, they assume, from my perspective, I'm not a -- I'm a police practices, but from my perspective, then Safariland embraces the constitutional hazards that it might create if they don't properly present their product.

15:19-23

Q    Well, the government is responsible for the policies and procedures.  That encompasses all policies and all procedures that relate to the CBP.  Is that fair?

A    I would agree that they are responsible and they hold the ultimate responsibility clearly.

Q    Okay.

A    But if they rely on the manufacturer as truthful

ROGER A. CLARK - 06/27/2017

and reliable, that's the best word, I think, and create their policy based on that false reliability, then I think the genesis of the policy falls then on the product or the person making the product.

Q   Well, are you saying that the customs and border patrol had a policy that the test, the NarcoPouch narcotics field test 923, was a conclusive test?

A   They --

Q   You're not saying that, right?

A   Well, that's why I quoted the testimony, briefly, in the report in that regard.  They -- they clearly did so as a custom.

If you read carefully through the policy, it's considered -- it says "Presumptive."  On your box in small letters it says "Presumptive," and I think there's -- there's some issues there.

I'll wait for the next question.

Q   Well, and Officer Gibbons, he knows it's presumptive.  He knows it's not 100 percent.

A   You know --

Q   He testified to that, right?

A   Yes, he testifies that he knows it's presumptive, but I don't think he understood what that meant in terms of the policies -- or what was required next.

EXHIBIT J - PAGE 265

ROGER A. CLARK - 06/27/2017                                    17:1-17

Now, Gibbons, as you saw in my report, I'm not critical of Gibbons using the test.  I think it -- the test worked -- and you saw the footnote.

Q    Yeah.

A    The test did not fail.  The test -- the chemical is designed to react to something that could be akin to methamphetamine or it could be methamphetamine and other contraband.

So it didn't fail, and based on that plus other things that are occurring, the fact that people do try to smuggle through that portal, et cetera, I'm not critical of him detaining Ms. Michel at all.

So my quote of his deposition testimony is that he did not under -- he did not understand the implications of presumptive, but he did use it and it was used -- he used it properly and it did give him the proper indicator for the detention.

Q    Okay.  Going back to your second page there. You have under No. 5, you have the California POST learning domains, and you've got a number of them listed there.                                                17:22-19:13

Are these learning domains applicable to the CBP?

A    Some are.  They're -- I'm going to be a little lengthy, but I'll try and be brief.

EXHIBIT J - PAGE 266

ROGER A. CLARK - 06/27/2017

Now, Gibbons, as you saw in my report, I'm not critical of Gibbons using the test. I think it -- the test worked -- and you saw the footnote.

Q    Yeah.

A    The test did not fail. The test -- the chemical is designed to react to something that could be akin to methamphetamine or it could be methamphetamine and other contraband.

So it didn't fail, and based on that plus other things that are occurring, the fact that people do try to smuggle through that portal, et cetera, I'm not critical of him detaining Ms. Michel at all.

So my quote of his deposition testimony is that he did not under -- he did not understand the implications of presumptive, but he did use it and it was used -- he used it properly and it did give him the proper indicator for the detention.

Q    Okay. Going back to your second page there. 17:18-19:13 You have under No. 5, you have the California POST learning domains, and you've got a number of them listed there.

Are these learning domains applicable to the CBP?

A    Some are. They're -- I'm going to be a little lengthy, but I'll try and be brief.

ROGER A. CLARK - 06/27/2017

In every state in the union, there are requirements in order to be vested with police powers. In California, it's called California POST, Peace Officer Standards and Training, and you'll see that I parenthetically said this is an expression of the law enforcement professional standards.

So -- but, for example, Learning Domain No. 5, Introduction to Criminal Law, that is a universal, throughout the country, including the federal government. It's commentary on the constitution, Bill of Rights, due process, those things. Laws of Arrest carries that, too.

But I -- I wanted -- I -- I thought as I wrote the report, what's the best way to express what the professional standard is, and that's why it's there.

Some of this is indeed restricted to California, not much.

And there are 42 skills that have to be certified. Then I listed just the select ones that I thought were important. Report writing's one. Investigative procedure's one. Custody is certainly one.

And custody, the custody, 31, learning domain cites federal law for keeping somebody in custody when they shouldn't be, that kind of thing.

Q   Are there learning domains for federal law enforcement?

ROGER A. CLARK - 06/27/2017

A   There's a curriculum required in order to be -- exercise law enforcement powers as a federal agent.  I do not have that curriculum.

Q   Okay.  So the California learning domains, while there may be some overlap, these are not what are applicable to the CBP.  It would be those federal rules, domains that the CBP, being federal officers, federal law enforcement, that's what they would be applicable to?

A   Well, if -- right, as I understand the question, but I need to add, only the manual, the policy manual was provided for me, which I listed, not the training documents when -- it's like a six-month academy for them back in Virginia.  So -- and they cover these topics.  17:18-19:13

Q   Did you ask Mr. Iredale to get those documents for you?

A   I don't remember asking him to get the training curriculum.

Q   Did you think that the training curriculum for these officers as it pertains to the handling of narcotics, use of narcotic tests would be relevant in this case?

A   Oh, there's more to it than just narcotic testing.

Q   Sure.

A   For example, Bulman, the absolute requirements

ROGER A. CLARK - 06/27/2017

A    There's a curriculum required in order to be -- exercise law enforcement powers as a federal agent.  I do not have that curriculum.

Q    Okay.  So the California learning domains, while there may be some overlap, these are not what are applicable to the CBP.  It would be those federal rules, domains that the CBP, being federal officers, federal law enforcement, that's what they would be applicable to?

A    Well, if -- right, as I understand the question, but I need to add, only the manual, the policy manual was provided for me, which I listed, not the training documents when -- it's like a six-month academy for them back in Virginia.  So -- and they cover these topics.

Q    Did you ask Mr. Iredale to get those documents for you?

A    I don't remember asking him to get the training curriculum.

Q    Did you think that the training curriculum for these officers as it pertains to the handling of narcotics, use of narcotic tests would be relevant in this case?

A    Oh, there's more to it than just narcotic testing.

Q    Sure.

A    For example, Bulman, the absolute requirements

EXHIBIT J - PAGE 270

ROGER A. CLARK - 06/27/2017

for a proper investigation and report writing and the processing of material that's suspected to be contraband and the implications of keeping somebody in custody longer than they should be.

Q   Right.  And the point is, wouldn't it have helped your analysis to actually get what the training that Officer Gibbons, Garza, and Bulman all got at FLETC?

A   I don't know how Mr. Iredale was -- whether that was denied or -- the only thing I had to rely on, and he certainly asked about it and it's quoted in the report, about their training.

So they could -- it's clear that they were given some training.  They don't really remember it.  They certainly don't remember it about the test kit as they should because it's something they would use almost daily.

Q   Have you ever been to -- well, what does FLETC stand for?

A   I don't know exactly.  It's the training facility.

Q   Okay.

A   It's their academy.  I think it's in Virginia.

Q   So the training academy, I presume you've never been there?

A   I have not.

20: 17-22

EXHIBIT J - PAGE 271

ROGER A. CLARK - 06/27/2017

Incomplete hypothetical.

A    It would be a tool -- an investigative tool.  It could swing both ways.

If a person -- if the officer doesn't know what he or she is looking at and does the test thinking there's a possibility and it turns up active, in other words, you get a positive result, then it could lead to further investigation and it might, with an explanation from the suspect, the target, simply result in a seizure and further investigation but not a further detention until it was verified at the lab.

Or it could swing the other way.  That's why I said I'm not critical in the -- right at the beginning of my first opinion.

I'll wait for the question, next question.

BY MR. SMELSER:

Q    Yeah.  Because the circumstances --

A    Let me say this:  It's hard for me to imagine a substance that would be deceptive in terms of -- to a typical law -- typical law enforcement officer, not necessarily even experienced, that they would not have some indicator that it's contraband and -- and from the basis of your question, you know, like cloth or something that doesn't typically look like narcotics.

Q    So going to Ms. Michel, considering all the

27:25-28:17

ROGER A. CLARK - 06/27/2017

circumstances of her pulling up to the border, the officers interviewing her, her acting nervous, at least per the patrol agent's testimony, the fact that she had hidden these bottles throughout the car, that coupled with the 923 positive, your opinion, that's acceptable, that's fine for her detention and arrest.

A    I think the answer is -- let me quote the line on Page 11.

"I am not critical of the investigatory detention of Ms. Michel, and the testing of the suspicious liquid in her possession by CBP officers Garza and Gibbons."

Q    The next line is "They appeared to use the Safariland field test kit as directed and had a reasonable belief that the liquid was contraband."

I've read that correctly?

A    You did.                                    27:25- 28:17

Q    So when you say they had a reasonable belief that the liquid was contraband, before they even did the test, they thought it could be contraband?

A    Well, of course.  That's what led to the test.

Q    So did Officer Gibbons or Garza, after they had turned Ms. Michel over to Agent Bulman, did they have any more involvement in this?

A    Not that I can see.

ROGER A. CLARK - 06/27/2017

Q   All right.  Looking at the fourth opinion on your report.  Well -- okay.  Yeah.  "Safariland's packaging and instructions fail to properly inform the police investigators who use the reagent in their daily work about the limitations and correct interpretation of the presumptive result."

Did I read that correctly?

A   You did.

(Mr. Iredale joins the deposition.)

BY MR. SMELSER:

Q   I mean, even you say in that statement it's a presumptive result, right?

A   Correct.

Q   You presume -- strike that.

47:15-24

You would assume that the police officers can understand and know what the word "presumptive" means?

A   Well, as you know, I put in a definition of presumptive in the deposition.

Q   Right on your piece of paper.

A   Right.  So I don't know -- exactly understand the question.

I would assume they would understand the English language, they would know the word "presumptive," and I think there's other factors.

You can see -- I'm 76.  It's hard for me to read

ROGER A. CLARK - 06/27/2017

word, hang their hat on this thing, as I said earlier. That's wrong.

Q   So that's commonly known.  It should certainly be commonly known amongst law enforcement.  I mean, that's actually what you're referring to.

When you say commonly known, it's commonly known amongst law enforcement that these tests, these NarcoPouch narcotics field tests are not enough for convicting someone.

A   Well, certainly Bulman would know it and -- but --

Q   You said common knowledge.  Common knowledge among law enforcement personnel.

A   Well --

Q   Right?

A   -- no, I don't know if that's -- I didn't get that from the two CBP officers that arrested her, that they considered it -- they considered it sufficient for their purpose of their duty to detain her and to seize.

Q   Right.

A   And I am not critical of that.

This is --

Q   But it's not enough for a conviction.  You knew that 30 years ago in your -- 30-plus years ago or however long ago that you were an officer and then a lieutenant,

*52:17-21*

EXHIBIT J - PAGE 275

ROGER A. CLARK - 06/27/2017

Safariland would be required.

Q   Are you saying that Safariland can't rely on the United States government to train its own officers, to train its chemists to conduct these tests in a way that should be done?  They need Safariland to come in and tell them when to do these type of tests?

A   As I understand the question, yes.  I can be more precise.

Q   Please be more precise.

A   Oh.  Because from what I saw in the record, tens of thousands a day and tens of thousands of agents, this is a huge responsibility of the manufacturer, and I think as good as the federal government is, I don't think it's reasonable to simply say you're the feds and you know better or you should know better and I don't have to worry about it, here it is.

57:17-22

Q   Well, it's law enforcement that is using this product, and it's used this product for the last 50 years, true?

A   I -- probably chemical testing goes -- you know, hand -- field chemical testing probably does go back 50 years, maybe even more.

Q   Right.  And the United States government has their own chemists that know exactly what this product does.

ROGER A. CLARK - 06/27/2017

MS. JUN:  Objection.  Calls for speculation. Lacks foundation.  Assumes facts not in evidence.

BY MR. SMELSER:

Q    They at least have one, Ms. Ambriz.

A    She answered some questions about how it works. She's a -- she's a degreed chemist.

Q    Right.  She knows exactly how it works.

A    Okay.

58:9-14

Q    That it's a presumptive test only, that you have to do confirmatory testing in the lab.

A    Okay.

Q    Which you said was common knowledge amongst law enforcement, true?

A    I believe, as I understand the question, yes.

Q    So what difference is it going to make if Safariland on a box of the NarcoPouch narcotics field test that's been used for 50 years says make sure you do your confirmatory testing timely?

MS. JUN:  And again, I'm going to object that that calls for an opinion outside the scope of this expert's expertise.

MR. SMELSER:  He's a practices guy.

MS. JUN:  And if I could clarify for the record. My understanding is that Mr. Clark is testifying as to the effect of such appropriate labeling or notice to the

ROGER A. CLARK - 06/27/2017

86:1-87:12

Q   Is there somebody that is identified as to who directs the usage and policies and procedures with respect to using the narcotic field tests?

A   Who directs it?  It's a -- this is a directive, a policy statement, an order, if you will, by the CBP department outlining eight -- excuse me, seven requirements.

Q   Okay.  May I see that?

MR. IREDALE:  Has that been marked as an exhibit?

MR. SMELSER:  Not yet, but it will be.

MR. IREDALE:  All right.

MR. SMELSER:  This will be 8.

(Exhibit 8 was marked.)

BY MR. SMELSER:

Q   It says "LSS."  Who is LSS?

A   Let me see.

Laboratories and Scientific Services.

Q   All right.  Who are they?

A   Well, they're -- it's part of the agency.

Q   Part of the U.S. Customs and Border Protection?

A   Yes.

Q   All right.  It says they are responsible for the development of guidelines and protocols for the proper usage related to NFTKs and for supplying the kits to

EXHIBIT J - PAGE 278

ROGER A. CLARK - 06/27/2017

field locations, under 4.2.

