# EXHIBIT M

PAGE 340



**Safariland LLC Presumptive Colorimetric Screening Report**

2

E X T E R N A L    M E M O R A N D U M

To:      Bobbie N. Eftekar, Yukevich Cavanaugh

From:    Angelina Duggan, Senior Managing Scientist

Date:    May 24, 2017

Project:  1701663.000

Subject:  Safariland LLC Presumptive Colorimetric Screening Report

Exponent has been retained by Yukevich and Cavanugh on behalf of their client Safariland, LLC (Safariland) to provide technical consultation, and if required expert witness testimony, on the matter of  Doyma Vanessa Michel v Safariland, LLC et al. Court Case No. 16CV0277-GPC-RBB ESIS File N0. 0A031309352695.

This report summarizes work performed to-date and presents the findings resulting from that work.  The findings presented herein are made to a reasonable degree of scientific certainty.  Exponent reserves the right to supplement this report and to expand or modify our opinions based on review of additional material as it becomes available through ongoing discovery and/or through any additional work or review of additional work performed by others.

1701663.000 - 6554

EXHIBIT M
PAGE 342

3

# Table of Contents

Report Cover Memo Statement                                                    2

Report Objective                                                              4

Executive Summary                                                             5

Introduction                                                                  8

Description and Application of Safariland Colorimetric Field Testing Kits    11

DEA Methodology, Presumptive Colorimetric Screening and GC-MS Analyses       16

Summary Conclusions                                                          20

References                                                                   21

Attachments                                                                  22

  Attachment 1.  NARCOPOUCH® Simplified Procedures for the Major Drugs of Abuse

  Attachment 2.  Images of NARCOPOUCH® #923 Packaging

  Attachment 3. Angelina Duggan Qualifications Summary

  Attachment 4.  Angelina Duggan Exponent CV

  Attachment 5.  Consulting Services Rates & Charges

1701663.000 - 6554

4

**Report Objectives**

The report provided herein has been prepared according to the following objectives that were agreed to beforehand with Yukevich and Cavanaugh.

- Describe the validity and accuracy of presumptive colorimetric screening.
- Describe Safariland's presumptive colorimetric field testing kit. Provide details on the NarcoPouch #923 test kit's capability to identify methamphetamine or any other secondary amine.
- Discuss the reliability of the US Drug Enforcement Agency's (DEA) presumptive colorimetric screening and Gas Chromatography-Mass Spectrometry (GC-MS) analyses to identify a specific secondary amine (that may be a controlled or other chemical substance).
- Identification and discussion of chemicals contained within the DEA's apprehended Cuajo (rennet) that would have caused a positive response in the Simon's presumptive colorimetric test.

1701663.000 - 6554

**EXHIBIT M**
**PAGE 344**

5

## Executive Summary

*It should be noted that the Executive Summary contained herein does not and cannot summarize all of Exponent's technical evaluation, analysis, conclusions, and recommendations. Hence, the main part of this report is at all times the controlling document.*

The use of presumptive colorimetric testing is widely accepted by the scientific and forensic communities and the United Nations (UN), United States Food and Drug Administration (FDA), and United States (US) and global law and drug enforcement entities. Presumptive colorimetric field testing is recognized as being sufficiently sensitive to be recognized as a reliable means of confirming the presence, or lack of presence, of specific chemical functionality that may be associated with a controlled drug substance. However, it has also been established a positive result in a colorimetric test, which is presented as the anticipated color response, must be confirmed by more rigorous and conclusive analytical methodology, such as Gas Chromatography-Mass Spectrometry (GC-MS), before it can be concluded that the suspected unknown substance is an illicit drug.

Presumptive colorimetric field testing kits have a long history of use in the US (and abroad) as an efficient means of identifying potential illicit drug substances for additional confirmatory analyses by the US Drug Enforcement Agency (DEA). The Safariland presumptive test kits contain the same packaged chemicals and reagents that a forensic scientist would prepare *de novo* for testing in the laboratory. The presumptive colorimetric tests in the Safariland products lines have been independently validated and extensively reported in the scientific literature. These tests are also reported in the scientific literature to be sensitive enough to detect regulated drug substances in small quantities at low concentrations.

Safariland represents in its NARCO® Pouch product information and packaging that a colorimetric presumptive field testing result, in which the anticipated color change is or is not noted, is not sufficient information to draw conclusions about the identity of a suspected unknown substance. Rather, Safariland acknowledges the FDA and UN's recommendations, as well as the recommendations of an independent DEA advisory group, the Scientific Working Group for the Analysis of Seized Drugs (SWGDRUG) (whose recommendations are incorporated into DEA protocols), regarding the appropriate use and interpretations of presumptive drug testing results. These recommendations of all of these three domestic and international entities advise that a confirmatory analysis, such as GC-MS, is required when the presumptive colorimetric testing results have, or have not, provided the anticipated color response occurs.

1701663.000 - 6554

6

As stated in the Safariland NarcoPouch® Instructions, included in Attachment 1:

- "Always retain sufficient sample of suspect material for evidential analysis by the forensics laboratory."
- "Note: All suspected materials that do not produce a positive response should be sent to the lab for further testing."

In May 2014, US Customs and Border Protection (CBP) agents apprehended 19 samples of suspicious brown liquids designated as Mexican Cuajo (rennet) that would be used for cheese making. All of the samples of seized Cuajo tested positive in the #923 Simon's Reagent Presumptive Test Kit marketed by Safariland. An indicative color change for a secondary amine in the #923 Simon's Reagent Presumptive Test Kit is the formation of a dark blue color. However, the blue color change is generally non-specific for various secondary amines substances and the suspected Cuajo may or may not be a controlled drug substance.

Methamphetamine and 3, 4-methylenedioxymethamphetamine (MDMA/Ecstasy) are widely used controlled drug substances that contain a secondary amine functionality. A DEA forensic scientist conducted an additional round of presumptive testing on the seized Cuajo samples in the laboratory using the Simon's test reagent that was prepared *de novo* (freshly prepared) to further confirm the results obtained previously by the CBP and her earlier test results using the Safariland's #923 Simon's Reagent Presumptive Test Kit. GC-MS was then utilized to conclusively determine that these secondary amines were either methamphetamine and/or 3, 4-methylenedioxymethamphetamine (MDMA/Ecstasy), and/or some other secondary amine (all of which could produce the blue color change in the Safariland #923 Simon's Reagent Presumptive Test.)

The DEA GC-MS analyses of 16/19 Cuajo samples did not indicate the presence of either methamphetamine and/or 3, 4-methylenedioxymethamphetamine (MDMA/Ecstasy). Rather, all of the 16 samples tested by the DEA using GC-MS analyses provided similar results. Matching the mass spectrum results to comparative mass spectrum reference libraries indicated that the unknown sample contained a mixture of specific primary and secondary amines. The DEA identified phenylethyl amine and tyramine as the primary amines, neither of which would have provided a positive blue color change (formation of a Simon-Awe complex) in the Safariland #923 test kit or in the laboratory-prepared Simon's colorimetric test reagent.

The DEA identified tryptamine and tetrahydroharmine (THH) in its testing, both of which are secondary amines that would provide a positive blue color change in the Safariland #923 Simon's Reagent Presumptive Test. None of these primary or secondary amine substances are currently designated as controlled drug substances in the US.

1701663.000 - 6554

EXHIBIT M
PAGE 346

7

To summarize, US and international regulatory authorities are in agreement that Simon's Reagent colorimetric presumptive testing is a reliable first step qualitative analytical tool in identifying secondary amines that may or may not be controlled substances.  In regards to matter of Doyma Vanessa Michel v Safariland, LLC et al. Court Case No. 16CV0277-GPC-RBB ESIS File N0. 0A031309352695, the Safariland #923 Simon's Reagent Presumptive Test Kit performed as anticipated, in properly identifying, through the formation of the blue Simon–Awe complex, that the bottles of Cuajo contained substance(s) with the secondary amine chemical functionality.  It is only through the subsequent application of GC-MS that the DEA was able to conclusively confirm the identity of the secondary amines that caused the formation of the blue Simon-Awe complex and that these substances were neither methamphetamine nor MDMA.

1701663.000 - 6554

**EXHIBIT M**
**PAGE 347**

8

**Introduction**

*Colorimetric Assays as Presumptive Tests*
Presumptive colorimetric assays are a classical means of confirming the presence, or lack of presence, of specific chemical functionality associated with various chemicals and drug substances.[1, 2, 3, 4]

As stated on page 17 of the 2006 UN Office on Drugs and Crime Manual for Colorimetric Testing,

> "Presumptive tests generally are fast screening procedures that usually consist of two or three independent tests. They are designed to provide an indication of the presence or absence of drug classes in the test sample and quickly eliminate negative samples."[3]

The colorimetric testing methodology utilizes simple reagents to induce an unambiguous color change, but only if a specific chemical functionality or functionalities are present within the unknown substance under evaluation. The results obtained through colorimetric test are qualitative, that is, the assay cannot determine the concentration of an unknown substance in a mixture. The scientific literature on the use of colorimetric testing for drug substances supports that colorimetric assays cannot conclusively confirm the identity of an unknown substance based on a color change alone and that additional, more conclusive analyses are necessary to determine the specific identity of the suspected unknown substance.[3, 4]

Colorimetric presumptive test have found extensive use in medical and forensic applications because these types of tests are sensitive (can detect small quantities of a chemical containing specific functionality in a mixture), reproducible and can easily and quickly be performed under field conditions.[4] The medical and forensic science applications of colorimetric tests are generally referred to as presumptive because they can only provide an indication, on the basis of a color change, the presence or absence of a type of chemical(s) in a suspected unknown test sample. In medical or forensic applications, a reliable presumptive test should maximize the probability of a "true" result—that is, display the expected color change indicative of a specific chemical functionality that may be associated with a class of drugs.[1, 2, 3, 4] For example, use of an appropriate presumptive test such as the #923 Simon's Reagent Presumptive Test, ensures that the potential identification of drugs containing secondary amine functionality, such as methamphetamines, is not overlooked.

