UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOYMA VANESSA MICHEL, an individual,<br><br>                              Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA, B. GIBBONS, an individual, E. GARZA, an individual, G. GARCIA, an individual, SAFARILAND, LLC, a Delaware limited liability company, AND DOES 1 THROUGH 100, inclusive,<br><br>                              Defendants. | Case No.:  16CV277-GPC(AGS)<br><br>**TENTATIVE ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT SAFARILAND, LLC'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>**[Dkt. Nos. 50, 53.]** |

Before the Court are Defendant Safariland, LLC's motion for summary judgment filed on July 21, 2017 and Plaintiff's motion for partial summary judgment against Safariland, LLC, filed on July 24, 2017.  (Dkt. Nos. 50, 53.)  The motions are fully briefed and a hearing is set on calendar for September 8, 2017.  After a review of the briefs, supporting documentation and the applicable law, the Court issues the following tentative ruling in advance of Friday's hearing granting in part and denying in part Defendant Sarfariland, LLC's motion for summary judgment and denying Plaintiff's motion for partial summary judgment.

## Procedural Background

On February 2, 2016, Plaintiff Doyma Vanessa Michel ("Plaintiff" or "Michel") filed a complaint against Defendant United States of America, three individual Government defendants, and Defendant Safariland, LLC ("Safariland") claiming she was wrongfully arrested and detained in jail for over six months based on a "positive" test result for methamphetamine generated by a field drug test kit called Narco Pouch 923, manufactured by Safariland, on four bottles containing a liquid substance found in her vehicle while crossing the San Ysidro Port of Entry, which later confirmed by laboratory testing to be negative for methamphetamine. (Dkt. No. 1.) A first amended complaint was filed. (Dkt. No. 6.) Pursuant to a joint motion by the parties, Michel filed a second amended complaint on June 29, 2017. (Dkt. Nos. 20, 22.) On August 2, 2016, Michel filed a notice of voluntary dismissal as to the individual Government defendants, B. Gibbons, E. Garza and G. Garcia. (Dkt. No. 29.)

The SAC alleges three causes of action against Defendant Safariland on the eighth cause of action for negligence - design defect and failure to warn; ninth cause of action for product liability - design defect[1]; and tenth cause of action for unfair business practices pursuant to California Business & Profession Code section 17200 *et seq.* (Dkt. No. 22 at 8-11.) On July 21, 2017, Safariland moved for summary judgment on the three causes of actions against it. (Dkt. No. 49.) On July 24, 2017, Plaintiff filed a motion for

---

[1]Plaintiff moves for summary judgment on solely the ninth cause of action for product liability for design defect and failure to warn. (Dkt. No. 53 at 2; Dkt. No. 53-1 at 6.) In opposition, Safariland argues that the ninth cause of action for product liability alleged in the SAC only asserts a claim for defective design and not a failure to warn. (See Dkt. No. 22, SAC ¶¶ 68-72.) Plaintiff does not address this argument in her reply and continues to seek summary judgment on product liability based on a failure to warn. As a threshold issue, a court may not consider a claim that is not alleged in the complaint. Trishan Air, Inc. v. Federal Ins. Co., 635 F.3d 422, 435 (9th Cir. 2011) (affirming dismissal of claim that was raised for the first time in opposition to summary judgment); Navajo Nation v. U.S. Forest Serv., 535 F.3d 1058, 1080 (9th Cir. 2008) ("[O]ur precedents make clear that [when] the complaint does not include the necessary factual allegations to state a claim, raising such claim in a summary judgment motion is insufficient to present the claim to the district court."). However, even if Plaintiff asserted a claim for strict liability failure to warn, the claim would be barred under the sophisticated intermediary defense discussed below.

partial summary judgment on the ninth cause of action for product liability based on design defect and a failure to warn.  (Dkt. No. 53.)

### Factual Background

On June 2, 2014, Customs and Border Protection ("CBP") Officer Eduardo Garza ("Officer Garza"), assigned to an Anti-Terrorism Contraband Enforcement Team, was conducting a pre-primary roving inspection at the San Ysidro Port of Entry when he encountered Plaintiff who was driving a black 2001 Audi A4.  (Dkt. No. 60-1, D's Response to P's SSUMF, Nos. 1, 2; Dkt. No. 61-2, P's Response to D's SSUMF, Nos. 1, 2.)  Officer Garza observed visible signs of nervousness from Michel; he noted that her hands were shaking, she avoided making eye contact, and he could see her carotid artery pulsing in her neck.  (Dkt. No. 61-2, P's Response to D's SSUMF, No. 3.)   Michel handed Officer Garza a valid U.S. passport and informed him that she was on her way to a smog check.  (Dkt. No. 60-1, D's Response to P's SSUMF, No. 3.)  Another CBP officer observed a bottle stuffed inside a black sock hidden between the glovebox and the firewall.  (Dkt. No. 61-2, D's Response to P's SSUMF, No. 4.)  Michel claimed she did not know what was in the bottle.  (Id.)  Based on Officer Garza's training and experience, he believed the bottle containing the liquid substance resembled liquid methamphetamine.  (Id.)  Michel and her vehicle were then escorted to secondary inspection, and during the escort, she recalled the content of the bottle to be a substance used to make cheese.  (Id., No. 5.)  When asked why she concealed it, she had no response.  (Id.)

At secondary, Garza conducted a test of the bottle of brown liquid using a field drug test kit.  (Dkt. No. 60-1, D's Response to P's SSUMF, No. 9.)  He stated that the test looked similar to the NarcoPouch 923 test.  (Id., No. 10.)  Officer Garza believed that if the test was positive, it was methamphetamine as that is what he had been taught.  (Dkt.

No. 53-7, P's Index of Exs., Ex. 2, Garza Depo. at 34:22-35:8[2].)  Officer Garza also knew that all field drug tests were sent to the lab to get retested for confirmation and that a positive test result, by itself, was not probable cause to arrest.  (Id. at 46:9-47:7; 49:1-11.) Officer Garza placed Michel in handcuffs and escorted her to the security office.  (Dkt. No. 60-1, D's Response to P's SSUMF, No. 14.)

CBP Officer Brandon Gibbons ("Officer Gibbons") conducted a thorough inspection of Michel's vehicle.  (Dkt. No. 61-2, P's Response to D's SSUMF, No. 6.)  He observed a bulge under the seat cover of the driver's seat and when he removed the seat cover, he found a one plastic bottle containing a "thick yellowish substance" and two glass tequila bottles strapped to the seat.  (Id.)  He found another plastic bottle of the thick liquid substance concealed in a black sock and hidden behind the driver's dashboard and another concealed inside the trunk.  (Id.)  A total of four plastic bottles of the thick liquid substances and seven bottles of Tequila were located in the car.  (Id.)  All four bottles tested positive for methamphetamine.  (Dkt. No. 50-4, Smelser Decl., Ex. A, Bulman Inv. Report at 10[3].)

Officer Gibbons tested the contents of the four plastic bottles of suspected liquid methamphetamine using Narco Pouch 923, and a dark blue color reaction resulted indicating a positive result.  (Dkt. No. 60-1, D's Response to P's SSUMF, Nos. 17, 18; Dkt. No. 61-2, P's Response to D's SSUMF, No. 7.)  When a blue color reaction resulted from the field drug test kit, Garza believed the substance tested positive for methamphetamine.  (Dkt. No. 53-7, P's Index of Exs., Ex. 2, Garza Depo. at 34:22-35:1.) He also testified that that he knew that all narcotics were sent to the lab to get retested to confirm it's a narcotic.  (Dkt. No. 60-2, Smelser Decl., Ex. B, Garza Depo. at 49:1-11.)

