UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOYMA VANESSA MICHEL, an individual,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA, B. GIBBONS, an individual, E. GARZA, an individual, G. GARCIA, an individual, SAFARILAND, LLC, a Delaware limited liability company, AND DOES 1 THROUGH 100, inclusive,<br><br>Defendants. | Case No.:  16CV277-GPC(AGS)<br><br>**ORDER GRANTING DEFENDANT UNITED STATES OF AMERICA'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>**[Dkt. Nos. 49, 52.]** |

Before the Court are Defendant United States of America's motion for summary judgment filed on July 19, 2017 and Plaintiff Doyma Vanessa Michel's motion for partial summary judgment against the United States of America filed on July 24, 2017.  (Dkt. Nos. 49, 52.)  Both parties filed their respective oppositions and replies.  (Dkt. Nos. 59, 62, 68, 71[1])  A hearing was held on September 8, 2017.  (Dkt. No. 74.)  Eugene Iredale,

---

[1] On August 25, 2017, Plaintiff filed an ex parte application to file an oversized reply brief which the Court granted.  (Dkt. Nos. 70, 72.)

Esq. and Grace Jun, Esq. appeared on behalf of Plaintiff, and Steve Chu, Esq. appeared on behalf of the United States of America.[2] (Dkt. No. 74.) After consideration of the briefs, supporting documentation, the applicable law, and oral argument, the Court GRANTS Defendant United States of America's motion for summary judgment and DENIES Plaintiff's motion for partial summary judgment.

## Procedural Background

On February 2, 2016, Plaintiff Doyma Vanessa Michel ("Plaintiff" or "Michel") filed a complaint against Defendant United States of America ("Defendant" or "Government"), three individual Government defendants, and Defendant Safariland, LLC ("Safariland") claiming she was wrongfully arrested and detained in jail for over six months based on a "positive" test result for methamphetamine, generated by a field drug test kit called Narco Pouch 923, manufactured by Safariland, on four bottles containing a liquid substance found in Michel's vehicle while crossing the San Ysidro Port of Entry, which later confirmed by laboratory testing to be negative for methamphetamine. (Dkt. No. 1.) A first amended complaint was filed. (Dkt. No. 6.) Pursuant to a joint motion by the parties, Michel filed a second amended complaint ("SAC"). (Dkt. Nos. 20, 22.) On August 2, 2016, Michel filed a notice of voluntary dismissal as to the individual Government defendants, B. Gibbons, E. Garza and G. Garcia.[3] (Dkt. No. 29.)

Michel alleges four causes of action against the Government. They are the fourth cause of action for negligence; fifth cause of action for false imprisonment; sixth cause of action for negligent infliction of emotional distress; and seventh cause of action for intentional infliction of emotional distress. (Dkt. No. 22.)

---

[2] At the hearing, Steven Smelser, Esq. appeared on behalf of Defendant Safariland, LLC. The Court also heard oral argument on Safariland, LLC's and Michel's motions for summary judgment. (Dkt. No. 74.)

[3] The dismissal of the individual Government defendants disposes of the first three causes of action alleging violations of the U.S. Constitution under 42 U.S.C. § 1983.

On July 19, 2017, the Government moved for summary judgment on all causes of actions against it. (Dkt. No. 49.) On July 24, 2017, Michel filed a motion for partial summary judgment on three causes of action for negligence, false imprisonment, and intentional infliction of emotional distress. (Dkt. No. 52.)

**Factual Background**

**A.      San Ysidro Port of Entry Detention**

On June 2, 2014, Customs and Border Protection ("CBP") Officer Eduardo Garza ("Officer Garza") was on duty at the San Ysidro Port of Entry. (Dkt. No. 62-1, P's Response to D's SSUMF, No. 1.) Officer Garza was a member of the Antiterrorism Contraband Enforcement Team. (Id.) Officer Garza was conducting a pre-primary roving inspection which involved random checks of vehicles that were entering the United States from Mexico looking for narcotics or contraband. (Id.; Dkt. No. 49-2, D's Index of Exs., Ex. A, Garza Depo. at 15:2-22[4].) Officer Garza noticed a black 2001 Audi waiting in a vehicle line and observed the driver, Michel, avoiding eye contact. (Dkt. No. 62-1, P's Response to D's SSUMF, No. 2; Dkt. No. 49-2, D's Index of Exs., Ex. B, Garza's Incident Report.) Officer Garza looked inside the vehicle and noticed that there were loose car seat covers and began asking questions of Michel who said she was going to do a smog check. (Dkt. No. 62-1, P's Response to D's SSUMF, No. 2; Dkt. No. 49-2, D's Index of Exs., Ex. B, Garza's Incident Report.) While Officer Garza spoke with Michel, another CBP officer stood in front of the vehicle on the passenger side, and a third CPB officer searched the inside of the car on the passenger side by the dashboard. (Dkt. No. 49-2, D's Index of Exs., Ex. A, Garza Depo. at 17:21-25; 18:20-23; 19:17-21.)

When Officer Garza asked Michel for her passport, she presented a valid U.S. passport. (Dkt. No. 59-1, Ds' Response to P's SSUMF, No. 3; Dkt. No. 49-2, D's Index of Exs., Ex. B, Garza Incident Report.) Officer Garza stood approximately two feet away

---

[4] Deposition pages numbers are based on the pagination of the deposition transcript.

and noticed that Plaintiff's hands were shaking as he stood there, and her left jugular vein was pulsing. (Dkt. No. 62-1, P's Response to D's SSUMF, No. 3; Dkt. No. 49-2, D's Index of Exs., Ex. A, Garza Depo. at 21:3-16.) The other CBP officer on the other side of the car signaled to Officer Garza to go come over and they discovered a bottle inside a sock, "in the glove box behind the glove in front of the firewall." (Dkt. No. 62-1, P's Response to D's SSUMF, No. 3; Dkt. No. 49-2, D's Index of Exs., Ex. A, Garza Depo. at 21:20-22:13.) The bottle inside the black sock contained a brown substance. (Dkt. No. 62-1, P's Response to D's SSUMF, No. 3; Dkt. No. 49-2, D's Index of Exs., Ex. A, Garza Depo. at 22:17-20.) Officer Garza asked Michel what was in the sock, and she turned and said she did not know. (Dkt. No. 62-1, P's Response to D's SSUMF, No. 4; Dkt. No. 49-2, D's Index of Exs., Ex. A, Garza Depo. at 23:24-24:4; Dkt. No. 49-2, D's Index of Exs., Ex. B, Garza Incident Report.) Officer Garza had previously encountered liquid methamphetamine on a prior occasion and recalled that liquid methamphetamine had a similar brownish haze color. (Dkt. No. 62-1, P's Response to D's SSUMF, No. 4; Dkt. No. 49-2, D's Index of Exs., Ex. A, Garza Depo. at 43:2-19.) The appearance of the substance, coupled with the fact that it had been concealed in the car, made Officer Garza suspect that the substance could be liquid methamphetamine. (Dkt. No. 62-1, P's Response to D's SSUMF, No. 4; Dkt. No. 49-2, D's Index of Exs., Ex. A, Garza Depo. at 43:2-19.) Officer Garza then escorted Michel to the vehicle secondary line in order to do a more intensive search of the vehicle. (Dkt. No. 62-1, P's Response to D's SSUMF, No. 4; Dkt. No. 49-2, D's Index of Exs., Ex. A, Garza Depo. at 25:3-10; id., Ex. B, Garza Incident Report.)

As the car was being escorted to vehicle secondary, Michel then said that the liquid in the bottle contained something used to make cheese. (Dkt. No. 62-1, P's Response to D's SSUMF, No. 5; Dkt. No. 49-2, D's Index of Exs., Ex. A, Garza Depo. at 27:2-6; id., Ex. B, Garza Incident Report.) Officer Garza asked Michel why she would put a bottle in the dash above the glove box in a sock if it was simply to make cheese and she had no answer. (Dkt. No. 62-1, P's Response to D's SSUMF, No. 5; Dkt. No. 49-2, D's Index of

Exs., Ex. A, Garza Depo. at 27:7-10; id., Ex. B, Garza Incident Report.)  Once arriving at vehicle secondary, Officer Garza obtained a field drug test kit, the NarcoPouch 923[5], and it tested positive.  (Dkt. No. 62-1, P's Response to D's SSUMF, Nos. 5, 8; Dkt. No. 49-2, D's Index of Exs., Ex. A, Garza Depo. at 28:1-5; id., Ex. B, Garza Incident Report; Dkt. No. 52-6, P's Index of Exs., Ex. 2, Garza Depo. at 30:18-31:1.)  Officer Garza believed the substance in the bottle was methamphetamine as he had been taught that a positive reaction from the field test kit meant the substance was methamphetamine.  (Dkt. No. 49-2, D's Index of Exs., Ex. A, Garza Depo. at 34:22-35:8.)