A    Exactly.

Q    And NFTK is narcotics field test kits?

A    Correct.

Q    It also says that LSS is also responsible for providing training held outside of the CBP and OBP academies and for reporting the total number of classes held outside the academies during the fiscal year.

Did I read that correctly --

A    You did indeed.

Q    -- also under 4.2?

A    Yes, you are correct.

*80:1-87:12*

Q    All right.  Under 5.2 it says, "The sequential testing method, detailed in the NFTK training, is recommended while using general purpose tests for presumptive testing of a suspect material."  That's under 5.2.

Now, did you ask for what this training material was?  Did you ask for a copy of that?

A    I took it as the training pages that I referred to, there are two in specific, that Safariland offers to the department or at least it's produced, if asked.

Q    Right.  So the U.S. Customs and Border Protection had those materials available to them?

A    Well, I took it as that, but I don't know.  I'm

ROGER A. CLARK - 06/27/2017

A    Well, I think based on that and other cases that were pending, and that's one of the reasons why I do what I do, to get this change -- these changes done --

Q    Sure.

A    -- policywise.

Q    But you didn't create the changed warning specifically, the words that are on the warning on that Taser or any other Taser that's sold in America, right?

A    You're right.

Q    All right.  You've never been hired by a company to draft any warning that went on any product ever, true?

A    True.

MR. SMELSER:  That's all I've got.

MS. JUN:  Do you want the same stipulation as yesterday?

MR. SMELSER:  Sure.  Yeah, we'll do the same.

MS. JUN:  And if you want to put it on the record because Mr. Cordero was not here yesterday.

MR. CORDERO:  That's okay.  If you've been using it, that's fine.

MS. JUN:  Okay.

And, Judy, could I get a copy, please?

THE REPORTER:  Yes.

Mr. Cordero, do you want a copy, or should I call Steve Chu?

EXHIBIT J - PAGE 280

ROGER A. CLARK - 06/27/2017

MR. CORDERO:   I'm sure we want a copy.

(Whereupon the deposition adjourned at
11:55 a.m.)


                    *    *    *

EXHIBIT J - PAGE 281

ROGER A. CLARK - 06/27/2017

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct; that I have read my deposition and have made the necessary corrections, additions, or changes to my answers that I deem necessary.

Executed on this_____day of _____,
2017.

_____

ROGER A. CLARK

EXHIBIT J - PAGE 282

ROGER A. CLARK - 06/27/2017

I, JUDY M. REIERSEN, Certified Shorthand Reporter for the State of California, do hereby certify:

That the witness in the foregoing deposition was by me first duly sworn to testify to the truth, the whole truth and nothing but the truth in the foregoing cause; that the deposition was taken by me in machine shorthand and later transcribed into typewriting, under my direction, and that the foregoing contains a true record of the testimony of the witness.

Dated:  This_____day of_____, 2017, at San Diego, California.

_____

JUDY M. REIERSEN
CSR No. 7505

EXHIBIT J - PAGE 283

# EXHIBIT K

PAGE 284

# Roger A. Clark

## Police Procedures Consultant, Inc.

10207 Molino Road.  Santee, CA 92071
Phone: (208) 351-2458,  Fax: (619) 258-0045
rclark9314@aol.com

May 29, 2017

Mr. Eugene G. Iredale, Esq.
Ms. Julia Yoo, Esq.
Ms. Grace Jun, Esq.
Iredale & Yoo, APC
105 West F Street, Fourth Floor
San Diego, CA 92101-6036

**Regarding:**   ***Doyma Vanessa Michel, v. United States of America.  Case No. Case No.16-CV-0277 GBC-RBB.***

Dear Counsel:

Thank you for retaining me to provide an expert opinion regarding the events and circumstances resulting the June 2, 2014 arrest and subsequent prosecution and 25 week incarceration of Ms. Doyma Vanessa Michel by United States Customs and Border Protection (CBP) Officer Eduardo Garza (Officer Garza), CBP Officer Brandon Gibbons (Officer Gibbons), Immigration Customs and Enforcement (ICE) Special Agent Zach Bulman (Agent Bulman) and others.  I have studied the reports, policy statements, training materials, deposition transcripts and other materials provided to me thus far (as listed below) regarding this case.  Please be advised that if or when any additional information is submitted, a supplementary report refining or adding to my expressed opinions in this report may be required.

It is also necessary to state at the beginning of this report I have not made credibility determinations in expressing my opinions.  That is, where there are differences in the events proffered by the Defendants and/or other witnesses, versus the events as proffered by Ms. Michel and/or other witnesses, I do not opine for the trier of fact regarding who are the more believable witness.  The resolution of any such conflicts is obviously within the purview of a jury to decide.

Page 1 of 20

**EXHIBIT K**
**PAGE 285**

**Items Reviewed Thus Far:**

1.  Plaintiff's Complaint.

2.  Documents: Bates SAFARILAND000001 - 000212.

3.  Documents: Bates USA0001 - 1051, including the following:

    a.  CBP Reports: Bates USA_0018 - USA_0044.
    b.  CBP Incident Report: Bates USA 0460 - USA 0487.
    c.  CBP Directive 3290-019A: Bates USA 0488 - USA 0493.
    d.  Miscellaneous CBP Email and correspondence: Bates USA0997 - USA1051.

4.  Deposition transcripts:
    a.  CBP Officer Eduardo Garza, March 22, 2017.
    b.  CBP Officer Brandon Michael Gibbons, March 22, 2017.
    c.  ICE Special Agent Zachary Steven Bulman with Exhibits 1-12, March 22, 2017.
    d.  DEA Chemist Alexandra Ambriz with Exhibits 1 - 6, March 30, 2017.
    e.  T. Allen Miller (Safariland PMK) with Exhibit, March 28. 2017.

5.  California POST Learning Domains (as an expression of Law Enforcement Professional Standards.)
    a.  #1: "Leadership, Professionalism & Ethics."
    b.  #2: "Criminal Justice System."
    c.  #3: "Policing in the Community."
    d.  #5: "Introduction to Criminal Law."
    e.  #15: "Laws of Arrest."
    f.  #16: "Search and Seizure."
    g.  #17: "Presentation of Evidence."
    h.  #18: "Investigative Report Writing."
    I.  #31: "Custody."
    j.  #36: "Information Systems."

EXHIBIT K
PAGE 286

**Brief Overview of Events and Commentary:**

On June 2, 2014, at approximately 2:10 PM, Ms. Michel was crossing (solo) into the United States from Mexico at the San Ysidro Port of Entry in the County of San Diego, California in her private vehicle. Officer Garza approached her vehicle while she was waiting in line. Officer Garza asked Ms. Michel why she did not have a front license plate on her vehicle while another officer opened the passenger door of the vehicle and saw a bottle of liquid in the glove compartment. Due to the unidentified liquid, Officer Garza directed Ms. Michel to the Secondary Inspection Area of the CBP border crossing facility.

Once in the Secondary Inspection area, Officer Garza and Officer Gibbons took additional bottles of liquid from Ms. Michel's vehicle and performed presumptive field drug tests on the contents and told Ms. Michel that the liquid in the bottles tested positive for methamphetamine. (The field drug test performed was the "Narco-Pouch 923 Methamphetamine Test Kit" produced and marketed by Safariland, LLC.) Ms. Michel told Officer Garza and Officer Gibbons that the liquid was not methamphetamine and explained that the suspect liquid was a well known product called, "cuajo" which is used to make Mexican cheese. Ms. Michel made similar statements during her interrogations by investigators. (It must be noted here that subsequent scientific testing - performed months later - established that the suspect liquid was, in fact, a legal and benign food enzyme extracted from calf stomach linings that is used in the cheese-making process. The enzyme is known in Spanish as, "cuajo.")

Based on the results of the Safariland test kit, Officer Garza placed Ms. Michel under arrest and booked the bottles of liquid into evidence. However, the liquid was not immediately sent for a scientific analysis and verification by the certified DEA laboratory. Accordingly, Ms. Michel was subsequently arraigned and then held in custody - apparently pursuant to established policy - for over six months solely on the results provided by the Safariland presumptive field kits.

Once Ms. Michel was under arrest she was interrogated and thereafter transported to the Metropolitan Correctional Center Federal prison in downtown San Diego, where she was incarcerated from June 3, 2014 to August 23, 2014. Ms. Michel was then transferred to the Otay Mesa/ San Diego detention facility run for the Federal government by the Corrections Corporation of America ("CCA"), where she remained until she was released on December 9, 2014. On October 14, 2014, while she was at the CCA facility, she was injured by another inmate while working in the kitchen.

Page 3 of 20

EXHIBIT K
PAGE 287

The laboratory testing of the liquid finally occurred in September of 2014 and verified that it was, in fact, a legal food enzyme ("cuajo") and not methamphetamine. Yet, Ms. Michel was not immediately released at the time of the test results.

Approximately six months after her arrest, the results of the scientific testing were finally acknowledged by reviewing authorities. However, Ms. Michel remained in custody for an additional week before her physical release actually occurred on December 9, 2014. .

*Chronological Sequence of Events:*

**June 2, 2014:**
Ms. Michel was arrested at the San Ysidro port of entry by CBP Officers Garza and Gibbons.

CBP Officer Garza does the first field test at San Ysidro port of entry. He detained her by handcuffing and escorted her to the security office because of field test result (Garza p. 47). Garza was never trained or told about risk of "false positive" from field test kits.[1] (Id. p. 38). CPB Officer Gibbons tested the four bottles using Safariland Narco Pouch 923 (Gibbons, pp. 13 - 14), and gets positive result for all four bottles. (Id. pp. 20-21). He then formally placed Ms. Michel under arrest. (Id. p. 21).

**June 9, 2014:**
DEA Chemist Alexandra Ambriz goes out to ICE evidence locker and does a field test using the Safariland Narco Pouch 923. The test results indicate positive for methamphetamine. (Ambriz pp. 102 - 105)

---

[1] In fact, "false positive" is technically a misnomer. The test did exactly what it is scientifically supposed to do: it detected the presence of a "secondary amine" in the cuajo. The CBP officers apparently did not know that, while methamphetamine is a "secondary amine" there are many legal substances, including cold medicine, allergy medication, and anti-depressants, as well as cuajo, that are secondary amines as well. The United States failed to train them as to the correct interpretation of the "positive" result on the Safariland test. Nothing in the box or accompanying materials adequately explained what the test results meant. In fact, the packaging material only reinforced the misconception that only methamphetamine or MMDA would provide the positive color change.

**EXHIBIT K**
**PAGE 288**

**July 3, 2014:**
The bottles of liquid are logged into the DEA lab.  (Ambriz p. 114)

**August 1, 2014:**
Assistant U.S. Attorney Matt Sutton tells ICE Special Agent Bulman
that there is no need for rush request to DEA yet (email, document
bates no. USA1028)

**August 18, 2014:**
DEA Chemist Alexandra Ambriz receives the liquid from DEA vault
(Ambriz p. 116)

**August 23, 2014:**
Ms. Michel was then transferred to the Otay Mesa/ San Diego
detention facility run for the Federal government by the Corrections
Corporation of America ("CCA")

**September 2014**:
DEA Chemist Alexandra Ambriz completed GC/MS testing on 4
samples taken from 4 bottles seized from Doyma and 12 samples
taken from 12 of 15 bottles seized from a storage unit.  GC/MS
results showed no controlled substances.  (Ambriz p. 121)

**September 10, 2014:**
DEA Chemist Alexandra Ambriz completed GC/MS analysis by this
date (Ambriz p. 139).  She did additional GCFID analysis after
GC/MS testing completed (*Id*. p. 133)

**September 19, 2014:**
All GC/MS and GCFID tests was completed by this date (*Id*. p. 134)

**September 22, 2014**:
Assistant U.S. Attorney Julia Cline sent ICE Special Agent Zachary
Bulman an email asking for rush on DEA lab tests.  Bulman did not
contact anyone at DEA.  (Bulman p. 88).  Additionally in October and
November 2014, Bulman did not contact anyone at DEA.  (Bulman
pp. 89-90).

**October 14, 2014:**
Ms. Michel was injured by another inmate while working in the

Page 5 of  20

EXHIBIT K
PAGE 289

kitchen at the Otay Mesa/ San Diego prison facility run for the Federal government by the Corrections Corporation of America ("CCA").

**November 21, 2014:**
DEA Chemist Alexandra Ambriz submitted her report re: no controlled substances found in the analyzed liquid (Ambriz p. 135). Her supervisor took one additional week to approve the report. (*Id.*). No one from DEA called ICE Special Agent Bulman on 11/21/2014 to tell him that the liquid was not contraband. (Bulman p. 90).

**December 3, 2014:**
ICE Special Agent Bulman received the lab results and talked to DEA Chemist Ambriz. He then discusses lab results with Assistant U.S. Attorney Matt Sutton. (Bulman p. 19)

**December 9, 2014:**
Ms. Michel is physically released from federal custody.

As stated above, Ms. Michel was arrested pursuant to results from a presumptive field test kit supplied to the Federal Government by Safariland LLC. (Narco Pouch 923). It is uncontested in the record (as demonstrated in this incident) that the field test kit can and will provide a "false positive" result. As such, it must only be used to justify a detention and immediate arrest pending the results of a laboratory test verifying the suspected contraband. This did not occur. Certainly neither Officer Garza nor Officer Gibbons were adequately trained in this regard:

*Officer Garza's Testimony:*

Q.   And when you say some chemists, were they chemists employed by the DEA if you know?
A.   I don't know.
Q.   Could you describe to me the conversation that you had with those chemists, what you said and what they said?
A.   Pretty much they were just giving us like heads up on hazardous materials so that we won't put our hands in anything that's hazardous that might end up getting us hurt, and then I went ahead and asked them about what had happened, and they couldn't explain to me what happened or why.