The general purpose and scientific rationale of conducting any preliminary screening, such as the use of presumptive color tests, is to determine whether additional testing and analyses are required. Therefore, a positive result (desired color change) in a colorimetric presumptive test should not be considered as sufficient evidence to conclusively identify a class of drugs or a

1701663.000 - 6554

EXHIBIT M
PAGE 348

9

specific drug. The results of any presumptive test must be confirmed by additional and more definitive laboratory testing/analyses. Confirmatory analyses/evaluations are more resource intensive than the simpler presumptive tests. Accordingly, presumptive testing, such as quick and easy to conduct colorimetric tests, are generally employed as a first step under field conditions in order to establish whether the more resource intensive and confirmatory laboratory testing/analyses should be conducted.[3, 4]

*UN Presumptive Testing Standards and Recommendations*
In 2006, the UN Office on Drugs and Crime (ODC) issued a manual for guidelines for national drug testing, in particular for the use of colorimetric testing for the analysis of amphetamines, methamphetamines, and their ring-substituted analogues.[3] In this document, the UN ODC states that presumptive tests are not considered to be sufficient and that more than one confirmatory analytical method, should be employed to confirm the identity of a suspected unknown substance.

As the manual states on page 17 paragraphs 1-2:

> "…presumptive tests are not considered sufficient for drug identification and results must be confirmed by additional laboratory tests. In recent times, presumptive tests are more often used as field tests, although they are also carried out in laboratories as a first screening procedure."

And also as stated on page 3 paragraph 2:

> "…When possible, three entirely different analytical techniques should be used, for example: colour tests, chromatography (e.g., TLC, GC or HPLC) and spectroscopy (e.g., IR or UV). Hyphenated techniques, such as GC-MS, count as two parameters, provided the information from both techniques is used (i.e. retention time and mass spectral characteristics)."

*FDA Presumptive Testing Standards and Recommendations*
In 2003, the U.S. Food and Drug Administration issued Guidance for Industry and FDA Staff entitled Draft Premarket Submission and Labeling Recommendations for Drugs of Abuse Screening Tests.[5] On Page 17, the FDA recommended a warning following the intended use statement that addresses the presumptive nature of screening test results, such as:

1701663.000 - 6554

**EXHIBIT M**
**PAGE 349**

10

*This assay provides only a preliminary result.*

"… Clinical consideration and professional judgment should be applied to any drug of abuse test result, in evaluating a preliminary positive result. To obtain a confirmed analytical result, a more specific alternate chemical method is needed. Gas chromatography/mass spectrometry (GC/MS) is the recommended confirmatory method."

*Drug Enforcement Agency (DEA) Use of Presumptive Colorimetric Test*
US DEA further evaluates the results of the field presumptive colorimetric testing obtained by CBP officers to determine whether an apprehended suspicious could potentially include an illicit drug. These colorimetric presumptive tests used by the CBP and US DEA are supported by the UN [1,3,4] and independently validated to provide efficient and accurate results at low concentrations.[6] For example, it has been reported that the limits of detection (LOD) for D-amphetamine hydrochloride using the Marquis Assay was 20 μg and the LOD for D-methamphetamine hydrochloride using Simon's reagent is 100ug.[6]

The DEA has utilized presumptive colorimetric field testing as a first step because it is an efficient way to evaluate whether the suspected unknown substance should then be further evaluated in the laboratory by a DEA forensic scientist. The presumptive testing methodology employed by the DEA has been thoroughly reviewed and recommended by an independent group of scientific advisors, the Scientific Working Group for the Analysis of Seized Drugs (SWGDRUG).[7] The use of GC-MS as follow-on confirmatory laboratory analysis has also been vetted and recommended by SWGDRUG.[7]

1701663.000 - 6554

**EXHIBIT M**
**PAGE 350**

11

**Description and Application of Safariland Colorimetric Testing Kits**

Safariland provides presumptive colorimetric testing kits for US state, municipal law, military and federal drug enforcement officers to facilitate the identification of illicit drug substances. The marketed test kits contain the same chemicals and reagents as the validated laboratory methods supported by the UN.[1, 3, 4]

It is recognized by the US and international medical and forensic communities that colorimetric testing is presumptive and cannot conclusively identify an unknown substance.[3, 4, 6] Safariland has not advertised that their presumptive colorimetric field kits provide a definitive answer or conclusive evidence that a particular drug substance may be present in a suspected unknown sample.  Safariland acknowledges in its product literature and packaging that a colorimetric presumptive field testing result, in which the anticipated color change occurs, is not sufficient to draw conclusions about the identity of a suspected unknown substance.

Safariland cautions in their #923 Simon's Reagent Presumptive Test kit product information and packaging against making conclusions based solely on the outcome of colorimetric testing.

- This is evident from the two statements provided in the instruction sheet included with the NarcoPouch #923 test kits (as shown in Attachment 1, NARCOPOUCH® SIMPLIFIED PROCEDURES for the MAJOR DRUGS of ABUSE) which state;

  1. "[a]lways retain sufficient sample of suspect material for evidential analysis by the forensic laboratory;" and,
  2. "[n]ote: All suspected materials that do not produce a positive response should be sent to the lab for further testing."

- This is evident in the statement  on NarcoPouch #923 box shown in Attachment 2, IMAGES OF NARCOPOUCH® #923 PACKAGING), "A presumptive test for methamphetamine and MDMA (Ecstasy)."

The US Department of Drug Administration (DEA) has utilized Safariland products for more than 17 years.  Safariland's product  are also distributed internationally and utilized in countries such as Spain, France, Germany and Mexico.  The global use of these products signifies that presumptive US colorimetric testing results can be harmonized internationally and across borders.

Safariland provides information for training on the proper use of the kit, including its reagents and evaluation of the test outcomes.  Instructions on how to safely prepare samples and use the reagents are included for each of the individual test kit pouches in order that law and drug

1701663.000 - 6554

**EXHIBIT M**
**PAGE 351**

12

officers can easily and safely conduct the presumptive tests in the field and obtain reliable results.

The Safariland product line includes comprehensive presumptive colorimetric testing kits. As illustrated in Attachment 1, the NarcoPouch® includes three presumptive testing reagents that can identify any of nitrogen-containing controlled drug substances that contain, as depicted below in Figure 1, the mono substituted primary, the di-substituted secondary or tri-substituted tertiary amine functionality that are referred to as primary, secondary and tertiary amines.

As illustrated in Figure 1, primary amines have two hydrogens bound to the nitrogen atom. In contrast, secondary amines possess a single hydrogen bound to the nitrogen atom, and tertiary amines possess no hydrogens bound to the nitrogen atom. The R groups on an amine may either be the same or have different linear or branched carbon chains and or an aryl group, and the nitrogen may also be contained as part of a heterocyclic ring.

### Figure 1 Amine Functionality

$$R \underset{\underset{H}{|}}{\overset{}{N}} H \qquad R^2 \underset{\underset{H}{|}}{\overset{}{N}} R^3 \qquad R^4 \underset{\underset{R^6}{|}}{\overset{}{N}} R^5$$

primary amine          secondary amine          tertiary amine

$$R, R^1, R^2, R^3, R^4, R^5, R^6 = \text{alkyl, aryl}$$

The nature of amine functionality and R groups attached to the amine affect the observed color changes in the three assays described below. However, it should be cautioned, that any non-drug primary, secondary or tertiary amine could also provide the same color reactions as identified and or unknown presumed primary, secondary, and tertiary amine containing controlled drug substances.

To emphasize, the presumptive test kits and reagents described below can only identify amine functionalities within a potential drug molecule, but not the identity of the specific drug molecule or any other molecule containing the amine chemical functionality. Additional follow-on confirmatory laboratory testing/analysis must be conducted to identify of a suspected unknown substance.

As specified in Attachment 1, the following tests could be used to differentiate primary and secondary amines from tertiary amines.

1701663.000 - 6554

13

1.  The #902 Marquis Reagent Presumptive Colorimetric test includes a non-specific presumptive test pouch that is generally used to identify and differentiate primary aromatic amine drugs such as amphetamines and secondary aromatic amine drugs such as methamphetamine and MDMA from the various tertiary amine opiates such as codeine and heroin.

2.  The #923 Simon's Reagent test pouch is used to differentiate primary amine drugs, such as amphetamine, from secondary amine drugs such as methamphetamine and MDMA.

3.  The #924 Mecke's Reagent test pouch is used to differentiate the primary drug amphetamine and secondary amine drugs methamphetamine and MDMA from the tertiary amine opiates such as codeine and heroin.

*Marquis Reagent* [1,2]

The Safariland #902 Marquis Reagent presumptive test kit includes a pouch containing a solution consisting of 1 part formaldehyde and 9 parts concentrated sulfuric acid. The test is performed by placing an unknown substance into the pouch and breaking the ampoule to expose the material to the test kit solution.