---

[2] Deposition pages numbers are based on the pagination of the deposition transcript.
[3] Page numbers are based on the CM/ECF pagination with the exception of deposition transcript page numbers.

16CV277-GPC(AGS)

Officer Gibbons then arrested Michel.  (Dkt. No. 50-4, Smelser Decl., Ex. C, Gibbons Depo. at 20:25-21:9.)

The Scientific Working Group for the Analysis of Seized Drugs ("SWGDRUG") is an organization formed by the Drug Enforcement Agency ("DEA") and the Office of National Drug Control Policy and provides minimum standards for the forensic examination of seized drugs domestically and internationally.  (Dkt. No. 50-5, Smelser Decl., Ex. P.)  The SWGDRUG lays out guidelines to the DEA as to the minimum requirements needed and is based on what is accepted by the "scientific community. (Dkt. No. 50-4, Smelser Decl., Ex. F Ambriz Depo. at 14:6-21).  While the SWGDRUG guidelines are recommendations, they are incorporated into the CBP's analysis of drugs. (Dkt. No. 50-4, Smelser Decl., Ex. L, Malone Depo. at 64:3-12.)  The use of presumptive colorimetric testing is widely accepted by the scientific and forensic communities as well as the UN, U.S. Food and Drug Administration and the United States.  (Dkt. No. 50-5, Smelser Decl., Ex. U, Malone Report at 5, 8-11.)   The DEA, SWGDRUG and UN have determined that the proper screening or presumptive color test for methamphetamine is the Simon's Reagent Test, also known as a Sodium Nitroprusside test.  (Dkt. No. 61-2, P's Response to D's SSMUF, No. 25.)  This presumptive color test is used to test for secondary amines, such as methamphetamine and MDMA.  (Id.)

The NarcoPouch field drug test kits are a product line of kits that allow law enforcement agents, including DEA, to conduct presumptive color tests approved by the Scientific Working Group for the Analysis of Seized Drugs ("SWGDRUG"), Drug Enforcement agency ("DEA") and United Nations ("UN").  (Dkt. No. 50-2, Miller Decl. ¶ 4; Dkt. No. 50-5, Smelser Decl., Ex. U, Duggan Report at 8-11.)  The NarcoPouch 923 is a portable means by which to conduct a Sodium Nitroprusside or Simon's Reagent test, which tests for the presence of a secondary amine.  (Dkt. No. 61-2, P's Response to D's SSMUF, No. 8.)  The NarcoPouch has taken the presumptive color tests used and approved by government agencies and provided a convenient portable packaging method so that agents and officers can perform the approved presumptive color tests out in the

field without having to bring spot plates, petri dishes and bottles of chemicals and reagents. (Dkt. No. 50-2, Miller Decl. ¶ 4.)

Safariland did not invent the Sodium Nitroprusside test or discover that it could be used to presumptively identify methamphetamine. (Id. ¶ 6.) It simply invented a packaging method to allow officers or agents to perform the tests typically performed with petri dishes and bottles of reagents in a small pouch that they can hold in the palm of their hands. (Id.) The NarcoPouch 923 is a presumptive test that produces a color change based on the presence of a secondary amine. (Dkt. No. 60-1, D's Response to P's SSUMF, Nos. 109, 112, 113.) A presumptive test is neither definitive or certain. (Id., No. 11.) A presumptive test such as NarcoPouch 923 tests for a family of chemical compounds, or a series of related chemical compounds, some of which may be illegal substances, and many of which may not be illegal. (Id., No. 111.) With the NarcoPouch 923 test, if the chemical reaction with the substance produces a blue color change, then there is a secondary amine and if there is no secondary amine, then the color change is burgundy. (Id., No. 115.)

Officer Gibbons placed Plaintiff under arrest due to the positive test. (Dkt. No. 53-8, P's Index of Exs., Ex. 3, Gibbons Depo. at 21:21-23; 35:17-20.) Officer Gibbons then contacted Immigration and Customs Enforcement ("ICE") to have an agent conduct an interrogation and follow up on an investigation, which is a general practice at the port of entry. (Dkt. No. 60-1, D's Response to P's SSUMF, No. 21.) U.S. Homeland Security Investigations ("HIS") Special Agent Zachary Bulman ("Agent Bulman") was advised of the seizures and of Michel's arrest. (Dkt. No. 50-4, Smelser Decl., Ex. A, Bulman Inv. Report at 10.)

Agent Bulman advised Michel of her Miranda rights and she chose to make a voluntary statement without counsel. (Id.) Michel was interviewed for over an hour by Agent Bulman. (Id.) Prior to the interview, Agent Bulman conducted a records check which revealed prior attempts to smuggle items and people in the United States and that she crossed into the United States fifty-nine times in the prior six months. (Dkt. No. 61-

2, P's Response to D's SSUMF, No. 11.)  Based on his records check, she provided inconsistent statements about her whereabouts on previous border crossing, about the number of bottles of alleged "cuajo" she was attempting to bring in the United States, about large amounts of cash she had with her and deposited in a Wells Fargo bank account leaving the question open as to where and how she obtained such cash, lied three times about renting a storage locker and omitted information regarding visiting it on prior crossings and the contents of the storage locker.  (Dkt. No. 61-2, P's Response to D's SSUMF, No. 12.)

On June 3, 2014, HIS agents visited Michel's storage unit, with her consent, at Hilltop Main Self Storage where agents discovered 36 bottles of tequila and 15 plastic bottles of liquid substance that were similar in appearance to those found in her car. (Dkt. No. 50-4, Smelser Decl., Ex. A, Bulman Inv. Report at 5.)  A field drug test of three of those bottles came back presumptive for the presence of methamphetamine.  (Id.) Agent Bulman also obtained the activity logs which lists the inbound and outbound activity from the front gate of the facility.  (Id.) The dates and times Michel accessed the storage unit coincide with the dates and time she crossed into the United States.  (Id.)

On June 3, 2014, a criminal complaint was filed against Plaintiff for one count of knowingly and intentionally importing approximately 4.45 kilograms of methamphetamine, a schedule II controlled substance in violation of 21 U.S.C. §§ 952, 960.  (United States v. Doyma Vanessa Michel, Case No. 14cr1864-DMS, Dkt. No. 1.) On that same day, June 3, 2014, Plaintiff was brought before Magistrate Judge Jill L. Burkhardt for her initial appearance.  (Id., Dkt. No. 3.)

On June 9, 2014, DEA Chemist Alexandra Ambriz ("Ambriz") responded to the CBP vault at Otay Mesa, CA to conduct field tests on samples of the bottles seized from Michel's vehicle and her storage unit.  (Dkt. No. 61-2, P's Response to D's SSMUF, No. 17.)  At the vault, when Ambriz conducted a field test, the results came out positive. (Dkt. No. 50-4, Smelser Decl., Ex. A at 5-6.)