NarcoPouch 923 is a presumptive test that produces a color change based on the presence of a secondary amine, some of which may be illegal substances and others which are not illegal.  (Dkt. No. 59-1, D's Response to P's SSMUF, Nos. 109, 111, 112.)  A presumptive test is neither definitive or certain.  (Id., No. 110.)  One secondary amine is methamphetamine.  (Id., No. 113.)  There are other secondary amines that give the same result, such as diphendyramine, a major ingredient in Dramamine, and produce the same color change as methamphetamine on the NarcoPouch 923.  (Id., Nos. 120, 121.)  The NarcoPouch 923 tests for the presence of any secondary amine, and does not specifically test for the presence of methamphetamine.  (Id., No. 114.)

A presumptive test is only a field test, and the content of the substance must still be confirmed by testing at the Drug Enforcement Agency ("DEA") lab.  (Dkt. No. 62-1, P's Response to D's SSUMF, No. 6.)  Because a field test is only considered a presumptive test, pursuant to DEA procedures, the DEA will only testify at trial about a substance after a confirmatory lab test is also performed.  (Id., No. 7.)

Given the positive reaction, Officer Garza took Michel into custody.  (Dkt. No. 62-1, P's Response to D's SSUMF, No. 8; Dkt. No. 49-2, D's Index of Exs., Ex. A, Garza Depo. at 28:1-5; id., Ex. B, Garza Incident Report.)  Officer Garza placed Michel in

---

[5] Officer Garza testified that the field drug test he used looked similar to the box of the NarcoPouch 923. (Dkt. No. 52-6, P's Index of Exs., Ex. 2, Garza Depo. at 30:18-31:1.)

handcuffs and escorted her to the security office.  (Dkt. No. 62-1, P's Response to D's SSUMF, No. 8; Dkt. No. 49-2, D's Index of Exs., Ex. A, Garza Depo. at 35:9-13; <u>id.</u>, Ex. B, Garza Incident Report.)  Officer Garza then turned the case over to another CBP officer.   (Dkt. No. 62-1, P's Response to D's SSUMF, No. 8; Dkt. No. 49-2, D's Index of Exs., Ex. A, Garza Depo. at 36:4-7; <u>id.</u>, Ex. B, Garza Incident Report.)

CBP Officer Brandon Gibbons ("Officer Gibbons") conducted a search of Plaintiff's car and discovered five bottles of alcohol that were concealed throughout the vehicle and three additional bottles of the yellowish substance in a plastic container found deep inside the dashboard.  (Dkt. No. 49-2, D's Index of Exs., Ex. C, Gibbons Depo. at 12:20-13:7;Dkt. No. 62-1, P's Response to D's SSUMF, No. 8; Dkt. No. 49-2, D's Index of Exs., Ex. A, Garza Depo. at 48:3-9.)  Officer Gibbons tested all four bottles of the brown[6] substance using the a field drug test kit, NarcoPouch 923, and all four bottles turned into a dark blue color indicating a positive result.  (Dkt. No. 62-1, P's Response to D's SSUMF, No. 9; Dkt. No. 49-2, D's Index of Exs., Ex. D, Gibbons Incident Report; Dkt. No. 52-7, P's Index of Exs., Ex. 3, Gibbons Depo. at 18:11-12.)  Due to the positive test results, Officer Gibbons placed Michel under arrest.  (Dkt. No. 62-1, P's Response to D's SSUMF, No. 9.)

**B.    Arrest and Criminal Complaint**

Immigration and Customs Enforcement ("ICE") was then notified so that an agent could be sent to question Plaintiff.  (<u>Id.</u>)  Homeland Security Investigation ("HIS") Special Agent Zachary Bulman ("Agent Bulman") arrived and Michel voluntarily gave a statement.  (<u>Id.</u>; Dkt. No. 49-2, D's Index of Exs., Ex. E, Bulman Depo. at 7:10-14.)  She

---

[6] At his deposition and on his Incident Report, Officer Gibbons described the substance in the four bottles as yellowish in color while Officer Garza described the substance as brown in color.  (<u>Compare</u> Dkt. No. 49-2, D's Index of Exs., Ex. C, Gibbons Depo. at 12:20-13:7; <u>id.</u>, Ex. D, Gibbons Incident Report <u>with</u> Dkt. No. 49-2, D's Index of Exs., Ex. B, Garza Incident Report; <u>id.</u>, Ex. A, Garza Depo. at 22:17-20.)

explained that the plastic bottle contained cuajo[7], a substance used to manufacture cheese, and that she planned to take the cuajo to a man in San Bernardino. (Dkt. No. 49-2, D's Index of Exs., Ex. E, Bulman Depo. at 47:14-48:1.) She continued to tell Agent Bulman that it was not methamphetamine and it was cuajo. (Id. at 54:17-19.) He responded that she was lying and he did not believe her. (Dkt. No. 52-8, P's Index of Exs., Ex. 4, Bulman Depo. at 69:2-7.) She said that the bottle still needed to be examined by a lab and Agent Bulman agreed. (Dkt. No. 52-8, P's Index of Exs., Ex. 4, Bulman Depo. at 55:3-5.) After the interview, on June 2, 2014, Agent Bulman prepared a criminal complaint, and transported Michel to the Metropolitan Correctional Center ("MCC") in San Diego. (Dkt. No. 49-2, D's Index of Exs., Ex. E, Bulman Depo. at 16:13-20.)

On June 3, 2014, with Michel's consent, Agent Bulman searched her storage unit in Chula Vista. (Dkt. No. 49-2, D's Index of Exs., Ex. E, Bulman Depo. at 43:18-22.) During the search of the storage unit, 36 bottles of Tequila were found as well as 15 more bottles of the cuajo, similar to what Michel had in her car, were found. (Id. at 56:4-17.) Three bottles were field tested at random and resulted in a positive reaction. (Id. at 50:7-25.)

Meanwhile, a criminal complaint was filed against Michel on June 3, 2014 for one count of knowingly and intentionally importing approximately 4.45 kilograms of methamphetamine, a schedule II controlled substance in violation of 21 U.S.C. §§ 952, 960. (United States v. Doyma Vanessa Michel, Case No. 14cr1864-DMS, Dkt. No. 1.) The probable cause statement, incorporated by reference in the criminal complaint, stated,

> On June 2, 2014, at approximately 2:10 p.m., Doyma Vanessa MICHEL applied for admission into the United States from Mexico through the San Ysidro, California Port of Entry (POE) as the driver and sole occupant of a Black 2001 Audi A4 bearing California license plate 4UBZ197. A Customs

---

[7] Officer Garza testified that after research, he learned that cuajo is a type of enzyme used to make cheese. (Dkt. No. 49-2, D's Index of Exs., Ex. A, Garza Depo. at 23:9-16.)

and Border Protection Officer (CBPO) was conducting roving pre-primary inspection operations when he encountered MICHEL in her Audi. MICHEL presented her valid U.S. Passport for entry into the U.S. During an inspection of the vehicle, the CBPO noticed a bottle within a sock concealed within the dashboard above the glove compartment. A subsequent field test of the liquid within the bottle resulted in a positive reaction for the properties of methamphetamine.

At approximately 4:20 p.m., a CBPO was assigned to conduct a detailed inspection of MICHEL's Audi. A total of four (4) bottles weighing approximately 4.45 kilograms were found within the vehicle. Field tests were conducted on the contents of of (sic) all four bottles resulting in four positive reactions for the properties of methamphetamine. MICHEL was arrested for violation of Title 21 USC 952, 960, Importation of a Controlled Substance.