Page 6 of 20

EXHIBIT K
PAGE 290

Q.  When you say I asked them what had happened, could you tell me whether you said what had happened or --

A.  I just asked them could there be a false positive to a liquid substance, and they couldn't really give me a good answer, so...

Q.  So as of the time that you did that test on the 2nd of June of 2014, nobody had ever told you that that test could result in a false positive, correct?

A.  Correct.

Q.  You had never been taught that at the training academy at FLETC?

A.  No.

Q.  Correct?

A.  Correct.

Q.  Never informed of that by the memo regarding liquid methamphetamine that we earlier discussed that you looked at?

A.  No.

Q.  Never told that by the supervisor at the briefing that you had concerning methamphetamine, liquid methamphetamine. Correct?

A.  Correct.

Q.  There was nothing in the materials on the box or in the testing instructions that said to you that there can be a false positive?

A.  I didn't remember reading anything about false positives.

Q.  And so when you put the handcuffs on Doyma Michel on that day, you did so because you had been trained and you had been taught and you had learned from everything that you knew that when that color change occurred that was because the substance was methamphetamine, correct?

A.  Correct. (Garza depo pp. 37 - 38)

*Officer Gibbons' Testimony*

Q.  Can you tell me how long after you finished your testing of the bottles you placed her under arrest?

A.  Usually right when I get one positive, I usually place the defendant right under arrest right away.

Q.  Okay. So it's the positive test that led you to place her under arrest?

A.  That -- yes.

Q.  And so can you tell me exactly the process of that? That is to say, what did you do? What did you say? And what did she do and say, if anything?

Page 7 of 20

**EXHIBIT K**
**PAGE 291**

A.    Nothing.  I just took pictures.  I told her she's being arrested for bringing narcotics into the U.S. Any questions she has -- there will be an ICE agent there to speak with her shortly.

Q.    Did you thereafter arrange to have ICE notified so they could send an agent?

A.    Yes.

Q.    And that's typical?  That is to say, if there is a seizure at the port of entry, generally ICE or DEA --

A.    Yeah.  Any other --

Q.    -- gets called over?

A.    Yes.

Q.    To do the interrogation?

A.    Correct.

Q.    And to follow up on any additional materials?

A.    Correct (Gibbons deposition pp. 21- 22)

*ICE Special Agent Bulman's testimony:*

Q.    And then she said "No, he initially asked me something, and I didn't know what he was referring to, but when he pulled the bottle out from behind the dash, then I told him that's cuajo, and cuajo is used to make cheese" or words to that effect?

A.    That's what I've written in my report, yes, sir.

Q.    Yes.  In other words, that was her statement to you?

A.    Yes, sir.

Q.    And you, as the investigator, of course, are concerned not only with her statement, but with comparing her statement to information that you have from other sources?

A.    Yes.

Q.    It was some point thereafter that you told her, "That bottle does not contain cuajo."

A.    Yes.

Q.    You ask her if other bottles of Cuajo hidden in the car had been in her possession the entire time.

A.    Yes, I did.

Q.    And she said yes?

A.    Yes.

Q.    You reiterated the question and asked if the bottles not found behind the dashboard but located elsewhere in the car had been in anyone else's possession?

Page 8 of 20

**EXHIBIT K**
**PAGE 292**

A.   Yes, I did.

Q.   And she said the cuajo had either been purchased by her or her uncle and that she had no idea how the one bottle ended up behind the dashboard but maybe her uncle had put it there.

A.   That is what she told me, yes, sir.

Q.   Shortly thereafter, she said the other three bottles had been in her control and her control only.

A.   That is what she told me.

Q.   At some later point in the interview, you told her "I am asking you for the truth, and if you continue to lie to me concerning what was in those Cuajo bottles, then this interview is just going to be stopped" or words to that effect?

A.   I do recall that, yes, sir.

Q.   And you said, whether she continued to lie to you or not, she was going to be going to jail regardless?

A.   That was -- yes, that is true.

Q.   And if she wanted to help herself out, she should provide information to you on who she was working for?

A.   Yes, I did.

Q.   And her response is "I'm taking the cuajo to Francisco" or words to that effect?

A.   I believe that was her response, yes.

Q.   Now, you tried to tell her at a later point, "I don't think you're a bad person because you smuggled methamphetamine, but I want to understand why."

A.   That's a general line of questioning I use in drug smuggling cases, yes.

Q.   And she continued to say what she had said before: "No, it's not methamphetamine. It's Cuajo."

A.   Yes.

Q.   And you said, "Well, you've been charged with smuggling before, and you're no stranger to smuggling things and people through the border."

A.   I did tell her that, yes.

Q.   And you said "Unlike the other times, you're not going to be released. You're going to be prosecuted this time" or words to that effect?

A.   That is true, yes, sir.

Q.   She said, "Well, the bottles of Cuajo still need to be examined by a laboratory."

Page 9 of 20

EXHIBIT K
PAGE 293

A.    That is what she said, yes, sir.
Q.    And you told her yes, you agreed with her?
A.    Because I knew that was going to be the case.
Q.    Then she said, "I bought the Cuajo in a store in Tijuana on May the 31st, and I purchased cuajo because it's legal, and I bring it into the United States because it is legal."
A.    That was what she said.

(Bulman deposition pp. 52-55)

Q.    All right. Now, did you ask Ms. Ambriz to do the confirmatory test as soon as possible when you saw her on the 9th of June?
A.    The -- when you -- when you ask about the confirmatory test, are you talking about the actual analysis that's conducted at the lab?
Q.    Yes. Did you ask her to speed up that analysis?
A.    I did not.
Q.    Did you ask her when she would do the analysis at the lab?
A.    I did not.  Not that I recall.
Q.    Well, now, you recall Ms. Michel told you that that's not liquid methamphetamine?
A.    That is what she told me, yes.
Q.    She told you that over and over and over again; yes?
A.    And I've been told crystal meth is -- is coconut shavings. It doesn't necessarily make it so.
Q.    That's quite true.  But she told you, "This -- this is cuajo.  This is not liquid methamphetamine."
A.    That is what she told me.
Q.    Now, you said, "You're lying to me. I don't believe you"; right?
A.    That's what I told her, yes.
Q.    And you told her that on the strength of at that point a test that you hadn't -- when you talked to her on the 2nd, you had been told, well, some of the CBP officers did some field tests and they showed, presumptively, methamphetamine; right?
A.    Yes.
Q.    So on that basis, you called her a liar?
A.    Yes.
Q.    And on that basis, you placed her under arrest and put her in the MCC.
A.    Not solely on that basis, no, sir.

Page 10 of  20

EXHIBIT K
PAGE 294

Q.    Well, did the test results -- if the test results had been negative, would you have placed her under arrest?

MR. CHU:

May call for speculation. You can answer.

THE WITNESS:

If the test results had been negative, I wouldn't have even been called.

BY MR. IREDALE:

Q.    Fair enough. So the test results, fair to say, were at least a major factor in your deciding to place her under arrest?

A.    Yes, sir.  (Bulman deposition pp. 68 - 70)


**Opinions Thus Far:**

1.    Throughout the nation both Federal and State Law Enforcement Officers are trained that, as a constitutional requirement, and prior to any arrest, there must exist at a minimum, probable cause to believe that a crime. has been committed and that the subject sought to be arrested is guilty of the crime.  Accordingly, I am not critical of the investigatory detention of Ms. Michel, and the testing of the suspicious liquid in her possession by CBP Officers Garza and Gibbons.  They appeared to use the Safariland field test kit as directed and had a reasonable belief that the liquid was contraband.  However, I am very critical of the actions by Federal Authorities in the chain of events that followed.  This includes their apparent deliberate failures to follow the obvious necessary procedures that would have quickly established that Ms. Michel was not smuggling methamphetamine into the United States.  She remained incarcerated for over six months simply for the sake of apparent convenience of the CBP, *et. al.* There was incompetent investigation.  Her wrongful imprisonment was easily avoidable.  As such they were obvious constitutional violations.

2.    ICE Special Agent Zachary Bulman, as the interrogator and lead agent regarding the investigation. was required to know that once he finished his investigation, he was required to present the case to an Assistant U.S. Attorney for prosecution.  Agent Bulman was trained that a prosecutor is held to a far higher standard than simple probable

Page 11 of 20

**EXHIBIT K**

**PAGE 295**

cause to arrest, but that there must be enough "admissible evidence to support a conviction."

"A prosecutor should not institute, or cause to be instituted, or permit the continued pendency of criminal charges when the prosecutor knows that the charges are not supported by probable cause. A prosecutor should not institute, cause to be instituted or permit the continued pendency of criminal charges in the absence of sufficient admissible evidence to support a conviction." (ABA Model Rule 3.8.)

The Prosecutor should charge only if the following four basic requirements are satisfied:

a. The prosecutor based on a complete investigation and a thorough consideration of all pertinent data readily available to him, is satisfied that the evidence shows the accused is guilty of the crime to be charged.

b. There is legally sufficient, admissible evidence of a corpus delecti.

c. There is legally sufficient, admissible evidence of the accused's identity as the perpetrator of the crime charged.

d. The prosecutor has considered the probability of conviction by an objective fact-finder hearing the admissible evidence. The admissible evidence should be of such convincing force that it would warrant conviction of the crime charged by a reasonable and objective fact-finder after hearing all the evidence available to the prosecutor at the time of charging and after hearing the most plausible, reasonably foreseeable defense that could be raised under the evidence presented to the prosecutor.

(Standard 3-3.9 Discretion in the Charging Decision.)

In summary, according to well-accepted standards, a prosecutor must have much more than mere probable cause to file charges and to prosecute a case. A prosecutor must first conduct a thorough investigation and review of the evidence, must consider the probability of conviction and must continue to evaluate the evidence, including any new evidence at every stage of the proceedings. *The*

EXHIBIT K
PAGE 296

*prosecutor cannot fulfill this duty to evaluate probable cause, let alone his heightened duties to seek justice by filing only those cases that are supported by sufficient admissible evidence of guilt, if evidence is hidden from him or if he is misled by investigators.* (Emphasis added.)

As quoted above, Agent Bulman was repeatedly told during his interrogation of Ms. Michel exactly what the liquid was - a legal product to make Mexican cheese. Proof of her claim of innocence was easily available to him within hours. He had on-line research available. He had the DEA laboratory available. He did absolutely nothing worthy of an honest investigation. As a prior Detective and Detective Bureau Commander I am very critical of Agent Bulman and consider his failures to be inexcusable.

3.  The record documents that the CBP, DEA, ICE, and U.S. Attorney's Office have embraced the presumptive Safariland field test kit as sufficient for prosecution and prolonged pretrial detention. This is an obviously false belief. There should have been well established policies and procedures in place requiring the prompt scientific testing of all suspected items to establish the actual existence of the crime. A "presumptive" field test does not meet this requirement. It should have been obvious to every agency using the field test for an investigative purpose because police officers are not trained in forensic chemistry. Accordingly, the reliance by the CBP, DEA, ICE, and U.S. Attorney on the presumptive test kit as sufficient to justify incarceration and prosecution appear in this set of facts as an established custom and practice that would result in the unconstitutional and lengthy incarceration of innocent persons such as Ms. Michel and others in similar circumstances.

4.  Safariland's packaging and instructions fail to properly inform the police investigators who use the reagent in their daily work about the limitations and correct interpretation of the presumptive result. They fail to explain that the test is for the presence of any secondary amine, of which methamphetamine and MDMA are only a subset. They fail to set out that many legal substances contain secondary amines which are both common and legal (cold remedies, allergy medications, and even an antidepressant medication). They fail to explain that timely confirmatory testing is required. Finally, the

Page 13 of 20

**EXHIBIT K
PAGE 297**

materials fail to state what Safariland properly admits: the test in and of itself does not constitute probable cause to arrest.

## My Qualifications to Review This Case:

My opinions are based in part on my training, professional experience and education. I am a twenty seven year veteran of the Los Angeles County Sheriff's Department (LASD). I was hired on December 1, 1965, and I retired from active service on March 31, 1993. My career included six years at the rank of Deputy Sheriff, six years as a Sergeant, and fifteen years as a Lieutenant. I retired holding a California Peace Officer Standards and Training (POST) Advanced Certificate, and I am a graduate of the POST Command College (class #5).

During the course of my service with the department, I had a wide range of duties. Those duties included an 18 month assignment as a staff jail deputy and two years as an Administrator/Lieutenant in the same jail facility (Men's Central Jail). I also served on the department as a patrol officer, field supervisor, jail watch commander and administrator, station watch commander, and commanding officer of investigative units. I was a field training officer while assigned as a patrol deputy, and I trained new officers in POST and department approved patrol procedures, field investigations, apprehension techniques, and emergency procedures.

I was a Station Detective and, as such, reviewed and assessed cases passed on to me by the patrol officers. Those cases included possible complaints relating to both misdemeanor and felony crimes. They frequently required follow up investigations and interviews before the exact nature of the case could be determined. As a field officer and detective, I was trained in interview and interrogation methods and subsequently trained other officers.

Among other assignments as a Sergeant, I supervised field officers and station detectives as they took complaints and conducted preliminary investigations regarding criminal and administrative matters.

As a Sergeant and as a Lieutenant, I served on the training staff of the Los Angeles County Sheriff's Department's Patrol School which taught the POST accepted patrol tactics, and investigation and apprehension methods.