The reaction of formaldehyde in the presence of sulfuric acid produces a dimerization reaction of the dimer test substance (resulting in the reaction of two molecules of the test substance to form a new molecule comprised of two of the original molecules). The resultant formation of a positive charge within the new molecule causes formation of different color types.[1]
As noted in Attachment 1, the different colorimetric reactions include: orange to red to brown sequence for primary and secondary amines whereas violet to reddish-purple is indicative of a tertiary amine opiate drug.

To emphasize, Marquis Reagent is non-specific but it a good first step to determine, based on the color reaction, that an unknown substance contains either primary, secondary or tertiary amine functionality. Unknown suspected test substances that provide an orange to red to brown color change should be evaluated in the Safariland #923 Simon's Reagent Presumptive Test kit and unknown test substances that provide a reddish violet to purple color change should be evaluated in the Safariland #924 Mecke's Reagent Presumptive test kit

As an alternative to conducting additional presumptive colorimetric testing (that is, the #923 Simon's Reagent and or #924 Mecke's Reagent presumptive colorimetric tests), going directly to GC-MS analysis can immediately provide more definitive information on the amine class and whether the suspected unknown substance is a regulated drug.

1701663.000 - 6554

14

*Simon's Reagent* [1,2]

Safariland #923 Simon's Reagent Presumptive Test Kit is used to differentiate whether a
suspected unknown substance, that provided a red to brown reaction in the Marquis Presumptive
test is either amphetamine (or another primary amine), or methamphetamine and or MDMA (or
another secondary amine). The Safariland #923 Simon's Reagent Presumptive Test Kit contains
equal parts of acetaldehyde, sodium carbonate and sodium nitroprusside. All secondary amine-
containing substances, including methamphetamine and MDMA, as well as other secondary
amines, will cause the formation of a dark blue color (a Simon-Awes Complex) in the presence
of Simon's Reagent. Primary amines, amphetamines, does not cause any color change (the
solution remains clear).

**Figure 2 Comparative Structures of Amphetamine, Methamphetamine, and MDMA**

amphetamine            methamphetamine            MDMA (ecstasy)

The #923 Simon's Reagent Presumptive Test Kit instructions specify the order to which the
suspected drug material should be exposed to the reagents. The unknown substance is
introduced into the reagent mixture and results in a series of chemical reactions. As illustrated in
Figure 3, the reaction of the secondary amine and acetaldehyde spontaneously produces an
enamine, which subsequently undergoes reaction with to form an imine salt which is then
undergoes hydrolysis under basic conditions to form the dark blue colored Simon-Awe
complex.[1,8] Using methamphetamine as an example, Figure 3 illustrates the complete Simon's
Reagent reaction sequence that results in the formation of the blue Simon-Awe complex.[1,8]

**Figure 3: Reaction of Methamphetamine with Simon's Reagent**

1701663.000 - 6554

EXHIBIT M
PAGE 354

15

In summary, Safariland #924 Simon's Reagent Presumptive Test Kit is a reliable first step to identify secondary amine-containing substances. However a positive Simon's screening test result should not be taken as conclusive evidence that the test sample contained either methamphetamine or MDMA. Follow-up analysis, GC-MS, as recommended by the FDA and UN, is required to definitively confirm any preliminary conclusions that may be drawn from Simon's Reagent testing results. [3, 4, 5]

*Mecke's Reagent*
The #924 Safariland Mecke's Reagent Presumptive Testing Kit is used to identify tertiary amine substances that may include the alkaloids opiate drugs. Mecke's Reagent is composed of 1 gram of selenous acid in 100 milliliters of concentrated (95–98%) sulfuric acid. The reagent is slowly dripped onto the suspected unknown test substance. Formation of a greenish to blue color [1] and indicates the possible presence of an opiate drug, such as codeine or heroin. Once again, GC-MS would substantiate that the suspected unknown substance was heroin, codeine or another opiate, such as oxycotin.[3, 4, 5]

1701663.000 - 6554

**EXHIBIT M**
**PAGE 355**

16

**DEA Methodology, Presumptive Colorimetric Screening and GC-MS Analyses**

In May 2014, CBP officers apprehended 19 bottles of Cuajo bottles, a presumed rennet product from Mexico. Field testing by CBP using Safariland #923 Simon's Reagent indicated a positive test result for the potential presence of either methamphetamine or MDMA in the Cuajo.

The DEA chemist, Alexandra Ambriz, retrieved aliquots from the 19 bottles seized by CBP and stored in the evidence vault in Otay Mesa, CA. She conducted follow-on presumptive colorimetric testing of the samples from the bottles of Cuajo to confirm the CBP testing results. In testimony provided on March 30, 2017, Ms. Ambriz stated that she had first taken the pH of the 19 aliquots solutions (prior to the presumptive colorimetric testing) and determined that the apprehended Cuajo solutions were basic and had a pH = 8. She did not conduct the Safariland #902 Marquis Reagent Presumptive Test, but proceeded directly to confirming the CBP field testing results using only the sodium nitroprusside test prepared *de novo* in the laboratory, which uses the same reagents found in the #923 Safariland Presumptive Test Kit. The testing results of all 19 aliquots provided a dark blue color. As explained above, this type of test response with Simon's Reagent, blue color change to the Simon-Awe complex, could be indicative of methamphetamine, MDMA/Ecstasy or another structurally unrelated and/or related secondary amine substance(s).

As an aside, it should be noted that the rennet cheese making enzyme process with milk (whose pH is generally 5.8 – 6.2) is a complicated process that needs to occur at acidic pH values and carefully controlled temperatures.[9] The pH of milk is generally close to neutral but on the acidic side and needs to be further reduced for the process to proceed. Rennet solutions for cheese making contain primarily chymosin, a protease enzyme that curdles the casein in milk to produce the curds (cheese) and whey, are generally not stable and like all protein enzymes may be denatured overtime in basic solutions. Thus, it may very well be that the seized Cuajo solutions containing basic amine substances (that will be discussed below) that were stored in a warehouse for several months at indiscriminate and unknown temperatures were unlikely to contain viable rennet (chymosin) for cheese making. It is also possible that the cheese-making capability of chymosin enzyme in the Cuajo solution was destroyed before being seized.

Following the Simon's Reagent colorimetric evaluation of all the test samples from the Otay vault warehouse, Ms. Ambriz then proceeded to conduct GC-MS analysis on 16 of the 19 Cuajo samples. Ms. Ambriz did not identify any secondary amine components in the 16 samples by GC-MS that had a mass spectrum that corresponded to amphetamine, methamphetamine, or any other controlled substances which were present in the DEA controlled substance MS reference library.

However, other non-regulated secondary amines were identified as being present in the mixture. In Figure 4, a GC-MS chromatogram from one of the 16 samples is shown below, along with the identities of the components present in the mixture. The identity of the compounds illustrated in

1701663.000 - 6554

EXHIBIT M
PAGE 356

17

Figure 4 was determined by comparison of the GC-MS trace against the MS reference library used by the DEA laboratory. The identified substances included two primary amines at the following retention times and mass units 1.459 minutes (m/z = 121, 91, 77, 65) as phenethylamine, widely found in nature and common foods such as chocolate and generally taken as a dietary supplement to enhance positive mood and weight loss [10, 11] and at 2.772 minutes (m/z = 137, 108, 77) as tyramine, a neurotransmitter that is ubiquitous in the human body and many common foods[12]. Most importantly, in this and all the other 16 samples analyzed by GC-MS, several secondary amine compounds were also identified that likely accounted for the dark blue color change and formation of the Simon-Awe complex. These secondary amines were identified at 4.103 minutes (m/z = 160, 130, 103, 77) as tryptamine, an alkaloid found in the brains of mammals and reported to be a neuromodulator and neurotransmitter[11] and at 4.724 minutes (m/z = 186, 171, 157, 130, 115, 85, 77)[13] and tetrahydroharmine (THH), a fluorescent indole alkaloid extracted from *Banisteriopsis caapi*, a woody vine that is used to produce a hallucinogenic psychoactive tea, ayahuasca.[14] Several other substances were also noted to be present at retention times of 1.39 minutes (m/z = 117, 83, 56), 1.754 minutes (m/z = 150, 122, 105, 77) and 4.785 minutes (m/z = 194, 143, 70). These substances either did not ionize as abundantly as the positively-identified compounds above or were present in insufficient concentration to be positively identified within the DEA MS library. The material at retention time 6.124 minutes is the C24 hydrocarbon compound tetracosane, used as an internal standard by the DEA. The DEA emphasized the all of the 16 samples labeled as Cuajo gave identical GC-MS traces.

The DEA GC-MS results should be considered valid and conclusive to confirm the identity of the secondary amines in the Cuajo samples seized by CBP and subsequently found to be positive (by production of the blue-colored Simon-Awe complex), by both the CBP and DEA using the Safariland Simon's Reagent Presumptive Colorimetric Test Kit and the sodium nitroprusside test prepared *de novo*. As is recommended by the FDA[5] UN,[3] and the DEA through the recommendations of SWGDRUG[7], the DEA has appropriately used the GC-MS results and compared these to known libraries of regulated drug and non-drug substances to verify the results of its Simon's Reagent presumptive colorimetric testing. Descriptions of the methodology are as follows.