Ambriz is a senior forensic chemic at the DEA and her primary job duties include analyzing evidence for the presence or absence of controlled substances, writing reports based on such analyses and testifying in court. (Dkt. No. 60-1, P's Response to D's SSMUF, No. 76.)  She was trained for six months at the DEA laboratory in Chicago, Illinois and then received an additional one month training in Quantico, VA.  (Id., No. 77.)  She knew a presumptive test would not establish, to a degree of scientific certainty, the identity of the liquid being identified.  (Id., No. 78.)  She was taught that a field test or a presumptive test is not a confirmatory or a definitive test.  (Id., No. 82.)

On August 18, 2014, Ambriz received the samples from the evidence vault of the DEA laboratory.  (Id., No. 92.)  First, she conducted a Sodium Nitroprusside color test on the samples but this time used bottles of reagents and a spot plate instead of NarcoPouch 923.  (Dkt. No. 61-2, P's Response to D's SSMUF, No. 18.)  She again received a positive result.  (Id.)  She then conducted confirmative gas chromatography mass spectrometry ("GC/MS") testing on each of the samples and ultimately determined that the substances were not controlled substances.  (Id., No. 19.)  The GC/MS is the most common instrument for analysis used in the DEA laboratory and one of the most accurate.  (Id., No. 93.)   She completed the GC/MS test of the samples by September 10, 2014 which showed no presence of a controlled substance.  (Id., No. 95.)  She conducted additional GCFID[4] analysis after the GC/MS testing to make sure there was no other controlled substance in the sample that she could have missed.  (Id., No. 96.)  By September 29, 2014, Ambriz completed all GC/MS and GCFID testing and concluded with 95% confidence that there was no controlled substance in the samples.  (Id., No. 97.)  Ambriz identified a secondary amine in the substance which accounted for the positive results on the NarcoPouch 923 Sodium Nitroprusside test as well as the Sodium Nitroprusside test conducted de novo at the laboratory.  (Id., No. 20.)

---

[4] Neither party has explained this acronym or test nor does any party dispute its accuracy or reliability.

Over two months, later, on December 4, 2014, the AUSA moved to dismiss the information when it was confirmed that the substance in the plastic bottles was not methamphetamine but a lawful substance.  (United States v. Michel, Case No. 14cr1864-DMS, Dkt. No. 28.)  On December 8, 2014, the Court granted the government's motion to dismiss the information.  (Id., Dkt. No. 29.)  Plaintiff was released on December 9, 2014.  (Id., Dkt. No. 31.)

Officer Garza was trained at Federal Law Enforcement Training Center ("FLETC") for five months and there he learned about the use of field tests for the testing of controlled substances.  (Dkt. No., 53-7, P's Index of Exs., Ex. 2, Garza Depo. at 7:5-8:11.)  He testified that he was taught that if the field test was positive, then it was a controlled substance.  (Id. at 9:14-18.)  Garza also testified that he knew the drugs were all sent to the lab to be retested to make sure it is positive for drugs.  (Dkt. No. 60-2, Smelser Decl., Ex. B, Garza Depo. at 49:1-11.)  During the 10 years working at the San Ysidro Port of Entry, Officer Garza did not receive any additional formal class or seminar training regarding the use of field tests but he had on the job training and briefings on how to use the test kits.  (Id., Garza Depo. at 10:17-11:23.) One briefing addressed how to test the liquid they encountered and to be careful not to get the hazardous material on their hands.  (Id. at 12:12-24.)

Officer Gibbons received training at the FLETC in 2012 for about six months where he received training on field tests, including how to properly use the test kits and how to use the kits to test for different narcotics.  (Dkt. No. 53-8, P's Index of Exs., Ex. 3, Gibbons Depo. at 9:5-10; 10:23-11:6.)  Officer Gibbons was taught that the field tests were not a 100 percent accurate, not conclusive and the substance still had to be confirmed to be methamphetamine by the DEA lab.  (Id. at 11:22-12:1; 40:8-18.)

Agent Bulman also attended training at FLETC for about six months in 2008.  (Dkt. No. 60-3, Smelser Decl., Ex. D, Bulman Depo. at 12:9-25.)  He recalled a two hour block of training on the use of field drug test kits.  (Id.)  He also had additional on-the-job training regarding issues related to his work as a special agent.  (Id. at 14:13-23.)  He

knew the field drug tests needed to be confirmed at the DEA laboratory.  (See id. at 54:24-55:7; 61:12-62:8.)

Safariland's training material states that a color test alone in not sufficient to arrest and it only one factor among others in determining whether there is probable cause to arrest.  (Dkt. No. 60-1, D's Response to P's SSMUF, No. 117.)  The gold standard for confirmation of a particular substance is the GC/MS, gas chromatography mass spectrometry test.  (Id., No. 119.)  One of Safariland's training program is self-directed where an officer or agency could request training materials.  (Dkt. No. 53-11, P's Index of Exs., Ex. 6, Miller Depo. at 50:1-18.)  Safariland offers the training but it is up to the department or agency whether it wants to receive training.  (Id.)

Safariland's training material states that the 923 test is a test for the presence of secondary amines and both methamphetamine and ecstacy contain secondary amines.  (Dkt. No. 60-1, D's Response to P's SMMUF, No. 125.)  According to the training manual, "[f]ield tests are often misinterpreted as being the probable cause or to establish probable cause.  Instead, field testing is designed simply as confirmation of probable cause.  You must have already established some form of probable cause (offer for sale, looks like, priced like, offered as a particular substance) prior to starting your testing procedures."  (Dkt. No. 53-23, P's Index of Exs., Ex. 18 at 12.)  The training material further states that a "positive predictable color change is only a *presumed* positive result for the suspected compound;  in no way should the test results be considered a confirmation of identification.  Many man-made and natural chemicals could produce a positive indication for the presence of an illicit substance."  (Dkt. No. 53-23, P's Index of Exs., Ex. 18 at 12.)  Training materials also state that it "is important to note that all test results, positive or negative, should be confirmed by the crime laboratory."  (Id.)  It is not disputed that the training materials were not provided to the CBP.

The packaging of the NarcoPouch 923 box stated, "**Methamphetamine & MDMA Reagent**. A Presumptive Test for Methamphetamine and MDMA (Ecstasy). (Dkt. No. 50-2, Miller Decl., Ex. B at 21, 25.)  The instructional insert states that "All

suspect materials that do not produce a positive result should be sent to the lab for further testing." (Id., Ex. C at 27.)   The instructional insert also states "Always retain sufficient sample of suspect material for evidential analysis by the forensic laboratory." (Id., Ex. C at 28.)

## Discussion

### A.    Request for Judicial Notice

Plaintiff requests judicial notice of the Court's docket entries in the criminal case of United States of America v. Doyma Michel, Southern District of California, Case No. 14CR1864-DMS.  (Dkt. No. 53-3.)  No party has objected to the request for judicial notice.  Facts proper for judicial notice are those not subject to reasonable dispute and either "generally known" in the community or "capable of accurate and ready determination" by reference to sources whose accuracy cannot be reasonably questioned. Fed. R. Evid. 201.  Here, the criminal docket in the court records are proper documents subject to judicial.  See United States v. Howard, 381 F.3d 873, 876 n. 1 (9th Cir. 2004) (taking judicial notice of court records in underlying criminal case).  Thus, the Court GRANTS Plaintiff's request for judicial notice of the Court's docket entries in Case No. 14CR1864-DMS.