(United States v. Michel, Case No. 14cr1864-DMS, Dkt. No. 1 at 2.) On that same day, Michel was brought before Magistrate Judge Jill L. Burkhardt for her initial appearance. (Id., Dkt. No. 3.)

C.    **Testing by DEA Laboratory**

Alexandra Ambriz ("Ambriz"), a senior forensic chemist at the DEA, went to the CBP vault on June 9, 2014 to take representative samples of the liquid substance. (Dkt. No. 62-1, P's Response to D's SSUMF, No. 13; Dkt. No. 59-1, D's Response to P's SSUMF, No. 76.) At the CBP evidence vault, Ambriz conducted a field test using NarcoPouch 923 which turned out positive. (Dkt. No. 59-1, Ds' Response to P's SSUMF, Nos. 60, 75.) The DEA laboratory received the bottles found in Michel's car on July 3, 2014. (Dkt. No. 62-1, P's Response to D's SSUMF, No. 13; Dkt. No. 59-1, D's Response to P's SSUMF, No. 91.) On August 18, 2014, Ambriz received the liquid bottles for analysis and had been assigned to conduct the lab testing a few days before. (Dkt. No. 59-1, D's Response to P's SSUMF, No. 92.)

On September 10, 2010 she conducted the gas chromatography mass spectrometry ("GC/MS") test, which is the most common instrument for analysis used in the DEA laboratory and one of the most accurate. (Id., No. 93.) The GC/MS testing on each of

the samples showed no presence of a controlled substance.  (Id., Nos. 94, 95.)  She then conducted additional GCFID[8] analysis after the GC/MS testing to make sure there were no other controlled substance in the samples that she could have missed.  (Id., No. 96.)  By September 29, 2014, Ambriz completed all GC/MS and GCFID testing and concluded with 95% confidence that there was no controlled substance in the samples.  (Id., No. 97.)

According to protocol, Ambriz then submits her report to her supervisor who reviews it for approval.  (Dkt. No. 49-2, D's Index of Exs., Ex. H, Ambriz Depo. at 134:16-23.)  She testified that the average time to submit a report to her supervisor after lab testing is complete is about a week.  (Id. at 135:12-136:6.)  However, in this case, she did not get her report to her supervisor until November 21, 2014.  (Id. at 135:6-8.)  She explained that during this time that she had other rushes, attended a training, and testified in court.  (Id. at 135:16-25.)  Her supervisor approved her report a week later on Friday, November 28, 2014.  (Id. at 135:9-11.)  Once the report gets approved, the program assistant sends out the lab report to the agency.  (Id. at 134:19-23.)

Ambriz is a senior forensic chemic at the DEA and her primary job duties include analyzing evidence for the presence or absence of controlled substances, writing reports on the analyses and testifying in court.  (Dkt. No. 59-1, D's Response to P's SSUMF, No. 76.)  She was trained for six months at the DEA laboratory in Chicago, Illinois and then received an additional one month training in Quantico, VA.  (Id., No. 77.)  She knew a presumptive test would not establish, to a degree of scientific certainty, the identity of the liquid being identified.  (Id., No. 78.)  She was taught that a field test or a presumptive test is not a confirmatory or definitive test.  (Id., No. 82.)

Ambriz had been taught and trained that a person charged with a crime involving controlled substances requires that the substance is, in fact, illegal to possess or distribute.  (Dkt. No. 59-1, D's Response to P's SSMUF, Nos. 98, 99.)  If it was proven that the

---

[8] Neither party has explained this acronym and test.

16CV277-GPC(AGS)

suspected substance was not a controlled substance, then the person cannot be guilty of having committed the crime.  (Id., No. 99.)  When Ambriz found that the liquid substance from Michel's car and storage unit contained no methamphetamine, she did not alert Agent Bulman, her supervisor or any laboratory official.  (Dkt. No. 52-9, P's Index of Ex., Ex. 5, Ambriz Depo. at 129:13-130:8.)

The DEA regional lab in Vista provides drug lab testing support for multiple states and multiple offices.  (Dkt. No. 62-1, P's Response to D's SSUMF, No. 14.)  During the year of 2014, although the lab had positions for 33 chemists, the lab had only 25 chemists on board and there was also a supervisor vacancy and administrative vacancies.  (Id.; No. 15.)  The shortage was due to a federal hiring freeze that had been in place for several years.  During the year of 2014, the processing time for the Southwest Region DEA lab to test a non-rushed exhibit was between six to nine months due to a high volume of work and very limited resources.  (Id., No. 15.)  This severely affected the laboratory's operations and the ability of the lab to test drug exhibits.  (Id.)  As an example, staffing was short to the point where chemists had to do additional tasks that would ordinarily be performed by support staff such as washing their own dishes, and restocking their own supplies.  (Dkt. No. 49-2, D's Index of Exs., Ex. G, Malone Depo. at 57:4-21.)

Moreover, the volume of incoming drug exhibits increased in 2013 and 2014 resulting in a backlog of 5400 drug exhibits in 2014.  (Id. at 58:20-59:12.)  Due to the backlog and shortage of resources, the lab devised a procedure with submitting federal officers, including the U.S. Attorney's office, to ensure that lab results were completed as required.  Therefore, cases that had a pending court date would be given first priority and could be rushed and those without a court date would not be rushed.  (Id. at 59:13-60:5.)  On average, an unrushed lab result would be completed between six to nine months while a rushed case would be a two to three month wait.  (Id. at 60:6-17.)

Ambriz has received requests to do rush analyses.  (Dkt. No. 59-1, D's Response to P's SSMUF, No. 84.)  The "Rush Analysis Request Form" is a standard form used to request the rush of the lab analysis which Ambriz has seen hundreds of times.  (Id., Nos.

85, 86.) She testified she is not aware of any policy that would have forbidden her from notifying the case agent that the results showed there was no controlled substance in the substance being tested.  (Id. at 136:16-21.)  She testified she would have accommodated Agent Bulman's request for a rush analysis, if he made one, and tries to accommodate all agents' rush requests. (Dkt. No. 59-1, D's Response to P's SSMUF, No. 90.)

On September 22, 2014, Assistant U.S. Attorney ("AUSA") Julia Cline sent an email to Agent Bulman requesting that he rush the lab results.  (Dkt. No. 52-17, P's Index of Exs., Ex. 13 at 5-6[9].)  Then on September 27, 2014, AUSA Matthew Sutton emailed Agent Bulman asking him to check with the DEA lab on their analysis.  (Id. at 3.)  While Agent Bulman responded to other requests made by the AUSAs in the email, he did not respond to either ASUA's rush request or inquiry into the lab testing.  Agent Bulman explained that despite AUSA Julia Cline's request for a rush request, he did not make a request to rush the testing with the DEA lab because he understood that the lab requires a trial date or plea agreement date in order to make a request to rush the testing or under extenuating circumstances where the AUSA, directly, or a judge is making the request for a rush.  (Dkt. No. 49-2, D's Index of Exs., Ex. E, Bulman Depo. at 99:7-100:13.)

Agent Bulman received the test results electronically on the afternoon of December 2, 2014, but was at the shooting range and had no opportunity to view the results until the next day on December 3, 2014.  (Dkt. No. 49-2, D's Index of Exs., Ex. E, Bulman Depo. at 91:13-92:7.)  On Wednesday, December 3, 2014, Agent Bulman first learned that the DEA lab test results were negative, and informed the AUSA assigned to the matter.  (Id. at 97:16-25.)  On December 4, 2015, the AUSA moved to dismiss the information.  (Case No. 14cr1864-DMS, Dkt. No. 28.)  On December 8, 2014, the Court granted the Government's motion to dismiss the information.  (Id., Dkt. No. 29.)  Michel was released on December 9, 2014.  (Id., Dkt. No. 31.)

---

[9] Except for deposition transcripts, pages numbers to documents are based on the CM/ECF pagination.

Michel filed this case on February 2, 2016. (Dkt. No. 1.) Michel seeks to proceed against the United States under tort theories of liability for (1) negligence (2) false imprisonment, (3) negligent infliction of emotional distress, and (4) intentional infliction of emotional distress.