As a Watch Commander and as a Lieutenant, I responded to, investigated, and reported on the use of force and officer-involved shootings. I was also assigned by my Department

Page 14 of 20

EXHIBIT K
PAGE 298

EXHIBIT L

PAGE 299

ALISON G. VREDENBURGH, PH.D., CPE - 06/26/2017

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOYMA VANESSA MICHEL, AN INDIVIDUAL, )<br><br>PLAINTIFF, )<br><br>VS. )<br><br>UNITED STATES OF AMERICA,<br>B. GIBBONS, AN INDIVIDUAL,<br>E. GARZA, AN INDIVIDUAL,<br>G. BARCIA, AN INDIVIDUAL,<br>SAFARILAND, LLC, A DELAWARE<br>LIMITED LIABILITY COMPANY,<br>AND DOES 1 THROUGH 100,<br>INCLUSIVE, )<br><br>DEFENDANTS. ) | CASE NO. 16CV0277-GPC-AGS |

DEPOSITION OF ALISON G. VREDENBURGH, PH.D., CPE

MONDAY, JUNE 26, 2017

JOB NO. 103784

REPORTED BY JUDY M. REIERSEN, CSR NO. 7505

ALISON G. VREDENBURGH, PH.D., CPE - 06/26/2017

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

DOYMA VANESSA MICHEL, AN INDIVIDUAL,

            PLAINTIFF,

VS.                           CASE NO. 16CV0277-GPC-AGS

UNITED STATES OF AMERICA,
B. GIBBONS, AN INDIVIDUAL,
E. GARZA, AN INDIVIDUAL,
G. BARCIA, AN INDIVIDUAL,
SAFARILAND, LLC, A DELAWARE
LIMITED LIABILITY COMPANY,
AND DOES 1 THROUGH 100,
INCLUSIVE,

            DEFENDANTS.

    DEPOSITION OF ALISON G. VREDENBURGH, PH.D., CPE,

TAKEN BY THE DEFENDANT SAFARILAND, LLC, COMMENCING AT

11:05 A.M. ON MONDAY, JUNE 26, 2017, AT

105 WEST F STREET, 4TH FLOOR, SAN DIEGO, CALIFORNIA,

BEFORE JUDY M. REIERSEN, CERTIFIED SHORTHAND REPORTER, IN

AND FOR THE STATE OF CALIFORNIA.

ALISON G. VREDENBURGH, PH.D., CPE - 06/26/2017

APPEARANCES:

    FOR THE PLAINTIFF:

        IREDALE & YOO, APC
        BY:  EUGENE G. IREDALE, ESQ.
                - AND -
        GRACE JUN, ESQ.
        105 WEST F STREET, 4TH FLOOR
        SAN DIEGO, CALIFORNIA  92101-6036
        619.233.1525
        EGIREDALE@IREDALELAW.COM
        GJUN@IREDALELAW.COM

    FOR THE DEFENDANT SAFARILAND, LLC:

        YUKEVICH CAVANAUGH
        BY:  STEVEN D. SMELSER, ESQ.
        355 SOUTH GRAND AVENUE, 15TH FLOOR
        LOS ANGELES, CALIFORNIA  90071
        213.362.7777
        SSMELSER@YUKELAW.COM

    FOR THE DEFENDANT UNITED STATES OF AMERICA:

        OFFICE OF THE U.S. ATTORNEY
        BY:  STEVE B. CHU, ASSISTANT U.S. ATTORNEY
        880 FRONT STREET, ROOM 6293
        SAN DIEGO, CALIFORNIA  92101-8893
        619.546.7167
        STEVE.CHU@USDOJ.GOV

    ALSO PRESENT:

        GIANNA CRESTO

EXHIBIT L - PAGE 302

ALISON G. VREDENBURGH, PH.D., CPE - 06/26/2017

I N D E X

WITNESS:  ALISON G. VREDENBURGH, PH.D., CPE


EXAMINATION                                              PAGE

BY MR. SMELSER                                             6
                                                         88

BY MS. JUN                                               82


                        E X H I B I T S

                (BOUND UNDER A SEPARATE COVER)

EXHIBIT                                                 MARKED

EXHIBIT A        DR. VREDENBURGH'S CV,                    23
                 19 PAGES

EXHIBIT B        "TRIAL EXPERIENCE," TWO PAGES            23

EXHIBIT C        BILLING, TWO PAGES                       23

EXHIBIT D        DOCUMENTS BEHIND BINDER TAB              23
                 "ADMINISTRATIVE"

EXHIBIT E        DOCUMENTS BEHIND BINDER TAB              23
                 "DISCOVERY REVIEW"

EXHIBIT F        DOCUMENTS BEHIND BINDER TAB              23
                 "PHOTOS"

EXHIBIT G        DOCUMENTS BEHIND BINDER TAB              23
                 "RELATED RESEARCH"

EXHIBIT H        HIGHLIGHTED DEPOSITION                   23
                 TRANSCRIPTS (TO BE PROVIDED
                 BY WITNESS)

EXHIBIT I        5/29/17 REPORT, 13 PAGES                 23

EXHIBIT J        NARCOPOUCH INSTRUCTIONS,                 51
                 TWO PAGES

ALISON G. VREDENBURGH, PH.D., CPE - 06/26/2017

E X H I B I T S (CONTINUED)

| EXHIBIT | | MARKED |
|---------|---|--------|
| EXHIBIT K | WARNING LABEL, ONE PAGE | 61 |
| EXHIBIT L | "CORRECT USE OF FIELD TESTS," "ABOUT THE TEST," 5/14/12 E-MAIL, THREE PAGES | 82 |

\*   \*   \*

EXHIBIT L - PAGE 304

ALISON G. VREDENBURGH, PH.D., CPE,

having been first duly sworn, testified as follows:


EXAMINATION

BY MR. SMELSER:

Q    State your name for the record, please.

A    Alison Vredenburgh.

Q    Vredenburgh?

A    Yes.

Q    Did I pronounce that correctly?

A    Yes.

Q    Okay.  Good.  And where is your office?

A    In Carlsbad, California.

Q    You've been deposed before?

A    Yes.

Q    A number of times?

A    Yes.

Q    Do you have any estimate of how many times?

A    Hundreds.

Q    Hundreds.  So we can probably bypass the rules, preliminary rules?

A    If you'd like.

Q    I would like.

I would just say, obviously, if you don't understand the question, tell me.  I'll rephrase it, do

EXHIBIT L - PAGE 305

ALISON G. VREDENBURGH, PH.D., CPE - 06/26/2017

the mass spec test knew --

Q    Right.

A    -- wrote a report, and then it sat around for several more months, and the people that were holding her did not demand the results because they were not aware that they were -- the ones that arrested her were not aware that that test was not conclusive for meth and in fact testified that based on that test result, that is why he arrested her.

Q    Are you saying that the officers that arrested her knew before it went to the lab that this product, this substance was not an illicit substance?

A    No, that's the problem, is that they did not know that the test was not testing for an illicit substance.

It was testing for lots of things, but they thought they were testing for an illicit substance. Therein lies the problem.

Q    Okay.  With respect to the design or manufacture of the NarcoPouch product, other than the warning that you have in your report, are you going to be offering any opinions with respect to the design or manufacture of the product?

A    You mean the chemistry issues?

Q    Chemistry issues, sure.

21:19-22:4

ALISON G. VREDENBURGH, PH.D., CPE - 06/26/2017

A    I will not be testifying about the chemistry other than what I have in my report about hazard management and control, just basic human factors protocol, and the first step would be design.

So if it was possible for you to design a test that did test for the two drugs that it specifies on the box and only those, then that would be controlling it through design. In other words, that would design out the hazard and eliminate the potential for an incorrect conclusion that the results were for those two things that are described on the package.

Q    Right. You're not a chemist and you don't have the background to know whether that's even feasible?

A    No. I'm going to talk about the hazard management, control, and as a theoretical construct, I'm saying, if possible, then that would be an example of controlling through design. Somebody else will testify whether that's possible or not.

Q    Do you have an opinion as to whether the NarcoPouch product itself was defective in any respect?

A    I don't like to use the word "defective" because that's a legal conclusion; however, the product includes the labeling, and I'm critical of the labeling because it would mislead the users.

Q    Outside the labeling, do you have any opinions

ALISON G. VREDENBURGH, PH.D., CPE - 06/26/2017

Q    Okay.

A    And then they did -- made no effort to get the results of the secondary testing, and the mass spec testing sat around for quite some time.

46:5-18

Q    All right.  So it sounds like you are giving an opinion that because there was no warning, these three officers, law enforcement personnel did not have probable cause to arrest her.  I mean, you're not giving that opinion, are you?  Isn't that going to be Roger Clark, police practices expert?

MR. IREDALE:  Let me just object to any opinion on probable cause on the basis of lack of expertise of this witness, but please answer the question if you can.

A    If you're asking for a legal conclusion, I can't answer that.

My testimony's about warnings, the research that goes into warnings, the purpose of warnings, how to create warnings, and where to place them.

BY MR. SMELSER:

Q    So you're not going to be giving an opinion as to whether these officers had probable cause to detain or arrest Ms. Michel?

A    No, I'm giving opinions that they clearly needed the warning because they were all uninformed.

Q    Okay.  If they had the warnings as you provide

ALISON G. VREDENBURGH, PH.D., CPE - 06/26/2017

48:2-13

A    As a -- right.

Q    But you just said you're not going to be providing an opinion as to probable cause.  That's why I'm confused.

I don't mean to argue with you, but obviously I need to know what you're going to testify at trial.

A    Okay.

Q    If you're going to come in and say that they used this test as their probable cause and that's not appropriate, well, I need to know that.

A    I'm going to rely on another expert specifically for the probable cause issue and I am going to assume they will talk specifically about that.

My understanding is, because there are so many other substances, that that should not be the sole basis, and as far as the legal aspects of that or the probable cause, somebody else will testify to that, but assuming that that's true, that should be in the warning.

Q    Okay.  So obviously you have opinions with respect to the instructions and the warnings that are on the box themselves and you think they don't go far enough?

A    Well, they're misleading.

Q    Okay.  So when it says "NarcoPouch, ODV's premiere product, one of the best presumptive field drug

ALISON G. VREDENBURGH, PH.D., CPE - 06/26/2017

the GC-MS color test, PH test.

61:2-7

Q   Right.   So in general, it's the police officers that make the determination as to whether there's probable cause to detain or arrest somebody?

A   That's a legal question.

Q   You don't know the answer to that?

A   I'm not going to answer any legal questions.

Q   All right.   Let's look at your -- well, you can look at -- either one.   If you want to make a copy of it, you certainly can.   I'll give it to you.

MS. JUN:   Why don't we go ahead and mark that as an exhibit and it will just make the record easier.

MR. SMELSER:   Okay.

THE WITNESS:   This is already marked.   Why don't you mark the big one.

MS. JUN:   Correct.   That's what I -- yeah.   That will make it easier.

(Exhibit K was marked.)

BY MR. SMELSER:

Q   All right.   The first line is "Test results should not be considered a confirmation of identification of an illicit substance."

Did I read that correctly?

A   Yes.

Q   All right.   Doesn't that essentially mean the

EXHIBIT L - PAGE 310

ALISON G. VREDENBURGH, PH.D., CPE - 06/26/2017

that there's all these other substances.

So I would think that an officer would know that there's all these different substances and there's a woman adamant that this is cuajo and not methamphetamine, that he would know that he would have to do that follow-up test because there's so many other things that it could be, and she's being very specific.

Moreover, she's not willing to plead. She's saying I'm innocent. She'll sit there in jail until she's found innocent. She's not willing to plead guilty, and why isn't someone testing it when she's sitting there month after month after month waiting for the follow-up test?

Q So as a part of the analysis for probable cause, the officers are supposed to take the word of the suspect?

MS. JUN: Objection. Outside the scope.

BY MR. SMELSER:

Q They're supposed to consider everything that the suspect says, right?

MS. JUN: Objection. Outside the scope of this expert's --

MR. SMELSER: I don't think it is outside because she's the one that put it's not the sole basis for probable cause for arrest.

EXHIBIT L - PAGE 311

ALISON G. VREDENBURGH, PH.D., CPE - 06/26/2017

manufacturer of a product to develop a warning that will be followed 100 percent of the time?

A    In general, that's probably true.  There are certain things that might affect compliance, but there are -- there's more than just compliance.

You need to first notice it, understand -- read it, understand it, and then comply with it, and what's missing here is these officers weren't even aware.  So if any one of the three were aware and could have put a rush on it.

73:11-16    73:11-20

Q    Could have put a rush on it, but they still would have arrested her?

A    And followed up.

I'm not going to give an opinion about whether they would have or should have arrested her.  That's a different expert.

Q    Just give me a moment.

Who has the ultimate responsibility to train law enforcement personnel to do their job?

A    Another expert will handle that.

Q    Okay.  So what training material Safariland should have provided to law enforcement, you're going to defer that to another expert?

A    Right.  I'm talking about the warning that was based on the training material that was created by

ALISON G. VREDENBURGH, PH.D., CPE - 06/26/2017

only thing that I would change in those materials.  Other than that, I think as far as what you created is fine.  It's just not getting to the officers.

*75:4-10*

Q   Okay.  Do you think it's Safariland's responsibility to train the police officers or do you think it's the law enforcement entity that employs those officers --

A   I'm not going to respond --

Q   -- to ultimately train them?

A   Someone else will respond to that question.

Q   You say in your report that Safariland should provide a list of non-illicit substances that will test positive in the training materials?

A   Somewhere.  The common ones, if there's common things that they may see.  There might be a huge list.  I don't know if they could give an exhaustive one because there might be a lot of chemicals, but anything in common, that might be in someone's car, certainly the officers should be aware of that and what that might look like.

Q   Wouldn't that list necessarily include -- or strike that.

Wouldn't that require Safariland to test every substance that's out there in the world?