GC-MS has the capability to separate the constituents of a mixture or solution on the basis of their physical properties, such as polarity and boiling point. As these components of the mixture are resolved, they exit the gas chromatograph at different times and enter the mass spectrometer detector, where they undergo ionization and fragmentation to provide information (a finger print) of mass fragments for the compound and its structure. By comparing the mass spectrum of the compound obtained in this manner with a reference library of mass spectra of compounds obtained under similar ionization conditions, the identity of a particular compound can be confirmed with a high degree of confidence. Reference libraries of compound mass spectra may be assembled in-house or purchased through several agencies including the National Institute of

1701663.000 - 6554

18

Standards and Technology. Further confirmation of the identity of an unknown compound can be provided by comparing the retention time, which is the characteristic time that the compound takes to be detected by the mass spectrometer after introduction onto the instrument, of the unknown compound to an authentic reference standard provided that the same instrumental conditions are used to analyze the unknown compound and the reference standard. As a result, the operator has a high degree of confidence in the identity assignment of an unknown compound when both the retention times and the mass spectra of the unknown compound and the reference standard are in good agreement. As further proof, the unknown sample may also be spiked with the reference sample. In doing so the GC retention time does not change but the area under the peak of the chromatogram would proportionally increase. Generally this is not necessary when the GC analysis is followed by the mass spectrum determination.

To summarize, as recommended by the FDA, UN and the SWGDRUG' the DEA's use of GC-MS as a confirmatory technique for the presence of controlled substances, enabled the DEA to make a confirmation of the identity of the unknown compounds in the seized samples of Cuajo as two specific secondary amines, tryptamine, and tetrahydroharmine (THH). These secondary amines provided the formation of the blue Simon-Awe Complex with Simon's Reagent. By comparing the retention time and mass spectrum to those obtained by analyzing authentic reference standards under the same instrumental conditions, it could be concluded that the suspected samples of Cuajo did not contain either methamphetamine or MDMA.

1701663.000 - 6554

EXHIBIT M
PAGE 358

19

## Figure 4.  DEA Cuajo GC-MS Analysis



Confidential-Subject to Protective Order

20

## Summary Conclusions

The information presented herein illustrates that US and international regulators have recommended the use of Simon's Reagent as a reliable first step qualitative analytical tool to identify secondary amine substances that may or may not contain methamphetamine or MDMA (ECSTACY).

The #923 Safariland Simon's Reagent Presumptive Test Kit performed as anticipated in properly identifying, through the formation of the blue color (the Simon–Awe complex), that the unknown suspected Cuajo samples contained substances with secondary amine chemical functionality.

As stated in the NARCOPOUCH ® product literature (Attachment 1) and on the NARCOPOUCH #923 Packaging (Attachment 2), Safariland has acknowledged the FDA, UN, DEA and SWGDRUG recommendations that a confirmatory laboratory analysis, should be conducted following the presumptive colorimetric testing results.

It is only through the further application of GC-MS that the DEA was able to conclusively confirm the identity of tryptamine and THH, both of which are the secondary amines that caused the blue color (the Simon-Awe complex) following treatment of the seized Cuajo samples with the Safariland #923 Simon's Reagent Presumptive Test Kit and the laboratory prepared Simon's colorimetric test reagent.  Moreover, these substances were neither methamphetamine nor MDMA.

1701663.000 - 6554

21

**References**

1. Kovar, K-A., and Laudszun, 1989. Chemistry and Reaction Mechanisms of Rapid Tests for Drugs of Abuse and Precursor Chemicals. United Nations Scientific and Technical Notes.
2. "Color Test Reagents/Kits for Preliminary Identification of Drugs of Abuse". Law Enforcement and Corrections Standards and Testing Program. July 2000.
3. United Nations Office on Drugs and Crime, 2006. Manual for use by national drug testing manuals. The recommended methods for the identification and analysis of amphetamine, methamphetamine and their ring-substituted analogues in seized materials.
4. United Nations Office on Drugs and Crime, 2005. Colour Tests for Precursor Chemicals of Amphetamine-Type Substances. The Use of Colour Tests for Distinguishing between Ephedrine-Derivatives.
5. U.S. Food and Drug Administration, 2003. Guidance for Industry and FDA Staff entitled Premarket Submission and Labeling Recommendations for Drugs of Abuse Screening Tests. Federal Register 68, No. 231 December 2, 2003.
6. O'Neal, C.L., Crouch, D.J., Fatah, A.A., 2000. Validation of Twelve Chemical Spots Test for the Detection of Drugs of Abuse. Forensic Sci Int., 109: 189-201.
7. Scientific Working Group for the Analysis of Seized Drugs (SWGDRUG) Recommendations. Version 7.1, 2016-June-9. Accessed at http://www.swgdrug.org/Documents/SWGDRUG%20Recommendations%20Version%207-1.pdf May 14, 2017.
8. Wiefgrebe, W. and Vilbig, M.1982. Enamines as intermediates of Simon-Awes complexes. Z. Naturfosch 37: 490-493.
9. http://www.cheesescience.org.html
10. https://pubchem.ncbi.nlm.nih.gov/compound/Phenethylamine
11. http://www.webmd.com
12. https://pubchem.ncbi.nlm.nih.gov/compound/tyramine
13. https://www.ncbi.nlm.nih.gov/pubmed/6131482
14. Frecska, E., Bokar, P., Winkelman, M., 2016. The Therapeutic Potentials of Ayahuasca: Possible Effects against Various Diseases of Civilization. Front Pharmacol. 7: 35 Accessed at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4773875

1701663.000 - 6554

**EXHIBIT M**

**PAGE 361**

**ATTACHMENT 1**

**NARCOPOUCH® SIMPLIFIED PROCEDURES for the MAJOR**

**DRUGS of ABUSE**

EXHIBIT M

PAGE 362












Re-Order #900

Copyright 2007 • Armor Holdings, Inc. • All Rights Reserved

**EXHIBIT M**
**PAGE 363**

## ODV PREPARATION OF SUSPECT MATERIAL
*Always retain sufficient sample of suspect material for evidential analysis by the forensics laboratory*

| | |
|---|---|
| Capsules | Open the capsule, remove sufficient material for the test using a sampling device or a flat toothpick. |
| Compressed Blocks | Cut or scrape the block to provide small flakes for testing. |
| Liquid, Oils | Absorb some on an uncolored, unscented tissue and allow to dry. Use a sample of dried tissue for testing. A single drop of suspected hash oil is sufficient. |
| Plant | 4-6 flakes of fresh plant material is sufficient. |
| Tablets | Crush tablet to a fine powder between a fold of paper and remove sufficient material for the test using a sampling device or flat toothpick. |

All color indicators, whether described or printed, are relative. Test responses will be affected by the purity and/or size of the sample, lighting conditions, temperature and how well the sample has been mixed with the reagent. Only if the full testing sequence is followed, and common sense applied to reading color responses, will the test results be conclusive.

### INDIVIDUAL TEST INSTRUCTIONS
**PROCEDURE A for 1 ampoule tests (1, 2, 3, 6, 26, & 28):** 1. Remove the clip. 2. Place sample in the pouch. 3. Replace clip carefully. 4. Break the ampoule. Mix. 5. Observe color development.

**PROCEDURE B for 2 ampoule tests (5, 9, 14, 22, 24, 25; & 27):** 1. Remove clip. 2. Place sample in pouch. 3. Replace clip carefully. 4. Break left (print facing you) ampoule. Mix well. 5. Observe any color formed. 6. Break the right ampoule and mix well. 7. Observe color.

**PROCEDURE C for 3 ampoule tests (4, 7, 8, & 23):** 1. Remove clip. 2. Place sample in pouch. 3. Replace clip carefully. 4. Break left (print facing you) ampoule. Mix well. Observe any color formed. 5. Break the center ampoule and mix well. Observe any color formed. 6. Break right ampoule, agitate for 2 to 3 seconds and hold the pouch steady. 7. Observe color.

*Test #901 - Mayer's Reagent - A general test for narcotic compounds and the suggested starting point for sequential testing*
The formation of a white to cream-colored gelatinous precipitate is indicative of the presence of a general narcotic compound (or the amphetamines). Proceed to Test #902 (Marquis Reagent) to test for opiates. If no precipitate is formed, proceed to Test #905 (Dille-Koppanyi Reagent) to test for barbiturates.
**CONTENTS:** Tri-iodo mercurate solution in water.
**ANTIDOTE:** Immediate dilution with water followed by induced vomiting using 2 tablespoons of syrup of ipecac. Seek medical advice.

*Test #902 - Marquis Reagent - A general test for Opiates and Amphetamine type compounds*
Violet to reddish-purple is indicative of opiates. Proceed to Test #924 (Mecke's Reagent) to confirm the presence of heroin, or Test #903 (Nitric Acid) to differentiate between heroin and morphine. An orange to red to brown sequence within 12 seconds may indicate the presence of an amphetamine. Brown may indicate Demerol, while red may indicate the presence of mescaline. Black may indicate MDMA (Ecstasy).
**CONTENTS:** Concentrated sulfuric acid with formaldehyde.
**ANTIDOTE:** Immediate dilution with water is recommended. Do Not induce vomiting. Seek medical advice.

*Test #904B - Cocaine Salts and Base - A test for Cocaine HCl, Free-Base and "Crack"*
Observe the color formation after breaking the left ampoule. Cocaine HCl and cocaine base will produce an immediate blue precipitate or blue flakes in a pink field. After breaking the middle ampoule, the blue converts to pink. After breaking the right ampoule, agitate briefly and hold the pouch steady. The solution should be pink over blue if Cocaine HCl or Cocaine base is present.
**CONTENTS:** Cobalt thiocyanate, chloroform, and HCl.
**ANTIDOTE:** Immediate dilution with water is recommended. Do Not induce vomiting. Seek medical advice.