### B.    Legal Standard on Motion for Summary Judgment

Federal Rule of Civil Procedure 56 empowers the Court to enter summary judgment on factually unsupported claims or defenses, and thereby "secure the just, speedy and inexpensive determination of every action." Celotex Corp. v. Catrett, 477 U.S. 317, 325, 327 (1986).  Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A fact is material when it affects the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of demonstrating the absence of any genuine issues of material fact. Celotex Corp., 477 U.S. at 323. The moving party can satisfy this burden by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element of his or her claim on which that party will bear the burden of proof at trial. Id. at 322-23. If the moving party fails to bear the initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. Adickes v. S.H. Kress & Co., 398 U.S. 144, 159-60 (1970).

Once the moving party has satisfied this burden, the nonmoving party cannot rest on the mere allegations or denials of his pleading, but must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324. If the non-moving party fails to make a sufficient showing of an element of its case, the moving party is entitled to judgment as a matter of law. Id. at 325. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). In making this determination, the court must "view[] the evidence in the light most favorable to the nonmoving party." Fontana v. Haskin, 262 F.3d 871, 876 (9th Cir. 2001). The Court does not engage in credibility determinations, weighing of evidence, or drawing of legitimate inferences from the facts; these functions are for the trier of fact. Anderson, 477 U.S. at 255.

**C.    Eighth and Ninth Causes of Action - Design Defect under Negligence and Product Liability**

Plaintiff alleges design defect under negligence and product liability causes of action. The eighth cause of action for design defect in negligence alleges that the NarcoPouch 923 was not reliable and accurate as marketed, and the ninth cause of action for design defect in product liability asserts that the product was defective by rendering a false positive on the substance in Plaintiff's car. (Dkt. No. 22, SAC ¶¶ 47, 49, 59, 71.)

Defendant moves for summary judgment on the design defect claim alleged under the eighth claim for negligence and ninth claim for product liability arguing there is no underlying design defect. Plaintiff disagrees contending that the NarcoPouch 923 is defective because the false and misleading statements on its packaging caused officers to believe that the NarcoPouch 923 produced a test result for methamphetamine. Plaintiff also moves for partial summary judgment solely on the ninth cause of action for a design defect based on product liability. Defendant disputes Plaintiff's motion.

A plaintiff may seek recovery in a products liability case under strict liability in tort or on the theory of negligence. Merrill v. Navegar, Inc., 26 Cal. 4th 465, 478 (2001). Under a negligence theory, a plaintiff must also prove "an additional element, namely, that the defect in the product was due to negligence of the defendant." Id. at 479.

"A design defect exists when the product is built in accordance with its intended specifications, but the design itself is inherently defective." Chavez v. Glock, Inc., 207 Cal. App. 4th 1283, 1303 (2012); Trejo v. Johnson & Johnson, 13 Cal. App. 5th 110, 153 (2017) (quoting Chavez, 207 Cal. App. 4th at 1303). To show a design defect, a plaintiff must ordinarily show "(1) the product is placed on the market; (2) there is knowledge that it will be used without inspection for defect; (3) the product proves to be defective; and (4) the defect causes injury . . . ." Nelson v. Superior Ct., 144 Cal. App. 4th 689, 695 (2006) (internal quotations and citations omitted). "A manufacturer is strictly liable in tort when an article [it] places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being." Greenman v. Yuba Power Prods., Inc., 59 Cal. 2d 57, 62 (1963).

In Barker, the California Supreme Court set forth two alternative tests to prove a design defect under strict product liability. Barker v. Lull Eng'g Co., 20 Cal. 3d 413, 432 (1978). The "consumer expectation test" permits a plaintiff to prove design defect by demonstrating that "the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner." Id. at 432. "The second test for design defect is known as the "risk-benefit test." Chavez, 207 Cal.

16CV277-GPC(AGS)

App. 4th at 1303. Under this test, "if the plaintiff demonstrates that the product's design proximately caused his injury and the defendant fails to establish, in light of the relevant factors, that, on balance, the benefits of the challenged design outweigh the risk of danger inherent in such design." Barker, 20 Cal. 3d at 432. In making the latter determination, the jury may consider these factors: "the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design." Id. at 431. "[U]nder either a negligence or a strict liability theory of products liability, to recover from a manufacturer, a plaintiff must prove that a defect caused injury." Merrill, 26 Cal. 4th at 479.

Defendant argues that the undisputed evidence reveals that the NarcoPouch 923 was accurate, reliable and worked as intended as it provided the same response when the DEA conducted its own Simon's Reagent/Sodium Nitroprusside test in the lab; therefore as a matter of law, Plaintiff cannot demonstrate that NarcoPouch 923 was defectively designed. (See Dkt. No. 61-2, P's Response to D's SSMUF, No. 37; Dkt. No. 50-5, Smelser Decl., Ex. M, P's Expert Report of R. Clark at 5 n.1 (the "test did exactly what it is scientifically supposed to do".) Michel does not dispute Defendant's argument that the NarcoPouch 923, itself, was reliable but instead she argues that the NarcoPouch 923 was designed defectively because the "false and misleading statements on the Narco Pouch 923's packaging caused law enforcement officers to expect the 923 to produce a test result for methamphetamine." (Dkt. No. 61 at 18.) She argues that because Safariland markets the NarcoPouch 923 test as a highly accurate test for the detection of methamphetamine, it is a design defect under the reasonable expectation of the consumer. (Id. at 18-19.)

Plaintiff's design defect claim is based on false marketing on its packaging of NarcoPouch 923, and not a defect in the design of the product, itself. Without explanation or legal authority, she contends that the consumer expectation test applies to

the design defect alleged in this case; therefore, the NarcoPouch 923 "did not perform in the manner that officers expected it to perform when they used the product as intended." (Dkt. No. 53-1 at 19.) Plaintiff does not provide legal analysis to support her argument that a design defect can be based on false marketing of a product, itself, without alleging an inherent defect in the design of the NarcoPouch 923. She has not demonstrated that a design defect claim, under either negligence or strict liability, can be based on "defects" in packaging or marketing. Accordingly, Defendant has demonstrated that Plaintiff has failed to make a showing to establish the elements of a design defect claim in either negligence or strict liability, and therefore, the Court tentatively GRANTS Defendant's motion for summary judgment on design defect under product liability and negligence, and tentatively DENIES Plaintiff's motion for summary judgment on design defect under product liability.

**D.    Eighth Cause of Action - Failure to Warn under Negligence**

The eighth cause of action for negligence includes a failure to warn claim where Michel alleges that she was harmed because Safariland breached a duty to Michel to warn CBP Officers that they could not base their probable cause to arrest her solely on the positive result generated from the Narco Pouch 923 field drug test kit because the product was inaccurate, unreliable, and defective. (Dkt. No. 22, SAC ¶¶ 60-64.)

Defendant moves for summary judgment on the negligence failure to warn cause of action. Although not alleged in the SAC, Plaintiff moves for summary judgment on the strict liability failure to warn claim. In her motion, Plaintiff argues that Safariland knew its product was being used as probable cause to arrest and it had a duty to properly warn and instruct its users. Specifically, it failed to warn officers that a positive test result should not be used as a sole basis of probable cause to arrest and detain, that the NarcoPouch 923 tests for any secondary amine, that many lawful substances contain secondary amines and can cause a positive result, and that a positive field drug test result should not be understood as confirmation of the presence of methamphetamine. (Dkt. No. 53-1 at 20-21.) Despite developing thorough training materials, Safariland made no

effort to distribute it to either law enforcement agencies purchasing its products or the end users, law enforcement officers. Further, it made no effort to communicate to law enforcement agencies the importance of subjecting their officers to proper training. These arguments, made in support of her motion for partial summary judgment, are also made in her opposition to Defendant's motion for summary judgment.