## Discussion

### A.    Request for Judicial Notice

Plaintiff requests judicial notice of the Court's docket entries in the criminal case of United States of America v. Doyma Michel, Southern District of California, Case No. 14CR1864-DMS. (Dkt. No. 52-3.) No party has objected to the request for judicial notice. Facts proper for judicial notice are those not subject to reasonable dispute and either "generally known" in the community or "capable of accurate and ready determination" by reference to sources whose accuracy cannot be reasonably questioned. Fed. R. Evid. 201. Here, the criminal docket in the court records are proper documents subject to judicial. See United States v. Howard, 381 F.3d 873, 876 n. 1 (9th Cir. 2004) (taking judicial notice of court records in underlying criminal case). Thus, the Court GRANTS Plaintiff's request for judicial notice of the Court's docket entries in Case No. 14CR1864-DMS.

### B.    Legal Standard on Motion for Summary Judgment

Federal Rule of Civil Procedure 56 empowers the Court to enter summary judgment on factually unsupported claims or defenses, and thereby "secure the just, speedy and inexpensive determination of every action." Celotex Corp. v. Catrett, 477 U.S. 317, 325, 327 (1986). Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material when it affects the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

16CV277-GPC(AGS)

The moving party bears the initial burden of demonstrating the absence of any genuine issues of material fact. Celotex Corp., 477 U.S. at 323. The moving party can satisfy this burden by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element of his or her claim on which that party will bear the burden of proof at trial. Id. at 322-23. If the moving party fails to bear the initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. Adickes v. S.H. Kress & Co., 398 U.S. 144, 159-60 (1970).

Once the moving party has satisfied this burden, the nonmoving party cannot rest on the mere allegations or denials of his pleading, but must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324. If the non-moving party fails to make a sufficient showing of an element of its case, the moving party is entitled to judgment as a matter of law. Id. at 325. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). In making this determination, the court must "view[] the evidence in the light most favorable to the nonmoving party." Fontana v. Haskin, 262 F.3d 871, 876 (9th Cir. 2001). The Court does not engage in credibility determinations, weighing of evidence, or drawing of legitimate inferences from the facts; these functions are for the trier of fact. Anderson, 477 U.S. at 255.

## C.     Federal Tort Claims Act

Michel alleges four California state tort claims against the United States under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 *et seq*.

Under the FTCA, the United States is liable for common law torts committed by federal employees within the scope of their federal employment. 28 U.S.C. § 1346(b); § 2674; Nurse v. United States, 226 F.3d 996, 1000 (9th Cir. 2000) ("The FTCA provides a limited waiver of the sovereign immunity of the United States for torts committed by federal employees acting within the scope of their employment."). Liability is

determined "in accordance with the law of the place where the [allegedly tortious] act or omission occurred."  28 U.S.C. § 1346(b); <u>Avina v. United States</u>, 681 F.2d 1127, 1130 (9th Cir. 2012).  The parties agree that the alleged tortious acts occurred in California; therefore, California law applies.

**D.    False Imprisonment**

Defendant seeks summary judgment on the false imprisonment claim arguing that the search of Plaintiff's vehicle and her arrest and detention were reasonable and proper, and supported by probable cause.[10]  Michel seeks summary judgment on this claim arguing that no probable cause to detain her ever existed; that there was never a legitimate judicial determination of probable cause; and that state law immunities for law enforcement officers do not apply.

The FTCA allows liability for false arrest or false imprisonment when they are committed by federal law enforcement officers.  28 U.S.C. § 2680(h); <u>Collins v. City & Cnty. of San Francisco</u>, 50 Cal. App. 3d 671, 674 (1975) (stating that false arrest is "but one way of committing a false imprisonment, and they are distinguishable only in terminology").

Both parties[11] agree that in California, the "elements of a tortious claim of false imprisonment are: (1) the nonconsensual, intentional confinement of a person, (2) without lawful privilege, and (3) for an appreciable period of time, however brief."  <u>Tekle v. United States</u>, 511 F.3d 839, 854 (9th Cir. 2007) (citing <u>Easton v. Sutter Coast Hosp.</u>, 80 Cal. App. 4th 485, 495 (2000)); <u>see also</u> <u>Fermino v. Fedco., Inc.</u>, 7 Cal. 4th 701, 715 (1994) (merchant's arrest).

---

[10] In its reply, the Government raises for the first time that the false imprisonment cause of action is barred by the discretionary function exception to the FTCA.  (Dkt. No. 68 at 8.) The Court declines to address an argument raised for the first time in its reply.  <u>See</u> <u>State of Nev. v. Watkins</u>, 914 F.2d 1545, 1560 (9th Cir.1990) ("[Parties] cannot raise a new issue for the first time in their reply briefs."); <u>Ass'n of Irritated Residents v. C & R Vanderham Dairy</u>, 435 F. Supp. 2d 1078, 1089 (E.D. Cal. 2006) ("It is inappropriate to consider arguments raised for the first time in a reply brief.").

[11] (<u>See</u> Dkt. No. 52-1 at 19 and Dkt. No. 68 at 11.)

California Penal Code Section 847(b) protects a law enforcement officer from liability for false arrest when an officer, acting within the scope of his or her authority either effects a lawful arrest or has "reasonable cause to believe the arrest was lawful." Cal. Penal Code § 847(b). In other words, if there was probable cause to arrest Michel, there can be no liability for false arrest. See Pierson v. Ray, 386 U.S. 547, 555 (1967) (a California peace officer may arrest an individual without a warrant if the "officer as probable cause to believe that the person to be arrested has committed a felony, whether or not a felony, in fact, has been committed.").

Meanwhile, in California, a private individual has lawful privilege to effectuate a citizen's arrest if there is probable cause to detain. Fermino v. Fedco., Inc., 7 Cal. 4th 701, 715 (1994) ("Merchants who detain individuals whom they have probable cause to believe are about to injure their property are privileged against a false imprisonment action."); Johnson v. United States, Case No. 13cv2405-JD, 2016 WL 4488180, at *8 (N.D. Cal. Aug. 26, 2016) (applying private person standard to false arrest claim against federal officer under the FTCA stating that "a federal officer – like a private person – has lawful privilege to "arrest someone for a misdemeanor when the offense actually has been committed or attempted in his presence.").

### 1. Probable Cause to Arrest Michel

The United States Supreme Court has described probable cause as a "flexible, common-sense standard. It merely requires that the facts available to the officer would 'warrant a man of reasonable caution in the belief.'" Texas v. Brown, 460 U.S. 730, 742 (1983). The belief that certain items may be contraband need not be correct or even more likely true than false. Id. All probable cause requires is "[a] 'practical, nontechnical' probability that incriminating evidence is involved is all that is required." Id. (citation omitted). "The substance of all the definitions of probable cause is a reasonable ground for belief of guilt." Id. A subsequent acquittal has no bearing on whether there was probable cause to arrest. Krause v. Bennett, 887 F.2d 362, 370 (2d Cir. 1989) (probable cause determined at time of arrest based on facts available to the officer).

16CV277-GPC(AGS)

Here, Officer Gibbons, the arresting officer, believed that Michel had committed a felony, a violation of 21 U.S.C. §§ 952, 960. Michel challenges her false imprisonment of more than six months arguing there was no probable cause during that period because she did not actually possess methamphetamine. (Dkt. No. 62 at 3, 7; Dkt. No. 52-1 at 19.) She argues she was detained and brought before a magistrate judge based solely on the results of the NarcoPouch 923, and a positive drug field test, by itself, does not constitute probable cause to arrest an individual.

When Officer Garza approached Michel in her vehicle, he noticed that she was avoiding eye contact and was visibly nervous. Her hands were shaking and he could see her left jugular vein pulsing. He and another CBP officer also discovered a brownish substance in a plastic bottle hidden in a black sock and the sock was "in the glove box behind the glove in front of the firewall." (Dkt. No. 62-1, P's Response to D's SSUMF, No. 3.) Once at secondary, Officer Gibbons then searched Michel's vehicle where he found three additional bottles of the substance hidden deep inside the dashboard along with five bottles of alcohol. The brownish substance in all four bottles were tested and they all came out presumptively positive for methamphetamine. These facts support a reasonable basis for an officer to believe that Michel was transporting controlled substance across the border.