A   You did not -- my last question said the common

ALISON G. VREDENBURGH, PH.D., CPE - 06/26/2017

So let's say that you want to test -- that you don't want to ever put anyone in jail that's innocent. So you have a test that only tests for meth but you need a certain amount of it to be positive so you may let some guilty people go.  That would be more of a Type II error.

Does that make sense?

81: 7-12

Q    Okay.  Do you think that the police officers should be able to use a narcotics field test at all?

A    I'm not going to answer that.  It's not -- that's not really a warnings expert opinion.  So that would just be a personal opinion, and it doesn't really have a place here.

Q    Well, with your warning, you wouldn't have any problem with the NarcoPouch product?

A    Again, any problem is a personal belief, which is not a warnings expert opinion.

Q    From an expert opinion.

Do you have an expert opinion -- if your warning is on all the material that you wanted it on, do you then say that there's anything wrong with our product?

A    Again, anything wrong is not a warnings expert opinion.  You keep asking for my personal beliefs and not a warnings expert opinion.

Q    Is there any governmental agency that regulates the warning that does have to be on the NarcoPouch

ALISON G. VREDENBURGH, PH.D., CPE - 06/26/2017

Q   And as an expert in human factors, do you believe that this constitutes sufficient notice or warning to the end user to send material that tests positive to the lab for confirmatory testing?

A   No.  It only says to send in the negative results and to retain material.

MS. JUN:  Thank you.  I have no further questions.

FURTHER EXAMINATION

BY MR. SMELSER:

Q   To be fair, it says retain the sufficient sample of suspect material for evidential analysis by the forensics laboratory.

A   Right.  So they said to send one and to retain the other.  So I guess at some point if they need to they'll have that retained, but --

Q   "For evidential analysis by the forensics laboratory."  What does that mean to you?

A   Right.  It doesn't -- it says to retain it.  So I guess at some point -- they have to retain some.

I mean, they clearly know how to say send because they said it on the front.  On the back, it's saying to retain some of it.          88:25-89:10

Q   Do you think the officers don't understand what

EXHIBIT L - PAGE 315

ALISON G. VREDENBURGH, PH.D., CPE - 06/26/2017

it means to -- when it says "Always retain sufficient sample of suspect material for evidential analysis by the forensics laboratory," you don't think they understand that means send it to the forensics laboratory for analysis?

A    I'll have to have a different expert say what those words mean, but they clearly -- they know how to say send because on the front it says to send it to the lab for further testing whereas the back, it says retain some of the sample.

So they do not say the same thing.  Clearly, they know how to say send it for testing, and on the back it does not say send all materials for testing; it says retain sufficient sample.

Q    So you think the back statement is confusing to police officers and they're not going to know what "evidential analysis by the forensics laboratory" means?

A    It --

MS. JUN:  Objection.  Calls for speculation.

A    It means to retain a sufficient sample.  So --

BY MR. SMELSER:

Q    For what purpose?

A    If it needs it for forensics -- I'm telling you what the words say, and they're open for interpretation. They're not clear.

ALISON G. VREDENBURGH, PH.D., CPE - 06/26/2017

there with it.

MR. SMELSER: Okay. Just so I know and it's on the record, which transcripts did you highlight? Is it just three officers or is it every deposition?

THE WITNESS: All the depos. I just highlight the same way as you saw those other ones.

I mean, they're summarized. If you want them, you can see them. I have nothing to hide. If there's some reason --

MR. SMELSER: No, I just -- I didn't know if you --

THE WITNESS: I just brought the wrong package with me, but I have no problem giving you the other ones if you desire to see them.

MS. JUN: Would you like those depositions to be marked as Exhibit M?

THE REPORTER: It's already marked as H.

THE WITNESS: All I'm asking for is something to ship them in so they go to wherever you want them to be. That's all I care about.

MR. SMELSER: Yeah, they just need to go to the court reporter.

(Discussion off the record.)

MR. SMELSER: I mean, just work it out.

THE WITNESS: All I need is an envelope that

ALISON G. VREDENBURGH, PH.D., CPE - 06/26/2017

says stick them in here, and I will ship them to wherever

it's addressed to.

        MR. SMELSER:  Okay.

        MS. JUN:  Steve, if we need to go back on the

record, just let us know, or we can go back on the record

when we have a stipulation we've worked out.

        THE REPORTER:  I've been on the record.

        MR. SMELSER:  No, that's fine.

        The original ultimately will end up in my office

and after -- I don't know what -- if the original is for

some reason unavailable, then a certified copy can be

used in its place.

        Anything else?

        MS. JUN:  Can the witness have 30 days to

review, make any corrections?

        MR. SMELSER:  Sure.

        MS. JUN:  Okay.  So stipulated.

        MR. CHU:  Agreed.

        THE REPORTER:  Mr. Chu, do you need a copy?

        MR. CHU:  Please.

        MS. JUN:  And also a copy for me, Judy.  Thank

you.

        (Whereupon the deposition adjourned at
         2:25 p.m.)

                *   *   *

ALISON G. VREDENBURGH, PH.D., CPE - 06/26/2017

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct; that I have read my deposition and have made the necessary corrections, additions, or changes to my answers that I deem necessary.

Executed on this_____day of _____,
2017.

_____

ALISON G. VREDENBURGH, Ph.D., CPE

EXHIBIT L - PAGE 319

ALISON G. VREDENBURGH, PH.D., CPE - 06/26/2017

I, JUDY M. REIERSEN, Certified Shorthand Reporter for the State of California, do hereby certify:

That the witness in the foregoing deposition was by me first duly sworn to testify to the truth, the whole truth and nothing but the truth in the foregoing cause; that the deposition was taken by me in machine shorthand and later transcribed into typewriting, under my direction, and that the foregoing contains a true record of the testimony of the witness.

Dated:  This_____day of_____,
2017, at San Diego, California.

_____
JUDY M. REIERSEN
CSR No. 7505

## Vredenburgh & Associates, Inc.
### Human Factors, Ergonomics, Safety and Organizational Consulting

*Mailing Address*
2588 El Camino Real, F353
Carlsbad, CA  92008
(442) 222–8289
avredenburgh@gmail.com
www.hfexpert.com

## ALISON G. VREDENBURGH, Ph.D., CPE
### Curriculum Vitae

## EDUCATION

- Post-Doctoral Research Fellow (1999 – 2001)
  University of California, San Diego, California
  Department of Anesthesiology, School of Medicine
  Designed, conducted, published and presented original research concerning issues critical to understanding the role of human error in medicine including how to objectively identify expert clinical performance and to best train clinicians to attain this level of expertise.  Areas of study included the impact of performance shaping factors such as workload, fatigue, training and sleep deprivation.

- Ph.D. (1998) Industrial-Organizational Psychology
  California School of Professional Psychology, San Diego
  Dissertation topic: Risk Management Programs

- M.S. (1996) Industrial-Organizational Psychology
  California School of Professional Psychology, San Diego

- M.S. (1987) Systems Management
  Systems Technology emphasis
  University of Southern California

- B.A., with Honors (1984) Organizational Psychology
  University of California, Santa Barbara


## LICENSES AND CERTIFICATIONS

- Certified Professional Ergonomist (CPE) #237 (1993)
- Board Certified Disability Analyst and Fellow #5432-01 (2001)
- California Teaching Credential (Secondary Social Science) #910021229 (1990)
- Certified NAUI Scuba Instructor #11578 (1989)

**Exhibit**
**A**
Vredenburgh
6/26/17

EXHIBIT L - PAGE 321

A. Vredenburgh, page  2

## CURRENT POSITION

**Principal, Vredenburgh & Associates, Inc.**
**Carlsbad, CA** (1998 – present)
Consults with businesses and industry in areas including product warning design, injury prevention, machine guarding, job design, job and task analysis, program evaluation, training, risk management, Americans with Disabilities Act (ADA), Fair Housing Act (FHA), Occupational Safety and Health Administration (OSHA), organizational development and assessment, and research instrument development and validation.  Conducts and presents original research.

Serves as a forensic (the application of science to law) consultant for product liability, personal injury, FHA/ADA, and employment cases in the areas of human factors, safety, and industrial-organizational psychology. Collects and reviews case material, inspects accident sites and equipment, and performs testing and evaluation. Issues include hazard management, communication, and warning effectiveness; accessibility of housing and public areas; product/equipment design; reasonableness of conduct; human error; adequacy of supervision and training; behavioral expectations; employee discrimination and harassment; visibility, conspicuity, and lighting; perception/reaction times; and slips and falls.  Since 1990, has consulted on hundreds of cases and qualified as an expert in Municipal, Superior, and Federal District courts.

## PATENTS

**Motorcycle Conspicuity Enhancement System** (Patent #5754097).
Inventor of new system designed to increase motorcycle visibility to other motor vehicle drivers during daytime conditions.

**Coefficient of Friction Tester** (Patent #5736630).
Consulted in the user requirements for the design of a COF tester that can be used to test both static and dynamic COF in both wet and dry conditions.

## UNIVERSITY APPOINTMENTS

**Consultant**
San Diego Center for Patient Safety (2001 – 2010)
A joint effort of UCSD and the VA San Diego Healthcare System
Participates in research design and analysis, manuscript preparation, and grant writing.

**Adjunct Research Associate**
Rensselaer Polytechnic Institute, Troy, New York
Department of Philosophy, Psychology and Cognitive Science (2000 – 2004)
Assisted in the development of the forensic psychology program.  Sat on thesis and dissertation committees.

Rev. 9/16

EXHIBIT L - PAGE 322

A. Vredenburgh, page   3

# INDUSTRIAL-ORGANIZATIONAL CONSULTING

**Warnings Consultant**
**Broco, Inc.** (2006)
Developed and tested warnings regarding an underwater cutting torch for the Owner's Manual and packaging.

**Warnings Consultant**
**E-Force** (2002)
Developed and tested warnings regarding protective eyewear for racquetball for the Owner's Manual and other product materials.

**Warnings Consultant**
**American Racing Wheels** (2001-2003)
Developed and tested warnings for the Owner's Manual and other product materials.

**Ergonomics Consultant**
**Cargill Corporation** (2001-2002)
Performed ergonomics and job hazard analyses of railcar unloading, including, hose management, steam cleaning, fall protection, and working under railcars. Developed, conducted and analyzed organizational safety culture study.

**Americans with Disability Act Consultant**
**Union-Tribune Newspaper, San Diego, CA** (1999 – 2004)
Developed an Americans with Disability Act (ADA) plan, which included an evaluation of the accessibility of the production and office facilities, and plan for barrier removal.

**Human Factors and Safety Consultant**
**Ventura County Medical Center** (1999)
Performed an analysis of back injury risk factors for four departments: medical/surgical, housekeeping, maintenance and laundry.  Trained hospital employees in the hazards associated with their jobs and methods to prevent back injuries.

**Human Factors and Safety Consultant**
**County of Ventura** (1999)
Performed a job hazard analysis to determine all potential areas of injury exposure in the performance of the garbage collection job.

**Human Factors and Safety Consultant**
**Stanford Health Services, Department of Radiology, Stanford, CA** (1996)
Determined the physical requirements of the hospital employees in the radiology department by conducting tests and force measurements of the equipment used to perform required tasks. Performed a job analysis in order to determine whether a disabled employee could perform the X-ray technician job based on his capabilities and limitations as specified in his functional capacity evaluation.

Rev. 9/16

EXHIBIT L - PAGE 323

A. Vredenburgh, page  4

**Human Factors and Safety Consultant**
**Bayer, Pharmaceutical Division, San Diego, CA** (1995)
Performed workstation evaluations of both office and industrial employees.  Identified risk factors, and made recommendations to increase safety and performance of employees.

**Human Factors and Safety Consultant**
**Lens Manufacturer, San Diego, CA** (1995)
Developed response to an OSHA Special Order. Developed and implemented a new risk management program, redesigned jobs, and designed new tools.

## EMPLOYMENT HISTORY

**Vice President, Research and Development**
**Error Analysis, Inc.**
**La Mesa, CA** (1990 –1998)
Consulted in industrial-organizational areas including warnings, job and task analysis, job design, training, occupational safety and health (OSHA), and research instrument development and validation. Directed, published, and presented original research studies. Directed Ph.D. internship program between Error Analysis, Inc. and the California School of Professional Psychology. Supervised students' pre-doctoral internship hours. Served as a forensic consultant for product liability and personal injury accident cases in the area of human factors, safety, and industrial-organizational psychology.

**Business Operations**
**Hughes Aircraft Company**
**El Segundo, CA** (1984 –1989)
Developed and implemented emergency preparedness program plan conforming to OSHA requirements. Developed specifications to automate a computer-generated monthly management reporting system. Administrated the performance and cost improvement programs. Researched, documented, and verified implementation of employee recommended system enhancements. Facilitated quality circles. Taught courses in the areas of safety, supervision, quality, computer software, and business writing. Interfaced with the customer (U.S. Army) regarding major proposal status and helped develop Hughes' negotiation position. Developed numerous safety, performance, and quality procedures.

## STUDENT INTERNSHIPS

**Peer Health Educator**
**University of California, Santa Barbara, CA** (1982 –1983)
Received UCSB certification. Developed and conducted seminars to student community on health-related issues.

**Medical Aide**
**Isla Vista Medical Clinic, Goleta, CA** (1982 –1983)
Assisted physicians with medical exams and minor surgeries. Ran lab tests.