*Test #905 - Dille-Koppanyi Reagent - A test for Barbiturates*
A purple or reddish-violet color indicates the presence of a barbiturate. A pale, blue color is a negative response.
**CONTENTS:** Cobalt acetate in isopropanol and isopropanol-amine.
**ANTIDOTE:** Immediate dilution with water followed by induced vomiting using 2 tablespoons of syrup of ipecac. Seek medical advice.

*Test #907 - Modified Ehrlich's Reagent - A test for Hallucinogens*
Since the active ingredient in hallucinogens may be present in very small quantities, a larger sample may be necessary to produce a color response that can be compared easily. A slowly-developing (30-60 seconds) purple color is indicative of the presence of LSD or other ergot alkaloids. Break the third ampoule and gently agitate. The color will intensify in the presence of LSD.
**CONTENTS:** Concentrated hydrochloric acid, phosphoric acid, and p-dimethylamino benzaldehyde.
**ANTIDOTE:** Immediate dilution with water is recommended. Do Not induce vomiting. Seek medical advice.

*Test #908 - Duquenois-Levine Reagent - A test for Marijuana, Hashish, Hash Oil, THC and residues of THC in smoking paraphernalia*
Break left ampoule and agitate one minute (typically no color forms). Break the middle ampoule, agitate, and allow blue-violet color to develop (Do Not allow color to get too rich). Break right ampoule and agitate 5 seconds only. Hold the pouch steady and allow colors to separate. A slate-grey upper level over a purple lower level is a positive result for marijuana, hashish, hash oil, and THC. Plant material failing to give a positive response to Duquenois-Levine or KN Reagent (Test #909) should be examined by a forensic laboratory, as many drugs other than Marijuana can be sprayed on plant material (PCP on parsley for example).
**CONTENTS:** Vanillin solution in alcohol, concentrated hydrochloric acid and chloroform.
**ANTIDOTE:** Immediate dilution with water is recommended. Do Not induce vomiting. Seek medical advice.

*Test #909 - KN Reagent (Fast Blue B Salt) - A test for Marijuana, Hashish, Hash Oil, THC and THC residues*
Mix vigorously for at least 30 seconds. Allow reagents to separate (layer). Observe the color in the bottom layer. An orange-red to a very dark reddish brown is indicative of the presence of marijuana, hashish, THC and other cannabis products. Strong samples will produce a very dark red color. Any other color in the bottom layer is a negative response.
**CONTENTS:** Fast Blue B Salt in a chlorinated hydrocarbon and an aqueous solution of sodium hydroxide.
**ANTIDOTE:** Immediate dilution with water is recommended. Do Not induce vomiting. Seek medical advice.

*Test #923 - Sodium Nitroprusside - A test for Methamphetamine and MDMA (Ecstacy)*
Place a very small amount of suspect material into the pouch. An immediate dark blue color indicates the presence of methamphetamine. Note: A similar reaction occurs with MDMA (Ecstacy). Distinguish using Test #902 (Marquis Reagent). MDMA will form a purple/black color, while Methamphetamine is a rapid orange to red to brown within 12 seconds. A negative result is pink, slowly turning to a reddish-brown color. Protect from direct exposure to sunlight. Temperatures over 130° F may destroy the active ingredient.
**CONTENTS:** Water, Sodium nitroprusside, Sodium carbonate.
**ANTIDOTE:** If swallowed, induce vomiting. Seek medical advice.

*Test #924 - Mecke's (Modified) Reagent - A test for Heroin*
After breaking the left ampoule, agitate well for 30 seconds. Various colors may be generated at this point. A slowly developing purple (4-5 seconds) in the first ampoule may indicate MDMA ("XTC") going to a deep brown in the second ampoule. After breaking the right ampoule, agitate for 5 seconds. The solution will turn green in the presence of heroin. Add Acid Neutralizer (Test #910) prior to disposal.
**CONTENTS:** Corrosive Acid (sulfuric acid in both ampoules). Keep out of the reach of children. Do not store after breaking ampoules.
**ANTIDOTE:** Immediate dilution with water. Do Not induce vomiting. Seek medical advice.

## EXHIBIT M
## PAGE 364

**ATTACHMENT 2**

**IMAGES OF NARCOPOUCH® #923 PACKAGING**









EXHIBIT M

PAGE 370



## ATTACHMENT 3
## ANGELINA DUGGAN QUALIFICATIONS SUMMARY

Angelina J. Duggan, Ph.D., is hereby providing my professional credentials and technical capabilities and experience as an organic chemist and experience in the development and appropriate interpretations of screening assays and tests to be an expert witness regarding Doyma Vanessa Michel v Safariland, LLC et al. Court Case No. 16CV0277-GPC-RBB ESIS File N0. 0A031309352695.
Neither Exponent, Inc. nor I have no interest in the case Doyma Vanessa Michel v Safariland, LLC et al. Court Case No. 16CV0277-GPC-RBB ESIS File N0. 0A031309352695. Moreover, I am not conflicted in any manner to provide technical consultation on the use and appropriate interpretation of presumptive colorimetric testing.

I am a graduate of Rutgers University where I earned a Bachelor of Arts Degree with a major in chemistry and minor in biology and then a Master of Science and Doctorate in Organic Chemistry I defended my dissertation titled The Reaction of 2-Alkoxy-3, 4-Dihydro-2Hpyrans With Electrophilic Reagents.   Prior to full-time employment, I continued my education in Organic and Natural Products Chemistry at Cornell University under the auspices of a National Institute of Health Postdoctoral Fellowship.

During the course of my career I have published 19 papers in peer-reviewed journals, written several book chapters, published numerous presentation abstracts and presented numerous lectures, talks and public comments at US and international scientific conferences, EPA advisory committee and technical meetings, and to international health and environmental regulatory authorities in Latin America, Europe and Asia. I have also been awarded four US patents, three of these inventions covered new chemical processes to manufacture pharmaceutical drug patents.

**CURRENT PROFESSIONAL AFFILIATIONS and EMPLOYMENT**
I have more than 30 years as a chemist in the pharmaceutical and agrochemical industries and in management and regulatory affairs as laboratory scientist and manager in the pharmaceutical, agrochemical industries and as a consultant in the Exponent, Inc. Health Group Practice.

I am a practicing organic chemist and through work experiences and course work I have also gained the capability to interpret and apply toxicology data in evaluating environmental human health risk and applying organic and biochemistry (metabolism) to develop Structure Activity Relationships in estimating toxicological properties for unknown chemicals.

I am currently a long-standing member of the American Chemistry Society and accepted by the Society of Toxicology as an associate member. Additionally, I was elected to Phi Beta Kappa and Sigma Xi (a non-profit scientific society).

On July 11, 2005, I joined Exponent, Inc. as a Managing Scientist in the Health Group Practice. In January 2008, I was promoted to the level of Senior Managing Scientist. During the past 12 years I have applied my chemistry background in natural products chemistry isolation and structure elucidation and process chemistry to intellectual property/patent infringement cases, litigation and Toxic Substances Control Act (TSCA) and Federal Insecticide and Fungicide and

1

**EXHIBIT M**
**PAGE 371**

Rodenticide Act (FIFRA) regulatory support. My regulatory and chemical support areas have included industrial chemicals, pharmaceuticals, pesticide active ingredients, inert surfactants, fragrances, dyes, medical devices, pigments, nanomaterials, and environmental contaminants. I am also a recognized expert in the application of comparative physicochemical properties and metabolism/biochemistry, as well as the toxicology of known compounds to estimate the toxicity of structurally related compounds for which there are no toxicology data.

**PAST PROFESSIONAL EXPERIENCE**
From 1999 into 2005 before joining Exponent, I was the Human Health Science and Policy Leader and Director for Crop Life America, the Washington DC trade association for pesticide and chemical manufacturers, formulators and distributors. During that time, I provided guidance to pesticide and chemical industries on Federal and State chemical and pesticide regulations. I was frequently called upon to provide written oral and written communications to provide technical feedback on EPA's risk assessment policy and regulations. I was also appointed by EPA to represent industry on advisory committees to develop screening and testing methodology to evaluate the potential effect of environmental exposures on the endocrines systems of humans and wildlife and children's health.

From 1994-1999, I was the Global R&D Development and Regulatory Affairs Manager in the FMC Corporation's Agricultural Products Group headquarters in Philadelphia, Pa. During that time I coordinated global registrations and product development for new and existing pesticide products. I also provided regulatory support for the business sectors and managed data composition and distributor supplier contracts.

From 1991-1994, I was the Discovery R&D Manager External Resources and Screening manager for the FMC Corporation's Agricultural Products Group that was located in Princeton. NJ. During that time my responsibilities included managing chemists and biologists in synthesizing and isolating new agrochemical chemicals. I was also responsible to develop high through put screening and testing methodology to discover new product leads from synthetic chemical and naturally occurring sources (e.g., microbial fermentation sources, spider venoms, plant extracts, etc.). I was also responsible for negotiating/executing R&D contracts to secure large blocks of chemicals for screening and testing from universities, pharmaceutical and chemical companies.

From 1988-1991, I was the New Leads Discovery Manager for FMC Corporation's Agricultural Products Group in Princeton, NJ. During that time, I directed a team of synthetic chemists, and also had responsibility for natural products discovery, the microbiology and the NMR laboratories, and the negotiation execution of Compound Acquisition and R&D contracts.

From 1985-1988, I was a Synthesis Insecticide Manager for FMC Corporation's Agricultural Products Group in Princeton, NJ. During that time, I managed 20 synthetic chemists involved in the discovery and optimization of new insecticides.