"Strict liability failure to warn requires the plaintiff to prove that the defendant 'did not adequately warn of a particular risk that was known or knowable in light of the generally recognized and prevailing best scientific and medical knowledge available at the time of the manufacture and distribution . . . ." Anderson v. Owens-Corning Fiberglass Corp., 53 Cal. 3d 987, 1002-03 (1991). For failure to warn, a manufacturer or distributor has a "duty to warn about all known or knowable risks of harm from the use of its product." Webb v. Special Elec. Co., Inc., 63 Cal. 4th 167, 185 (2016) (citing Anderson, 53 Cal. 3d at 1000). The "duty applies to all entities in a product's supply chain." Id. Liability for failure to warn is imposed only if the manufacturer had actual or constructive knowledge of the risk. Id. at 181. A seller will be "*strictly liable* for failure to warn if a warning was feasible and the absence of a warning caused the plaintiff's injury." Id. (emphasis in original). Reasonableness of the seller's failure to warn is not relevant in the strict liability context. Id. However, a claim for negligent failure to warn requires "a plaintiff to prove that a manufacturer or distributor did not warn of a particular risk for reasons which fell below the acceptable standard of care, i.e., what a reasonably prudent manufacturer would have known and warned about." Anderson, 53 Cal. 3d at 1002; Webb, 63 Cal. 4th at 181 ("plaintiff must prove that the seller's conduct fell below the standard of care."). "Whether the absence of a warning makes a product defective involves several factors, including a consumer's normal expectations of how a product will perform; degrees of simplicity or complication in its operation or use; the nature and magnitude of the danger to which the user is exposed; the likelihood of injury; and the feasibility and beneficial effect of including such a warning." Trejo v. Johnson & Johnson, 13 Cal. App. 5th 110, 125 (2017) (citation omitted).

First, Defendant contends that in order to assert a failure to warn claim there must be an underlying defect in the product. However, California courts have held that under the "failure to warn theory, a product may be defective even though it is manufactured or designed flawlessly." <u>Canifax v. Hercules Powder Co.</u>, 237 Cal. App. 2d 44, 52-53 (1965). "[A] product, although faultlessly made, may nevertheless be deemed 'defective' under the rule and subject the supplier thereof to strict liability if it is unreasonably dangerous to place the product in the hands of a user without a suitable warning and the product is supplied and no warning is given." <u>Anderson</u>, 53 Cal. 3d at 995-96 (quoting <u>Canifax</u>, 237 Cal. App. 2d at 53.) Defendant's argument requiring an underlying defect for a failure to warn claim is without merit.

Next, even if there was a duty to warn the CBP of the legal sufficiency of making a probable cause determination, Defendant argues Michel cannot establish causation because the proposed instructions would not have prevented her injury.[5] Plaintiff alleges that Officers Garza, Gibbons and Bulman arrested Plaintiff solely on the false positive generated by the NarcoPouch 923 test; however, the undisputed facts demonstrate that it was Officer Gibbons that arrested Plaintiff. Officer Gibbons arrested Michel after Officer Garza noticed visible signs of nervousness from Michel. Michel's hands were shaking, she avoided making eye contact and her carotid artery was pulsing in her neck.

---

[5] In its motion, Safariland also argues there was no unsafe or unreasonably dangerous condition that would require a warning because the "dangerous condition" appears to be the officer's determination of probable cause to arrest Michel based on the positive test results from the NarcoPouch 923 test. Safariland further contends there is no legal duty to provide a legal education to users or provide any instruction about possible decisions users may make after correctly using the product. It manufactures a portable way for law enforcement to take the test and its duties are to instruct on the safe use of its products, such as avoiding chemical burns or other physical injuries, and not on the proper legal decisions a law enforcement officer should make. The Court need not address these other arguments since the issue of causation and the sophisticated intermediary defense bar the failure to warn claims.

Officer Garza and another CBP officer noticed and discovered a bottle containing a brown liquid stuffed inside a sock hidden between the glove box and the fire wall. Officer Garza then conducted a field drug test of the substance in the bottle that was hidden in her car, which resulted in a positive reaction. He then detained Michel and took her to the security office. After Officer Garza brought Michel to secondary, Officer Gibbons conducted a thorough search of Michel's vehicle and discovered three additional bottles of thick yellow substance hidden in her vehicle along with seven bottles of Tequila. After the substance in the four bottles tested positive using a field drug test, Officer Gibbons arrested her. Once she was arrested, Agent Bulman was called in to conduct the interrogation and follow up investigation. Officer Bulman did not conduct any drug field tests and relied on the probable cause determination by Officer Gibbons. The Court concludes there was probable cause to arrest Michel as there were reasonable grounds to believe she was transporting a controlled substance across the border based on the totality of the circumstances. See Maryland v. Pringle, 540 U.S. 366, 372 (2003) ("The substance of all the definitions of probable cause is a reasonable ground for belief of guilt."). Notably, courts in other districts have held that a presumptive field drug test, by itself, is sufficient probable cause to arrest even if the confirmatory test comes out negative. See Pennington v. Hobson, 719 F .Supp. 760, 767-69 (S.D. Ind. 1989) (probable cause to arrest existed where field test indicated powder was cocaine even though subsequent laboratory test identified powder as aspirin and record contains no evidence defendants were disingenuous in performing field test); Herron v. Lew Sterrett Justice Ctr., No. 07cv357-N ECF, 2007 WL 2241688, at *3 (N.D. Tex. Aug. 6, 2007) (probable cause to arrest based on field drug test indicating that the powder was a controlled substance although the substance was later found not to be a controlled substance); Hines v. Port Authority of New York and New Jersey, No. 94 CIV 5109 NRB, 2000 WL 420555, at *4-5 (S.D.N.Y. Apr. 18, 2000) (field tests showing the white powdery substance tested positive for heroin were sufficient to establish probable cause, although laboratory eventually found substance negative for cocaine).

16CV277-GPC(AGS)

Since Michel's initial arrest was lawful, even if Safariland properly trained Officers Garza, Gibbons and Bulman, concerning the potential hazards of relying solely on NarcoPouch 923, Michel would still have been detained until confirmatory lab results exonerated her. Officer Garza, Gibbons and Bulman testified that they knew that all field drug tests needed to get confirmed by the laboratory. Even Michel knew the substance had to get tested at the laboratory as she stated during her interrogation. Once the confirmatory lab results came back negative, she was released from custody. The absence of a warning did not cause her prolonged detention. Therefore, because Plaintiff has not established that the failure to warn caused her injuries, her failure to warn claim fails.

Next, Defendant invokes the "sophisticated user" defense as a bar to Plaintiff's failure to warn claims. Plaintiff opposes arguing the facts do not support the affirmative defense because Officers Garza, Gibbons and Agent Bulman used the results of the NarcoPouch 923 as probable cause to detain and arrest Michel. According to Plaintiff, there is no evidence that they received any specific training on the use of NarcoPouch 923 and no evidence that they were trained that Narco Pouch 923 was a field test for secondary amines and that any substance containing secondary amines, even if lawful, would result in a positive test. (Dkt. No. 53-1 at 4-5.) Therefore, Officers Garza, Gibbons and Agent Bulman were not sophisticated users.