At the hearing on the summary judgment motions, Plaintiff argued that Officer Gibbons improperly relied solely on the positive results of the NarcoPouch 923 test to arrest Michel and did not have specific personal knowledge of facts to support probable cause. The Ninth Circuit has held that probable cause can be established by the "collective knowledge" of the law enforcement officers involved in an investigation. United States v. Jensen, 425 F.3d 698, 704-05 (9th Cir. 2005). Therefore, an arresting officer need not have personal knowledge of all the facts known to the other officers involved in the arrest and can rely on the knowledge of these other officers involved in the investigation. Id. at 705 (quoting United States v. Bernard, 623 F.2d 551, 560-61 (9th Cir. 1980) ("In effect all of them participated in the decision to make the arrests . . .[One

officer] was entitled to rely on the observations and knowledge of [the others], even though some of the critical information had not been communicated to him."). In other words, "probable cause may be based on the collective knowledge of all the officers involved in the investigation and all of the reasonable inferences that may be drawn therefrom." Id. (citation omitted). Therefore, the arrest by Officer Gibbons and the subsequent interrogation of Michel conducted by Agent Bulman were supported by probable cause. Michel was promptly brought before the Magistrate Judge the next day on June 3, 2014.

### 2. Judicial Determination of Probable Cause to Arrest

Michel next argues that there was no legitimate judicial determination of probable cause to detain her pending trial. She claims that her lengthy pretrial detention was unlawful and without probable cause because it was based on false evidence. While Plaintiff concedes that she was brought promptly before the Magistrate Judge, she contends the Magistrate Judge's determination of probable cause to detain her was defective because it was based on false evidence. It was based on the positive results of the NarcoPouch 923 tests which did not demonstrate the substance was methamphetamine but merely indicated the presence of a secondary amine. Therefore, the Magistrate Judge's order detaining Michel prior to trial "lacked any proper basis." The Government opposes contending that Agent Bulman's statement was truthful and established probable cause.

Here, the probable cause statement relied on more than just the positive results from the field drug test. (United States v. Michel, Case No. 14cr1864, Dkt. No. 1 at 2.) The probable cause statement also explained that the CBP Officer "noticed a bottle within a sock concealed within the dashboard above the glove compartment." (Id.) Moreover, Agent Bulman's statement truthfully stated that the field test resulted in a "positive reaction for the properties of methamphetamine." (Id.)

Plaintiff cites to the Supreme Court case of Manuel v. City of Joliet, 137 S. Ct. 911 (2017) as being factually similar. However, in that case, the lab technicians lied in his

report and falsely stated there was a positive result for controlled substances which the Magistrate Judge relied on in deciding probable cause. Here, Agent Bulman did not provide false information in the probable statement but presented truthful facts he received from Officers Garza and Gibbons from the results of the drug field test and accurately wrote that the tests came back "positive for properties of methamphetamine." (See Dkt. No. 50-4, Smelser Decl., Ex. A, Bulman Inv. Report at 10 ("Special Agent . . Zachary Bulman . . . was advised of the seizures and of MICHEL's arrest."); United States v. Michel, Case No. 14cr1864, Dkt. No. 1 at 2.)

Even if the arrest and subsequent arraignment were based solely on the positive field drug test, courts have held that a positive field test, by itself, constitutes probable cause. See Pennington v. Hobson, 719 F .Supp. 760, 767-69 (S.D. Ind. 1989) (probable cause to arrest existed where field test indicated powder was cocaine even though subsequent laboratory test identified powder as aspirin and record contained no evidence defendants were disingenuous in performing field test); Herron v. Lew Sterrett Justice Ctr., No. 07cv357-N ECF, 2007 WL 2241688, at *3 (N.D. Tex. Aug. 6, 2007) (probable cause to arrest based on field drug test indicating that the powder was a controlled substance although the substance was later found not to be a controlled substance); Hines v. Port Authority of New York and New Jersey, No. 94 CIV 5109 NRB, 2000 WL 420555, at *4-5 (S.D.N.Y. Apr. 18, 2000) (field tests showing the white powdery substance tested positive for heroin were sufficient to establish probable cause, although laboratory eventually found substance negative for cocaine).

The Court concludes there is no genuine issue of material fact that there was a legitimate judicial determination of probable cause to detain Michel pending trial.

### 3. Liability Under Private Person or Government Function Standard

While the Court has found that there was a legitimate judicial determination of probable cause to arrest Michel, there is an issue as to whether Defendant is liable for false imprisonment once Ambriz learned, on September 29, 2014, that the substance found in Michel's car was not an illegal substance. Plaintiff asserts that applying a private

person standard to Ambriz' actions, Michel was held without lawful privilege from September 29, 2015 once Ambriz learned that the substance found in her car was not an illegal substance, through November 21, 2014, when Ambriz completed her report to her supervisor for approval, and until December 9, 2014, when Michel was released from detention.  Defendant asserts that the judicial determination of probable cause forecloses liability after the date of such determination and that Ambriz's actions are protected under the intentional tort exception to the FTCA general waiver of sovereign immunity.

"A person may not be arrested, or must be released from arrest, if previously established probable cause has dissipated." <u>United States v. Ortiz–Hernandez</u>, 427 F.3d 567, 574 (9th Cir. 2005), <u>cert denied</u>, 549 U.S. 876 (2006).  "The continuation of even a lawful arrest violates the Fourth Amendment when the police discover additional facts dissipating their earlier probable cause." <u>United States v. Lopez</u>, 482 F.3d 1067, 1073 (9th Cir. 2007) (quoting <u>BeVier v. Hucal</u>, 806 F.2d 123, 129 (7th Cir. 1986)); <u>Sialoi v. City of San Diego</u>, 823 F.3d 1223, 1232 (9th Cir. 2016) (officers may not disregard facts that dissipate probable cause).

Under the state law enforcement privilege/immunity, liability for false imprisonment is limited to the time-period between when the false arrest and/or false imprisonment occurs and when criminal charges are instituted.  <u>Asgari v. City of Los Angeles,</u> 15 Cal. 4th 744, 753-54 (1997).  In the case of a private person, there would be no such limitation for liability.  Here, to the extent that the state law enforcement immunity applies, there can be no liability for false imprisonment and false arrest after the judicial determination of probable cause.  <u>See</u> Cal. Penal Code § 847(b).  Plaintiff does not dispute the effect of the state law immunity, instead she argues that the immunity does not apply under the FTCA.  The Court finds that the state law enforcement immunity applies to Agent Bulman.

The FTCA provides that the government "is liable in the same manner and to the same extent as a private individual under like circumstances."  28 U.S.C. § 2674.  The parties disagree as whether the state law enforcement privilege/immunity applies to a

claim of false imprisonment by a federal law enforcement officer under the FTCA. Defendant argues that because law enforcement officers engage in a unique governmental function that has no private sector analogue, the law governing state law enforcement officers performing similar actions applies. In response, Plaintiff contends that the Government is liable under a "private person standard" or in this case, the standard for citizen's arrest as directed by the United States Supreme Court in United States v. Olson, 546 U.S. 43 (2005) and the Ninth Circuit case of Tekle v. United States, 511 F.3d 839 (9th Cir. 2007).

In Olson, a case concerning federal mine inspectors' negligence that caused a mine accident causing injury to two workers, the United States Supreme Court held that under the FTCA, the scope of liability depends on state law liability of a "private person" or "private entities" and not liability based on state law of public entities, even where uniquely governmental functions are at issue and even "in the performance of activities which private persons do not perform." United States v. Olson, 546 U.S. 43, 45-47 (2005). Even if the conduct entails uniquely governmental functions, the court is to look "further afield" to examine the liability of private persons in analogous situations. Id. at 47. In Olson, the government conceded that private persons who conduct safety inspections would be analogous to what federal mine inspectors do. Id.