Rev. 9/16

EXHIBIT L - PAGE 324

A. Vredenburgh, page 5

## VOLUNTEER POSITIONS

- Safety Technical Group (FPG) of the Human Factors and Ergonomics Society, Elected Chair (2016-present).
- Forensics Professional Group (FPG) of the Human Factors and Ergonomics Society, Elected Program Chair (2014-2016). Also elected FPG Chair 2004-2006; 2010-2012.
- Served as peer reviewer for numerous scientific publications.
- Has served as Chair of various technical sessions at Annual Meetings of the HFES.
- Served as a judge for the San Diego Science and Engineering Fair (2006 - 2011).
- Served as a judge for the California State Science Fair (2006 - 2011).
- Elected to the Board of the Forensic Expert Witness Association (FEWA), Orange County. Served as delegate to the State FEWA Board (2004).
- Served as Vice-President of the San Diego Forensics Consultants Association (2002-2003).
- Developed the program and coached the Valley Middle School Science Olympiad team. Received the Chamber's *Outstanding Educational Program* award for most Innovative Program (5/20/05).
- Served on the Citizens' Bond Oversight Committee of the Carlsbad City Schools (2000-2001). Met monthly with the Superintendent (specialty area: school safety).
- Served as a member of Carlsbad Unified School District, Parent/Superintendent Advisory Committee (2005-2006).
- Served on the Board of the Carlsbad Strings Education Association (Vice-President 2004-2007).

## MEMBERSHIPS

- Human Factors and Ergonomics Society (HFES)
- Forensics Professional Group of the HFES
- Safety Technical Group of the HFES
- Psi Chi Honors Society

## RELATED SKILLS

- Fluent in Spanish for instructions and warnings development and translations
- Photography: photographs of accident sites, equipment, and the workplace are frequently used for courtroom exhibits, textbooks, lectures and industrial-organizational training.

## PEER REVIEWER

- *Applied Ergonomics* (Journal). Elsevier
- *Journal of Occupational and Environmental Medicine.* Lippincott Williams & Wilkins.
- *The Handbook of Warnings: Design and Use.* Lawrence Erlbaum Associates, Inc.

Rev. 9/16

EXHIBIT L - PAGE 325

A. Vredenburgh, page 5 A

## VOLUNTEER POSITIONS

♦ Safety Technical Group (STG) of the Human Factors and Ergonomics Society, Elected Chair (2016-present).

♦ Forensics Professional Group (FPG) of the Human Factors and Ergonomics Society, Elected Program Chair (2014-2016). Also elected FPG Chair 2004-2006; 2010-2012.

♦ Served as peer reviewer for numerous scientific publications.

♦ Has served as Chair of various technical sessions at Annual Meetings of the HFES.

♦ Served as a judge for the San Diego Science and Engineering Fair (2006 - 2011).

♦ Served as a judge for the California State Science Fair (2006 - 2011).

♦ Elected to the Board of the Forensic Expert Witness Association (FEWA), Orange County. Served as delegate to the State FEWA Board (2004).

♦ Served as Vice-President of the San Diego Forensics Consultants Association (2002-2003).

♦ Developed the program and coached the Valley Middle School Science Olympiad team. Received the Chamber's *Outstanding Educational Program* award for most Innovative Program (5/20/05).

♦ Served on the Citizens' Bond Oversight Committee of the Carlsbad City Schools (2000-2001). Met monthly with the Superintendent (specialty area: school safety).

♦ Served as a member of Carlsbad Unified School District, Parent/Superintendent Advisory Committee (2005-2006).

♦ Served on the Board of the Carlsbad Strings Education Association (Vice-President 2004-2007).

## MEMBERSHIPS

♦ Human Factors and Ergonomics Society (HFES)

♦ Forensics Professional Group of the HFES

♦ Safety Technical Group of the HFES

♦ Psi Chi Honors Society

## RELATED SKILLS

♦ Fluent in Spanish for instructions and warnings development and translations

♦ Photography: photographs of accident sites, equipment, and the workplace are frequently used for courtroom exhibits, textbooks, lectures and industrial-organizational training.

Rev. 6/17

EXHIBIT L - PAGE 326

A. Vredenburgh, page 6

## PEER REVIEWER

♦ *Forensic Human Factors and Ergonomics: Case Studies and Analysis.* Taylor & Francis / CRC Press

♦ *Applied Ergonomics* (Journal). Elsevier

♦ *Journal of Occupational and Environmental Medicine.* Lippincott Williams & Wilkins.

♦ *The Handbook of Warnings: Design and Use.* Lawrence Erlbaum Associates, Inc.

♦ *Human Factors Aspects of Handgun Safety.* Lawrence Erlbaum Associates, Inc.

♦ *Human Factors Perspectives on Warnings, Volume 2.* Human Factors and Ergonomics Society

♦ *Human Factors and Ergonomics Society Annual Meeting Proceedings.* Human Factors and Ergonomics Society

♦ *Regulation & Governance.* Wiley-Blackwell, John Wiley & Sons, Inc.

## PUBLICATIONS

Zackowitz, I.B., Kalsher, M.J., Pollack-Nelson, C., Vredenburgh, A. & Miller, J.M. (in press). Adult products that kill and injure children. *Proceedings of the Human Factors and Ergonomics Society 2017 Annual Meeting*, Santa Monica, CA: Human Factors and Ergonomics Society.

Bench, M.L., Vredenburgh, M.J., Zackowitz, I.B. & Vredenburgh, A.G. (in press). An epidemiological perspective of individual and population health risk prevention. 8th International Conference on Applied Human Factors and Ergonomics (AHFE 2017).

Bench, M.L., Vredenburgh, M.J., Zackowitz, I.B. & Vredenburgh, A.G. (in press). Risk Communication for Consumer Products. 8th International Conference on Applied Human Factors and Ergonomics (AHFE 2017).

Huyen, C., Vredenburgh, A.N., Zackowitz, I.B. & Vredenburgh, A.G. (in press). Role of emotions in risk perception. 8th International Conference on Applied Human Factors and Ergonomics (AHFE 2017).

Zackowitz, I.B. Vredenburgh, M.J., Bench, M.L., & Vredenburgh, A.G. (2017). Types of Consumer Products. In G. Emilien, R. Weitkunat & Ludicke (Eds.). *Consumer Perception of Product Risks and Benefits.* (pp. 3-22). Switzerland: Springer.

Brill, J.C., Bliss, J.P., Hancock, P.A., Manzey, D., Meyer, J., & Vredenburgh, A. (2016). Matters of Ethics, Trust, and Potential Liability for Autonomous Systems. *Proceedings of the Human Factors and Ergonomics Society 2016 Annual Meeting*, Santa Monica, CA: Human Factors and Ergonomics Society, 308-312.

Vredenburgh, A.N., Zackowitz, I.B. & Vredenburgh, A.G. (2015). Air Rage: What factors Influence Airline Passenger Anger? *Proceedings of the Human Factors and Ergonomics*

Rev. 6/17

EXHIBIT L - PAGE 327

A. Vredenburgh, page 7

*Society 59th Annual Meeting*, Santa Monica, CA: Human Factors and Ergonomics Society, 59:400-404.

Rice, J.B.R., Brickman, D., Lueder, R., Smith-Jackson, T., Vredenburgh, A. & Zackowitz, I. (2015). "Conflicting design considerations for children and people with disabilities." In Designing for Children: What Do Human Factors Professional Need to Know? *Proceedings of the Human Factors and Ergonomics Society 59th Annual Meeting*, Santa Monica, CA: Human Factors and Ergonomics Society, 59:413-415.

Wogalter, M.S. Laughery, K.R., Vredenburgh, A.G., Deppa, S.W., Lueder, R. & Zackowitz, I.B. (2014). Child Injury: Forensic human factors points to the need for better product designs and warnings. *Proceedings of the Human Factors and Ergonomics Society 58th Annual Meeting*, Santa Monica, CA: Human Factors and Ergonomics Society, 58:1864-1868.

Vredenburgh, A.G., & Vanderpol, E. (2014). Case Study: A Novice Unlicensed Child Operator of a Motorized Dirt Bike Versus an Ambulance Driver. *Proceedings of the Human Factors and Ergonomics Society 58th Annual Meeting*, Santa Monica, CA: Human Factors and Ergonomics Society, 58:554-558.

Hornick, R.J., Vredenburgh, A.G., Laughery, K.R., Pauls, J.L., & Wogalter, M.S. (2014). Dealing with Dubious Testimony Provided by Opposing Experts. *Proceedings of the Human Factors and Ergonomics Society 58th Annual Meeting*, Santa Monica, CA: Human Factors and Ergonomics Society, 58:559-561.

Vredenburgh, A.G., & Spencer, D.R. (2013). Sophisticated User: When Does a Jury Find Users to Have Sophisticated Knowledge after Determining Liability/Failure to Warn? *Proceedings of the Human Factors and Ergonomics Society 57th Annual Meeting*. Santa Monica, CA: Human Factors and Ergonomics Society, 57:565-569.

Zackowitz, I.B., & Vredenburgh, A.G. (2013). A Forensic Human Factors Analysis of a Playground Designated for Special Needs Children. *Proceedings of the Human Factors and Ergonomics Society 57th Annual Meeting*. Santa Monica, CA: Human Factors and Ergonomics Society, 57:585-589.

Runge, K. & Vredenburgh, A.G. (2013). A False Sense of Security: Hazards Associated with Working on Flat Roofs with Parapet Walls. *Proceedings of the Human Factors and Ergonomics Society 57th Annual Meeting*. Santa Monica, CA: Human Factors and Ergonomics Society, Vol. 57, 590-594.

Vredenburgh, A.G., & Zackowitz, I.B. (2013). Falling from Airstairs while Disembarking from a Commuter Plane. *Proceedings of the Human Factors and Ergonomics Society 57th Annual Meeting*. Santa Monica, CA: Human Factors and Ergonomics Society, Vol. 57, 600-604.

Vredenburgh, A.G., & Zackowitz, I.B. (2012). Case Study: Evaluating the Warnings on a Tanning Bed. *Proceedings of the Human Factors and Ergonomics Society 56th Annual Meeting*. Santa Monica, CA: Human Factors and Ergonomics Society, Vol. 56, 671-674.

Vredenburgh, A.G., & Zackowitz, I.B. (2012). When a Dog is Just a Dog? A Case Study Evaluating the ADA service animal rules. *Proceedings of the Human Factors and Ergonomics Society 56th Annual Meeting*. Santa Monica, CA: Human Factors and Ergonomics Society, Vol. 56, 720-723.

Rev. 6/17

EXHIBIT L - PAGE 328

A. Vredenburgh, page  8

Vredenburgh, A.G., & Zackowitz, I.B. (2011). Research in Motion: A Case Study Evaluating the Accessibility of Public Transit in our Nation's Capital. In *Proceedings of the Human Factors and Ergonomics Society 55th Annual Meeting.* Santa Monica, CA: Human Factors and Ergonomics Society, 584-588.

Laughery, K., Wogalter, M., Nemire, K., Vredenburgh, A.G., & Kalsher, M.J. (2011). What do human factors/ergonomics experts have to tell juries that they don't know - but may think they know? In *Proceedings of the Human Factors and Ergonomics Society 55th Annual Meeting.* Santa Monica, CA: Human Factors and Ergonomics Society, 604-607.

Vredenburgh, A.G., Williams, K., Zackowitz, I.B., & Welner, J.M. (2010). Evaluation of Wheelchair Users' Perceived Kitchen and Bathroom Usability: Effort and Accessibility. *Journal of Architectural and Planning Research,* 27(3), 219-236.

Zackowitz, I.B., Vredenburgh, A.G., Calkins, L., & Kessler, D. (2010). The current state of legal, design, and residential usability issues for people with various disabilities. In *Proceedings of the Human Factors and Ergonomics Society 54th Annual Meeting.* Santa Monica, CA: Human Factors and Ergonomics Society, 753-756.

Zackowitz, I.B., & Vredenburgh, A.G. (2010). Evaluation of Methods to Remedy Existing Multi-Family Housing to Maximize Accessibility to Residents. In Tadeusz Marek, Waldemar Karwowski & Valerie Rice, (Ed.). *Advances in Understanding Human Performance: Neuroergonomics, Human Factors Design and Special Populations,* 613-623.

Vredenburgh, M.J., Zackowitz, I.B., Spencer, D., DeTaboada, M.R., & Vredenburgh, A.G. (2010). What constitutes typical adolescent behavior and how does it differ from adult conduct? In Waldemar Karwowski & Gavriel Salvendy (Ed.). *Advances in Human Factors, Ergonomics, and Safety Manufacturing and Service Industries,* 927-936.

Vredenburgh, A.G., & Zackowitz, I.B. (2009). Evaluating Common Approaches Used to Accommodate People with Disabilities Residing in Existing Multi-Family Housing. In *Proceedings of the Human Factors and Ergonomics Society 53rd Annual Meeting.* Santa Monica, CA: Human Factors and Ergonomics Society. (Distributed at conference. Not included in proceedings CD due to a technical problem. Paper accepted for publication by reviewers and is available through the HFES central office).

Vredenburgh, A.G., Hedge, A., Zackowitz, I.B., & Welner, J.M. (2009). Evaluation of Wheelchair Users' Perceived Sidewalk and Ramp Slope: Effort and Accessibility. *Journal of Architectural and Planning Research,* 26(2), 145-158.

Vredenburgh, A.G., & Zackowitz, I.B. (2009). Drug Labeling and its Impact on Patient Safety. In Sonja Koneczny (Ed.), *WORK: A Journal of Prevention, Assessment & Rehabilitation,* Volume 33, Number 2. (pp. 169-174). The Netherlands: IOS Press.

Zackowitz, I.B., & Vredenburgh, A.G. (2008). Forensic Human Factors: People, places, products. In C.M. Carswell (Ed.). *Reviews of Human Factors and Ergonomics, Volume 4.* (pp. 75-104). Santa Monica, CA: Human Factors and Ergonomics Society.

Vredenburgh, A.G., & Zackowitz, I.B. (2008). Drug Labeling and its Impact on Patient Safety. In *Proceedings of the Human Factors and Ergonomics Society 52nd Annual Meeting.* Santa Monica, CA: Human Factors and Ergonomics Society, 842-844.