From 1983-1985, I was a Senior Discovery Research Chemist for FMC Corporation's Agricultural Products Group in Princeton, NJ. During that time I was responsible for identifying and optimizing new insecticide leads.

2

**EXHIBIT M**
**PAGE 372**

From 1977-1983, I was a Senior Process Research Chemist for the Merck Pharmaceutical Company in Rahway, NJ.  During that time, I was responsible for researching new chemical processes and analytical procedures for experimental pharmaceutical development candidates and optimizing/improving pharmaceutical manufacturing processes.

From 1976 to 1977, I was a Senior Chemist for Smith Kline French in Philadelphia, Pa.  During that time, I was responsible for synthesizing new drug chemical candidates, and to develop new chemical syntheses to optimizing and improving pharmaceutical manufacturing.

From 1967 after graduating from Rutgers and until to 1972 when I left to return to graduate school, I was an associate chemist for Hoffmann-La Roche in Nutley, NJ.  During that time I assisted in the syntheses of experimental pharmaceuticals and the development of new synthetic methods

3

**EXHIBIT M**

**PAGE 373**

**ATTACHMENT 4**
**ANGELINA DUGGAN EXPONENT CV**



## E$^x$ponent®
Engineering & Scientific Consulting

### Angelina J. Duggan, Ph.D.

Senior Managing Scientist | Health Sciences
3440 Market Street, Suite 600 | Philadelphia, PA 19104
(646) 660-2677 tel | aduggan@exponent.com

## Professional Profile

Dr. Duggan is an organic chemist and toxicologist. She has more than 30 years of experience in pharmaceutical and chemical product development, project management, product stewardship, environmental risk assessment, and regulatory support for compliance with the Toxic Substances Control Act (TSCA) and the Federal Insecticide and Fungicide and Rodenticide Act (FIFRA). Dr. Duggan specializes in applying a multidisciplinary approach to risk assessment that considers toxicology, exposure, biomonitoring, metabolism, and chemical properties. Her product support expertise includes industrial chemicals, pesticide active ingredients and inert surfactants, fragrances, dyes, medical devices, pigments, nanomaterials, and environmental contaminants.

Dr. Duggan has successfully applied her academic and industrial background in synthetic natural products chemistry and pharmaceutical process chemistry to intellectual property/patent infringement cases, litigation, and regulatory support. She is also experienced in the synthesis and isolation/structure elucidation of naturally occurring compounds, and has managed pharmaceutical and agrochemical screening programs of natural products derived from marine plants and animals (venoms) and microbial fermentation broths and plants (pharmacognosy).

Dr. Duggan is accomplished in applying her chemistry and toxicology experience to evaluate Structure Activity Relationships (SARs), cluster analysis, and read-across strategies for TSCA regulatory support (Low Volume Exemptions, Premanufacturing Notifications, Polymer Exemption Files), FIFRA (pesticide inert tolerance exemption petitions), and REACh applications. Her regulatory experience includes endocrine disruption science policy and project management and regulatory support for Endocrine Disruption Screening Program (EDSP) test orders, screening support, and the development of EDSP Other Significant Regulatory Information (OSRI) analyses. Her project management experience includes multi-disciplinary litigation teams, discovery research and development, process chemistry, and global registration and product stewardship

Before joining Exponent, Dr. Duggan provided scientific guidance for Washington, D.C. trade associations, as well as 50 pesticide and chemical manufacturers and formulators, regarding EPA and state regulations and human health science and policy. EPA also appointed her to provide science and policy for the Endocrine Disruption Screening and Testing Advisory Committee (EDSTAC), as well as the Children's Health Protection Advisory Committees. She has also provided technical leadership and expert opinions for task forces and project teams to address endocrine disruption, cancer risk assessment, farm family risk, worker exposure, pesticide human testing, and chemical inert surfactants tolerance reassessments.

4

**EXHIBIT M**
**PAGE 374**

Dr. Duggan can effectively communicate risk assessment issues and complex technical issues to scientists and non-scientists. She has presented and provided written public comments at EPA workshops and to science advisory panels and boards. Dr. Duggan has also oral and written comments to EPA and organized the submission of numerous technical and regulatory science policy papers to EPA's Public Docket. She has also presented safety product profiles internationally to Latin American, European, and Asian regulators.

## Academic Credentials & Professional Honors

Ph.D., Marine Natural Products, Synthetic Organic Chemistry, Rutgers University, 1974

M.S., Organic Chemistry, Rutgers University, 1972

B.A., Biology and Chemistry, Rutgers University, *with honors*, 1967

N.I.H Postdoctoral Fellow: Natural Products Synthesis, Isolation and Structure Elucidation, Cornell University, 1976

N.I.H. Predoctoral Fellow, Rutgers University, 1972-1974

## Academic Appointments

Drexel University Biocompatibility Seminar Speaker

Adjunct Chemistry Lecturer, Rutgers University Newark, NJ, 1974

## Prior Experience

Human Health Science and Policy Leader and Director Science Policy, CropLife America (formerly America Crop Protection Association), 1999-2005

Global R&D Development and Regulatory Affairs Manager, FMC Corporation Agricultural Products Group, 1994-1999

Discovery Manager External Resources and Screening, FMC Corporation Agricultural Products Group, 1991-1994

New Leads Discovery Manager, FMC Corporation Agricultural Products Group, 1988-1991

Synthesis Manager, Insecticides, FMC Corporation Agricultural Products Group, 1985-1988

Senior Discovery Research Chemist, FMC Corporation Agricultural Products Group, 1983-1985

Process Research Senior Chemist, Merck, 1977-1983

Process and Medicinal Research Senior Chemist, Smith Kline French/Beecham, 1976-1977

Associate Chemist, Hoffmann-La Roche, 1967-1972

## Professional Affiliations

American Chemical Society

CropLife America

5

Phi Beta Kappa

Sigma Xi

Society of Toxicology

## Patents

Patent 4,895,871: Benzoheterocyclyl ketone hydrazone insecticides, 1989 (with J.F. Engel and K.A. Lutomski).

Patent 4,767,779: Pyrazoline insecticides, 1988.

Patent 4,622,408: Vinyl phenylthiocarbonate, 1986.

Patent 4,272,440: New process for preparing hydroxyphenylpyridazinones, 1978 (with R.L. Webb).

## Publications

Tsuji JS, Duggan AJ, Mowat FS. Beyond buckyballs: Nanomaterial product growth amidst regulatory uncertainty. Bloomberg BNA Product Safety and Liability Reporter, February 13, 2012.

Duggan A, Snedeker S, Zambrone F. Sessions on the toxicology of agricultural exposures and cancer. Scandinavian J Work Environ Health 2005; 31:119.

Charnley G, Chukwudebe A, Chen W, Duggan A, Hawk R, Krieger RI, Ross J, Yarborough C. Di-alkyl phosphate biomonitoring data: Assessing cumulative exposure to organophosphate pesticides. Regul Toxicol Pharmacol 2003; 37:382.

Cardona R, Duggan A, Gordon E, Stevens E, Tobia A. ACPA perspective on EPA's cancer risk assessment policy in light of the proposed 1996 guidelines for carcinogen risk assessment. Risk Policy Report, September 22, 2000.

Hughes PR, Wood HA, Breen JP, Simpson SF, Duggan AJ, Dybas JA. Enhanced bioactivity of recombinant baculovirus expressing insect-specific spider toxins in lepidopteran crop pests. J Invertebrate Pathol 1997; 69:112.

Duggan AJ, Grabowski EJJ, and Russ WK Jr. Phase — Transfer mediated heteroaromatic nucleophilic substitution: introduction of a beta-adrenergic blocking moiety. Synthesis 1981; 573.

Adams MA, Duggan AJ, Smolanoff J, Meinwald J. The total synthesis of (+/-) pederamide. J Am Chem Soc 1979; 101:5374.

Duggan AJ, Roberts FE. A facile preparation of a VOC reagent, vinyl phenylthiocarbonate. Tetrahedron Lett 1979; 595.

Adams MA, Duggan AJ, Meinwald J. Synthesis of ethyl 1,3,6-trioxaspiro-(4.5) decane-4-carboxylate derivatives from delta - lactones (preparation of 2-methoxy-2- glycolamide-tetrahydro-2H-pyran; elaboration of pederamide side chain). Tetrahedron Lett 1978; 4327.

Adams MA, Brynes PJ, Duggan AJ, Meinwald J. Reaction of enolate anions with lactones. Tetrahedron Lett 1978; 4323.

Duggan AJ, Hall SS, Weber GF. Relative reactivity of substituted 2-alkoxy and 2-phenoxy-3,4-dihydro-2H-

6

EXHIBIT M
PAGE 376

pyrans with tert-butyl hypochlorite: Effect of substituents on reactivity and products. J Org Chem 1978; 43:667.

Duggan AJ, Hall SS. Addition of tert-butyl hypohalites to 3,4-dihydro-2H-pyran and its 2-alkoxy 6-methyl derivatives in hydroxylic solvents. J Org Chem 1977; 42:1057.

Duggan AJ, Eisner T, Kinnel R, Meinwald J, Miura I. Panacene: An aromatic bromoallene from a sea hare (Aplysia brasiliana). Tetrahedron Lett 1977; 3913.

Adams MA, Duggan AJ, Meinwald J. An adventitious synthesis of pederolactone. Heterocycles 1977; 7:989.

Duggan AJ, Hall SS. 3-Alkoxy-2-oxanorcarenes: synthesis of cyclopropanes from labile olefins using an improved lithium ammonia reduction procedure on the dichlorocarbene adducts. J Org Chem 1975; 40:2238.