The "sophisticated user" defense relieves the manufacturer of their liability for failure to warn. Johnson v. American Standard, Inc., 43 Cal. 4th 56, 65 (2008). Under the "sophisticated user" defense, "sophisticated users need not be warned about dangers of which they are already aware or should be aware." Id. Under this theory, because "sophisticated users already know, or should know, about the product's dangers, the manufacturer's failure to warn is not the legal cause of any harm." Webb, 63 Cal. 4th at 182. The defense does not require a user's actual awareness of potential hazards. Id. "The focus of the defense . . . is whether the danger in question was so generally known within the trade or profession that a manufacturer should not have been expected to

provide a warning specific to the group to which plaintiff belonged." Id. at 72. This affirmative defense applies to both failure to warn theories under strict liability and negligence. Id. at 71-73. The California Supreme Court has explained, "[t]he duty to warn is measured by what is generally known or should have been known to the class of sophisticated users, rather than by the individual plaintiff's subjective knowledge." Id. at 65-66. The sophistication of the user is measured at the time of injury. Id. at 73.

Defendant argues that the CBP, DHS and DEA are sophisticated users as a matter of law concerning the detention and seizure of suspected controlled substances and arresting suspected smugglers. As sophisticated users, the agencies had a duty to warn the end users, the officers, about the hazards of the product and Safariland relied on the agencies to warn the end users. In response, Plaintiff claims that the Court must look at Officers Garza, Gibbons and Bulman's sophistication to determine whether the defense applies.

Typically, an injured plaintiff is the user of the product and courts look at the sophistication of the plaintiff. See e.g., Willis v. Buffalo Pumps, Inc., 34 F. Supp. 3d 1117, 1127-28 (S.D. Cal. 2014) (rejecting sophisticated user defense when the employer is the sophisticated user, and not the injured employee, the user of the product); Sclafani v. Air and Liquid Sys., Corp., 12cv3013-SVW-PJW, 12cv3037-SVW-PJW, 2013 WL 12119556, at *15 (C.D. Cal. Mar. 20, 2013) (sophisticated user defense requires the defense to show that the end user of its product knew the dangers of working with asbestos).

In this case, Michel did not use the product but was the injured party when the product was used by CPB Officers. Therefore, the end users were Officers Gibbons and Garza and the Court looks at their sophistication to determine whether Safariland failed to warn them of the potential dangerous consequence of a false positive. The CPB, as the employer, was not the user of the product and is not considered the sophisticated user. Moreover, an employer's sophistication cannot be attributed to an employee. Pfeifer v. John Crane, Inc., 220 Cal. App. 4th 1270, 1297-98 (2013) ("The fact that the user is an

employee or servant of the sophisticated intermediary cannot plausibly be regarded as a sufficient reason, as a matter of law, to infer that the latter will protect the former."); Stewart v. Union Carbide Corp., 190 Cal. App. 4th 23, 28-29 (2010), disapproved on other grounds by Webb, 63 Cal. 4th at 188 ("Johnson did not impute an intermediary's knowledge to the plaintiff, or charge him with any knowledge except that which had been made available to him through his training and which, by reason of his profession and certification, he should have had."). Defendant does not claim that Officers Garza and Gibbons were sophisticated users, but claim that their employer, the CBP was a sophisticated user; therefore, the sophisticated user defense does not apply in this case.

Defendant also indirectly raises the "sophisticated intermediary" affirmative defense, which is distinct from the "sophisticated user" defense. See Webb, 63 Cal. 4 at 182-83, 185-86. Safariland argues that the federal agencies, as intermediaries, had a legal duty to warn end users about any particular hazards at issue and contends it relied on the agencies to warn their employees. Safariland also addresses the elements of the sophisticated intermediary defense within its additional argument that the defense of bulk seller doctrine applies in this case. In addition to the sophisticated user defense, Safariland contends that as a bulk supplier, the bulk purchaser has a duty to warn the user of the product.

The bulk seller doctrine applies to manufacturers of components parts or raw materials that are incorporated into finished products by the buyer of the component part. Webb, 63 Cal. App. at 183. Under the bulk seller doctrine, the supplier is not liable for injuries "unless: (1) the component itself was defective and caused injury or (2) the supplier participated in integrating the component into a product, the integration caused the product to be defective, and that defect caused injury." Id. Here, the NarcoPouch is not a raw material or a component part used to create a finished product but it is the finished product. Defendant argue that the Court should consider the NarcoPouch 923 to be a "'component' of the formation of probable cause, leading to Plaintiff's arrest" and since Safariland had no control over any officer of the CBP or agent of HIS or the U.S.

Attorney's office to instruct them to arrest Michel. (Dkt. No. 50-1 at 29-30.) While creative, Defendant has not provided any legal authority to support an analogy that NarcoPouch 923 is a component part of probable cause. The bulk seller doctrine applies to a component part that ends up in a finished product; here, the NarcoPouch 923 was not altered or used as part of a finished product. Therefore, the Court disagrees with Defendant's application of the defense of the bulk seller doctrine in this case, but instead considers Defendant's argument to apply to the sophisticated intermediary defense.

Under the "sophisticated intermediary" defense, a manufacturer or supplier must show "not only that it warned or sold to a knowledgeable intermediary, but also that it actually and reasonably relied on the intermediary to convey warnings to end users." Webb, 63 Cal. 4th at 189. An intermediary is sufficiently sophisticated to establish the defense if the buyer "was so knowledgeable about the material supplied that it knew or should have known about the particular danger." Id. at 188. "Under this rule, a supplier may discharge its duty to warn end users about known or knowable risks in the use of its product if it: (1) provides adequate warnings to the product's immediate purchaser, or sells to a sophisticated purchaser that it knows is aware or should be aware of the specific danger, *and* (2) reasonably relies on the purchaser to convey appropriate warnings to downstream users who will encounter the product." Webb, 63 Cal. 4th at 187 (emphasis in original). It is the supplier's burden to demonstrate this affirmative defense. Id.

In In re Related Asbestos Cases, 543 F. Supp. 1142, 1151 (N.D. Cal. 1982), the district court found that the Navy was a sophisticated intermediary that failed to warn its employees because the Navy had to meet strict specifications for content of asbestos fiber, performance and packaging. In Akin v. Ashland Chemical Co., 156 F.3d 1030, 1037 (10th Cir. 1998), the plaintiffs were Air Force employees injured while cleaning jet engine parts due to low-level, chronic exposure to chemicals manufactured by the defendants. Id. Plaintiffs argued that defendants breached their duty to warn potential users of the dangerous propensities of these chemicals even though the chemicals supplies were not improperly manufactured or contaminated. Id. The Tenth Circuit

concluded that the Air Force easily qualifies as a "knowledgeable purchaser" that should have known the risks of low-level chemical exposure based on the "wealth of research available, the ability of the Air Force to conduct studies and its extremely knowledgeable staff." Id.

In Hernandez v. City of Beaumont, Case No. EDCV 13-967 DDP(DTBx), 2016 WL 8732460, at *1 (C.D. Cal. Sep. 30, 2016), the district court granted third party defendant manufacturer's motion for summary judgment on the failure to warn claims based on the sophisticated intermediary defense. Id. A police officer, effected a traffic stop of the plaintiff and during the course of the interaction, the officer shot plaintiff with a JPX jet protector pepper spray gun from a distance of less than one foot in violation of JPX device's five-foot minimum safety distance. Id. Plaintiff was rendered permanently blind and filed a complaint against the City of Beaumont and other officers, and the City filed a third party complaint against the manufacturer defendant on numerous causes of action including failure to warn. Id. The district court concluded that the distributor and its agent, who trained the Police Department, were sophisticated intermediaries. Id. at 6-7.