In Tekle, a case without a majority opinion, Judge Tashima followed the holding in Olson in a case involving, inter alia, a claim for false arrest against a minor boy. Tekle, 511 F.3d at 851-54. In doing so, Judge Tashima applied California's law of citizen's arrest, the state law's private person analogue. Id. at 854. In applying this standard, Judge Tashima concluded there were genuine issues of material fact regarding the officer's liability for false arrest. Id. In a concurring opinion, Judge Fisher found that "Olson could be read to support the conclusion that law enforcement privileges should not be recognized in FTCA suits, and that federal officers are left only with those privileges available to private citizens such as the citizen's arrest privilege. But I would read Olson's instruction . . . to provide courts with enough flexibility to preserve law

enforcement privileges." Id. at 857 (Fisher, J., concurring in part and in judgment) (citation omitted). Judge Kleinfeld's concurring opinion stated that the panel "should not reach the [FTCA] issues," but "agree[d] with Judge Fisher that the [FTCA] does not expose federal law enforcement officers to liability when they are acting within the confines of the special law enforcement privileges conferred upon them by other statutes." Id. at 859-62 (Kleinfeld, J., concurring).

Given the split decision in Tekle, it provides no binding authority for this Court to apply the law of citizen's arrest to Plaintiff's false imprisonment claim against federal border patrol agents. Instead, two of the panel judges have left undisturbed Ninth Circuit precedent supporting the application of the law enforcement privilege to federal law enforcement officers in actions brought under the FTCA.

In Arnsberg v. United States, the Ninth Circuit, relying on the reasoning in a Second Circuit case, Caban v. United States, 728 F.2d 68 (2nd Cir. 1984), declined to apply the law of private individuals on law enforcement officers because they "have law enforcement obligations, such as the duty to execute warrants, which private citizens lack; those obligations make the law of citizen arrests an inappropriate instrument for determining FTCA liability. The proper source for determining the government's liability is not the law of citizen's arrests, but rather the law governing arrests pursuant to warrants." Arnsberg v. United States, 757 F.2d 971, 979 (9th Cir. 1985). The court explained that because law enforcement officers have different privileges and duties than private individuals, "a private citizen making a citizen's arrest does not act under the 'like circumstances' required" under the FTCA. Id.

In Rhoden, the Ninth Circuit concluded that courts "must apply the law the state courts would apply in the analogous tort action, including federal law." Rhoden v. United States, 55 F.3d 428, 431 (1995). The court explained that under California law, "a California court would apply federal law to determine whether an arrest by a federal officer was legally justified and hence privileged." Id. at 431. In reversing the district court's grant of summary judgment for the government, the court concluded that the

government's liability would be based on whether the INS agents complied with the relevant federal standards when they detained the plaintiff.  Id.

In Cervantes, the Ninth Circuit applied California law, specifically, California Penal Code section 847(b),[12] which is a law enforcement immunity[13] to customs agents who were subject to a false arrest and false imprisonment claim.  Cervantes v. United States, 330 F.3d 1186, 1188 (9th Cir. 2003) (applying California Penal Code section 847(b) to FTCA claims for false arrest and false imprisonment and concluded that there was probable cause sufficient for the arrest and the district court properly dismissed those claims).  In Galvin v. Hay, 374 F.3d 739, 758 (9th Cir. 2004), a protestor brought false arrest claims against the United States under the FTCA for his arrest by members of the Federal Park Police.  Citing Arnsberg for the proposition that law enforcement responsibilities make the law of citizens arrests an inappropriate standard to determine FTCA liability, the Ninth Circuit, following Cervantes, applied California law that protects a law enforcement officer from liability for false arrest if the officer, acting within the scope of his authority, effects a lawful arrest or has reasonable cause to believe the arrest was lawful.  Id. at 758.

---

[12] Section 847(b) provides that,

There shall be no civil liability on the part of, and no cause of action shall arise against, any peace officer or federal criminal investigator or law enforcement officer described in subdivision (a) or (d) of Section 830.8, acting within the scope of his or her authority, for false arrest or false imprisonment arising out of any arrest under any of the following circumstances:
(1) The arrest was lawful, or the peace officer, at the time of the arrest, had reasonable cause to believe the arrest was lawful.
(2) The arrest was made pursuant to a charge made, upon reasonable cause, of the commission of a felony by the person to be arrested.
(3) The arrest was made pursuant to the requirements of Section 142, 837, 838, or 839.

Cal. Penal Code § 847(b).

[13] Courts have referred to California Penal Code section 847(b) as a statutory immunity.  Blankenhorn v. City of Orange, 485 F.3d 463, 486-487 (9th Cir. 2007) (officers were entitled to immunity under California Penal Code section 847(b)); see O'Toole v. Superior Ct., 140 Cal. App. 4th 488, 510-11 (2006).

16CV277-GPC(AGS)

In <u>Tekle</u>, Judge Fisher noted the "slight tension" between <u>Rhoden,</u> applying federal law enforcement privilege, and <u>Galvin,</u> applying state law enforcement immunity but concluded it is settled that California courts would apply a law enforcement privilege to federal law enforcement officers sued under the FTCA. <u>Id.</u> at 859.

The Court agrees with Judge Fisher and Judge Kleinfeld's opinions that law enforcement privileges may still be applicable even after <u>Olson</u> as it does not explicitly foreclose the applicability of the privilege. Thus, the Court applies the state law enforcement privilege to the false arrest claim brought by Plaintiff. In so doing, liability for false imprisonment is extinguished for the actions or inactions of Agent Bulman as of June 3, 2014.

Assuming that the private actor standard applies to the actions of Agent Bulman, there is no evidence that he knew of Ambriz's test results until December 3, 2014 or that he had a duty to continue investigating the drug test results. <u>Cf</u>. <u>Gramenos v. Jewel Companies, Inc.</u>, 797 F.2d 432, 437-42 (7th Cir. 1986) (officer who has established cause on every element of the crime need not continue investigating to check out leads or test the suspect's claim of innocence).

The state law enforcement officer immunity would not apply to the actions of chemist Ambriz. However, Ambriz, as a chemist, is immune under the intentional tort exception to the FTCA's waiver sovereign immunity. The intentional tort exception states that the FTCA's general waiver of sovereign immunity shall not apply to "[a]ny claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights" except when the "acts or omissions" are by "investigative or law enforcement officers." 28 U.S.C. § 2680(h); <u>Millbrook v. United States</u>, 133 S. Ct. 1441, 1446 (2013) (holding that this exception to the § 2680(h) bar applies "regardless of whether the officers are engaged in investigative or law enforcement activity, or are executing a search, seizing evidence, or making an arrest"). An "investigative or law enforcement officer" is defined by statute as "any officer of the United States who is

empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law." 28 U.S.C. § 2680(h).

> By its terms, this provision [28 U.S.C. § 2680(h)] focuses on the *status* of persons whose conduct may be actionable, not the types of activities that may give rise to a tort claim against the United States. The proviso thus distinguishes between the acts for which immunity is waived (e.g., assault and battery), and the class of persons whose acts may give rise to an actionable FTCA claim. The plain text confirms that Congress intended immunity determinations to depend on a federal officer's legal authority, not on a particular exercise of that authority.

Millbrook, 133 S. Ct. at 1445.

The parties do not dispute that as a senior forensic chemist, Ambriz' primary job duties involve analyzing evidence for the presence or absence of controlled substances, writing reports on the analyses and testifying in Court. (Dkt. No. 59-1, D's Response to P's SSUMF, No. 76.) Because there are no facts to demonstrate that Ambriz has the power to "execute searches, to seize evidence, or to make arrest", she is not an "investigative or law enforcement officer." Thus, she is not subject to liability for any intentional tort specified in 28 U.S.C. § 2680(h). See Bunch v. Frank, Cause No. 14cv438-WTL-DKL, 2016 WL 5409153, at *4 (S.D. Ind. Sept. 28, 2016) (evidence demonstrated that government employee, who was chemist for ATF (Bureau of Alcohol, Tobacco, Firearms, and Explosive) and a gunshot residue analyst specialist was not investigative or law enforcement officer since he was not authorized to obtain a search warrant, execute a search warrant, or seize evidence). Therefore, any claim for false imprisonment for the acts or omissions by Ambriz fails under the intentional tort exception of the FTCA. Thus, even applying the citizen's arrest standard, the Court GRANTS Defendant's motion for summary judgment and DENIES Plaintiff's motion for partial summary judgment on the false imprisonment/false arrest cause of action.