Rev. 6/17

EXHIBIT L - PAGE 329

A. Vredenburgh, page 9

Vredenburgh, A.G., & Zackowitz, I.B. (2008). Who turned off the lights? *Proceedings of the Applied Human Factors and Ergonomics 2nd International Conference*, Las Vegas, NV.

Zackowitz, I.B., & Vredenburgh, A.G. (2008). When is a Warnings Case Not a Warnings Case? *Proceedings of the Applied Human Factors and Ergonomics 2nd International Conference*, Las Vegas, NV.

Kalsher, M.J., Cao, C.G.L., Weinger, M., Vredenburgh, A.G., Israelski, E., Spyridon, G., Yoshida, D., & McLeod, R. (2007). Mock Trial: Role of Human Factors in Litigation Involving Automated External Defibrillators (AED). In *Proceedings of the Human Factors and Ergonomics Society 51st Annual Meeting*. Santa Monica, CA: Human Factors and Ergonomics Society, 1514-1516.

Zackowitz, I.B., & Vredenburgh, A.G. (2007). When Communication Failure Contributes to an Injury: A Case Study of Para-Transportation for Wheelchair Users. In *Proceedings of the Human Factors and Ergonomics Society 51st Annual Meeting*. Santa Monica, CA: Human Factors and Ergonomics Society, 559-563.

Kalsher, M.J., Van Duijne, F., Waters Deppa, S., Mont.Alvão Pontificia, C., Rother, H.A., Vredenburgh, A.G., & Wogalter, M. (2007). An International Perspective on Risk Communications: Adapting to Safety Demands in the Emerging Global Economy. In *Proceedings of the Human Factors and Ergonomics Society 51st Annual Meeting*. Santa Monica, CA: Human Factors and Ergonomics Society, 1403-1405.

Vredenburgh, A.G., & Zackowitz, I.B. (2007). Playground: Safety and Ergonomics. In R. Lueder & V. Berg Rice (Eds.). *Ergonomics for Children: Designing products and places for toddler to teens.* (pp. 907-925). London: Taylor & Francis.

Catalano, J.N., & Vredenburgh, A.G. (2007). Trial Demonstration: Cross-examination of an expert witness. *Proceedings of the 16th Annual National Expert Witness Conference*, Falmouth, MA: SEAK, 37-40.

Vredenburgh, A.G. (2007). Advanced expert techniques. *Proceedings of the 16th Annual National Expert Witness Conference*, Falmouth, MA: SEAK, 151-155.

Vredenburgh, A.G., Hedge, A., Zackowitz, I.B., & Welner, J.M. (2007). Vol. 13. Using human factors engineering to evaluate existing walkway accessibility standards. In *Proceedings of the 59th Annual Meeting of the American Academy of Forensic Sciences*, Denver, CO: Publication Printers, Corp., 172-173.

Vredenburgh, A.G., Vredenburgh, M.J., & Kalsher, M.J. (2006). Adolescent risk perception and self-protective behavior regarding airsoft and paintball Guns. *IEA2006: 16th World Congress on Ergonomics.* Elsevier Ltd.

Vredenburgh, A.G., Kalsher, M.J., & Vredenburgh, M.J., (2006). Evaluating hazard communication of patient medication information sheets for prescription drugs. *IEA2006: 16th World Congress on Ergonomics.* Elsevier Ltd.

Vredenburgh, A.G. (2006). How do consumer expectations affect warning compliance? *The Daily Transcript.* (San Diego Top Attorneys supplement). July 20, 2006.

Rev. 6/17

EXHIBIT L - PAGE 330

Vredenburgh, A.G., & Vredenburgh, M.J. (2006). Vol. 12. Human factors evaluation of a steam shower. In *Proceedings of the 58th Annual Meeting of the American Academy of Forensic Sciences*, Denver, CO: Publication Printers, Corp., 132.

Vredenburgh, A.G., & Zackowitz, I.B. (2006). Expectations. In M. Wogalter (Ed.), *The Handbook of Warnings*. (pp. 345-354). Mahwah, NJ: Lawrence Erlbaum Associates, Inc.

Vredenburgh, A.G., & Helmick-Rich, J.A. (2006). Extrinsic nonwarning factors. In M. Wogalter (Ed.), *The Handbook of Warnings*. (pp. 373-384). Mahwah, NJ: Lawrence Erlbaum Associates, Inc.

Vredenburgh, A.G., & Williams, K. (2005). Evaluating the effects of frost heave on the feasibility of compliance with existing walkway accessibility standards. In *Proceedings of the Human Factors and Ergonomics Society 49th Annual Meeting*. Santa Monica, CA: Human Factors and Ergonomics Society, 813-817.

Zackowitz, I.B., Vredenburgh, A.G., & Hedge, A. (2005). A critical analysis of the usability and design of aluminum wheelchair ramps. In *Proceedings of the Human Factors and Ergonomics Society 49th Annual Meeting*. Santa Monica, CA: Human Factors and Ergonomics Society, 803-807.

Murphy, W.H., Vredenburgh, A., Weinger, M.G., & Yoshida, D. (2005). Human factors engineering, legal liability, malpractice, and patient safety. *In Human Factors, Ergonomics, and Patient Safety for medical Devices*. Arlington, VA: Association for the Advancement of Medical Instrumentation (AAMI).

Vredenburgh, A.G., Longden, S., Williams, K.J., & Kalsher, M.J. (2005). Evaluating latex glove container warnings in a realistic setting. *International Journal of Industrial Ergonomics*, 35, 559-568.

Vredenburgh, A.G., & Zackowitz, I.B. (2005). Human factors issues to be considered by product liability experts. In Y.I. Noy & W. Karwowski (Eds.), *Handbook of Human Factors in Litigation*. (pp. 26-1 – 26-11). Boca Raton, FL: CRC Press.

Vredenburgh, A.G., & Zackowitz, I.B. (2005). Sexual harassment: A forensic human factors perspective. In Y.I. Noy & W. Karwowski (Eds.), *Handbook of Human Factors in Litigation*. (pp. 36-1 – 36-9). Boca Raton, FL: CRC Press.

Zackowitz, I.B, & Vredenburgh, A.G. (2005). Preschoolers, adolescents and seniors: Age-related factors that pertain to forensic human factors analyses. In Y.I. Noy & W. Karwowski (Eds.), *Handbook of Human Factors in Litigation*. (pp. 35-1 – 35-11). Boca Raton, FL: CRC Press.

Vredenburgh, A.G., & Weinger, M.B. (2004). Communication of drug hazard information: A critical analysis of how the relationship between the pharmaceutical companies, the FDA, clinicians and patients impacts patient safety. In *Proceedings of the Human Factors and Ergonomics Society 48th Annual Meeting*. Santa Monica, CA: Human Factors and Ergonomics Society, 2040-2044.

Hornick, R.J., & Vredenburgh, A.G. (2004). A two-way street – with hazards; Expert/attorney communications. In *Proceedings of the Human Factors and Ergonomics Society 48th Annual Meeting*. Santa Monica, CA: Human Factors and Ergonomics Society, 1129-1130.

Rev. 6/17

EXHIBIT L - PAGE 331

A. Vredenburgh, page 11

Vredenburgh, A.G., & Weinger, M.B. (2004). Examination of apparent flaws in the American drug hazard detection, evaluation, and risk communication system. Abstract in the Program of the *Second Annual Patient Safety Conference: Making care safer one patient at a time*. San Diego, CA, 100.

Vredenburgh, A.G. (2003). Intervention effectiveness: Evaluation of six workplace safety programs to determine their contribution to injury reduction. Abstract in *Proceedings of the National Occupational Injury Research Symposium (NOIRS)*. Pittsburgh, PA, 101.

Vredenburgh, A.G., Longden, S., Williams, K.J., & Kalsher, M.J. (2003). Medical product labeling: The evaluation of latex allergy warnings in a realistic setting. In *Proceedings of the Human Factors and Ergonomics Society 47th Annual Meeting*. Santa Monica, CA: Human Factors and Ergonomics Society, 1554-1558.

Vredenburgh, A.G., & Zackowitz, I.B. (2003). Conducting a systems evaluation to address workplace radiation exposure hazard. In *Proceedings of the Human Factors and Ergonomics Society 47th Annual Meeting*. Santa Monica, CA: Human Factors and Ergonomics Society, 1252-1255.

Vredenburgh A.G., & Zackowitz I.B. (2002). Sexual harassment: An organizational safety issue. In *Proceedings of the Human Factors and Ergonomics Society 46th Annual Meeting*. Santa Monica, CA: Human Factors and Ergonomics Society, 915-919.

Vredenburgh, A.G. (2002). Organizational safety: Which management practices are most effective in reducing employee injury rates? *Journal of Safety Research, 33*, 259-276.

Vredenburgh, A.G., & Zackowitz, I.B. (2002). Playground safety: A forensic human factors analysis of fall injuries. In *Proceedings of the 54th Annual Meeting of the American Academy of Forensic Sciences*, Denver, CO: Publication Printers, Corp., 95-96.

Zackowitz, I.B, & Vredenburgh, A.G. (2002). Applying a forensic human factors engineering analysis to falls in elderly people. In *Proceedings of the 54th Annual Meeting of the American Academy of Forensic Sciences*, Denver, CO: Publication Printers, Corp., 96-97.

Vredenburgh, A.G., & Zackowitz, I.B. (2001). Evaluating the effectiveness of a pictorial-only warning on a trolley coupler. In *Proceedings of the Human Factors and Ergonomics Society 45th Annual Meeting*. Santa Monica, CA: Human Factors and Ergonomics Society, 848-851.

Vredenburgh, A. (Feb. 2001) Letter to the Editor: The safety bar. *Consumer Reports*.

Vredenburgh, A.G., & Zackowitz, I. B. (2001). Work-related musculoskeletal disorders: Ergonomic risk to healthcare workers. In D. Alexander & R. Rabourne (Eds.), *Applied Ergonomics*. (pp. 146-155). London: Taylor & Francis.

Vredenburgh, A.G., & Zackowitz, I. B. (2001). Ergonomics programs: Reducing work-related musculoskeletal injuries. In D. Alexander & R. Rabourne (Eds.), *Applied Ergonomics*. (pp. 259-268). London: Taylor & Francis.

Weinger, M.B., Vredenburgh, A.G., Schumann, C.M., Macario, Williams, K.J., Kalsher, M.J., Smith, B., Truong, P.C., & Kim, A. (2000). Quantitative description of the workload associated with airway management procedures. *Journal of Clinical Anesthesiology, 12*(4), 273-82.

Rev. 6/17

EXHIBIT L - PAGE 332

A. Vredenburgh, page 12

Vredenburgh, A., Weinger, M., Macario, A., & Smith, B. (2000). Developing a technique to measure anesthesiologists' real-time workload. In *Proceedings of the XIVth Triennial Congress of the International Ergonomics Association and 44th Annual Meeting of the Human Factors and Ergonomics Society*. Santa Monica, CA: Human Factors and Ergonomics Society, 4-241 – 4-244.

Vredenburgh, A. (2000) Get ready to be challenged: How to prepare for the qualification process. *Forvm, 16*(2), 5. Reprinted in *Council of Technical Groups Digest*, 3(I) March 2001.

Vredenburgh A., Hendrick, H., & Zackowitz, I. (2000). Are personality traits useful predictors of managers' success? In *Proceedings of the XIVth Triennial Congress of the International Ergonomics Association and 44th Annual Meeting of the Human Factors and Ergonomics Society*. Santa Monica, CA: Human Factors and Ergonomics Society, 2-301 – 2-304.

Noy, I., Vredenburgh, A., Hornick, R., Mortimer, R., Olsen, R., Thompson, D., Ryan, P., Savaglio, B. & Spangler, J. (2000). Mock trial: Human factors contributions to litigation involving adaptive cruise control. In *Proceedings of the XIVth Triennial Congress of the International Ergonomics Association and 44th Annual Meeting of the Human Factors and Ergonomics Society*. Santa Monica, CA: Human Factors and Ergonomics Society, 6-398 – 6-401.

Vredenburgh, A., McLeod, J., & Nebeker, D. (1999). Under what circumstances do extrinsic rewards decrease intrinsic motivation? In *Proceedings of the Human Factors and Ergonomics Society 43rd Annual Meeting*. Santa Monica, CA: Human Factors and Ergonomics Society, 830-834.

Vredenburgh, A. (1999). Risk management: Which management practices are best predictors of employee injury rates? In *Proceedings of the Human Factors and Ergonomics Society 43rd Annual Meeting*. Santa Monica, CA: Human Factors and Ergonomics Society, 902-906.

Vredenburgh, A.G. (1998). *Safety management: Which organizational factors predict hospital employee injury rates?* Doctoral dissertation. California School of Professional Psychology, San Diego, CA.

Vredenburgh, A.G., & Zackowitz, I.B. (1998). Older drivers: A forensic human factors analysis. (Summary) In *Proceedings of the 50th Annual Meeting of the American Academy of Forensic Sciences*, Denver, CO: Publication Printers, Corp., 91-92.

Vredenburgh, A., Hendrick, H. & Zackowitz, I. (1998). Hotel managers: What personality traits predict their success? (Summary) In *Proceedings of the IO/OB 19th Annual Graduate Conference*, San Diego, CA., 112-114.

Zackowitz, I.B. & Vredenburgh, A.G. (1998). Preschoolers: A forensic human factors analysis. (Summary) In *Proceedings of the 50th Annual Meeting of the American Academy of Forensic Sciences*, Denver, CO: Publication Printers, Corp., 90-91.