Duggan AJ, Hall SS. The chemistry of 2-alkoxy-3,4-dihydro-2H-pyrans III: synthesis and solvolysis of the dichlorocarbene adducts 3-alkoxy-2-oxa-7,7-dichloro-norcaranes. J Organ Chem 1975; 40:2234.

Duggan AJ, Hall SS. The Chemistry of 2-alkoxy~3,4-dihydro-2H-pyrans II: addition of dimethyl acetylenedicarboxylate. J Org Chem 1974; 39:3432.

Borer R, Duggan AJ, Muller R, Rosenberger M, Saucy G. Steroid total synthesis part 8;

(+/-) - Estr4-ene-3,17- dione. Helvetica Chemica Acta 1972; 55:2663.

Duggan AJ, Rosenberger M, Saucy G. Steroid total synthesis part 7; (+/-) -Estr-4-ene-3, 17-dione and (j) 1 3-ethyl-gon-4-ene-3, 1 7-dione. Helvetica Chemica Acta 1972; 55:1333.

Rosenberger M, Andrews D, DiMaria F, Duggan AJ, Saucy G. Synthesis of delta-lactones from gluteraldehyde. Helvetica Chemica Acta 1972; 55:249.

**Book Chapters**

Duggan A. Putting the toxicology and risk assessment of approved organic pesticides in perspective. American Chemical Society Symposium Series 947: Crop Protection Products for Organic Agriculture, Environmental Health and Efficacy Assessment, 2006.

Duggan AJ. Endocrine issues update: pesticide formulations and application systems. 18th Volume, ASTM STP 1347, Monograph of the proceedings American Society for Testing and Materials, Pesticide Formulations and Application Systems San Diego, CA, October 1997.

**Recently Published Abstracts**

Duggan A, Siskey R, Kurtz S. Risk assessment of the biocompatibility of Vitamin E blended. 5th UHMWPE International Meeting, Philadelphia, PA, 2011.

Duggan A, Johnston J, Messina J, Akkari K, Hillebold D, Lindner G, McCain P. Use of cluster analysis in pesticide inert ingredient risk assessment. 50th Annual Society of Toxicology Meeting, San Francisco, CA, Abstract 1526, The Toxicologist 2011; 116(1):328.

Duggan A. Applying cluster analysis to pesticide inert tolerance reassessment. American Chemical Society National Meeting, San Francisco, CA, March 2010.

Duggan A, Messina J. The Joint Inerts Task Force (JITF), an effective task force model. American Chemical Society National Meeting, San Francisco, CA, March 2010.

7

EXHIBIT M
PAGE 377

Duggan AJ, McIntosh LJ. Challenges in Applying Computational Structure-Activity Relationship (SAR) modeling for predicting toxicological endpoints for risk assessment. 46th Annual Society of Toxicology Meeting, Salt Lake City, UT. Abstract 190, The Toxcologist. 114(1):41.

Duggan AJ, McIntosh LJ. Challenges in applying computational, Structure-Activity Relationship (SAR) modeling in predicting toxicology for risk assessment. EPA The First ToxCast Data Analysis Summit, Research Park, NC, May 2009.

Kaetzel RS, Teta MJ, Wagner LM, Duggan A, Sweeney L, Gargas M. An evaluation of early-life susceptibility and exposures to ethylene oxide. 49th Annual Society of Toxicology Meeting, Charlotte, NC. Abstract 1617. The Toxcologist; 96(1):334.

Bloemen L, Duggan A. Lessons for the European pilot project from biological monitoring programs in the chemical industry. BIOmonitoring (ESBIO) Lisbon, Portugal, April 2006.

Duggan A. Regulatory science and risk assessment of endocrine-active substances. Presented at the IUPAC-KSPS International Workshop on Pesticides 2003, Seoul, Korea, October 2003.

Duggan A. Putting the toxicology and risk assessment of approved organic pesticides in perspective. American Chemical Society National Meeting, New Orleans, LA, March 2003.

Duggan A. To what extent have we known about endocrine disruption chemicals? 3rd International Symposium on Environmental Endocrine Disrupters co-sponsored by the Japan Society of Endocrine Disrupter Research (JSEDR) and the Japan Environment Agency (JEA) Yokohama, Japan, December, 2000.

**Selected Presentations**

Duggan A. Risk assessment of the biocompatibility of Vitamin E Blended. 5th UHMWPE International Meeting, Philadelphia, PA, 2011.

Duggan A. Applying cluster analysis to pesticide inert tolerance reassessment. American Chemical Society Meeting, San Francisco, CA, March 2010.

Duggan A. Biocompatibility: Risk analysis and safety evaluations, a risk assessor's perspective. Drexel University, Philadelphia, PA, May 2008, May 2009, May 2010, May 2011, and May 2012.

Duggan A. Historical perspective of the endocrine disruption issue, EDSTAC and validation. Chair Session One: Background on the Endocrine Screening (EPA's EDSP Tier I), International Society of Regulatory Toxicology and Pharmacology, NIH Bethesda, MD, February 2008.

Duggan A. Consortia/Task Forces/SIEFS: Challenges in participation and organization. Personal Care Products Council REACH Symposium, Washington, DC, February 2008.

Duggan A. Interpreting biomonitoring in the context of risk assessment and liability. NJ Chapter of Society of Woman Environmental Professionals, Newark, NJ, January 2008.

Duggan A. Biocompatibility: Risk analysis and safety evaluations, a risk assessor's perspective. Drexel University, Philadelphia, PA, June 2007.

Duggan A. Interpreting biomonitoring in the context of risk assessment, introductory remarks. Presented at Society of Risk Analysis, Baltimore, MD, December 2006.

Duggan A. Regulatory science and risk assessment of endocrine-active substances. Presented at the IUPAC -KSPS International Workshop on Pesticides 2003, Seoul, Korea, October 2003.

8

**EXHIBIT M**
**PAGE 378**

Duggan A. Putting the toxicology and risk assessment of approved organic pesticides in perspective. Presented at the American Chemical Society National Meeting, New Orleans, LA, March 2003.

Duggan A. Toxicology rappateur. International Symposium on Agricultural Exposures and Cancer. Presented at Oxford University, Oxford, UK, November 2002.

Duggan A. The value of human data in conducting safety assessments. Presented at Chemicals Manufacturers and Distributor Association (CPDA) Annual Meeting, Washington, D.C., February 2001.

Duggan A. What are the actual risks to children and EPA regulation of pesticides. Presented and moderated expert panel discussion on children's health issues at the Responsible Industry for a Sound Environment (RISE) Annual Meeting, Palm Springs, FL, September 2001.

Duggan A. FQPA science and policy implications. Presented to the Agricultural Company and Banana Company Task Force, San Jose, Costa Rica, May 2000.

Duggan A. Industry perspective: To what extent have we known about endocrine disruption chemicals? Presented and participated on panel discussion, 3rd International Symposium on Environmental Endocrine Disrupters, co-sponsored by the Japan Society of Endocrine Disrupter Research (JSEDR) and the Japan Environment Agency (JEA), Yokohama, Japan, December, 2000.

Duggan A. US and EU endocrine disruption policy — Implications for Japan and children's health initiatives: Potential emerging global policy issue. Presented to the Japanese Chemical Industry Association (JCIA) Tokyo, Japan, December 2000.

Duggan A. Endocrine Disruption Screening and Testing Committee (EDSTAC) update on priority setting. Presented at Chemical Manufacturers Association (now known as the American Chemistry Council, ACC) Endocrine Issues Science Forum, November 1999.

Duggan A. Evaluation of the endocrine disruption theory. Presented at University of Hawaii, Honolulu, Hawaii, July 1998.

Duggan A. Evaluation of the endocrine disruption theory. Presented Rutgers University New Brunswick, NJ, April 1998.

Duggan A. Progress report on the Endocrine Disruption Screening and Testing Committee (EDSTAC). Presented to Illinois EPA and Illinois Chemical Manufacturers Association, Chicago, IL, June 1997.

Duggan AJ. Endocrine issues update: pesticide formulations and application systems. Presented at American Society for Testing and Materials, Pesticide Formulations and Application Systems, San Diego, CA, October 1997.

Duggan A. Industry perspective on the endocrine disruption theory. Presented and participated in a panel discussion at the Responsible Industry for a Sound Environment (RISE) Annual Meeting, Washington, D.C., September, 1997.

Duggan A. Endocrine disruption screening and testing advisory committee update. Presented at the American Crop Protection Association (now known as CropLife America, CLA) Spring Conference, May 1997.

## Project Experience

Successfully defended several pharmaceutical intellectual property patent challenges. In doing so, provided intellectual property technology assessment and written expert declarations for alternative syntheses, process chemistry, and manufacturing.

9

**EXHIBIT M**
**PAGE 379**

Provided technical support for dietary supplement and industrial chemical litigations

Provided technical support for chemical toxic tort litigation and contributed to the development of expert witness summaries of ethylene oxide.

Experienced and trained in media relations. Provided oral interviews and written statements to trade publications and the press.

Presented oral and written public comments on EPA regulatory science and policy to the FIFRA Science Advisory Panel, Federal Advisory Committees, EPA Science Advisory Board, and at EPA technical briefings and workshops.

For several FDA medical device submissions, evaluated biocompatibility and component chemicals, properties and related impurities.

Developed and optimized chemical synthetic processes for pilot plant production and manufacturing.

Developed procedures and analyses to support the synthesis, isolation and structure elucidation of natural products.