Under the first prong, the sophisticated intermediary defense requires a manufacturer to establish that it provided adequate warnings to the immediate purchaser or that it sold the product to a sophisticated purchaser that it knows is aware or should be aware of the specific danger. Webb, 63 Cal. 4th at 188. Here, it is undisputed that Safariland did not provide any warnings to the CBP when it supplied the NarcoPouch 923; therefore, the issue is whether the CBP was "so knowledgeable about the material supplied that it knew or should have known about the particular danger." See id.

Here, the CBP is a sophisticated user that is aware and should be aware of the proper use of the NarcoPouch 923 field drug test kits to conduct presumptive testing for controlled substances. The SWGDRUG sets the minimum standards for the forensic examination of seized drugs. (Dkt. No. 50-5, Smelser Decl., Ex. P.) The CBP has incorporated SWGDRUG guidelines into its analysis of drugs. (Dkt. No. 50-4, Smelser

Decl., Ex. L, Malone Depo. at 64:3-12.)   The DEA, SWGDRUG and UN have determined that the proper presumptive color test for methamphetamine is the Sodium Nitroprusside test.  (Dkt. No. 61-2, P's Response to D's SSMUF, No. 25.)  NarcoPouch 923 is a portable way to conduct the Sodium Nitroprusside test to test presumptively for methamphetamine.  Safariland sells its NarcoPouch field drug test kits to hundreds of law enforcement and military agencies around the world.  (Dkt. No. 50-2, Miller Decl. ¶ 9.)  Safariland does not market or advertise its NarcoPouch field drug test kits to the general public but its kits are intended for sale solely to law enforcement and military agencies and personnel.  (Id. ¶ 13.)  The United States government agencies, such as the CBP, is responsible for monitoring and securing the border and determining whether there is probable cause to arrest an individual for crossing the border with controlled substances.

Moreover, Plaintiff's expert, Roger Clark, testified that Laboratories and Scientific Services, part of U.S. Custom and Border Protection, is responsible for developing guidelines and protocols for the usage concerning drug field tests and provides for testing outside of the "CBP and OBP academies."  (Dkt. No. 60-4, Smelser Decl., Ex. J, Clark Depo. at 86:1-87:12.)  He also stated that as there is a federal version of the California Peace Officer Standard and Training ("POST"), which are guidelines on law enforcement professional standards and cover 42 skills.  (Id. at 17:18-19:13.)  He also testified that the government is responsible for policies and procedures for CBP and has ultimate responsibility.  (Id. at 15:19-23.)

These facts demonstrate that the CBP is a sophisticated purchaser that is aware and should be aware of the potential dangers of using field drug test kits, such as NarcoPouch 923, since there are standards it follows as part of its role in conducting drug field tests.  Moreover, CBP is responsible for securing the border and determining whether probable cause exists to detain an individual crossing the border.

Next, for the second prong, the Court considers whether Defendant actually and reasonably relied on the intermediary, the CBP, to convey appropriate warnings to the end users who will encounter the product.  See Webb, 63 Cal. 4th at 189.  In Webb, the

California Supreme Court provided three factors for courts to consider to make this determination: "the gravity of the risks posed by the product, the likelihood that the intermediary will convey the information to the ultimate user, and the feasibility and effectiveness of giving a warning directly to the user." Id. at 190.

Here, the gravity of the risks posed if a false positive by the NarcoPouch 923 field drug test was the sole reason to support probable cause is great as an innocent individual would be detained and not be released until confirmatory laboratory results are completed. However, the gravity of the risks posed if a false positive by the NarcoPouch 923 test was accompanied with other factors supporting probable cause, would not be as great because CBP officers would have reasons to detain the individual. In this case, there were sufficient factors to support probable cause, which included the results of the NarcoPouch 923 test.

Next, the CBP conveys a lot of information concerning field drug testing and probable cause to its employees. FLETC is the country's "largest provider of law enforcement training." (Dkt. No. 60-6, Smelser Decl., Ex. N at 7.) It provides training in all areas of law enforcement, and partners with other agencies to provide higher quality training and improved interoperability. (Id.) It engages experts across all levels of law enforcement and "delivers the highest quality training possible for those who protect the homeland." (Id.)

The evidence shows that CPB provides training to each and every officer and agent. Once hired, the CBP officers attend mandatory training for about a six week period at FLETC. Officer Gibbons received training at the Federal Law Enforcement Training Center in 2012 for about six months where he received training on field tests, including how to properly use the test kits and how to use the kits to test for different narcotics. (Dkt. No. 60-3, Smelser Decl., Ex. C, Gibbons Depo. at 9:5-10; 10:23-11:6.) Officer Gibbons was taught that the field tests were not 100 percent accurate, not conclusive and the substance still had to be confirmed to be methamphetamine by the DEA lab. (Id. at 11:22-12:1; 40:8-18.)

Officer Garza was also trained at FLETC for five months and there he learned about the use of field tests for the testing of controlled substances. (Dkt. No. 53-7, P's Index of Exs., Ex. 2, Garza Depo. at 7:5-8:11.) He estimated that he spent about two or three days on field drug test training. (Dkt. No. 60-2, Smelser Decl., Ex. B, Garza Depo. at 40:18-41:19.) He testified that he was taught that if the field test was positive, then it was a controlled substance. (Id. at 9:14-18.) Garza also testified that he knew the drugs were all sent to the lab to be retested to confirm the positive test result. (Id. at 49:1-11.) He understood that a positive test kit itself is not probable cause to arrest but that additional evidence was necessary. (Id. at 46:9-47:7.) During the 10 years working at the San Ysidro Port of Entry, Officer Garza received on the job training and briefings on how to use the test kits. (Id. at10:17-11:23.)

Agent Bulman also attended training at FLETC for about six months in 2008. (Dkt. No. 60-3, Smelser Decl., Ex. D, Bulman Depo. at 12:9-25.) He recalled a two hour block of training on the use of field drug test kits. (Id.) He also had additional on-the-job training regarding issues related to his work as a special agent. (Id. at 14:13-23.) He knew the field drug tests need to be confirmed at the DEA laboratory. (See id. at 54:24-55:7; 61:12-62:8.)

DEA Lab Director James Malone testified that upon request, he has trained CBP officers on how to conduct field drug tests. (Dkt. No. 60-3, Smelser Decl., Ex. G, Malone Depo. at 52:10-53:15, 64:13-65:1.) He has specifically explained to CBP officers that the tests are presumptive and not definitive. (Id. at 64:13-65:1.) Occasionally, he shows the officers another compound that is not a drug that produces a color. (Id. at 64:13-19.)

Safariland relied on the law enforcement agencies to train their officers, agents, and other personnel in the proper use and interpretation of the NarcoPouch test kits since the kits are used according to each agencies' own policies, procedures and governing law. (Dkt. No. 50-2, Miller Decl. ¶ 10.) Based on the training offered by FLETC and

occasionally by the DEA lab, it was very likely that the CBP would convey the information concerning the proper use of NarcoPouch 923 to its employees.