////

16CV277-GPC(AGS)

**E.    Discretionary Function Exception to the FTCA**

Michel's negligence and negligent infliction of emotional distress claims are based on the period between September 29, 2014, when Ambriz definitively learned that the substance in the bottles found in Michel's car was not a controlled substance, and December 9, 2014, when Michel was released from jail. Michel contends that Ambriz and Agent Bulman failed to exercise due care imposed on them by the Fourth Amendment to immediately seek to release Michel from jail upon a definitive determination of her innocence. (Dkt. No. 52-1 at 28.)

In its motion, Defendant asserts that the discretionary function exception to the FTCA, 28 U.S.C. § 2680(a), bars Plaintiff's negligence and negligent infliction of emotional distress claims. It maintains that Ambriz and Agent Bulman were following government procedures and that Plaintiff does not have a constitutional right to have her drug samples tested at a lab within a specified time period when her situation did not fall within the types of cases where the drug testing is rushed. Michel argues that the discretionary function exception does not apply to override constitutional mandates of the Fourth Amendment.

The FTCA provides a broad waiver of the government's sovereign immunity for "the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." 28 U.S.C. § 1346(b). However, the FTCA's waiver of immunity is limited by certain statutory exceptions. 28 U.S.C. § 2680. If the cause of action falls under any of these exceptions, then federal courts lack subject matter jurisdiction. <u>Nurse v. United States</u>, 226 F.3d 996, 1000 (9th Cir. 2000). One such exception is the discretionary function exception when the claim is based upon the "exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a).[1] "[I]t is the nature of the conduct,

---

[1]The discretionary function exception provides that the waiver of sovereign immunity does not apply to: "(a) Any claim based upon an act or omission of an employee of the

16CV277-GPC(AGS)

rather than the status of the actor, that governs whether the discretionary function exception applies in a given case." <u>United States v. Varig Airlines</u>, 467 U.S. 797, 813 (1984). If governmental conduct falls within the discretionary function exception, it is irrelevant whether the United States abused its discretion or acted negligently. <u>U.S. Fidelity & Guar. Co. v. United States</u>, 837 F.2d 116, 120 (3d Cir. 1988) <u>cert denied</u>, 487 U.S. 1235 (1988).

The applicability of the discretionary function exception involves a two part test. First, a court must determine whether the challenged actions involve an "element of judgment or choice." <u>Berkovitz by Berkovitz v. United States</u>, 486 U.S. 531, 536 (1988). "In examining the nature of the challenged conduct, a court must first consider whether the action is a matter of choice for the acting employee." <u>Id.</u> "Thus, the discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow. In this event, the employee has no rightful option but to adhere to the directive." <u>Id.</u> "When established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." <u>United States v. Gaubert</u>, 499 U.S. 315, 324 (1991).

Here, it is not disputed that there is no federal statute, policy or regulation requiring the manner that DEA labs should test incoming drug exhibits. The DEA lab implemented a prioritization policy, based on budgetary restrictions and staff shortages due to a federal hiring freeze where the ones with a trial date, a plea agreement or court order for immediate testing would be given priority. The Court concludes that the DEA's prioritization policy on drug testing involves an element of judgment and choice based on considerations of

---

Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a).

budgetary restrictions, staff shortages and an increase in the number of drug exhibits in 2014 resulting in a backlog of 5400 drug exhibits to be tested.

If the discretionary element is met, then at the second step, the court "must determine whether that judgment is of the kind that the discretionary function exception was designed to shield." Berkovitz by Berkovitz, 486 U.S. at 536. The exception protects "only governmental actions and decisions based on considerations of public policy." Id. at 537. "In sum, the discretionary function exception insulates the Government from liability if the action challenged in the case involves the permissible exercise of policy judgment." Id. "Public policy has been understood to include decisions 'grounded in social, economic, or political policy.'" Terbush v. United States, 516 F.3d 1125, 1129 (9th Cir. 2008) (quoting United States v. S.A. Empresa De Viacao Aerea Rio Grandense, 467 U.S. 797, 814 (1984)). The challenged decision "need not *actually* be grounded in policy considerations" so long as it is, "by its nature, susceptible to a policy analysis." Nurse, 226 F.3d at 1001 (quoting Miller v. United States, 163 F.3d 591, 593 (9th Cir. 1998) (emphasis in original)). Even if a decision is an abuse of the discretion, the exception still applies. Soldano v. United States, 453 F.3d 1140, 1145 (9th Cir. 2006).

The Court agrees with Defendant that the DEA lab's decision on which track, rushed or not rushed, to test the substance found in Plaintiff's vehicle was driven by policy considerations. The Government explains and the evidence demonstrates that the DEA, during 2014, was understaffed due to a hiring freeze, where the lab had only 25 chemists instead of the fully staffed 33 chemists, and there were also supervisory and administrative vacancies. Moreover, there was an increase in the number of drug in 2013 and 2014 that resulted in a backlog of 5400 drug exhibits in 2014. The DEA lab's prioritization balanced policy considerations of completing accurate drug testing despite a backlog, a staffing shortage and a significant increase in the number of incoming drug exhibits.

The Court concludes that the DEA lab's policy concerning how it prioritizes when drug samples are to be tested is discretionary. See Nurse, 226 F.3d at 1002 (promulgation of polices and rules is protected by discretionary function exception); Weissich v. United

States, 4 F.3d 810, 813 (9th Cir. 1993) (policy concerns such as budget and personnel allocation fall within discretionary function exception); Miller, 163 F.3d at 596 (quoting Parsons v. United States, 811 F. Supp. 1411, 1420 (E.D. Cal. 1992) (establishing priorities and assigning resources are discretionary choices protected by section 2680(a)). Therefore, the discretionary function exception bars the negligence claims, based on Ambriz' failure to timely report her findings and on Agent Bulman's failure to follow up with the DEA Lab and make a rush request upon the AUSA's request. Ambriz and Agent Bulman exercised their discretion in complying with the prioritization policy established by the DEA lab.

Michel does not dispute the two factors the Court must consider in determining whether the discretionary function exception applies, but contends that the discretionary function exception should not apply once probable cause dissipated when the drug testing confirmed that the substance was not a controlled substance. In her response and in her motion, Plaintiff argues that the federal law enforcement officers had no discretion to exercise because the Fourth Amendment requires probable cause to detain an individual and a federal agent has no authority or discretion to extend a pretrial deprivation of liberty for a criminal defendant once definitive results showed that there was no probable cause to continue detaining that individual.

The discretionary function exception does not apply if it violates the Constitution, a statute, or an applicable regulation since federal officers do not possess discretion to violate constitutional rights or federal statutes. U.S. Fidelity & Guar. Co., 837 F.2d at 120; Nurse, 226 F.3d at 1002 ("governmental conduct cannot be discretionary if it violates a legal mandate."). In Galvin, the Ninth Circuit held that the discretionary function exception did not apply because "federal officials do not possess discretion to violate constitutional rights." Galvin, 374 F.3d at 758 (quoting U.S. Fidelity & Guar. Co., 837 F.2d at 120) (since court already concluded that defendant violated the constitution, the discretionary function exception did not apply to false arrest claim).

Michel argues once Ambriz learned, on September 29, 2014, that testing confirmed no methamphetamine or other controlled substance in the plastic bottles, there was no discretion to continue to detain Michel in jail. In addition, she contends that Agent Bulman should have remained vigilant of the possibility that probable cause could dissipate. Michel asserts that Agent Bulman and Chemist Ambriz are responsible for her continued detention from September 29, 2014 until December 9, 2014.

In reviewing the cases cited by Plaintiff and on the Court's own review of cases concerning the dissipation of probable cause, the imposition of a duty to act once probable cause has dissipated requires actual knowledge of the underlying investigation or arrest and actual knowledge of facts that probable cause has dissipated. See United States v. Grubbs, 547 U.S. 90, 95 n.2 (2006) ("The police may learn, for instance, that contraband is no longer located at the place to be searched."); Hernandez ex rel. Hernandez v. Foster, 657 F.3d 463, 479 (7th Cir. 2011) (defendants were Department of Children and Family Services' investigator, supervisor and manager and took protective custody of a child and refused to release the child to his parents even after probable cause had dissipated); United States v. Ortiz-Hernandez, 427 F.3d 567, 574-75 (9th Cir. 2005) (if "probable cause is established at any early stage of the investigation, it may be dissipated if the investigating officer later learns additional information that decreases the likelihood that the defendant has engaged, or is engaging, in criminal activity.").