Zackowitz, I. & Vredenburgh, A. (1998). How individuals manage their impressions when presenting to their peers. (Summary) In *Proceedings of the IO/OB 19th Annual Graduate Conference*, San Diego, CA., 94.

Rev. 6/17

EXHIBIT L - PAGE 333

A. Vredenburgh, page 13

Zackowitz, I., Cohen, H. & Vredenburgh, A. (1998). Operationally defining a legal term for forensic human factors. In *Proceedings of the Silicon Valley Ergonomics Conference*, Palo Alto, CA., 185-189.

Vredenburgh, A., Cohen, H.H., Hornick, R., Laughery, K., Leonard, D., Olsen, R., Smith, L., Thompson, D., Wogalter, M. & Zackowitz, I. (1997). Mock trial: How human factors experts contribute to civil litigation. Case 1: A pedestrian's encounter with a tripping hazard. In *Proceedings of the 41st Annual Meeting of the Human Factors and Ergonomics Society*. Santa Monica, CA: Human Factors and Ergonomics Society, (1) 524-528.

Vredenburgh, A., Cohen, H.H., Hornick, R., Laughery, K., Leonard, D., Olsen, R., Smith, L., Thompson, D., Wogalter, M., & Zackowitz, I. (1997). Mock trial: How human factors experts contribute to civil litigation. Case 2: Adequacy of warning systems to address product hazards. In *Proceedings of the 41st Annual Meeting of the Human Factors and Ergonomics Society*. Santa Monica, CA: Human Factors and Ergonomics Society, (1) 524-528.

Vredenburgh, A.G., Andressen, B. & Cohen, H.H. (1996). The development and testing of a device to enhance motorcycle conspicuity and reduce accident. In *Proceedings of the 48th Annual Meeting of the American Academy of Forensic Sciences*, Denver, CO: Publication Printers, Corp., 74.

Vredenburgh, A.G. & Plourd, S. (1996). The development of a time-distance factor for car accident reconstruction. In *Proceedings of the 48th Annual Meeting of the American Academy of Forensic Sciences*, Denver, CO: Publication Printers, Corp., 73-74.

Vredenburgh, A.G., & Cohen, H.H. (1996). Human factors analysis applied to a first amendment case: The rights of a few evaluated in terms of public safety. *The Forvm, 12*(2). Santa Monica, CA: Human Factors and Ergonomics Society, 7-10.

Vredenburgh, A.G., Zackowitz, I.B., & Cohen, H.H. (1996). Comparative risk perception of common activities: A forensic perspective. In *Proceedings of the 41st Annual Meeting of the Human Factors and Ergonomics Society*. Santa Monica, CA: Human Factors and Ergonomics Society, (1), 520-524.

Vredenburgh, A.G., Saifer, A.G., & Cohen, H.H. (1995). You are going to do what with that thing? An ergonomic analysis of a medical device. *Ergonomics in Design*, April. Santa Monica, CA: Human Factors and Ergonomics Society, 16-20.

Vredenburgh, A.G., & Cohen, H.H. (1995). High-risk recreational activities: Skiing and scuba – What predicts compliance with warnings? *International Journal of Industrial Ergonomics, 15*, 123-128.

Abstract reprinted (1996), *Journal of Safety Research*, 27(2), 134-135.

Vredenburgh, A.G., & Cohen, H.H. (1995). Does culture affect risk perception?: Comparisons among Mexicans, African-Americans, Asians, and Caucasians. In *Proceedings of the 39th Annual Meeting of the Human Factors and Ergonomics Society*. Santa Monica, CA: Human Factors and Ergonomics Society, (2), 1015-1019.

Abstract reprinted (1996), *Journal of Safety Research*, 27(2), 272.

Rev. 6/17

EXHIBIT L - PAGE 334

A. Vredenburgh, page 14

Vredenburgh, A.G., & Cohen, H.H. (1995). Enhanced motorcycle conspicuity through daytime use of the Motorcycle Conspicuity Enhancement System (MCES). In *Proceedings of the 39th Annual Meeting of the Human Factors and Ergonomics Society*. Santa Monica, CA: Human Factors and Ergonomics Society, (2), 1048-1052.

Vredenburgh, A.G., Plourd, S., Saifer, A.G., & Cohen, H.H. (1994). Collision causation: Time attention is directed away from traffic in front of vehicle while preparing for a lane change. In *Proceedings of the 12th Triennial Congress of the International Ergonomics Association Congress*, Vol. 6. Toronto: Human Factors Association of Canada, 252-254.

Vredenburgh, A.G., & Cohen, H.H. (1993). Compliance with warnings in high-risk recreational activities: Skiing and scuba. In *Proceedings of the 37th Annual Meeting of the Human Factors and Ergonomics Society*. Santa Monica, CA: Human Factors and Ergonomics Society (2), 945-949.

## INVITED LECTURES AND SYMPOSIA

Trial demonstration: Cross-examination of an expert witness. Presented with Jeffrey Catalano, Esq. at the 16th Annual National Expert Witness Conference (SEAK), Hyannis, Massachusetts, June 21, 2007.

Advanced seminar. Presented at the 16th Annual National Expert Witness Conference (SEAK), Hyannis, Massachusetts, June 22, 2007.

Human factors engineering, legal liability, malpractice, and patient safety. Panel presentation to the Association for the Advancement of Medical Instrumentation (AAMI), Washington, DC, June 28, 2005.

Intervention effectiveness: Evaluation of six workplace safety programs to determine their contribution to injury reduction. Presented to the National Occupational Injury Research Symposium (NOIRS). Hosted by the National Institute for Occupational Safety and Health (NIOSH), Pittsburgh, Pennsylvania, October 29, 2003.

Reducing work-related musculoskeletal injuries. Presented to the San Diego Chapter of the Human Factors and Ergonomics Society, San Diego, March 28, 2000.

Ergonomic risks to healthcare workers. Presented to the San Diego Chapter of the Human Factors and Ergonomics Society, San Diego, March 28, 2000.

Work-related musculoskeletal disorders: Ergonomic risk to healthcare workers. Presented at the Applied Ergonomics Conference, Los Angeles, March 15, 2000.

Ergonomics programs: Reducing work-related musculoskeletal injuries. Presented at the Applied Ergonomics Conference, Los Angeles, March 16, 2000.

Rev. 6/17

EXHIBIT L - PAGE 335

A. Vredenburgh, page 15

Consulting in the real world: A realistic job profile for graduate students. Presented to a graduate seminar in organization development, Rensselaer Polytechnic Institute, Troy, New York, February 17, 2000.


## LECTURES

Matters of Ethics, Trust, and Potential Liability for Autonomous Systems. Washington DC: Human Factors and Ergonomics Society. September 23, 2016.

Air Rage: What factors Influence Airline Passenger Anger? Los Angeles, CA: Human Factors and Ergonomics Society. October 28, 2015.

Conflicting design considerations for children and people with disabilities. Panel discussion: Designing for children. Los Angeles, CA: Human Factors and Ergonomics Society. October 29, 2015.

Child Injury: Forensic human factors points to the need for better product designs and warnings. Panel discussion. Chicago, IL: Human Factors and Ergonomics Society. October 28, 2014.

Case Study: A Novice Unlicensed Child Operator of a Motorized Dirt Bike Versus an Ambulance Driver. Chicago, IL: Human Factors and Ergonomics Society. October 28, 2014.

Dealing with Dubious Testimony Provided by Opposing Experts. Panel discussion. Chicago, IL: Human Factors and Ergonomics Society. October 29, 2014.

Sophisticated User: When Does a Jury Find Users to Have Sophisticated Knowledge after Determining Liability/Failure to Warn? San Diego, CA: Human Factors and Ergonomics Society. October 2, 2013.

Falling from Airstairs while Disembarking from a Commuter Plane. San Diego, CA: Human Factors and Ergonomics Society. October 2, 2013.

Case Study: Evaluating the Warnings on a Tanning Bed. Boston, Massachusetts: Human Factors and Ergonomics Society. October 23, 2012.

When a Dog is Just a Dog?  A Case Study Evaluating the ADA service animal rules. Boston, Massachusetts: Human Factors and Ergonomics Society, October 25, 2012.

Research in Motion: A Case Study Evaluating the Accessibility of Public Transit in our Nation's Capital. Las Vegas, Nevada: Human Factors and Ergonomics Society, September 22, 2011.

What do human factors/ergonomics experts have to tell juries that they don't know - but may think they know? Las Vegas, Nevada: Human Factors and Ergonomics Society, September 20, 2011.

The current state of legal, design, and residential usability issues for people with various disabilities. San Francisco, CA: Human Factors and Ergonomics Society, September 30, 2010.

Rev. 6/17

EXHIBIT L - PAGE 336

A. Vredenburgh, page 16

How Best to Accommodate People with Disabilities Residing in Existing Multi-Family Housing. San Antonio, Texas: Human Factors and Ergonomics Society, October 22, 2009.

Mock Trial: Role of Human Factors in Litigation Involving Automated External Defibrillators (AED). Baltimore Maryland: Human Factors and Ergonomics Society, October 5, 2007.

An international perspective on risk communications: Adapting to safety demands in the emerging global economy. Baltimore, Maryland: Human Factors and Ergonomics Society, October 5, 2007.

Using human factors engineering to evaluate existing walkway accessibility standards. San Antonio, Texas: American Academy of Forensic Sciences, February 23, 2007.

From practice to science: How application guides warning research. Panel presentation to the IEA2006: 16th World Congress on Ergonomics, Maastrict, Netherlands, July 14, 2006.

Human factors evaluation of a steam shower. Seattle, Washington: American Academy of Forensic Sciences, February 23, 2006.

Evaluating the effects of frost heave on the feasibility of compliance with existing walkway accessibility standards. Orlando, Florida: Human Factors and Ergonomics Society, September 27, 2005.

Communication of drug hazard information: A critical analysis of how the relationship between the pharmaceutical companies, the FDA, clinicians and patients impacts patient safety. New Orleans, Louisiana: Human Factors and Ergonomics Society, September 21, 2004.

A two-way street – with hazards: Expert/attorney communications. New Orleans, Louisiana: Human Factors and Ergonomics Society, September 23, 2004.

Examination of apparent flaws in the American drug hazard detection, evaluation, and risk communication system. San Diego, California: Second Annual Patient Safety Conference: Making care safer one patient at a time, March 19, 2004.

Medical product labeling: The evaluation of latex allergy warnings in a realistic setting. Denver, Colorado: Human Factors and Ergonomics Society October 15, 2003.

Conducting a systems evaluation to address workplace radiation exposure hazard. Denver, Colorado: Human Factors and Ergonomics Society, October 17, 2003.

Playground safety: A forensic human factors analysis of fall injuries. Atlanta, Georgia: American Academy of Forensic Sciences, February 15, 2002.

Developing a technique to measure anesthesiologists' real-time workload. San Diego, California: International Ergonomics Association and Human Factors and Ergonomics Society, August 3, 2000.

Rev. 6/17

EXHIBIT L - PAGE 337

A. Vredenburgh, page 17

Are personality traits useful predictors of managers' success? San Diego, California: International Ergonomics Association and Human Factors and Ergonomics Society, August 4, 2000.

Mock trial: Human factors contributions to litigation involving adaptive cruise control. San Diego, California: International Ergonomics Association and Human Factors and Ergonomics Society, August 4, 2000.

Under what circumstances do extrinsic rewards decrease intrinsic motivation? Presented at the Houston, Texas: Human Factors and Ergonomics Society, September 28, 1999

Risk management: Which management practices are best predictors of employee injury rates? Houston, Texas: Human Factors and Ergonomics Society. September 30, 1999.

Falling, the ADA, and the ergonomics of walking.  Los Angeles, California: American Society of Safety Engineers (ASSE), Los Angeles Area Professional Development Conference, April 21, 1998.

Older drivers: A forensic human factors analysis. San Francisco, California: American Academy of Forensic Sciences, February 11, 1998.

Hotel managers:  What personality traits predict their success? San Diego, California: IO/OB 19th Annual Graduate Conference, March 29, 1998.

Mock trial: How human factors experts contribute to civil litigation. Case 1: A pedestrian's encounter with a tripping hazard. Albuquerque, New Mexico: Human Factors and Ergonomics Society. September 24, 1997.

Mock trial: How human factors experts contribute to civil litigation. Case 2: Adequacy of warning systems to address product hazards.  Albuquerque, New Mexico: Human Factors and Ergonomics Society. September 24, 1997.

The development and testing of a device to enhance motorcycle conspicuity and reduce accident. Nashville, Tennessee: American Academy of Forensic Sciences, February 21, 1996.

The development of a time-distance factor for car accident reconstruction. Nashville, Tennessee: American Academy of Forensic Sciences, February 21, 1996.

Comparative risk perception of common activities: A forensic perspective. Philadelphia, Pennsylvania: Human Factors and Ergonomics Society.  September 4, 1996.

Does culture affect risk perception? Comparisons among Mexicans, African-Americans, Asians, and Caucasians. San Diego, California: Human Factors and Ergonomics Society. October 10, 1995.

Enhanced motorcycle conspicuity through daytime use of the Motorcycle Conspicuity Enhancement System (MCES). San Diego, California: Human Factors and Ergonomics Society. October 13, 1995.

Rev. 6/17

EXHIBIT L - PAGE 338

A. Vredenburgh, page 18

Collision causation: Time attention is directed away from traffic in front of vehicle while preparing for a lane change. Presented at the 12th Triennial Congress of the International Ergonomics Association Congress. Toronto, Canada, August 17, 1993.

Compliance with warnings in high-risk recreational activities: Skiing and scuba. Presented at the 37th Annual Meeting of the Human Factors and Ergonomics Society. Seattle, Washington, October 12, 1993.

Rev. 6/17

EXHIBIT L - PAGE 339