Developed screens to evaluate natural products derived from marine plants and animals (venoms) and microbial fermentation broths and plants (pharmacognosy) and spider venoms as synthetic chemical leads for pharmaceutical and agrochemical product development-

Had managerial responsibility for the robotic screening laboratory and developed procedures and screens to identify new agrochemical products.

Completed the chemical characterization and cluster analysis of the Research Institute of Fragrance materials (RIFM) fragrance ingredients database. Also prepared group summaries for specific classes of fragrance ingredients.

Developed and applied read-across strategies, organizing chemical cluster groups and structure-to-activity analyses, in support of data development plans for FIFRA, TSCA, and REACh regulatory applications.

Appointed to serve on EPA Advisory Committee with other stakeholders to develop endocrine disruption screens and tests.

Provided FIFRA human health risk assessment science and policy guidance for Washington, DC, trade pesticide association composed of more than 50 member companies (basic and generic manufacturers), formulators, and distributors regarding crop and non-crop uses of pesticide products at both the federal and state level.

Managed negotiations to address EPA Developmental Neurotoxicity Testing Data Call-in for more than 30 organophosphate insecticides.

Project management, risk assessment, and regulatory support experience for pesticide formulation inert ingredients, pesticide active ingredients, nanomaterials, industrial chemicals, polymers, monomers, dyes, pigment, fragrance ingredients, and medical devices.

Prepared regulatory strategies and submissions for Toxic Substances Control Act (TSCA) 5e PMN; for Pre-Manufacture Notices (PMNs; Low Volume Exemptions (LVEs); Polymer Exemption Files, and High Production Volume (HPV) testing.

Developed risk communication strategies and prepared written responses for a broad array of EPA

10

EXHIBIT M
PAGE 380

science and risk assessment regulations and policy that included Food Quality Protection Act.

Wrote and organized numerous science policy and technical papers for the EPA Public Docket relating to the use of human data in risk assessment, FQPA 99.9 percentile of regulation, FQPA aggregate and cumulative risk assessment,, EPA's aging initiative, endocrine disruption (priority setting, screening, and validation), biomonitoring, cancer risk assessment, , human testing, endocrine issues, developmental neurotoxicity testing (DNT), environmental exposure and disease links for children's health, and farm family exposure.

Served as Technical Project Manager for the Joint Inerts Task Force (JITF) to fulfill the1996 Food Quality Protection Act and the revocation of pesticide inert ingredient tolerance exemptions data requirements This 3-year project successfully met the EPA tolerance reassessment requirements for pesticide surfactants (inert ingredients) without the cancellation of any tolerance exemptions. The JITF regulatory and management responsibilities required organizing cluster groupings for various chemicals and overseeing the preparation of more than 18 data development plans and petitions for the chemically diverse classes of surfactants used in pesticide formulations.

Developed and submitted a Significant New Alternatives Policy (SNAP) application to the US EPA office of Air and radiation to gain approval for a safer polyurethane foam blowing agent to replace the use of ozone-depleting chemicals.

Provided regulatory and project management support for Endocrine Disruption Screening and Testing Program (EDSP) Tier 1 Other Scientifically Relevant Information (OSRI) submissions and List 1 screening results to EPA for several pesticide products.

Served on the Exponent Institutional Review Board to evaluate protocols, ethical aspects (informed consent and questionnaires), and safety considerations for observational studies involving human participants.

Successfully responded to toxicology and chemical polymer degradation issues raised in expert witness testimony in dental device manufacturing litigation.

Conducted due diligence for toxicology and product chemistry regulatory studies.

Provided chemical assessment expertise to support environmental forensics for 1,2,3 trichloropropane.

Represented pesticide and chemical industries, and provided presentations, at international symposiums on endocrine disruption, children's health, agrochemical cancer epidemiology, and biomonitoring.

Project manager for development of multi-million-dollar FQPA risk assessment software, the Cumulative Aggregate Risk Evaluation System (CARES).

Participated in global pesticide product stewardship and safety audits. Met with international regulators to remediate product-specific human health and environmental safety concerns. Also wrote the activity/conditions assessment checklist and criteria to audit U.S. and international formulation/manufacturing plants and product supply/distributor business partners.

Provided project management for global regulatory affairs, product safety and development, including FIFRA 6(A)(2) and international conventions such as FAO Code of Conduct, Prior Informed Consent (PIC), Persistent Organic Pollutants (POPs), and CODEX Alimentarius (FAO and WHO food standards).

Provided product-specific presentations and written communications to U.S. EPA and international government authorities in Australia, Canada, Latin America (Brazil, Costa Rica, Guatemala, and Mexico), EU countries, and throughout Asia (including Korea, North Vietnam, India, China, Pakistan, Philippines, Indonesia, and Thailand) that saved multi-million-dollar product registrations.

11

EXHIBIT M
PAGE 381

Provided project management, work plans, and timelines and negotiated intellectual property agreements for university and industrial partner research and development contracts that included discovery research and pharmaceutical uses of agrochemicals.

Managed strategic planning and implementation of agrochemical biotechnology and research and development discovery screening projects for natural products and synthetic chemicals.

Collaborated with laboratory and field biologists, toxicologists, metabolism and environmental scientists, and business development staff to address field efficacy, toxicology, and environmental safety issues, and the economic viability of insecticide, fungicide, and herbicide development candidates.

Secured and managed major contracts to acquire large blocks of chemicals from universities, small companies, and major pharmaceutical and agrochemical companies to support an automated high-throughput screening laboratory.

Project manager for two $3 million biotechnology discovery contracts evaluating spider venoms and fermentation broths. Directed research of multi-disciplinary teams of company and external scientists, which resulted in patentable new leads and genetically engineered (baculovirus) insecticide product candidates.

Significant line management experience in developing research programs and preparing budgets for more than two dozen scientists involved in all phases of agrochemical discovery research and product development, which included responsibility for external research programs and robotic high-throughput screening, microbiology, NMR, HPLC analysis, and chemical synthesis laboratories.

## Advisory Appointments

International Society of Regulatory Toxicology and Pharmacology Board Councilor (Since 2005)

ILSI International Biomonitoring Symposium (2004)

International Life Sciences (ILSI) CARES Steering Committee (2004-2005)

Children's Health Protection Advisory Committee (2001-2005)

Harvard Center for Risk Analysis Advisory Committee  (2002)

American Crop Protection Association (now CropLife America) Biotechnology Steering Committee (1997)

EPA Endocrine Disruption Screening and Testing Advisory Committee (1996-1998)

## Peer Reviewer

Journal of Organic Chemistry

International Society of Exposure Assessment

Regulatory Toxicology and Pharmacology

Synthesis

12

**EXHIBIT M**

**PAGE 382**

**Attachment 5**

**Consulting Services
Rates & Charges**

Exponent charges $265/hour for Dr. Angelina Duggan's professional services.

The Exponent Schedule of Rates and Charges are included below.

13

EXHIBIT M
PAGE 383

# SCHEDULE OF RATES AND CHARGES

E$^x$ponent

## PROFESSIONAL FEES

Exponent charges its clients for services provided according to the qualifications and experience level of the individuals assigned to the client's project at each employee's specific current hourly rate. These rates are modified annually on or about January 1. Exponent provides the following staff classifications that designate relative experience, training, and accomplishment within a technical field, together with the range of hourly rates. Payment is required in U.S. dollars within 30 days after the date of the invoice, or interest charges may be applied.

| | | |
|---|---|---|
| Principal/Officer | Senior-level technical or management person, responsible for technical direction or general management or administration. | $275–$750 |
| Senior Manager | Senior technical professional providing high-level or individual consulting assignments, or overall technical direction of projects, may have management responsibility for a technical field. | $250–$500 |
| Manager | Senior technical professional providing high-level or individual consulting assignments or overall technical direction of projects. | $200–$425 |
| Senior Engineer/ Scientist/Associate | Experienced technical professional skilled in planning, organizing, controlling, and executing complex, higher-order projects or assignments. | $175–$325 |
| Engineer/Scientist/ Associate | Trained/degreed professional responsible for executing technical assignments in support of client projects. | $150–$275 |
| Technical/Research Specialist | Personnel experienced in instrumentation, programming, testing, library science, or the development or execution of research methodologies in support of projects. | $135–$200 |
| Technical/Research Assistant | Laboratory, data processing, engineering-graphics, engineering technician, or other personnel responsible for the execution of specialized tasks in support of projects. | $90–$150 |
| Non-technical Assistant | Personnel who assist technical staff in various non-technical areas, including scheduling, report productions, communications, logistics, and project support. | $ 75–$125 |

## TECHNICAL EQUIPMENT, SOFTWARE AND LAB CHARGES

Exponent personnel may utilize Exponent's technical equipment and software to assist them in the performance of client's project. Exponent charges an hourly or daily usage fee for selected equipment, software and labs (e.g., scanning electron microscope, finite element software and biomedical laboratory).

## TRAVEL AND MEAL EXPENSES

Travel and meal expenses are charged at Exponent's cost. Local mileage is charged in accordance with I.R.S. guidelines. The most effective air travel for the project will be utilized and personnel below the Principal classification will charge coach fares.

## OTHER PROJECT EXPENSES

Project expenses including materials, subcontractors and third-party vendors are charged at cost plus fifteen percent. If the client prefers to procure the project expenses directly to avoid the additional fifteen percent charge then notify Exponent at the initiation of the engagement. Consumable materials may be charged on an applied rate rather than an incurred cost basis.

Rev. 010217

EXHIBIT M
PAGE 384