Lastly, as to the feasibility and effectiveness of Safariland giving a warning directly to CBP Officers on how to use the NarcoPouch 923, Safariland asserts it has no authority to mandate police procedures and guidelines, and cannot interpret or teach the law of each relevant jurisdiction. (Id.) Safariland has no legal authority to tell the DEA how to conduct its drug testing. (Dkt. No. 50-4, Smelser Decl., Ex. L, Malone Depo. at 54:13-25.) Ambriz also testified that if Safariland had provided packaging and instructional materials, they would still have to comply with police and agency procedures according to the law, and not what Safariland mandates. (Dkt. No. 50-4, Smelser Decl., Ex. F, Ambriz Depo. at 153:3-154:1.) Therefore, it was not feasible for Safariland to provide warnings directly to the officers.

In sum, the Court concludes that the sophisticated intermediary defense applies in this case and bars the failure to warn causes of action. Accordingly, the Court tentatively GRANTS Defendant's motion for summary judgment on the failure to warn under negligence and strict liability, and even if Plaintiff alleged a claim for failure to warn under strict liability, the Court would DENY Plaintiff's motion for partial summary judgment.

**E.      Unfair Competition Claim**

Plaintiff alleges a claim against Safariland pursuant to California Business and Professions Code section 17200 alleging false advertising constituting an unfair business practice. (Dkt. No. 22, SAC ¶ 68.) The SAC alleges an "unfair business act and practice"; "fraudulent business acts and practices"; and "unfair, deceptive, untrue and misleading advertising." (Id.) She alleges that Safariland's acts and omissions about the unreliability of the tests which allowed the product to be in the marketplace caused her harm. (Id.)

Defendant moves for summary judgment arguing that Plaintiff has failed to demonstrate that Michel relied on any alleged misrepresentation by Safariland because

she did not purchase the product, did not use the product and did not read any advertisement about the product; therefore, she cannot show "actual reliance."  Plaintiff contends that actual reliance needs to be shown only if the claims are fraud based and she argues that she only alleges unfair business acts based on Safariland's omissions concerning the reliability of the NarcoPouch 923 test, that was allowed to be in the marketplace and which caused her harm.

"[U]nfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by . . . [section 17500]."  Cal. Bus. & Prof. Code § 17200.  To state a cause of action under sections 17200 and 17500 for injunctive relief, it is only required to show that members of the public are likely to be deceived, but does not call for a showing of "[a]ctual deception or confusion caused by misleading statements."  Day v. AT&T Corp., 63 Cal. App. 4th 325, 331-32 (1998).  These sections protect the public from a "wide spectrum of improper conduct in advertising."  Id. at 332.  "The plaintiff has the burden of proving that the challenged advertising is false or misleading to a reasonable consumer."  Arizona Cartridge Remanufacturers Ass'n, Inc. v. Lexmark Internat'l, Inc., 421 F.3d 981, 985 (2005).  "The law encompasses not just false statements but those statements 'which may be accurate on some level, but will nonetheless tend to mislead or deceive . . . . A perfectly true statement couched in such a manner that it is likely to mislead or deceive the consumer, such as by failure to disclose other relevant information, is actionable under these sections.'"  Id. (citation omitted).

In order to assert a claim under the UCL, a person must have "suffered injury in fact and ha[ve] lost money or property as a result of the unfair competition." Cal. Bus. & Prof. Code § 17204.  The California Supreme Court in In re Tobacco II Cases, 46 Cal. 4th 298 (2009) has interpreted the standing provision, "as a result of the unfair competition language" as "impos[ing] an actual reliance requirement on plaintiffs prosecuting a private enforcement action under the UCL's fraud prong."  Morgan v. AT&T Wireless Servs., Inc., 177 Cal. App. 4th 1235, 1257 (2009) ("In Tobacco II, the

Supreme Court held that this standing requirement . . . imposes an actual reliance requirement on named plaintiffs seeking relief under the fraudulent prong of the UCL."). The <u>Tobacco II</u> ruling has also been extended to unlawful conduct based on an underlying misrepresentation. <u>Durell v. Sharp Healthcare</u>, 183 Cal. App. 4th 1350, 1363 (2010) (extending <u>Tobacco II's</u> reasoning to the "unlawful" prong of the UCL when the predicate unlawfulness is misrepresentation and deception); <u>see</u> <u>Kwikset Corp. v. Superior Court</u>, 51 Cal. 4th 310, 326 (2011) (holding that plaintiff was required to demonstrate actual reliance to establish standing to pursue claims under the UCL's unlawful prong because his claims were "based on a fraud theory involving false advertising and misrepresentations to consumers").

While Plaintiff seems to indicate that her claim under the UCL is not predicated on fraud or deceptive misrepresentations or omissions, the SAC makes such allegations. (<u>See</u> Dkt. No. 22, SAC ¶ 68.) To the extent the SAC alleges claims based on fraud or deceptive conduct, the Court concludes that "actual reliance" must be shown and in this case, Plaintiff has not created a genuine issue of material fact that Michel actually relied on the packaging of the NarcoPouch 923, and therefore, the Court GRANTS Defendant's motion for summary judgment on a fraud based false advertising claim. However, to the extent that the SAC alleges a claim for unfair practices based on false advertising, "actual reliance" does not need to be demonstrated; therefore, Defendant's argument that the UCL claim fails based on Plaintiff's inability to demonstrate actual reliance is without merit. Defendant has not addressed whether the other elements of Plaintiff's false advertising claims under the UCL are met. As such, the Court DENIES Defendant's motion for summary judgment to the extent the claims are non-fraud based false advertising claims.

## F. Evidentiary Objections

Defendant filed evidentiary objections to evidence used to support Michel's opposition to its motion for summary judgment. (Dkt. No. 67-2.) It objects to Plaintiff's expert, Alison Vredenburgh's testimony as the matters on which she testified far exceed

the scope of her expertise. Next, it also seeks to strike Exhibit 17 of Jun's Declaration, an email by Allen Miller, Safariland's Products Manager for the Forensics Division as inadmissible hearsay. Finally, it objects to the Declaration of Grace Jun, which was filed three past the deadlines set in the court's briefing schedule.

The Court SUSTAINS the objections to Vredenburgh's testimony and the email by Allen Miller as the Court did not consider them in its ruling. The Court OVERRULES the objection to the Declaration of Grace Jun as she filed the declaration based on a clerical error in failing to file a declaration regarding exhibits filed in support of her opposition to summary judgment. (Dkt. No. 63 at 2.)

### Conclusion

The Court tentatively GRANTS Defendant Safariland's motion for summary judgment the eighth and ninth causes of action for design defect and failure to warn, and the Court tentatively DENIES Plaintiff's motion for partial summary judgment on the ninth cause of action. The Court also tentatively GRANTS in part and DENIES in part Defendant's motion for summary judgment on the tenth cause of action under the UCL.[6] Counsel are advised that the Court's rulings are tentative and the Court will entertain additional arguments at the hearing on **September 8, 2017 at 1:30 p.m.** in Courtroom 2D.

IT IS SO ORDERED.

Dated: September 8, 2017

Hon. Gonzalo P. Curiel
United States District Judge

---

[6] In Safariland's motion for summary judgment, it seeks an award of attorneys' fees and costs incurred in this action; however, it provides no legal authority to support an award of attorneys' fees and costs. (Dkt. No. 50 at 2.) Thus, the Court denies Defendant's request as unsupported.