In this case, Ambriz, as a chemist, had no actual knowledge concerning the facts in Michel's underlying criminal case and no duty to promptly act to secure the release of Michel. Ambriz was not an investigating officer, as such, she was not involved in the detention and arrest of Michel, involved in the filing of the criminal complaint, aware of Michel's bail status or aware of the evidence in the possession of the Government supporting Michel's charges. She testified that she had no knowledge about the underlying criminal case and did not know whether Michel was in custody or not. (Dkt. No. 52-9, P's Index of Exs., Ex. 5, Ambriz Depo. at 124:3-15.) Plaintiff's argument that Ambriz, due to her experience, knowledge and training on whether an individual has committed a crime,

should have understood the significance of her findings is unsupported by case law. Since she was not involved in the investigation of Michel, Ambriz did not know that the drug testing she performed would have dissipated probable cause to detain Michel. Plaintiff has failed to demonstrate that Ambriz had a duty to promptly act to secure the release Michel.

As to Agent Bulman, he did not know about the results of the drug tests until he received an email from the DEA lab on December 3, 2014. Plaintiff claims he should have remained vigilant because of the possibility that probable cause could dissipate and should have complied with the AUSA's request to have the drug testing rushed. Agent Bulman knew about the DEA lab's prioritization policy concerning drug testing which is subject to the discretionary function exception. Since there was no court date or sentencing date or any extenuating circumstance for a rush request in Michel's criminal case, Agent Bulman had discretion to not make the request. Since Agent Bulman did not acquire notice or knowledge that the tests confirmed the absence of a controlled substance until December 3, 2014, he cannot be liable for his failure to act.

Accordingly, the Court concludes that the discretionary function exception applies to the conduct of Ambriz and Agent Bulman's actions and/or failure to act concerning the drug testing, and the Court lack subject matter jurisdiction over the claims. Thus, the Court GRANTS Defendant's motion for summary judgment and DENIES Plaintiff's motion for partial summary judgment on the negligence and negligent infliction of emotional distress causes of action.

**F.    Intentional Infliction of Emotional Distress**

Defendant moves for summary judgment arguing that there is no viable claim for intentional infliction of emotional distress based on the facts presented. Moreover, the Government contends that Ambriz cannot be liable for intentional infliction of emotional distress because the intentional tort exception bars Plaintiff's claim since she is not an investigator or law enforcement officer. Plaintiff does not respond to the Defendant's arguments in her opposition. However, in her motion for partial summary judgment, she moves for summary judgment arguing that Ambriz and Bulman engaged in outrageous

conduct with reckless disregard for the probability of causing Michel distress. She claims they ignored evidence exonerating Michel and allowed an innocent person to remain in jail. Agent Bulman took no action despite two requests by two AUSAs to either rush or inquire into the status of the lab results and Ambriz, who knew the significance of her findings, did nothing to report her findings for nearly two months. In response, the Government, similar to its moving brief, asserts that the evidence does not demonstrate a claim for intentional infliction of emotional distress and that any claim against DEA chemists, as a non-law enforcement officers, fails. In reply, Plaintiff again does not address the Government's contention.

"A cause of action for intentional infliction of emotional distress exists when there is (1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct." Hughes v. Pair, 46 Cal. 4th 1035, 1050 (2009) (quoting Potter v. Firestone Tire & Rubber Co., 6 Cal. 4th 965, 1001 (1993)); see also Christensen v. Superior Court, 54 Cal. 3d 868, 903 (1991). "A defendant's conduct is 'outrageous' [only] when it is so 'extreme as to exceed all bound of that [which is] usually tolerated in a civilized community.'" Hughes, 46 Cal. 4th at 1050-51 (quoting Potter, 6 Cal. 4th at 1001). "Severe emotional distress means emotional distress of such substantial . . . or enduring quality that no reasonable [person] in civilized society should be expected to endure it." Id. at 1051 (quoting Potter, 6 Cal. 4th at 1004). The California Supreme Court has set a "high bar" to demonstrate severe emotional distress. Id. Suffering discomfort, worry, anxiety, an upset stomach, concern and agitation do not constitute emotional distress. Id. Under California law, where reasonable persons may differ as to whether "the conduct has been sufficiently extreme and outrageous to result in liability," the issue is a question for the trier of fact. Alcorn v. Anbro Eng'g, Inc., 2 Cal. 3d 493, 798 (1970).

Plaintiff relies on extreme and outrageous conduct based on "reckless disregard for the probability of causing emotional distress." Under that standard, "it is not essential to liability that a trier of fact find a malicious or evil purpose. It is enough that defendant 'devoted little or no thought' to the probable consequences of his conduct." KOVR-TV, Inc. v. Superior Ct., 31 Cal. App. 4th 1023, 1031 (1995).

Here, as discussed above on the discretionary function exception, Agent Bulman was exercising his discretion in complying the DEA lab policy concerning prioritization of drug testing. Because he was aware of DEA lab policy, he did not comply with the two requests by the AUSAs' to either rush or inquire into the status of the lab results. Plaintiff has not demonstrated any facts that Agent Bulman acted with reckless disregard to cause emotional distress to Michel. The Court GRANTS Defendant's motion for summary judgment on the intentional infliction of emotional distress claim as to Agent Bulman.

As discussed above, Ambriz, as a DEA chemist, is subject to the intentional tort exception to the FTCA. See 28 U.S.C. § 2680(h). Defendant argues that the intentional tort exception bars Plaintiff from proceeding against the chemists, who are non-law enforcement officers, under a tort theory. Plaintiff does not address or dispute the Government's position. As stated above, because there are not facts showing Ambriz, as a chemist, has any authority to "execute searches, to seize evidence, or to make arrest", she is not an "investigative or law enforcement officer." The Court concludes that the chemists are not subject to liability for any intentional tort specified in 28 U.S.C. § 2680(h). The issue in this case is whether intentional infliction of emotional distress, while not an enumerated act under 28 U.S.C. § 2680(b), may still be barred.

The Ninth Circuit has held that "the tort of intentional infliction of emotional distress is not excluded as a matter of law from FTCA by § 2680(h)." Sheehan v. United States, 896 F.2d 1168, 1172 (9th Cir. 1990), amended, 917 F.2d 424 (9th Cir. 1990). However, instead of the label or characterization of the cause of action, the Supreme Court has focused the inquiry on the conduct upon which the plaintiff's claim is based.

Id. at 1171 (discussing Block v. Neal , 460 U.S. 289, 298 (1983)); Thomas– Lazear v. Federal Bureau of Inv., 851 F.2d 1202, 1207 (9th Cir. 1988) (negligent infliction of emotional distress is merely a restatement of the slander claim which is barred by § 2680(h) or "put another way the Government's actions that constitute a claim for slander are essential to [the plaintiff's] claim for negligent infliction of emotional distress."); Metz v. United States, 788 F.2d 1528, 1535 (11th Cir. 1986) (concluding that facts that support intentional infliction of emotional distress claims arise out of the false arrest claim and are barred by § 2680(h), or in other words, "the injury the plaintiff suffered as a result of the alleged torts stems from his false arrest, a tort expressly exempted under the FTCA").

Similarly, in this case, the claim for intentional infliction of emotional distress is based upon the facts that support the false imprisonment cause of action and the injury Michel suffered originate from the false imprisonment claim which is explicitly exempt under the FTCA. Thus, the Court concludes that the intentional infliction of emotional distress claims against the DEA chemists, including Ambriz, are barred.

In conclusion, the Court GRANTS Defendant's motion for summary judgment and DENIES Plaintiff's motion for partial summary judgment on the intentional infliction of emotional distress claim.

## Conclusion

Based on the above, the Court GRANTS Defendant's motion for summary judgment on all causes of action, and DENIES Plaintiff's motion for partial summary judgment. The Clerk of Court is directed to enter judgment accordingly.

IT IS SO ORDERED.

Dated:  October 31, 2017

Hon. Gonzalo P. Curiel
United States District Judge